UNITED STATES DISTRICT COURT
For The Southern District Of New York

|  |  |
|---|---|
| COUNTER TERRORIST GROUP US, COUNTERR GROUP, *and* J. K. IDEMA, *Plaintiffs,*<br><br>v.<br><br>AUSTRALIAN BROADCASTING CORP.; *aka* ABC AUSTRALIA; ABC CORPORATIONS 1-100; LIZ JACKSON; ERIC CAMPBELL; JOSEPH A. CAFASSO; EDWARD A. ARTIS; KNIGHTSBRIDGE INTERNATIONAL, Inc.; KNIGHTSBRIDGE INTERNATIONAL HUMANITARIAN RELIEF AND HUMAN IMPROVEMENT PROGRAMS, INC.; ROBERT C. MORRIS; PARTNERS INTERNATIONAL FOUNDATION; WILLIAM JOHN HAGLER, Both Individually and Severally, and DOES 1 through 7, inclusive, *Defendants.* | **COMPLAINT**<br><br>**(Jury Trial Demanded) Injunctive Relief Requested**<br><br>Case # 08 CV _____<br><br>08 CV 2356<br>Assigned Judge: _____ |

**NOW COME,** Plaintiffs, and allege and say the following concerning Defendants, and each of them:

### JURISDICTION

1.      This is an action for copyright infringement, contributory copyright infringement, and vicarious liability for Copyright Infringement, arising under the Copyright Acts of 1909 and 1976, 17 U.S.C. §§ 101 *et seq.*, and includes various state law claims.  This Court has subject matter jurisdiction over these federal question claims pursuant to 28 U.S.C. §§ 1331 and 1338(a) & (b).  This complaint also alleges violations of New York, and North Carolina law to include; Breach of Contract, Theft, Civil Conspiracy, Fraud, Conversion, Breach of Implied Contract, Breach of Confidence, Tortuous Interference with Economic Prospective, Interference with Contractual Relations, Interference with Prospective Economic Advantage, Negligent Misrepresentation, Unfair and Deceptive Trade Practices, Defamation,

and includes a claim for declaratory relief.  This Court has jurisdiction over these state law claims pursuant to its supplemental jurisdiction, 28 U.S.C. § 1367(a), and has jurisdiction over declaratory relief claims pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

## VENUE

2.      Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(a) because the copyright infringement, contributory copyright infringement, and many of the other wrongful acts that give rise to these claims occurred in this district.  In addition, Defendants regularly transact business here, the infringing photographs were distributed here, and the infringing network, the Australian Broadcasting Corporation, has extensive commercial activities in this state and their American headquarters is within this district.  Additionally, this Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332.

## CASE OVERVIEW

3.      This case is primarily about the theft of the most valuable commodity in the news and media industries— images.  This is about the theft of images which were the protected property of Plaintiffs.  Those protected images were actually stolen and then published with the full knowledge of their copyright infringement by Defendants.  This case demonstrates how theft has become a way of doing business by the media.  Steal now, pay later.  If you get caught, if the plaintiff can afford a lawyer, and if your victim is still breathing or in business… then consider paying.  This *modus operandi* by the industry not only deprives copyright owners of profits, but also deprives them of credits and future work and sales.  In this case, Defendants went far beyond the mere copying and distribution of protected images.  These Defendants accused other images and video belonging to Plaintiffs of being faked and fabricated, and engaged in a carefully planned and orchestrated conspiratorial enterprise designed to defame Plaintiffs, cause Idema to remain illegally imprisoned in Afghanistan, sway public support by publishing a fictional narrative of events that would cause him to be abandoned by business associates, friends, and relatives, and destroy him financially.  That specific purpose; Plaintiffs' financial destruction, was paramount in Defendants' conspiracy.  It was consummated through a vicious and false broadcast and online story titled "*Jack of All Trades?*"  The March 7, 2005 presentation called itself "a cautionary tale" of a "conman."

4.      Further, between 2001 and the present day, the individual Defendants engaged in an ongoing pattern of disingenuous subterfuge, defamation, conspiracy, interference with business relations, and copyright infringement, culminating in this case, with the Australian Broadcasting Network story which aired on March 7, 2005, repeated at least six more times, and was permanently placed online.  Defendants intentionally and knowingly made, and caused to be republished by third parties, statements which were patently false and/or misleading, in bad faith, and designed to interfere with Plaintiffs' prospective economic advantage.  They have also distributed protected images which were the rightful property of Plaintiffs.

5.      Upon information and belief, each of the Defendants was empowered to act as the agent, servant, employee and/or co-conspirator of each of the other Defendants, and that the acts alleged herein to have been done by Defendants were authorized, approved and/or ratified and/or known by each of the other Defendants.  To this end, Defendants engaged in a conspiratorial enterprise, which spanned multiple countries, and a dozen states.  They illegally intercepted private emails, stole documents, forged documents and evidence, fabricated events, stalked persons helping Idema, broke into cars and computer programs, and knowingly orchestrated the financial demise of Plaintiffs.

6.      The pinnacle of Defendants' conspiratorial enterprise was "*Jack of All Trades?*" and was so bold in their copyright infringement that the story actually stated:

> "Media Watch has obtained photos of what Idema was up to."

> "We've been told he's the one who scrawled across them, NOT FOR RELEASE — at least, it appears, not until you pay."

One of the photos on the ABC website actually acknowledged Plaintiffs' ownership of the photo in the caption:

> "<u>Not for release 1</u> Idema photo of a bound and masked man being retained by US soldiers"

It was a vicious and false story which used false documents, stolen documents, and pictures stolen from Plaintiffs as the source of its credibility causing permanent and irreparable harm which cannot be overstated.  The problem was that the story was based on lies— it was, quite simply, fantasy from the twisted minds of Liz Jackson's sources.

**PARTIES**

7.      Plaintiffs, Counter Terrorist Group US (hereafter "CTG" or Counterr Group) and Counterr Group are North Carolina companies engaged in the support of US counter-terrorist initiatives, located in Cumberland County, NC.

8.      Plaintiff J. K. Idema is United States citizen formerly employed by the Counter-Terrorist Group, residing in New York.

9.      Defendant **AUSTRALIAN BROADCASTING CORPORATION, aka ABC AUSTRALIA,** is an Australian television broadcast company and online news agency.

10.     Defendant **ABC CORPORATIONS 1-100** are divisions, subsidiaries, holding companies, or affiliates of the Australian Broadcasting Corporation whose exact identities are unknown at this time.

11.     The Australian Broadcast Corporation Defendants' American offices are located at 747 Third Avenue, Suite 8C, New York, New York 10017.  Defendant Australian Broadcasting Corporation, ABC Australia, and Defendants ABC Corporations 1-100 are collectively referred to hereafter as "the ABC."  The ABC, is not affiliated with, owned by, or related to American Broadcasting Corporation, the American ABC network, nor is the American Broadcasting Corporation involved in anyway in this case.

12.     **LIZ JACKSON** is alleged to be the author of the defamatory and infringing story aired on March 7, 2005, and published online thereafter and still available online.  She is believed to be a resident of Australia.  Her debut as the host of the Australian Broadcast Corporation's Media Watch was the infringing story "Jack of All Trades?"

13.     **ERIC CAMPBELL,** is a journalist employed by the ABC as a television and radio correspondent.  He is also the author of a book about Afghanistan and in large part about Idema, which was not only defamatory and in many cases completely false and/or fabricated, but also violated prior confidentiality agreements and implied contracts with Idema.

14.     The Australian Broadcasting Corporation, ABC Australia, ABC Corporations 1-100, Liz Jackson, and Eric Campbell Defendants are collectively referred to hereafter as the "ABC Defendants."

15.     **JOSEPH A. CAFASSO,** is a source of the defamatory and infringing story and article published by ABC.  Cafasso has stalked Idema for years and engaged in a relentless

smear campaign designed to destroy Plaintiffs reputations and income.  Cafasso was last known to be a resident of Carteret, New Jersey.

16.    **EDWARD A. ARTIS,** is a source of the defamatory and infringing story and article published by ABC.  Artis has engaged in a long-running relentless smear campaign designed to destroy Plaintiffs reputations and income.  He is believed to be a resident of the Philippines.  Artis and Cafasso were primary co-conspirators in the copyright infringement and contributed by assisting ABC with illegally obtaining the images.

17.    **KNIGHTSBRIDGE INTERNATIONAL, Inc.,** according it its website "is a California 501(c), (3), Non-Membership, Not for Profit Corporation (state and federal tax exempt # 95-4546892), dedicated to providing humanitarian assistance and disaster relief worldwide without regard to race, religion or national origin. Founded in August 1995 by several members of a self-styled US Priory of the Knights of Malta and OSMTH TEMPLAR Knights for the specific purpose of providing an independent vehicle through which focused international and domestic humanitarian assistance and medical relief programs could be organized."

18.    **KNIGHTSBRIDGE INTERNATIONAL HUMANITARIAN RELIEF AND HUMAN IMPROVEMENT PROGRAMS, INC.,** aka **KNIGHTSBRIDGE INTL HUMANITARIAN & HUMAN IMPROVEMENT PROGRAMS INC** is a company affiliated with or which operates or is the predecessor or successor of Knightsbridge International, Inc.  All of the Knightsbridge Defendants, including the individual Defendants working for Knightsbridge, are collectively referred to hereafter as "Knightsbridge."

19.    **ROBERT C. MORRIS, Jr.,** is a source of the defamatory and infringing story and article published by ABC.  His websites states that "[h]e is a frequent speaker and writer on human rights and international relief operations."  Upon information and belief, Morris exercises leadership in the conspiratorial enterprise described herein.  He is a resident of Connecticut with an address of 41 Cedar Hill Rd, Newtown, CT 06470.

20.    **PARTNERS INTERNATIONAL FOUNDATION**, also known as "PIF," is Morris' non-profit humanitarian organization working in the United States and the world supposedly to provide disaster relief and other support. Claiming assets of $7,526,420 in 2003, Partners International is also located at 41 Cedar Hill Rd, Newtown, CT 06470.

21.    **WILLIAM JOHN HAGLER** is a co-conspirator and another source of the defamatory and infringing story and article published by ABC, who upon information and belief, among other wrongful acts, provided ABC with a variety of information he stole from Plaintiffs' offices and documents he either fabricated or assisted his co-conspirators with the fabrication of.  Hagler is believed to be a resident of Fayetteville, North Carolina.

22.    **JOHN DOES 1-7,** are persons yet unknown whose identities are believed will be determined during the course of discovery.  Plaintiffs do not know the true names and capacities of those Defendants sued herein as DOES 1 through 7, inclusive, and therefore sues these Defendants by such fictitious names.  Plaintiffs will amend this complaint to allege their true names and capacities when such are ascertained.  Plaintiffs are informed and believe, and on that basis allege, that each of the Defendants sued herein as DOES 1 through 7, inclusive, is in some manner legally responsible for one or more of the wrongful acts set forth herein.

### BACKGROUND FACTS

23.    In the 1980's Idema and Counterr Group assisted the United Front Military Forces (hereinafter the "UFMF"), often referred to improperly as the "Northern Alliance" by the press, in their struggle against the Soviets.  In 2001-2002, Idema was a military advisor to Commander Ahmad Shah Massoud's UFMF.

24.    Shortly after Massoud's assassination on September 9, 2001, and the subsequent September 11 attacks, Idema joined with the UFMF (*aka* Northern Alliance) in Northern Afghanistan and remained with their forces until June 2002, upon which time he returned to the United States.  He continued working with the UFMF and the transitional Afghan Ministry of Defence (MOD) in an advisory capacity.

### RELEVANT FACTS

25.    On March 7, 2005, Liz Jackson made her debut as host of ABS's Media Watch program, selecting as her debut program the infringing, defamatory, and patently false story— "*Jack of All Trades?*"  In her story, Jackson used stolen copyright protected images belonging to Plaintiffs, forged documents, fabricated documents, highly questionable sources (several of which were using false identities and fictitious credentials), stolen and altered emails.  Contrary to her claims of impartiality, Jackson refused to allow Idema to contradict false statements made by Jackson's "sources."

26.    Jackson's debut as the host of ABC's Media Watch and her vicious attacks on Jack Idema were met by varying opinions from viewers, some of which appear on a forum dedicated to the show, as follows:

One Viewer wrote in:

"Liz Jackson's debut as media watch host was far from impressive. She began by claiming that change of genitals on the seat after 15 years was important, delivered in a terribly awkward and fidgeting performance. The director did try to cut her figeting (sic) hands out of the rest of the episode, to little effect … The episode itself was supposedly a startling revelation about Jack Idema. She threw Eric Campbell, a well known ABC tabloid hack, to the wolves in some sort of token attempt at non-biased credibility. Sorry never respected anything Eric Campbell said, nor ever heard of Jack Idema, nor ever seen any footage concerning him."

Another Viewer wrote

"Her opening story was disjointed, hard to follow, went on too long - and I still can't work out what the hell she was on about, what the whole point of the story was. OK, so Jack whatever might be a bullshit artist and conman, but all the evidence she offered about his connections and involvement in Asia and the Middle East was just other peoples opinions - who says they are the ones that are right??? She certainly didn't offer any evidence his videos were staged/forged/whatever."

In response to that another Viewer wrote:

*"OK, so Jack whatever might be a bullshit artist and conman, but all the evidence she offered about his connections and involvement in Asia and the Middle East was just other peoples opinions - who says they are the ones that are right??? She certainly didn't offer any evidence his videos were staged/forged/whatever.*

There was no definitive evidence either way, so there could be no resolution."

Peter Ballard wrote:

"Exactly. If the videos weren't forged (and there was no direct evidence that they were), then what did Campbell do wrong? It's not Campbell's

fault that some American talk host in a cowboy hat beats up Jack's credentials."
      (*see*: http://phorums.com.au/archive/index.php/t-99949.html)

27.     After the online publication of the ABC story Idema called Liz Jackson at ABC and told her the photographs were stolen and being illegally used.  He also told Jackson that some of documents they were using were false and fabricated, and others were confidential communications which had been stolen by the other individual Defendants.  Idema requested that this conduct cease and that the photos and his videotapes be returned.  Jackson, who was quite surprised Idema could make a call from an Afghan prison, stated to Idema, "well, if you get out of prison alive in ten or twenty years, then you can go ahead and sue me," or words to that effect, then laughed.  Idema informed Jackson that if they did not remove the photos and the documents and make a retraction of the false statements, he would indeed sue her.

28.     Upon information and belief, the ABC Defendants have continued to publish and distribute those pictures and other images to third parties in further violation of contracts, breach of confidentiality agreements, and in breach of confidence.

29.     Upon information and belief, many of these photographs and documents were obtained from Artis, Cafasso, and/or Morris, the three of which, along with their two "humanitarian aid organizations"— Knightsbridge and Partners International— engaged in an continuing conspiratorial enterprise, the purpose of which was to humiliate and financially destroy Plaintiffs.

### DEFENDANTS' INTENTIONAL AND NEGLIGENT VIOLATIONS OF THE COPYRIGHTS

30.     First, Defendants had actual knowledge that Plaintiffs' photos were being licensed through Polaris Images in New York—a professional international licensing agency for images.  ABC had even entered into agreements to refer requests for images to Getty Images originally, and then to Polaris Images, which they violated.

31.     Second, Defendants made a conscious and knowing decision to forgo proper licensing and simply steal the images.

32.     Third, Defendants intentionally and knowingly concealed the source of the photos to conceal their theft.

33. Fourth, Defendants had a responsibility to properly license the images, to know copyright law, and to correctly report the facts and refrain from the intentional copyright violations which these Defendants and their co-conspirators engaged in and continue.

34. Fifth, ABC has refused to remove the infringing photographs from their website, making them constantly available for almost three years, where they have been accessed by other parties and re-used over and over, thereby destroying their value.

### SPECIFIC COPYRIGHTED IMAGES – WRONGFUL USE

35. Some of the known wrongful uses of specific images by Defendants are:

35.1.     **US Copyright Registration # VAu754-933 (registered on June 15, 2005), titled "TF-180 Turnover to Bragram MPs."** Identified by Australian Broadcasting Corporation in their story as **"Not for release 1 Idema photo of a bound and masked man being retained by US soldiers."** This photograph of the Combined Joint Special Operations Task Force (CJSOTF) taking custody of a high-ranking terrorist was published in violation of copyright law because Idema created the photo.

35.2.     **US Copyright Registration # VAu755-447 (registered on June 15, 2005), titled "TASK FORCE SABER 7 Interrogation Photo – May 2004,"** and alternatively titled "EPW2748 Monk Interrogation Photo – May 2004." Identified by Australian Broadcasting Corporation in their story as **"Not for release 2 A photo of Idema filming his alleged interrogation of an Iraqi 'terrorist'"** this photograph of the interrogation of an EPW[1] high-ranking *al-Qaida* linked Taliban terrorist was published in violation of copyright law as it is Plaintiffs' photo.

35.3.     **US Copyright Registration # VAu755-440 (registered on June 15, 2005), titled "TASK FORCE SABER 7 With EPW MONK,"** and alternatively titled "EPW2766 Surgery Photo – May 2004." Identified by Australian Broadcasting Corporation in their story as **"Not for release 3 A photo of Idema tending to an alleged terrorist,"** this photograph of the interrogation of an EPW high-ranking *al-Qaida* linked Taliban terrorist undergoing medical treatment was published in violation of copyright law as it is Plaintiffs' photo.

---

[1] EPW- *Enemy Prisoner of War*

36.     Upon information and belief, Defendants obtained these photographs from a confidential email, and not only violated Plaintiffs' copyright by publishing them, but also, upon information and belief, intercepted private and confidential correspondence, thereby violating a right to privacy and electronic communication laws.  The ABC did not seek a license or permission to publish the photographs, nor was a license or permission obtained from Plaintiffs.  The ABC Defendants published the photos and ignored all rights and privileges.  This was an intentional and knowing violation of law.

37.     Defendants' copyright violations and the criminal liability derived from the interception of electronic communications (including their civil liability for violations of privacy) were knowing and planned acts of which Defendants were fully aware of the wrongful and illegal nature of those acts.

### ABC'S INTENTIONALLY FALSE REPORTING

38.     The ABC Defendants exercised property rights and ownership in violation of law relying on the hope that if Idema remained in an Afghan prison for twenty years he would be unable to engage in legal recourse against these Defendants.

39.     To this end, the ABC Defendants intentionally misreported the facts of stories and used questionable sources which they knew, and/or should have known, were providing false information.

40.     The ABC Defendants knowingly and negligently republished false statements with a reckless disregard for the truth and used Plaintiffs' stolen images to increase the distribution of those false statements and aid their fraud.  The stolen images gave the impression that the ABC Defendants had exclusive, special access, and insider knowledge of the story.  By illegally using those images the ABC Defendants were able to make their story appear as though it was credible and true.

41.     The purpose of this false reporting was, among other things, to assert permanent dominion and control over a variety of images, including Plaintiffs' *8mm VideoX al-Qaida Terrorist Training Tapes*, by perpetuating the false version of the Idema story, which the ABC Defendants and their co-conspirators could thereby profit from.

42.    What was particularly egregious, was that while the ABC Defendants were profiting from their distribution of Plaintiffs' images, at the same time Jackson was intentionally omitting the exculpatory nature of other images from her story and continuing to propagate the vicious myths that Idema *8mm VideoX al-Qaida Terrorist Training Tapes* were fake and fabricated by him and that he had been thrown out of the US Army Special Forces.

43.    By continuing to disseminate what at least four Afghan high court and appeals court judges later called "propaganda" and "lies," Jackson and her co-conspirators were able to wrongfully use Plaintiffs' images and documents without fear of reprisal believing that Idema would be imprisoned for many years, and certainly longer than the statute allowed for filing of civil actions in U.S. courts.

44.    To this end, Liz Jackson, and others, both known and unknown, knowingly joined in a conspiratorial enterprise with sources that were questionable at best for the purpose of destroying Idema's reputation and income by continuing a false story so shocking, and so vicious, that it had encircled the globe in one of the largest and far-reaching stories related to the War on Terror in 2004, and which, although completely false, helped alter foreign policy and the Pentagon's strategic plan against terrorism in Afghanistan.  The false accusations against Idema and his men were, upon information and belief, a carefully engineered propaganda campaign covertly orchestrated by these Defendants, and others, which ultimately caused the death of innocent people from terror attacks which could have been stopped. Jackson made these false statements without exercising due diligence to report events in a foreign country and which are unprotected by any Fair Reporting Privilege.

45.    This conspiratorial enterprise is further addressed herein, and was responsible for countless false articles throughout the world, which— like *Jack of All Trades?* remain online[2] — and continue to be republished[3] to this day.

---

[2] http://www.abc.net.au/mediawatch/transcripts/s1317953.htm
[3] *i.e.*: http://www.militaryphotos.net/forums/showthread.php?t=37521;
www.privateforces.com/index2.php?option=com_docman&task=doc_view&gid=49&Itemid=4
http://www.sourcewatch.org/index.php?title=Jonathan_Keith_Idema

**RECKLESS DISREGARD FOR THE TRUTH & INTERFERENCE WITH ECONOMIC PROSPECTIVE**

46.    In December 2001, Idema obtained what are known worldwide as the *8mm VideoX al-Qaida Terrorist Training Tapes*.  These tapes show *al-Qaida* terrorists training in terrorist techniques and training to attack western targets.  They have been licensed to networks around the world and generated substantial licensing fees from CBS, NBC, ABC,[4] Newsweek, Time, US News & World Report, and many other broadcast and print news agencies throughout the world.   The tapes and all other images belonging to Plaintiffs are represented by Polaris Images, a professional worldwide photo agency which provides licenses for networks and magazines wishing to use the videos or photographs.  These licensing fees helped support a variety of anti-terrorist and humanitarian aid projects.

47.    In March 2003, the New York Times bestselling book, *The Hunt for Bin Laden* was released to rave reviews and much media attention.  Within days of publication the book was number four on the New York Times bestseller list.  A second book, *Task Force Dagger* was released in England in August 2003.  Jack Idema is the copyright holder (US Copyright Office, 2003, Registration Number: TX0005860241).  Immediately after the release of the book, Artis, Cafasso, and others acting as part of their newly formed conspiratorial enterprise began littering the internet with posts about the book being fictional.  To do this, Artis, Cafasso, and their co-conspirators, used countless fake email addresses and names to post and repost their slanderous statements and false accusations on numerous websites, such as Amazon.com and BarnesandNoble.com.  Through this anonymous slander campaign, Cafasso, Artis, and others, such as Tracy Paul-Warrington and Robert Morris, were able to destroy the sales of book and drive it into the ground.

48.    At the same time, as unbelievable as it may sound, these Defendants rewrote *The Hunt For bin Laden* themselves, changing the story to portray themselves as the heroes of the 2001-2002 war.  In the new version, Jackson's sources, and their friends and relatives (such as the "Flag Girl") were prominently portrayed as integral in the post 9/11 war, and liberation of Afghanistan, even though Morris, Cafasso, Warrington, and the others had never been to

---

[4] Referring to the American Broadcasting Corporation – completely unrelated to Australian Broadcasting Corporation.

Afghanistan, and Artis had only been there a few weeks.  This was an illegal derivative work.
They also continued their campaign, now greatly increased, to destroy the credibility of the
*8mm VideoX al-Qaida Terrorist Training Tapes* by alleging Idema faked and fabricated them.

49.    In April 2004, Idema's counter-terrorist team, known as Task Force Saber, then
Task Force 7, and later TF Saber 7, was back in Afghanistan working closely with U.S. and
Afghan military and intelligence activities.  All of Idema's actual team members were
officially employed by the Ministry of Defense or Afghan CIA.

50.    In June 2004, Idema and his team had captured the brother-in-law of bin Laden's
chief of security and the terrorists responsible for the murder of Canadian ISAF Corporal Jamie
Brendan Murphy.  Corporal Murphy had been murdered in a bombing on Darlaman Road in
Kabul on January 27, 2004.  Idema's team also interdicted the planned assassination of key
"Northern Alliance" leaders and stopped a gas tanker suicide attack on US soldiers at Bagram
Airbase in Afghanistan.

51.    On July 5, 2004, anti-UFMF / Karzai government forces captured Idema during
his anti-terrorist operations on behalf of the United Front Military Forces and other official
governmental agencies.  Idema was sentenced to ten years in prison by a Taliban judge.
During the trials and appeals, Artis, Cafasso, Morris, Warrington, and others, continued their
slander campaign claiming Idema's *8mm VideoX al-Qaida Terrorist Training Tapes* were fake
and fabricated.  The result was that all licensing income from these videotapes ceased.  The
ABC Defendants republished these false statements in various forms, as more particularly set
forth hereafter.

52.    On March 7, 2005, Liz Jackson and ABC aired their story— "Jack of All
Trades?" which infringed Plaintiffs' photographs and contained defamatory statements.  The
ABC Defendants had a duty to disclose the exculpatory information they withheld and to
include this information in their story about Plaintiffs.

53.    Prior to the story airing, the ABC Defendants possessed substantial, if not
overwhelming, information disproving these false allegations and directly refuting the charges
against Idema in the Afghan Taliban controlled court.  In spite of that, they intentionally and
knowingly withheld this information from their reporting which would have aided Idema and
his men who had been falsely accused of horrific crimes.

54.     The ABC Defendants published false, and in many cases completely fabricated fictional statements about Idema and the *8mm VideoX al-Qaida Terrorist Training Tapes* negligently and with a reckless disregard for the truth.

55.     By falsely reporting the events the ABC Defendants, and their co-conspirator sources stood to profit immensely.  As an example, with Idema in prison for ten years, ABC would be able to have unlimited use of the *8mm VideoX al-Qaida Terrorist Training Tapes* in violation of prior agreements between Idema and the ABC.

56.     The ABC Defendants "added value" to the Idema story with an angle of a fraudster con man, who had faked the *8mm VideoX al-Qaida Terrorist Training Tapes* for profit and prestige, was relentless self-promoter and media hound, who fabricated events about the 2001-2002 war in Afghanistan.

57.     These false claims by the ABC Defendants, Edward Artis, Joseph Cafasso, and other co-conspirators, both known and unknown, have caused serious and devastating financial lost to Plaintiffs in lost revenues from the *Hunt From Bin Laden* book, other associated books, and the *8mm VideoX al-Qaida Terrorist Training Tapes.*

58.     Defendants acted wrongfully and engaged in defamation, libel, slander, and libel *per se*, by negligently and recklessly republishing false statements which the ABC Defendants knew firsthand to be false.

### BACKGROUND OF THE ABC'S SOURCES & CO-CONSPIRATORS

59.     The ABC Defendants' story was in most part based entirely on fiction.  ABC attributed some of its information to Artis, and other information to the Columbia Journalism Review which printed a viciously false story, based on the same sources, such as Artis and Cafasso, and called Idema "a monster," a "liar," a "thug," and "a con man," who was "recklessly" given "credibility and glory he could turn into cold hard cash."  The story claimed Idema spent only three years in Special Forces and was refused permission to re-enlist.

60.     The ABC Defendants intentionally concealed the identity of those sources, such as Joseph Cafasso and the John Doe Defendants, so they could not be refuted or disputed, and/or, proven to be fictitious.  However, it was eventually discovered that the ABC Defendants used a real con man named Joseph Cafasso as one of their primary anonymous sources.  Cafasso had been previously fired from FOX News for impersonating a Colonel in

the US Army Special Forces' Delta Force. Cafasso falsely claimed to have three Silver Stars and been the hero that rescued a flight crew from a burning plane during the Iranian hostage rescue attempt in 1979. In reality, Cafasso had 44 days in the army, and was discharged as a private.[5]

61.    In 2004, Cafasso reinvented himself as Colonel Gerry Blackwood, a member of the White House staff who was CENTCOM's top intelligence commander in the Gulf War, a pilot and nuclear physicist who spoke six languages. He claimed to be a DIA and CIA agent who was on special assignment to the FBI. The entire "Blackwood" persona and background was of course, transparently phony. In July 2006, plaintiffs discovered that Cafasso, *aka* the new Colonel Blackwood, was speaking regularly at a university, and was on the Committee for Concerned Journalists. Cafasso, posing as CIA/DIA/FBI operative Colonel Blackwood, worked closely with Jackson and others to orchestrate the ABC "*Jack of All Trades?*" story.

62.    Joseph Cafasso has fraudulently misrepresented himself as, among other false identities, both a US Army Delta Force Colonel with numerous Silver Star awards for heroism, and a CIA agent who was working for the White House. The ABC Defendants knew, or should have known, that Cafasso was a fraud, because the NY Times had previously run a story exposing Cafasso (*The Colonel Who Wasn't* – Jim Rutenberg, April 29, 2002). Upon information and belief, the emails destroyed contained evidence of the fabrication of events, theft of images, illegal access to private email accounts, and conspiracy to infringe copyrights and violate property rights.

63.    Currently, Cafasso operates a vitriolic web blog that routinely issues death threats to people involved in related cases. He has stalked several women involved in related cases as witnesses, he has threatened them, and he has threatened counsel in another case. Cafasso has impersonated CIA agents, FBI agents, US Army Colonels, DIA agents, NY City Police Detectives, a lawyer, a judge, a boat captain, a nuclear physicist, a White House staff member, a biological weapons specialist, a Delta Force Commander, and many other personas. Joseph A. Cafasso currently uses the alias names of Joe Cafasso, and the fraudulent names of Jay Cafasso, Jay Mosca, Big Joey Mosca, Colonel Gerry Blackwood, Lieutenant Colonel Joseph Cafasso, Special Agent Joe Blackwood, Jake Adams, and many more.

---

[5] NY Times Article, *The Colonel Who Wasn't*

64.    The ABC's primary source, "Sir Edward Artis," has repeatedly misrepresented himself for fraudulent reasons. Artis has admitted under oath, that he illegally wore Bronze Star and Silver Star medals for heroism in violation of federal law and which he never earned and was never awarded by the United States Army. Additionally, as previously alleged, Artis has impersonated Special Forces and Navy SEAL commandos and falsified his military records. He has falsely claimed a PhD and a knighthood from the Vatican. Artis has also admitted possessing and using numerous fraudulent passports. He has worn fake medals for heroism at fundraisers for his Knightsbridge companies, and even worn these phony medals to an event at West Point. Plaintiffs further allege that Artis is a master of deception, and an accomplished con man. While in Northern Afghanistan in 2001, Artis attempted to steal official stationary from the personal office of the Minister of State, Dr. Abdullah Abdullah. Idema discovered the documents hidden under Artis' shirt and returned the documents to an official with the United Front. Idema advised H.E. Abdullah of the theft. Artis later claimed his theft was simply the way business was done in Afghanistan. Artis also admitted that he was stealing the documents to forge letters he might need in the future.

65.    Robert Morris has operated behind the scenes as their partner and co-conspirator in a variety of wrongful conduct, and as one of the masterminds of their conspiratorial enterprise. Several false, malicious, fabricated, and or misleading documents used in the story and on the ABC's website were later obtained digitally by Plaintiffs. The source of these ABC story documents was determined to be Morris and positively identified as coming from Morris' computer. The ABC has since removed several of them from online access.

66.    William Hagler is another source and co-conspirator who assisted the Defendants. Another document the ABC purported to be true and accurate was a draft PSI report letter in a 1991 wire fraud case. These documents are sealed by the Court. Furthermore, it was completely inaccurate and false, and later proven in court to be false. Upon information and belief Hagler obtained this document through wrongful acts and provided it to Robert Morris who then provided it to the ABC, who then posted it on their website. It is also believed that Morris and Hagler worked together with Artis to provide an intercepted and altered email to the ABC which was also used in their story. Hagler's conduct and involvement in the conspiratorial enterprise encompasses the commission of more than twenty

felony crimes, including receiving stolen goods, felonious Possession of Stolen Goods (NCGS §14-72(a)), Criminal Conspiracy (NCGS §14-72(c)),   Obtaining Property Under False Pretenses (NCGS §14-100), Illegally Administering Narcotics to Render One Helpless (NCGS §14-401.16), Blackmail and Extortion (NCGS §14-118 and §14-118.4) (which, upon information and belief, Morris and Artis participated in), and will be more fully set forth in an amended complaint.  In essence, Hagler was the instrument of the other conspirators when they required the actual physical commission of a serious criminal act in the furtherance of their conspiratorial enterprise.

67.    Tracy Paul Warrington was a co-conspirator who joined Artis, Cafasso, Morris, and others in first, their destruction of books sales, and then his baseless and false attacks on the *al-Qaida* tapes.  Warrington, a self-proclaimed expert on *al-Qaida*, wrote to news agencies in 2003, that:

>"Against international law, Idema used hospitals and aid stations as cover for mortar and machine gun fire against Taliban and Al-Qaida personnel,"

>"Idema has no Special Operations experience at all,"

>Idema "was kicked out of Special Forces way back in the 70s before he even started his career," and that,

>"There are persistent rumors in Afghanistan that he shot and killed surrendering Afghanis."

These statements were not just false, but ludicrous. His emails to news agencies resulted in numerous promotional appearances for *The Hunt For bin Laden* being cancelled.  Warrington also stated, having joined the conspiratorial enterprise, that Idema "used aid relief organizations in Afghanistan as a means of gaining glory and attention for himself." Warrington later started claiming Plaintiffs' *8mm VideoX al-Qaida Terrorist Training Tapes* were fake.  In essence, Warrington accused Mr. Idema of (a) being a fraud, (b) violating the Geneva Convention, (c) being a murderer, and (d) being a fugitive, and hence, the *The Hunt For bin Laden* book was "all lies," and the *al-Qaida* tapes fake.

68.    Artis, Warrington, and Cafasso, all discussed killing Idema and on numerous occasions.  Yet these were the sources the ABC used for their photos, documents, and story.

69.    In a deposition of Edward Artis, taken in Santa Monica, California, on
Monday, March 22, 2004, Edward Artis did not deny this discussion:

> MR. SANDFORD:  That was not the question.  There was a question after
>      that.  Did you ever put in an e-mail that you thought Mr. Idema
>      should have been shot in Afghanistan was the question.
> A   EDWARD ARTIS:  I'm not sure.  I can't recall.
> Q   BY MR. PIZZULLI:  **Did Tracy Warrington and you discuss that
> topic?**
> A   EDWARD ARTIS:  **I'm not sure**.
> Q   BY MR. PIZZULLI:  And you were jealous when that book came out,
>      weren't you?
> A   EDWARD ARTIS:  Absolutely not.  It was fiction, Mr. Pizzulli.
>      Anybody that reads it that knows him, he's the most despised guy in
>      Special Forces.  That's a moniker he earned.  Special Forces
>      personnel have told me about that about him.  I don't have to make
>      that up about him.
> Q   BY MR. PIZZULLI: Who told you that in Special Forces?
> A   EDWARD ARTIS:  Many people.  Just --
> Q   BY MR. PIZZULLI: Name one.
> A   EDWARD ARTIS:  -- do a Google search.
> Q   BY MR. PIZZULLI: Name one.
> A   EDWARD ARTIS:  Do what?
> Q   BY MR. PIZZULLI: Name one.
> A   EDWARD ARTIS:  I can't offhand.
>
> [Emphasis added]

70.    ABC and their co-conspirators intentionally and knowingly misrepresented
Idema's military record, and used falsified documents fabricated by Joseph Cafasso
(masquerading as "Colonel Blackwood"), and upon information and belief, Edward Artis,
Morris, Hagler, and others, both known and unknown.   The ABC considered these charlatans
reliable sources and/or experts on various subjects, including Afghanistan and the *8mm VideoX
al-Qaida Terrorist Training Tapes*

71.    No <u>actual</u> expert believed the tapes were fabricated.  Neither the real Cafasso,
nor the fictional Blackwood, actually served in the army, nor ever was employed by the CIA or
in Special Forces, but that didn't stop Jackson from using him as a source.  Upon information
and belief, another ABC source and "expert" was Tracy Paul Warrington, a man who had been
out of the military for 15 years, had never been to Afghanistan, or engaged *al-Qaida*, or even
seen a terrorist, except on television.

72.    In fact, just some of the actual experts to view the tapes included, Tom Sanderson Director of the Transnational Threat Initiative at the Center for Strategic & International studies, who said, "This looks like a *bona fide* training video – that's for sure;" and General Gary Harrell, a former member of the US Army Special Forces Operational Detachment Delta (Delta Force), and at the time commander of the Special Operations Task Force in Afghanistan, came to the opposite conclusion.  ABC had seen this videotape.  Also appearing in that video, in various programs, such as NBC *Dateline*, where Plaintiffs' *8mm VideoX al-Qaida Terrorist Training Tapes* were aired, are FBI Supervisor Tom Maxwell, Chief of the New York Counter-Terrorism Bureau, "Terrorism Expert Bruce Hoffman," "*al-Qaida* Expert Simon Reeves," and "Washington Post CIA Reporter Dana Priest."  None of which questioned the authenticity of the *8mm VideoX al-Qaida tapes.*  ABC purposefully ignored every legitimate expert on the planet.  In other words, not a single KNOWN expert alleged the tapes were fake, but four people who were defendants in prior cases accused of fraud, among other things, none of which were experts, and all of which lied about their credentials, were used by Liz Jackson and the ABC's Media Watch program.

73.    Defendants Artis, Cafasso, Morris, Hagler, and the John Doe Defendants also made, published, or caused to be published, false, and completely fabricated fictional statements accusing the Counter Terrorist Group of criminal activity, being charged with criminal activity, of wrongfully seeking charitable donations in violation of law, mail fraud, faking (along with Idema) *al Qaida* terrorist training tapes, and other false conduct.

74.    Defendants Artis, Cafasso, Morris, Hagler, and the John Doe Defendants also made, published, or caused to be published, false, and in many cases completely fabricated fictional statements accusing Idema of criminal activity, mail fraud, faking both *al Qaida* training tapes and videotapes of conversations with Department of Defense officials, creating an imaginary war, falsifying events in the NY Times best-selling book, *The Hunt For Bin Laden,* stealing books from Random House, and stealing money from bank accounts.

75.    By impugning the integrity of the *8mm VideoX al-Qaida tapes* the ABC, and their co-conspirators, achieved their ultimate goal, to impeach Plaintiffs'' credibility and destroy their financial income to assure that Idema was rendered destitute and remained in an Afghan prison.

### ADDITIONAL FALSE AND/OR MISLEADING STATEMENTS

76.    Defendants have wantonly, knowingly, and repeatedly, published intentionally false or misleading statements to the detriment of Plaintiffs, which they are liable for that distribution in violation of Defendants' verbal and express contracts.

77.    Although Idema commanded Afghan soldiers who were fighting foreign (Arab, Iraqi, Pakistani, Kuwaiti, and Emirates terrorist fighters, Artis has repeatedly made the ridiculously false statement that Idema said his goal upon arriving in Afghanistan was "to kill every Afghan I see." Contrarily to Artis' statement was the fact that Idema repeatedly credited with the saving the lives of Afghan men, women, and children.  Artis' statement was designed by Artis to make good copy.  Copy so salient, that news organizations, like the ABC, were willing to jump at it.  One article stated, "According to Ed Artis, the former Army sergeant who heads *Knightsbridge*, Idema curtly announced on his arrival that he wanted "to kill every fucking Afghan I see."

78.    Artis and Morris both claimed that Idema misrepresented the reasons he was going to Afghanistan to gain the cooperation of their aid groups.  They also stated that Idema "would claim, falsely, to be working for *Partners International*, which, like *Knightsbridge*, had severed all ties" with Idema.

79.    Knightsbridge and Partners International were quoted in one article as follows; "while Idema was thumping his chest in this fashion, officials from *Knightsbridge* and *Partners International* tried to warn American authorities that they had a rogue operator on their hands."  In fact, Artis who had only been in Afghanistan during the 2001 war for a few weeks, just long enough to get video footage of him handing out blankets and food, sent a letter to the United States Special Operations Command on December 18, 2001, accusing Idema of a wide variety of insanity.  ABC not only quoted the letter, but reproduced it on their website as evidence that Idema was indeed a dangerous nut:

> This man is a very dangerous person by virtue of his carelessness and stupidity and before he gets someone killed, possibly me or someone traveling with me inside Afghanistan...He needs to be removed from the area."

> "...Idema has managed to either tarnish or ruin our reputations.... For one reason... to make Keith Idema look like a hero..."

"As long as he remains in the region, I consider my personal threat level and that of those traveling with me to be at a very high level.  He is like a wounded animal right now and I feel that given the amount of time that he has been allowed to run around telling people he has been working for the US Embassy, Pentagon, Special Ops under cover or the CIA, that he has garnered or bought enough contacts to pose a real threat to not only me and those near me but the over all mission of the United States and the Coalition that is fighting there.

80.    The ABC Defendants adopted these vicious and false accusations of horrific conduct which was completely fabricated and fictional, and are still being, republished in articles, internet sites, and web blogs throughout the world.  These statements also constituted Tortious Interference With Prospective Economic Advantage, Tortious Interference With Contractual Relations, Negligent Misrepresentation, Unfair And Deceptive Trade Practices, and other causes of action.

### ERIC CAMPBELL'S FALSE AND/OR MISLEADING STATEMENTS

81.    Eric Campbell works for the ABC as a correspondent and is the author of "*Absurdistan,*" his book about his experiences in Afghanistan in 2001 and 2002.  The book is sold on the ABC website through the ABC Online Shop and mentioned in the ABC "Jack of All Trades?" story.

82.    Campbell and Idema made certain agreements during the course of their relationship in Afghanistan.  One of those agreements as that Campbell would not use certain information Idema told him in confidence.  Another agreement was related to the specific way the ABC and Campbell could use Plaintiffs' *8mm VideoX al-Qaida Terrorist Training Tapes.* And, another agreement was made after Campbell and Idema discussed Campbell writing a book.  Campbell entered into an agreement with Idema that he would not use any confidential material or information from Idema in any book or article he wrote, nor would Campbell base any future book on Idema or his exploits in Afghanistan under any circumstances.  Idema only agreed to assist Campbell in Afghanistan because Campbell promised not to write about Idema in any book.  In spite of that agreement Campbell used Idema and events which Campbell promised not to include Idema in as a primary basis and thread throughout *Absurdistan*.

83.    Equally as important as the breach of agreements between Campbell and Idema is that *Absurdistan* was, just as its title suggests, completely absurd in its description of Idema

related events.  *Absurdistan* was not just inaccurate but defamatory and vicious in its attack upon Idema and his associates in Afghanistan.

84.    Campbell portrayed Idema a raving lunatic who was incompetent, fat, idiotic, erratic, and criminal.  Most of what Campbell wrote was either false or inaccurate and spanned pages upon pages of the book.  Just a few of the false and absurd excerpts are as follows:

84.1.    "Jack came up with a revolutionary idea for entertainment in Kabul – a Beef, Bourbon and Burqa Bar.  His plan was to open a Thai-style alcoholic bar with strippers taking off their burqas and everything underneath.  "Jack, you will be shot dead the first night," I warned.  But he wasn't fazed.  He appeared to have no concept that even in Afghanistan there were limits to what a foreigner could get away with.  He saw no problem selling alcohol in a country with the highest number of weapons per person in the world.  Fortunately, it was one of Jack's long-tem schemes and remained in the conceptual stage."

84.2.    "But nobody had counted on trying to prise a weapon from [Idema] a paid-up member of the National Rifle Association."

84.3.    "Mission accomplished, it should have been time for Jack to go home. But he hadn't come all the way not to kill some Taliban."

84.4.    "At every prayer and pee-stop, Jack sent his soldiers off in pairs to scan the horizon, which they faithfully did until the moment he looked away, when they sat down and smoked."

84.5.    "But Jack clearly relished the chance for some face time with *'ass-wipe terrorists'* and went in with them."

84.6.    "Jack also had visions of stardom and gave Zabi a small digicam to film him.  Jack was planning to piece together a documentary about his exploits in Afghanistan."

84.7.    "Instead of filming Jack, Rafi had recorded half an hour's footage of himself, swirling the camera round, puckering his lips and preening in the monitor.  Jack wanted to kill him."

84.8.    "Jack's militia was starting to get out of hand.  We had grown used to Jack's expansive presence and idiosyncrasies, although Kim was losing

patience with him smoking for hours in the toilet and leaving cans of Pepsi and Snickers wrappers around the bowl."

84.9.    "Jack was determined to make his protection service a going concern and he'd found a Brazilian crew willing to make use of it if they could share the cost with someone.  They were also keen to go to Bamiyan, but for a different reason – they were following someone who was even crazier than Jack was."

84.10.    "Bottom line.  Jack hadn't come here to eat Snickers.  He'd come to kill Taliban.  But weeks of relatively soft living and junk food were blunting his edge.  "In the states I normally eat a couple of cucumbers and a tuna sandwich," he'd often say through a Hershey Bar.  Now he was threatening to burst out of his uniform."

85.    *Absurdistan* goes on to tell story after story of Jack Idema, culminating with Campbell's observation that Idema had been cut loose by the US and Afghan governments and left to languish in an Afghan prison for ten years.  Campbell, who had portrayed Jack Idema and factual events accurately and diametrically opposed to his new *Absurdistan* version had obviously fallen into the same trap as the other Defendants—thinking he could jump on the bandwagon and portray Idema as a psychopath, rewrite the history of the *8mm VideoX al-Qaida Terrorist Training Tapes*, fictionalize events into defamatory and derogatory lunacy, falsify his reporting, violate his agreements, and destroy Idema's credibility and reputation, because, after all, Campbell, like others, never expected Idema to leave an Afghan prison alive, no less in time to file suit.

## CAUSES OF ACTION

1ST CLAIM FOR RELIEF – Copyright Infringement                                        25

2ND CLAIM FOR RELIEF – Contributory Copyright Infringement                           25

3RD CLAIM FOR RELIEF –Breach of Contract                                             25

4TH CLAIM FOR RELIEF –
     Tortious Interference With Prospective Economic Advantage                        26

5TH CLAIM FOR RELIEF –
     Tortious Interference With Contractual Relations                                 27

6TH CLAIM FOR RELIEF – Civil Conspiracy                                              27

7TH CLAIM FOR RELIEF – Fraud                                                         28

8TH CLAIM FOR RELIEF – Unfair And Deceptive Trade Practices                          29

9TH CLAIM FOR RELIEF – Defamation                                                   29

10TH CLAIM FOR RELIEF – Conversion                                                  30

11TH CLAIM FOR RELIEF – Negligent Misrepresentation                                 30

12TH CLAIM FOR RELIEF – Breach of Contract and/or Implied Contract                   31

13TH CLAIM FOR RELIEF – Breach of Confidentiality                                    31

14TH CLAIM FOR RELIEF – Negligent Misrepresentation                                 31

## FIRST CLAIM FOR RELIEF
### COPYRIGHT INFRINGEMENT
**(Against The ABC Defendants - 17 U.S.C. Sections §§ et seq.)**

86.     Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

87.     Defendants, as set forth herein, have directly violated the copyrights of Plaintiffs and engaged in the copyright infringement of Plaintiffs' images by distributing those images to third parties.

88.     As a direct and proximate result of Defendants copyright infringement and/or contributory copyright infringement, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus statutory damages, against each of the ABC Defendants, both jointly and severally.

## SECOND CLAIM FOR RELIEF
### CONTRIBUTORY COPYRIGHT INFRINGEMENT
**(Against All Defendants - 17 U.S.C. Sections §§ et seq.)**

89.     Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

90.     Defendants have directly violated the copyrights of Plaintiffs and contributed to the copyright infringement of Plaintiffs' through their acts as set forth herein.

91.     As a direct and proximate result of Defendants copyright infringement and/or contributory copyright infringement, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus statutory damages, against each of the Defendants, both jointly and severally.

## THIRD CLAIM FOR RELIEF
### BREACH OF CONTRACT
**(Against The ABC Defendants, Including Eric Campbell)**

92.     Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

93.     Plaintiffs and the ABC and Eric Campbell, had a series of valid contracts and implied contracts related to the *8mm VideoX al-Qaida Terrorist Training Tapes*.  These Defendants repeatedly and wantonly breached the terms of those contracts as set forth herein.

94.    These breaches of contract were material breaches that substantially defeated the purpose of the agreements and in some cases were both a violation of contract and/or a breach of confidence.

95.    The ABC Defendants' actions constitute a breach of the agreements and contracts between Plaintiffs and Defendants under the laws of North Carolina.

96.    As a direct and proximate result of this breach of contract, Plaintiffs have suffered, and will suffer, damages.  Plaintiffs' damages exceed $10,000, exclusive of costs and interest.

## FOURTH CLAIM FOR RELIEF
### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
#### (Against All Defendants)

97.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

98.    Plaintiffs had economic relationships with major US news networks, and numerous foreign news networks, which were ongoing and had resulted in past economic benefits to Plaintiffs in support of their anti-terrorism efforts, and were fully expected to result in future economic benefits to Plaintiffs.

99.    Defendants had knowledge of most if not all of these business and economic relationships between Plaintiffs and third parties.

100.    The intentional acts of Defendants, as set forth throughout this complaint, such as the false accusations of outrageous conduct, including claims that Plaintiffs committed mail fraud and related crimes, faked and fabricated videotapes, and fabricated events in *The Hunt For Bin Laden* and *Task Force Dagger* books, were intentional acts by Defendants designed to disrupt the relationships between Plaintiffs and third parties and which did in fact disrupt these relationships, causing economic harm to Plaintiffs.

101.    Furthermore, upon information and belief, Defendants induced third parties to refrain from entering into licensing contracts with Plaintiffs for their videotapes and other images.  Plaintiffs have lost valuable royalties from their copyrights and intellectual property as the result of Defendants' wrongful actions more fully set forth herein.

102.    Defendants' actions constitute a tortious interference with the economic advantage of Plaintiffs under the laws of North Carolina and an interference with economic gain under the laws of Afghanistan.

103.    As a direct and proximate result of this wrongful interference, Plaintiffs have suffered, and will suffer, damages.  Plaintiffs' damages exceed $10,000 exclusive of costs and interest.

## FIFTH CLAIM FOR RELIEF
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
**(Against All Defendants)**

104.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

105.    Plaintiffs had legally binding contracts with major news networks and publishing houses.  Defendants' actions constitute a tortious interference with contract under the laws of North Carolina and disruption of contract under the laws of Afghanistan in that Defendants' false statements, fabricated events, and wrongful conduct, caused others to violate their contracts or cancel planned contracts with Plaintiffs.

106.    As a direct and proximate result of this wrongful interference with contract, Plaintiffs have suffered, and continue to suffer, damages.  Plaintiffs' damages exceed $10,000 exclusive of costs and interest.

## SIXTH CLAIM FOR RELIEF
### CIVIL CONSPIRACY
**(Against All Defendants)**

107.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

108.    Defendants and their agents and employees, and each of them, entered into a conspiracy to engage in the wrongful conduct complained of herein, and intended to benefit both individually and jointly from their conspiratorial enterprise.  Defendants and their employees were jointly aware of the others acts, and the acts of their agents in furtherance of the conspiracy, and benefited therefrom.

109.    The purpose of the conspiracy was to intentionally interfere in the contracts between Plaintiffs and others and exercise dominion and control over property to which Defendants had no rights and deprive Plaintiffs of income derived from their *Task Force Saber Videotapes*, the *8mm VideoX al-Qaida Terrorist Training Tapes, The Hunt For Bin Laden* and *Task Force Dagger* books, thereby injuring Plaintiffs for Defendants' own profit and gain.

110.    As a direct and proximate result of Defendants' conspiracy and fraudulent misrepresentations, Plaintiffs have suffered damages in excess of $10,000 exclusive of cost and interests, plus punitive damages, under the laws of North Carolina.

## SEVENTH CLAIM FOR RELIEF
### FRAUD
**(Against Artis)**

111.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

112.    Artis entered into agreements in which he stated he would not continue his conduct and would refrain from further defamatory statements, without the intention to abide by that agreement, and repeatedly made false statements which Plaintiffs relied on to their detriment and loss.

113.    Artis knew or should have known that the statements he had relayed to Plaintiffs were false.  Artis made these statements intending for the Plaintiffs to rely upon them. Plaintiffs reasonably relied upon these statements.

114.    Artis' false representations and/or concealment of material facts, were reasonably calculated to deceive, were made with the intent to deceive, and did in fact deceive, which resulted in damage to Plaintiffs.

115.    As a direct and proximate result of Artis' fraudulent misrepresentations Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, under the laws of North Carolina.

## EIGHTH CLAIM FOR RELIEF
### UNFAIR AND DECEPTIVE TRADE PRACTICES
### (Against All Defendants)

116.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

117.    Defendants were at all times relevant to this matter, acting in and affecting commerce.  The ABC Defendants operate media businesses, and have used those businesses and their misrepresentations to wrongfully usurp and deprive Plaintiffs financial income from their intellectual property, thereby benefiting third parties, for wrongful purposes.

118.    Defendants' continued misrepresentations were unethical and/or unscrupulous and were deceptive not only because they had the tendency to deceive, but did in fact deceive. As a direct result of their actions, Defendants have damaged Plaintiffs, and are liable to Plaintiffs for those damages. These unfair and deceptive trade practices caused extensive harm to Plaintiffs by subverting and interfering with Plaintiffs' sale and licensing of their *8mm VideoX al-Qaida Terrorist Training Tapes to* broadcast agencies around the world and destroying the sales of *The Hunt for Bin Laden* and *Task Force Dagger* books.

119.    Defendants' actions constitute unfair and deceptive trade practices in violation of Chapter 75 of the North Carolina General Statutes.

120.    As a direct and proximate result of Defendants' unfair and deceptive trade practices Plaintiffs have suffered damages far in excess of $10,000 exclusive of costs and interest, and treble and/or punitive damages are especially warranted.

## NINTH CLAIM FOR RELIEF
### DEFAMATION
### (Against All Defendants)

121.    Plaintiffs repeat and incorporate by reference, as if fully set forth, the allegations herein.

122.    In their stories and statements which were re-published on internet sites around the world, Defendants (1) made false, defamatory statements about Idema; (2) repeatedly published those statements to third persons; and (3) caused injury to Plaintiff's reputation through those statements.  Further, Defendants acted knowingly and intentionally, with constitutional malice.

123.    Defendants committed libel *per se*, by continually making numerous and repeated false statements, which Defendants knew were false.  These statements accused Idema of committing infamous crimes and impeached him in his trade and profession; and subjected him to ridicule, contempt and/or disgrace, and continued false imprisonment.

124.    The ABC Defendants used their story to impeach Idema's *8mm VideoX Terrorist Training Tapes* which show al-Qaida terrorists training at a terrorist training center in Mir Bacha Kot Afghanistan.  Defendants impugned the credibility and authenticity of the *8mm VideoX Terrorist Training Tapes,* thereby subjecting them and Idema to doubt as to their credibility.

125.    As a direct and proximate result of these false statements above, made negligently and with reckless disregard for the truth, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages and presumed damages, under the laws of North Carolina.

## TENTH CLAIM FOR RELIEF
### CONVERSION
**(Against All Defendants)**

126.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

127.    Defendants used Plaintiffs' proprietary images, documents, and emails, and distributed these images to third parties for their own profit and benefit.

128.    As a direct and proximate result of the Defendants conversion of Plaintiffs original proprietary materials, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages.

## ELEVENTH CLAIM FOR RELIEF
### NEGLIGENT MISREPRESENTATION
**(Against Eric Campbell)**

129.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

130.    Campbell engaged in negligent misrepresentation for his own profit and benefit.

131.    As a direct and proximate result of Campbell's negligent misrepresentation Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages.

## TWELFTH CLAIM FOR RELIEF
### BREACH OF CONTRACT AND/OR IMPLIED CONTRACT
**(Against The ABC Defendants)**

132.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

133.    Campbell engaged in breach of contract, and, or in the alternative, breach of implied contract for his own, and the ABC's profit and benefit.

134.    As a direct and proximate result of Campbell's breach of contract, and, or in the alternative, breach of implied contract, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages.

## THIRTEENTH CLAIM FOR RELIEF
### BREACH OF CONFIDENTIALITY
**(Against Eric Campbell)**

135.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

136.    Campbell engaged in breach of confidentiality for his own, and the ABC's profit and benefit.

137.    As a direct and proximate result of Campbell's breaches of confidentiality, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages.

## FOURTEENTH CLAIM FOR RELIEF
### NEGLIGENT MISREPRESENTATION
**(Against Eric Campbell)**

138.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

139.    Campbell engaged in breach of confidentiality for his own, and the ABC's profit and benefit.

140.    As a direct and proximate result of Campbell's breaches of confidentiality, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Counter Terrorist Group and Idema pray that this Honorable Court enter judgment in their favor and against Defendants as follows:

1.    Awarding Plaintiffs damages in excess of $10,000 against Defendants pursuant to each of the claims for relief.

2.    Awarding Plaintiffs punitive damages pursuant to the seventh and eighth claims for relief.

3.    Awarding Plaintiffs treble damages, and attorneys' fees against Defendants pursuant to the eighth claim for relief.

4.    Awarding Plaintiffs special and presumed damages, corrective advertising, and attorneys' fees against Defendants pursuant to the eighth claim for relief.

5.    Entering a Temporary Restraining Order pursuant to the eighth claim for relief as set forth below until such time as a preliminary injunction can be heard and placed in effect until this case is concluded;

(a) adjudge and declare, that the ABC Defendants have contributorily and vicariously infringed Plaintiffs' exclusive rights under the contracts and agreements, and Plaintiffs' rights under North Carolina law;

(b) preliminarily and permanently enjoin, pursuant to Rule 65 (b) of the N.C. Rules of Civil Procedure, the ABC Defendants, their officers, agents, employees and those persons in active concert or participation with them, from directly, contributorily and/or vicariously violating Plaintiffs' rights under the agreements, including but not limited to, any use, exhibition, display or broadcast of Plaintiffs' video and images or from licensing or allowing any other person to do the same;

(c) preliminarily and permanently enjoin the ABC Defendants from possessing any copies of Plaintiffs' images or images;

(d) preliminarily and permanently enjoin, pursuant to Chapter 75 of the North Carolina General Statutes, the ABC Defendants, their officers, agents, servants, employees and those persons in active concert or participation with them, from engaging in one or more unfair and/or unlawful business acts or practices, including but not limited to, their possession, use, and/or display of Plaintiffs' pictures or video;

(e) require the ABC Defendants and their officers, agents, servants, employees and those persons in active concert to cease any activity that encourages others to violate Plaintiffs' exclusive property rights in their images, or that encourages or permits viewers or other news organizations to transmit or possess copies of Plaintiffs' images to other persons;

(f) require the ABC Defendants to engage in corrective advertising specifying the source, ownership, and authenticity of the *8mm VideoX al-Qaida Training Tapes* and the *Task Force Saber Videotapes*, photographs, and events related to Idema's case, and

6. Awarding Plaintiffs costs and interest against Defendants and

7. Granting a trial for all issues that are triable.

Respectfully submitted, this 6th day of March 2008,

_____
J. K. Idema, *Plaintiff*
12 Jonathan Lane
Poughkeepsie, NY 12603
Fax:      480/246-5626

_____
For Counter Terrorist Group US, *Plaintiff*
PO Box 691, Fayetteville, NC 28302

____/s/_____
Vijayant Pawar (VP-7642)
*Counsel for Counter Terrorist Group US*
Law Offices of VIJAYANT PAWAR
35 Airport Road, Suite 330
Morristown, New Jersey 07960
Phone: (973) 267-4800
Fax:    (973) 215-2882
www.pawarlaw.com
Email: vpawar@pawarlaw.com

_____
John Edwards Tiffany, Attorney (JT-7322)
*Lead Counsel for Counter Terrorist Group US*
Law Offices of John E. Tiffany P.C.
The Robert Treat Center
50 Park Place, 10th Floor,
Newark, New Jersey 07102
Tel:  (973) 242-3700
Fax: (973) 242-3799
www.JohnTiffanyLaw.com
Email: Jet@Jet4Law.com