UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

COUNTER TERRORIST GROUP US,  :
COUNTERR GROUP, and J. K. IDEMA,  :
                                  :        08 Civ 2356 (DAB)
            Plaintiffs,           :
                                  :
        - against -               :        **AFFIDAVIT OF**
                                  :        **EDWARD J. DAVIS**
AUSTRALIAN BROADCASTING CORP.;    :
a/k/a ABC AUSTRALIA; ABC          :
CORPORATIONS 1-100; LIZ JACKSON;  :
ERIC CAMPBELL; JOSEPH A. CAFASSO; :
EDWARD A. ARTIS; KNIGHTSBRIDGE    :
INTERNATIONAL, INC.; KNIGHTSBRIDGE :
INTERNATIONAL HUMANITARIAN        :
RELIEF AND HUMAN IMPROVEMENT      :
PROGRAMS, INC.; ROBERT C. MORRIS; :
PARTNERS INTERNATIONAL            :
FOUNDATION; WILLIAM JOHN HAGLER,  :
Both Individually and Severally, and DOES 1 :
through 7, inclusive,             :
                                  :
            Defendants.           :

------------------------------------------------------- x

STATE OF NEW YORK      )
                       )  ss.:
COUNTY OF NEW YORK  )

    EDWARD J. DAVIS, being duly sworn, deposes and says:

    1.    I am a member of the firm Davis Wright Tremaine LLP, counsel for defendants

the Australian Broadcasting Corporation (the "ABC") and Liz Jackson in the above-captioned

action.

    2.    I submit this affidavit to provide certain background information in support of

their motion to dismiss the complaint on the grounds of lack of subject-matter jurisdiction and/or

*forum non conveniens.*

### The Complaint

    3.    A copy of the complaint in this action is annexed hereto as Exhibit A.

4.      The complaint asserts fourteen claims against the ABC and two of its journalists, Liz Jackson and Eric Campbell (the "ABC Defendants"), and seven unrelated parties that allegedly were sources for the ABC news story at issue in this action (the "Source Defendants"). It charges that defendants have conspired to interfere with the successful exploitation of certain videotapes and photographs of alleged terrorist and counter-terrorist activities in Afghanistan and have damaged plaintiffs' reputation by spreading false rumors about the authenticity of the tapes and about plaintiff J. K. Idema ("Idema"). Idema says he acquired the videotapes (the "Terrorist Training Tapes"), purportedly showing Al Qaeda training exercises, in Afghanistan while helping the Northern Alliance rout the Taliban after September 11, 2001. The still photographs (the "Torture Photos") were taken of suspected terrorists who were held and interrogated by Idema in a private house he maintained in Kabul in 2004. Comp.¶¶ 3, 6, 35.

5.      Several judicial decisions and other documents filed in previous litigations brought by plaintiffs are relevant to the question of jurisdiction over their claims in this action and the suitability of New York as a forum for this dispute.

### The Citizenship of Plaintiffs

6.      The complaint alleges that plaintiffs Counter Terrorist Group US and Counterr Group are "North Carolina companies" and that plaintiff Idema is a New York resident (Comp. ¶¶ 7, 8), and it provides an address for Idema in Poughkeepsie, New York. However, it does not appear that Idema actually resides in New York or even in the United States at this time.

7.      Idema appears to have resided primarily in Afghanistan for the past 7 ½ years. According to the complaint, he worked with United Front Military Forces (a/k/a/ the Northern Alliance) in Afghanistan in 2001-2002 and then returned to Afghanistan by April 2004 as the head of a counter-terrorist task force (Comp. ¶¶24, 49). Mr. Idema is a former soldier in the U.S. Army, but evidently is not currently a member of any branch of the U.S. armed services. He

remained in Afghanistan for the next three years because he was arrested by Afghan government authorities on July 5, 2004 (Comp. ¶ 51) and "convicted of running a private prison, illegally arresting and torturing suspected terrorists" in Kabul, and sentenced to ten years in prison. *Id.*; a copy of relevant portions of a Verified Petition for Writ of Habeas Corpus filed in this Court by Idema on March 17, 2005, acknowledging his conviction on those charges, is annexed hereto as Exhibit B. Idema remained in prison in Afghanistan until he was released in June 2007. *See* "Afghans free US 'bounty hunter'", BBC News, June 13, 2007. A copy of the article is annexed hereto as Exhibit C.

8.    Since his release last year, Idema appears to have returned to Kabul to live and work. On April 29, 2008 – only weeks after he filed this action alleging that he resides in New York – Idema submitted a letter to the Trial Court Administrator of Cumberland County, North Carolina in another action, on letterhead printed in English and Arabic indicating that Idema is "Licensed to Practice Law" in several Afghan courts and providing a telephone number for him in Kabul, a "US Address" for him at a post-office box in Fayetteville, North Carolina, and a "US Phone" number for him with a North Carolina area code. His letterhead does not provide any contact information for Idema in New York. A copy of the letter is annexed hereto as Exhibit D.

9.    We have searched but found no evidence that Idema actually resides in New York. The address he has used in Poughkeepsie appears to be owned by relatives. A copy of the most recent deed for the property at 12 Jonathan Lane, Poughkeepsie, New York, filed in the Dutchess County Clerk's Office, is annexed hereto as Exhibit E.

10.    Recent filings Idema has made in several courts show that he has provided various addresses in North Carolina, Virginia and Afghanistan. Documents filed in the Superior Court Division, Cumberland County, North Carolina, give addresses for Idema in Afghanistan

and New York, including the same address in Poughkeepsie that he has used in this action. Idema evidently represents himself in that case, as he does here, but documents he has filed contain instructions directing mail for him to be sent to a lawyer for another plaintiff in the case, at an address in Newark, New Jersey, instead of Idema's purported address in New York. Copies of two such documents and a third document filed by another party, with a certificate of service showing an address for Idema in Kabul, are annexed hereto as Exhibit F.

11.     In another action before this Court, *CBS Broadcasting Inc. v. Counter Group and J.K. Idema*, No. 05 CV 7946 (S.D.N.Y) (DAB), Idema provided yet another address – in Dulles, Virginia – in the signature block below his name on his answer, but he provided a telephone number in Afghanistan and a fax number in North Carolina on the same document.  His verification attached to the answer indicates that it was executed in Pulacharke, Afghanistan (where he was presumably in prison), but it provides an address for him in Fayetteville, North Carolina (the same post-office box listed on his current Afghan letterhead).  A copy of relevant excerpts of the answer and the verification is annexed hereto as Exhibit G.

### Prior Litigations

12.     Idema has sued many media organizations before, often advancing multiple overlapping claims for business torts, breach of contract, defamation, conspiracy and other wrongs, as he has done here.  He has also in the past sued many of the same non-media defendants that are named in this action, alleging that they have conspired to discredit him, prevent him from realizing the full value of the tapes and photos he has, keep him in prison and ruin him financially, as he also claims here.  (Comp. ¶¶ 3, 4, 29, 44, 47, 48, 51, 57, 75)

13.     For example, Idema sued the Fox News Network after it terminated a relationship with him as a commentator on the war in Afghanistan.  He alleged that Fox stole and broadcast

the Terrorist Training Tapes, breached contracts with him, conspired with his enemies (five of the Source Defendants named here) to deprive him of resources, and damaged the value of the Tapes.  His claims were voluntarily dismissed after Fox made a motion to strike the complaint, and Fox was awarded costs and fees under California's statute barring SLAPP suits.  *Idema v. Fox News Network LLC*, No. BC 296228, (Los Angeles Super. Ct. Feb. 6, 2004), *appeal dism'd*, No. B175323 (Cal. Ct. App. Jan. 28, 2005) (Exhibit H).

14.    Idema has sued *New York Magazine*, alleging many of the same claims, pleaded in many of the same words (and same sentences and paragraphs) as the complaint in this action, and naming two of the same Source Defendants sued in this action as defendants in that case, based upon the same allegations of a conspiracy among journalists and Idema's enemies to thwart his enterprise.  The case is pending before this Court.  *Counter Terrorist Group US v. New York Magazine,* 07 Civ. 9516 (S.D.N.Y) (DAB).  A copy of the complaint is annexed hereto as Exhibit I.

15.    Some of the other media organizations Idema has sued include CBS News, the Associated Press, *Columbia Journalism Review,* the *Poughkeepsie Journal,* Gannett Newspapers, *Maxim* and *Stuff.*

### The Source Defendants

16.    The seven defendants named in this action in addition to the ABC Defendants are individuals and organizations against whom Idema has been waging battles in the courts and/or the media for many years: Joseph A. Cafasso ("Cafasso"), Edward A. Artis ("Artis"), Knightsbridge International, Inc. ("Knightsbridge Int'l"), Knightsbridge International Humanitarian Relief and Human Improvement Programs, Inc. ("Knightsbridge Int'l H.R.H.I.P."), Robert C. Morris ("Morris"), Partners International Foundation ("Partners") and William John Hagler ("Hagler").

17.    As of May 20, 2008, no return of service has been filed for any of these "Source Defendants" in this action.  On information and belief, none of the Source Defendants has been served.

18.    All but two of the Source Defendants, however, have been sued by Idema before. The suits have made essentially the same allegations made here – not only that Source Defendants supplied false information to the media, but that they conspired with the media to damage Idema personally and commercially in the exploitation of the Terrorist Training Tapes and other materials.

19.    In his lawsuit against Fox News, Idema named Cafasso, Artis, Morris, Knightsbridge Int'l H.R.H.I.P. and Partners as co-defendants and accused them of conspiring to destroy the value of the Terrorist Training Tapes by spreading false information about them and about Idema.   He asserted claims for tortious interference with contract, interference with prospective economic advantage and unfair business practices.  After Idema's claims against Fox News were dismissed, he pursued the claims against the other defendants, but court records indicate that two were awarded monetary discovery sanctions against him, and all the claims were ultimately voluntarily dismissed. *Idema v. Fox News Network LLC*, No. BC296228 (Los Angeles Super. Ct. July 18, 2005).  Copies of Idema's amended complaint, an order confirming the imposition of discovery sanctions, and an order of dismissal and notices of dismissal of the claims against each of the Source Defendants Idema sued there are annexed hereto together as Exhibit J.

20.    In his suit against *New York Magazine*, Idema and his co-plaintiffs in this action haves similarly named Cafasso and Artis as co-defendants.   They have again alleged a conspiracy to deprive Idema of the fruits of his activities in Afghanistan, asserting claims for

tortious interference, fraud, unfair business practices, defamation and many other of the same claims asserted in the complaint in this case. *See* Exhibit I.

21.    The only defendants here not previously sued as alleged co-conspirators with media defendants by Idema, as far as the ABC Defendants can determine, are Hagler and Knightsbridge International, but the complaint identifies Knightsbridge Int'l as an affiliate, operating unit, predecessor or successor to defendant Knightsbridge Int'l H.R.H.I.P. (Comp. ¶¶ 17, 18), which Idema has sued before. *See* Exhibits H, J.

### The *Media Watch* Program

22.    The Declaration of Robert Simpson, Director Legal and General Counsel of the ABC, submitted herewith, identifies a video recording relevant to the present motion. Mr. Simpson has forwarded a copy of that recording to me for submission to the Court.

23.    Annexed hereto as Exhibit K is a copy of a video recording of the "Jack of All Trades" story broadcast by the ABC on its *Media Watch* program on March 7, 2005.

24.    The "*Jack of All Trades*" story is not available on the *Media Watch* web page. However, a transcript of the story is available, at the following web address: http://www.abc.net.au/mediawatch/transcripts/s1317953.htm.    A copy of the transcript is annexed hereto as Exhibit L.

25.    Copies of the Torture Photos are available at the same web address, accessed by clicking on tabs to the right of the transcript itself.  Copies of the Torture Photos are annexed hereto as Exhibit M.

_____
Edward J. Davis

Sworn to before me this
20ᵗʰ day of May, 2008

Notary Public

AMALIA M. KAPITANELIS
Notary Public, State of New York
No. 01KA4621757
Qualified in New York County
Term Expires September 7, 2010

Exhibit A

## UNITED STATES DISTRICT COURT
### For The Southern District Of New York

| | |
|---|---|
| COUNTER TERRORIST GROUP US, COUNTERR GROUP, *and* J. K. IDEMA, *Plaintiffs,* <br><br> v. <br><br> AUSTRALIAN BROADCASTING CORP.; *aka* ABC AUSTRALIA; ABC CORPORATIONS 1-100; LIZ JACKSON; ERIC CAMPBELL; JOSEPH A. CAFASSO; EDWARD A. ARTIS; KNIGHTSBRIDGE INTERNATIONAL, Inc.; KNIGHTSBRIDGE INTERNATIONAL HUMANITARIAN RELIEF AND HUMAN IMPROVEMENT PROGRAMS, INC.; ROBERT C. MORRIS; PARTNERS INTERNATIONAL FOUNDATION; WILLIAM JOHN HAGLER, Both Individually and Severally, and DOES 1 through 7, inclusive, *Defendants.* | **COMPLAINT** <br><br> **(Jury Trial Demanded)** <br> **Injunctive Relief Requested** <br><br> Case # 08 CV _____ <br><br> 08 CV 2356 <br> Assigned Judge: _____ <br><br> MAR 0 8 2008 <br> U.S.D.C. S.D.N.Y. CASHIERS |

**NOW COME,** Plaintiffs, and allege and say the following concerning Defendants, and each of them:

### JURISDICTION

1.     This is an action for copyright infringement, contributory copyright infringement, and vicarious liability for Copyright Infringement, arising under the Copyright Acts of 1909 and 1976, 17 U.S.C. §§ 101 *et seq.*, and includes various state law claims. This Court has subject matter jurisdiction over these federal question claims pursuant to 28 U.S.C. §§ 1331 and 1338(a) & (b). This complaint also alleges violations of New York, and North Carolina law to include; Breach of Contract, Theft, Civil Conspiracy, Fraud, Conversion, Breach of Implied Contract, Breach of Confidence, Tortuous Interference with Economic Prospective, Interference with Contractual Relations, Interference with Prospective Economic Advantage, Negligent Misrepresentation, Unfair and Deceptive Trade Practices, Defamation,

and includes a claim for declaratory relief. This Court has jurisdiction over these state law claims pursuant to its supplemental jurisdiction, 28 U.S.C. § 1367(a), and has jurisdiction over declaratory relief claims pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

## VENUE

2.    Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(a) because the copyright infringement, contributory copyright infringement, and many of the other wrongful acts that give rise to these claims occurred in this district. In addition, Defendants regularly transact business here, the infringing photographs were distributed here, and the infringing network, the Australian Broadcasting Corporation, has extensive commercial activities in this state and their American headquarters is within this district. Additionally, this Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332.

## CASE OVERVIEW

3.    This case is primarily about the theft of the most valuable commodity in the news and media industries— images. This is about the theft of images which were the protected property of Plaintiffs. Those protected images were actually stolen and then published with the full knowledge of their copyright infringement by Defendants. This case demonstrates how theft has become a way of doing business by the media. Steal now, pay later. If you get caught, if the plaintiff can afford a lawyer, and if your victim is still breathing or in business... then consider paying. This *modus operandi* by the industry not only deprives copyright owners of profits, but also deprives them of credits and future work and sales. In this case, Defendants went far beyond the mere copying and distribution of protected images. These Defendants accused other images and video belonging to Plaintiffs of being faked and fabricated, and engaged in a carefully planned and orchestrated conspiratorial enterprise designed to defame Plaintiffs, cause Idema to remain illegally imprisoned in Afghanistan, sway public support by publishing a fictional narrative of events that would cause him to be abandoned by business associates, friends, and relatives, and destroy him financially. That specific purpose; Plaintiffs' financial destruction, was paramount in Defendants' conspiracy. It was consummated through a vicious and false broadcast and online story titled "*Jack of All Trades?*" The March 7, 2005 presentation called itself "a cautionary tale" of a "conman."

4.     Further, between 2001 and the present day, the individual Defendants engaged in an ongoing pattern of disingenuous subterfuge, defamation, conspiracy, interference with business relations, and copyright infringement, culminating in this case, with the Australian Broadcasting Network story which aired on March 7, 2005, repeated at least six more times, and was permanently placed online. Defendants intentionally and knowingly made, and caused to be republished by third parties, statements which were patently false and/or misleading, in bad faith, and designed to interfere with Plaintiffs' prospective economic advantage. They have also distributed protected images which were the rightful property of Plaintiffs.

5.     Upon information and belief, each of the Defendants was empowered to act as the agent, servant, employee and/or co-conspirator of each of the other Defendants, and that the acts alleged herein to have been done by Defendants were authorized, approved and/or ratified and/or known by each of the other Defendants. To this end, Defendants engaged in a conspiratorial enterprise, which spanned multiple countries, and a dozen states. They illegally intercepted private emails, stole documents, forged documents and evidence, fabricated events, stalked persons helping Idema, broke into cars and computer programs, and knowingly orchestrated the financial demise of Plaintiffs.

6.     The pinnacle of Defendants' conspiratorial enterprise was *"Jack of All Trades?"* and was so bold in their copyright infringement that the story actually stated:

> "Media Watch has obtained photos of what Idema was up to."

> "We've been told he's the one who scrawled across them, NOT FOR RELEASE — at least, it appears, not until you pay."

One of the photos on the ABC website actually acknowledged Plaintiffs' ownership of the photo in the caption:

> "<u>Not for release 1</u> Idema photo of a bound and masked man being retained by US soldiers"

It was a vicious and false story which used false documents, stolen documents, and pictures stolen from Plaintiffs as the source of its credibility causing permanent and irreparable harm which cannot be overstated. The problem was that the story was based on lies— it was, quite simply, fantasy from the twisted minds of Liz Jackson's sources.

## PARTIES

7.      Plaintiffs, Counter Terrorist Group US (hereafter "CTG" or Counterr Group) and Counterr Group are North Carolina companies engaged in the support of US counter-terrorist initiatives, located in Cumberland County, NC.

8.      Plaintiff J. K. Idema is United States citizen formerly employed by the Counter-Terrorist Group, residing in New York.

9.      Defendant **AUSTRALIAN BROADCASTING CORPORATION, aka ABC AUSTRALIA,** is an Australian television broadcast company and online news agency.

10.     Defendant **ABC CORPORATIONS 1-100** are divisions, subsidiaries, holding companies, or affiliates of the Australian Broadcasting Corporation whose exact identities are unknown at this time.

11.     The Australian Broadcast Corporation Defendants' American offices are located at 747 Third Avenue, Suite 8C, New York, New York 10017.  Defendant Australian Broadcasting Corporation, ABC Australia, and Defendants ABC Corporations 1-100 are collectively referred to hereafter as "the ABC."  The ABC, is not affiliated with, owned by, or related to American Broadcasting Corporation, the American ABC network, nor is the American Broadcasting Corporation involved in anyway in this case.

12.     **LIZ JACKSON** is alleged to be the author of the defamatory and infringing story aired on March 7, 2005, and published online thereafter and still available online.  She is believed to be a resident of Australia.  Her debut as the host of the Australian Broadcast Corporation's Media Watch was the infringing story "Jack of All Trades?"

13.     **ERIC CAMPBELL,** is a journalist employed by the ABC as a television and radio correspondent.  He is also the author of a book about Afghanistan and in large part about Idema, which was not only defamatory and in many cases completely false and/or fabricated, but also violated prior confidentiality agreements and implied contracts with Idema.

14.     The Australian Broadcasting Corporation, ABC Australia, ABC Corporations 1-100, Liz Jackson, and Eric Campbell Defendants are collectively referred to hereafter as the "ABC Defendants."

15.     **JOSEPH A. CAFASSO,** is a source of the defamatory and infringing story and article published by ABC.  Cafasso has stalked Idema for years and engaged in a relentless

smear campaign designed to destroy Plaintiffs reputations and income. Cafasso was last known to be a resident of Carteret, New Jersey.

16.    **EDWARD A. ARTIS,** is a source of the defamatory and infringing story and article published by ABC. Artis has engaged in a long-running relentless smear campaign designed to destroy Plaintiffs reputations and income. He is believed to be a resident of the Philippines. Artis and Cafasso were primary co-conspirators in the copyright infringement and contributed by assisting ABC with illegally obtaining the images.

17.    **KNIGHTSBRIDGE INTERNATIONAL, Inc.,** according it its website "is a California 501(c), (3), Non-Membership, Not for Profit Corporation (state and federal tax exempt # 95-4546892), dedicated to providing humanitarian assistance and disaster relief worldwide without regard to race, religion or national origin. Founded in August 1995 by several members of a self-styled US Priory of the Knights of Malta and OSMTH TEMPLAR Knights for the specific purpose of providing an independent vehicle through which focused international and domestic humanitarian assistance and medical relief programs could be organized."

18.    **KNIGHTSBRIDGE INTERNATIONAL HUMANITARIAN RELIEF AND HUMAN IMPROVEMENT PROGRAMS, INC.,** aka **KNIGHTSBRIDGE INTL HUMANITARIAN & HUMAN IMPROVEMENT PROGRAMS INC** is a company affiliated with or which operates or is the predecessor or successor of Knightsbridge International, Inc. All of the Knightsbridge Defendants, including the individual Defendants working for Knightsbridge, are collectively referred to hereafter as "Knightsbridge."

19.    **ROBERT C. MORRIS, Jr.,** is a source of the defamatory and infringing story and article published by ABC. His websites states that "[h]e is a frequent speaker and writer on human rights and international relief operations." Upon information and belief, Morris exercises leadership in the conspiratorial enterprise described herein. He is a resident of Connecticut with an address of 41 Cedar Hill Rd, Newtown, CT 06470.

20.    **PARTNERS INTERNATIONAL FOUNDATION,** also known as "PIF," is Morris' non-profit humanitarian organization working in the United States and the world supposedly to provide disaster relief and other support. Claiming assets of $7,526,420 in 2003, Partners International is also located at 41 Cedar Hill Rd, Newtown, CT 06470.

21.    **WILLIAM JOHN HAGLER** is a co-conspirator and another source of the defamatory and infringing story and article published by ABC, who upon information and belief, among other wrongful acts, provided ABC with a variety of information he stole from Plaintiffs' offices and documents he either fabricated or assisted his co-conspirators with the fabrication of. Hagler is believed to be a resident of Fayetteville, North Carolina.

22.    **JOHN DOES 1-7,** are persons yet unknown whose identities are believed will be determined during the course of discovery. Plaintiffs do not know the true names and capacities of those Defendants sued herein as DOES 1 through 7, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when such are ascertained. Plaintiffs are informed and believe, and on that basis allege, that each of the Defendants sued herein as DOES 1 through 7, inclusive, is in some manner legally responsible for one or more of the wrongful acts set forth herein.

## BACKGROUND FACTS

23.    In the 1980's Idema and Counterr Group assisted the United Front Military Forces (hereinafter the "UFMF"), often referred to improperly as the "Northern Alliance" by the press, in their struggle against the Soviets. In 2001-2002, Idema was a military advisor to Commander Ahmad Shah Massoud's UFMF.

24.    Shortly after Massoud's assassination on September 9, 2001, and the subsequent September 11 attacks, Idema joined with the UFMF (*aka* Northern Alliance) in Northern Afghanistan and remained with their forces until June 2002, upon which time he returned to the United States. He continued working with the UFMF and the transitional Afghan Ministry of Defence (MOD) in an advisory capacity.

## RELEVANT FACTS

25.    On March 7, 2005, Liz Jackson made her debut as host of ABS's Media Watch program, selecting as her debut program the infringing, defamatory, and patently false story—"*Jack of All Trades?*" In her story, Jackson used stolen copyright protected images belonging to Plaintiffs, forged documents, fabricated documents, highly questionable sources (several of which were using false identities and fictitious credentials), stolen and altered emails. Contrary to her claims of impartiality, Jackson refused to allow Idema to contradict false statements made by Jackson's "sources."

26.    Jackson's debut as the host of ABC's Media Watch and her vicious attacks on Jack Idema were met by varying opinions from viewers, some of which appear on a forum dedicated to the show, as follows:

One Viewer wrote in:

"Liz Jackson's debut as media watch host was far from impressive. She began by claiming that change of genitals on the seat after 15 years was important, delivered in a terribly awkward and fidgeting performance. The director did try to cut her figeting (sic) hands out of the rest of the episode, to little effect ... The episode itself was supposedly a startling revelation about Jack Idema. She threw Eric Campbell, a well known ABC tabloid hack, to the wolves in some sort of token attempt at non-biased credibility. Sorry never respected anything Eric Campbell said, nor ever heard of Jack Idema, nor ever seen any footage concerning him."

Another Viewer wrote

"Her opening story was disjointed, hard to follow, went on too long - and I still can't work out what the hell she was on about, what the whole point of the story was. OK, so Jack whatever might be a bullshit artist and conman, but all the evidence she offered about his connections and involvement in Asia and the Middle East was just other peoples opinions - who says they are the ones that are right??? She certainly didn't offer any evidence his videos were staged/forged/whatever."

In response to that another Viewer wrote:

"OK, so Jack whatever might be a bullshit artist and conman, but all the evidence she offered about his connections and involvement in Asia and the Middle East was just other peoples opinions - who says they are the ones that are right??? She certainly didn't offer any evidence his videos were staged/forged/whatever.

There was no definitive evidence either way, so there could be no resolution."

Peter Ballard wrote:

"Exactly. If the videos weren't forged (and there was no direct evidence that they were), then what did Campbell do wrong? It's not Campbell's

fault that some American talk host in a cowboy hat beats up Jack's credentials."

(*see*: http://phorums.com.au/archive/index.php/t-99949.html)

27.    After the online publication of the ABC story Idema called Liz Jackson at ABC and told her the photographs were stolen and being illegally used. He also told Jackson that some of documents they were using were false and fabricated, and others were confidential communications which had been stolen by the other individual Defendants. Idema requested that this conduct cease and that the photos and his videotapes be returned. Jackson, who was quite surprised Idema could make a call from an Afghan prison, stated to Idema, "well, if you get out of prison alive in ten or twenty years, then you can go ahead and sue me," or words to that effect, then laughed. Idema informed Jackson that if they did not remove the photos and the documents and make a retraction of the false statements, he would indeed sue her.

28.    Upon information and belief, the ABC Defendants have continued to publish and distribute those pictures and other images to third parties in further violation of contracts, breach of confidentiality agreements, and in breach of confidence.

29.    Upon information and belief, many of these photographs and documents were obtained from Artis, Cafasso, and/or Morris, the three of which, along with their two "humanitarian aid organizations"— Knightsbridge and Partners International— engaged in an continuing conspiratorial enterprise, the purpose of which was to humiliate and financially destroy Plaintiffs.

### DEFENDANTS' INTENTIONAL AND NEGLIGENT VIOLATIONS OF THE COPYRIGHTS

30.    First, Defendants had actual knowledge that Plaintiffs' photos were being licensed through Polaris Images in New York—a professional international licensing agency for images. ABC had even entered into agreements to refer requests for images to Getty Images originally, and then to Polaris Images, which they violated.

31.    Second, Defendants made a conscious and knowing decision to forgo proper licensing and simply steal the images.

32.    Third, Defendants intentionally and knowingly concealed the source of the photos to conceal their theft.

33.    Fourth, Defendants had a responsibility to properly license the images, to know copyright law, and to correctly report the facts and refrain from the intentional copyright violations which these Defendants and their co-conspirators engaged in and continue.

34.    Fifth, ABC has refused to remove the infringing photographs from their website, making them constantly available for almost three years, where they have been accessed by other parties and re-used over and over, thereby destroying their value.

### SPECIFIC COPYRIGHTED IMAGES – WRONGFUL USE

35.    Some of the known wrongful uses of specific images by Defendants are:

35.1.    **US Copyright Registration # VAu754-933 (registered on June 15, 2005), titled "TF-180 Turnover to Bagram MPs."** Identified by Australian Broadcasting Corporation in their story as **"Not for release 1 Idema photo of a bound and masked man being retained by US soldiers."** This photograph of the Combined Joint Special Operations Task Force (CJSOTF) taking custody of a high-ranking terrorist was published in violation of copyright law because Idema created the photo.

35.2.    **US Copyright Registration # VAu755-447 (registered on June 15, 2005), titled "TASK FORCE SABER 7 Interrogation Photo – May 2004,"** and alternatively titled "EPW2748 Monk Interrogation Photo – May 2004." Identified by Australian Broadcasting Corporation in their story as **"Not for release 2 A photo of Idema filming his alleged interrogation of an Iraqi 'terrorist'"** this photograph of the interrogation of an EPW[1] high-ranking *al-Qaida* linked Taliban terrorist was published in violation of copyright law as it is Plaintiffs' photo.

35.3.    **US Copyright Registration # VAu755-440 (registered on June 15, 2005), titled "TASK FORCE SABER 7 With EPW MONK,"** and alternatively titled "EPW2766 Surgery Photo – May 2004." Identified by Australian Broadcasting Corporation in their story as **"Not for release 3 A photo of Idema tending to an alleged terrorist,"** this photograph of the interrogation of an EPW high-ranking *al-Qaida* linked Taliban terrorist undergoing medical treatment was published in violation of copyright law as it is Plaintiffs' photo.

---

[1] EPW- *Enemy Prisoner of War*

36.     Upon information and belief, Defendants obtained these photographs from a confidential email, and not only violated Plaintiffs' copyright by publishing them, but also, upon information and belief, intercepted private and confidential correspondence, thereby violating a right to privacy and electronic communication laws.  The ABC did not seek a license or permission to publish the photographs, nor was a license or permission obtained from Plaintiffs.  The ABC Defendants published the photos and ignored all rights and privileges.  This was an intentional and knowing violation of law.

37.     Defendants' copyright violations and the criminal liability derived from the interception of electronic communications (including their civil liability for violations of privacy) were knowing and planned acts of which Defendants were fully aware of the wrongful and illegal nature of those acts.

## ABC's Intentionally False Reporting

38.     The ABC Defendants exercised property rights and ownership in violation of law relying on the hope that if Idema remained in an Afghan prison for twenty years he would be unable to engage in legal recourse against these Defendants.

39.     To this end, the ABC Defendants intentionally misreported the facts of stories and used questionable sources which they knew, and/or should have known, were providing false information.

40.     The ABC Defendants knowingly and negligently republished false statements with a reckless disregard for the truth and used Plaintiffs' stolen images to increase the distribution of those false statements and aid their fraud.  The stolen images gave the impression that the ABC Defendants had exclusive, special access, and insider knowledge of the story.  By illegally using those images the ABC Defendants were able to make their story appear as though it was credible and true.

41.     The purpose of this false reporting was, among other things, to assert permanent dominion and control over a variety of images, including Plaintiffs' *8mm VideoX al-Qaida Terrorist Training Tapes,* by perpetuating the false version of the Idema story, which the ABC Defendants and their co-conspirators could thereby profit from.

42.    What was particularly egregious, was that while the ABC Defendants were profiting from their distribution of Plaintiffs' images, at the same time Jackson was intentionally omitting the exculpatory nature of other images from her story and continuing to propagate the vicious myths that Idema *8mm VideoX al-Qaida Terrorist Training Tapes* were fake and fabricated by him and that he had been thrown out of the US Army Special Forces.

43.    By continuing to disseminate what at least four Afghan high court and appeals court judges later called "propaganda" and "lies," Jackson and her co-conspirators were able to wrongfully use Plaintiffs' images and documents without fear of reprisal believing that Idema would be imprisoned for many years, and certainly longer than the statute allowed for filing of civil actions in U.S. courts.

44.    To this end, Liz Jackson, and others, both known and unknown, knowingly joined in a conspiratorial enterprise with sources that were questionable at best for the purpose of destroying Idema's reputation and income by continuing a false story so shocking, and so vicious, that it had encircled the globe in one of the largest and far-reaching stories related to the War on Terror in 2004, and which, although completely false, helped alter foreign policy and the Pentagon's strategic plan against terrorism in Afghanistan. The false accusations against Idema and his men were, upon information and belief, a carefully engineered propaganda campaign covertly orchestrated by these Defendants, and others, which ultimately caused the death of innocent people from terror attacks which could have been stopped. Jackson made these false statements without exercising due diligence to report events in a foreign country and which are unprotected by any Fair Reporting Privilege.

45.    This conspiratorial enterprise is further addressed herein, and was responsible for countless false articles throughout the world, which— like *Jack of All Trades?* remain online[2] — and continue to be republished[3] to this day.

---

[2] http://www.abc.net.au/mediawatch/transcripts/s1317953.htm

[3] *i.e.:* http://www.militaryphotos.net/forums/showthread.php?t=37521;
www.privateforces.com/index2.php?option=com_docman&task=doc_view&gid=49&Itemid=4
http://www.sourcewatch.org/index.php?title=Jonathan_Keith_Idema

**RECKLESS DISREGARD FOR THE TRUTH & INTERFERENCE WITH ECONOMIC PROSPECTIVE**

46.    In December 2001, Idema obtained what are known worldwide as the *8mm VideoX al-Qaida Terrorist Training Tapes*. These tapes show *al-Qaida* terrorists training in terrorist techniques and training to attack western targets. They have been licensed to networks around the world and generated substantial licensing fees from CBS, NBC, ABC,[4] Newsweek, Time, US News & World Report, and many other broadcast and print news agencies throughout the world. The tapes and all other images belonging to Plaintiffs are represented by Polaris Images, a professional worldwide photo agency which provides licenses for networks and magazines wishing to use the videos or photographs. These licensing fees helped support a variety of anti-terrorist and humanitarian aid projects.

47.    In March 2003, the New York Times bestselling book, *The Hunt for Bin Laden* was released to rave reviews and much media attention. Within days of publication the book was number four on the New York Times bestseller list. A second book, *Task Force Dagger* was released in England in August 2003. Jack Idema is the copyright holder (US Copyright Office, 2003, Registration Number: TX0005860241). Immediately after the release of the book, Artis, Cafasso, and others acting as part of their newly formed conspiratorial enterprise began littering the internet with posts about the book being fictional. To do this, Artis, Cafasso, and their co-conspirators, used countless fake email addresses and names to post and repost their slanderous statements and false accusations on numerous websites, such as Amazon.com and BarnesandNoble.com. Through this anonymous slander campaign, Cafasso, Artis, and others, such as Tracy Paul-Warrington and Robert Morris, were able to destroy the sales of book and drive it into the ground.

48.    At the same time, as unbelievable as it may sound, these Defendants rewrote *The Hunt For bin Laden* themselves, changing the story to portray themselves as the heroes of the 2001-2002 war. In the new version, Jackson's sources, and their friends and relatives (such as the "Flag Girl") were prominently portrayed as integral in the post 9/11 war, and liberation of Afghanistan, even though Morris, Cafasso, Warrington, and the others had never been to

---

[4] Referring to the American Broadcasting Corporation – completely unrelated to Australian Broadcasting Corporation.

Afghanistan, and Artis had only been there a few weeks. This was an illegal derivative work. They also continued their campaign, now greatly increased, to destroy the credibility of the *8mm VideoX al-Qaida Terrorist Training Tapes* by alleging Idema faked and fabricated them.

49.    In April 2004, Idema's counter-terrorist team, known as Task Force Saber, then Task Force 7, and later TF Saber 7, was back in Afghanistan working closely with U.S. and Afghan military and intelligence activities. All of Idema's actual team members were officially employed by the Ministry of Defense or Afghan CIA.

50.    In June 2004, Idema and his team had captured the brother-in-law of bin Laden's chief of security and the terrorists responsible for the murder of Canadian ISAF Corporal Jamie Brendan Murphy. Corporal Murphy had been murdered in a bombing on Darlaman Road in Kabul on January 27, 2004. Idema's team also interdicted the planned assassination of key "Northern Alliance" leaders and stopped a gas tanker suicide attack on US soldiers at Bagram Airbase in Afghanistan.

51.    On July 5, 2004, anti-UFMF / Karzai government forces captured Idema during his anti-terrorist operations on behalf of the United Front Military Forces and other official governmental agencies. Idema was sentenced to ten years in prison by a Taliban judge. During the trials and appeals, Artis, Cafasso, Morris, Warrington, and others, continued their slander campaign claiming Idema's *8mm VideoX al-Qaida Terrorist Training Tapes* were fake and fabricated. The result was that all licensing income from these videotapes ceased. The ABC Defendants republished these false statements in various forms, as more particularly set forth hereafter.

52.    On March 7, 2005, Liz Jackson and ABC aired their story— "Jack of All Trades?" which infringed Plaintiffs' photographs and contained defamatory statements. The ABC Defendants had a duty to disclose the exculpatory information they withheld and to include this information in their story about Plaintiffs.

53.    Prior to the story airing, the ABC Defendants possessed substantial, if not overwhelming, information disproving these false allegations and directly refuting the charges against Idema in the Afghan Taliban controlled court. In spite of that, they intentionally and knowingly withheld this information from their reporting which would have aided Idema and his men who had been falsely accused of horrific crimes.

54.    The ABC Defendants published false, and in many cases completely fabricated fictional statements about Idema and the *8mm VideoX al-Qaida Terrorist Training Tapes* negligently and with a reckless disregard for the truth.

55.    By falsely reporting the events the ABC Defendants, and their co-conspirator sources stood to profit immensely. As an example, with Idema in prison for ten years, ABC would be able to have unlimited use of the *8mm VideoX al-Qaida Terrorist Training Tapes* in violation of prior agreements between Idema and the ABC.

56.    The ABC Defendants "added value" to the Idema story with an angle of a fraudster con man, who had faked the *8mm VideoX al-Qaida Terrorist Training Tapes* for profit and prestige, was relentless self-promoter and media hound, who fabricated events about the 2001-2002 war in Afghanistan.

57.    These false claims by the ABC Defendants, Edward Artis, Joseph Cafasso, and other co-conspirators, both known and unknown, have caused serious and devastating financial lost to Plaintiffs in lost revenues from the *Hunt From Bin Laden* book, other associated books, and the *8mm VideoX al-Qaida Terrorist Training Tapes*.

58.    Defendants acted wrongfully and engaged in defamation, libel, slander, and libel *per se*, by negligently and recklessly republishing false statements which the ABC Defendants knew firsthand to be false.

### BACKGROUND OF THE ABC'S SOURCES & CO-CONSPIRATORS

59.    The ABC Defendants' story was in most part based entirely on fiction. ABC attributed some of its information to Artis, and other information to the Columbia Journalism Review which printed a viciously false story, based on the same sources, such as Artis and Cafasso, and called Idema "a monster," a "liar," a "thug," and "a con man," who was "recklessly" given "credibility and glory he could turn into cold hard cash." The story claimed Idema spent only three years in Special Forces and was refused permission to re-enlist.

60.    The ABC Defendants intentionally concealed the identity of those sources, such as Joseph Cafasso and the John Doe Defendants, so they could not be refuted or disputed, and/or, proven to be fictitious. However, it was eventually discovered that the ABC Defendants used a real con man named Joseph Cafasso as one of their primary anonymous sources. Cafasso had been previously fired from FOX News for impersonating a Colonel in

the US Army Special Forces' Delta Force. Cafasso falsely claimed to have three Silver Stars and been the hero that rescued a flight crew from a burning plane during the Iranian hostage rescue attempt in 1979. In reality, Cafasso had 44 days in the army, and was discharged as a private.[5]

61.    In 2004, Cafasso reinvented himself as Colonel Gerry Blackwood, a member of the White House staff who was CENTCOM's top intelligence commander in the Gulf War, a pilot and nuclear physicist who spoke six languages. He claimed to be a DIA and CIA agent who was on special assignment to the FBI. The entire "Blackwood" persona and background was of course, transparently phony. In July 2006, plaintiffs discovered that Cafasso, *aka* the new Colonel Blackwood, was speaking regularly at a university, and was on the Committee for Concerned Journalists. Cafasso, posing as CIA/DIA/FBI operative Colonel Blackwood, worked closely with Jackson and others to orchestrate the ABC "*Jack of All Trades?*" story.

62.    Joseph Cafasso has fraudulently misrepresented himself as, among other false identities, both a US Army Delta Force Colonel with numerous Silver Star awards for heroism, and a CIA agent who was working for the White House. The ABC Defendants knew, or should have known, that Cafasso was a fraud, because the NY Times had previously run a story exposing Cafasso (*The Colonel Who Wasn't* – Jim Rutenberg, April 29, 2002). Upon information and belief, the emails destroyed contained evidence of the fabrication of events, theft of images, illegal access to private email accounts, and conspiracy to infringe copyrights and violate property rights.

63.    Currently, Cafasso operates a vitriolic web blog that routinely issues death threats to people involved in related cases. He has stalked several women involved in related cases as witnesses, he has threatened them, and he has threatened counsel in another case. Cafasso has impersonated CIA agents, FBI agents, US Army Colonels, DIA agents, NY City Police Detectives, a lawyer, a judge, a boat captain, a nuclear physicist, a White House staff member, a biological weapons specialist, a Delta Force Commander, and many other personas. Joseph A. Cafasso currently uses the alias names of Joe Cafasso, and the fraudulent names of Jay Cafasso, Jay Mosca, Big Joey Mosca, Colonel Gerry Blackwood, Lieutenant Colonel Joseph Cafasso, Special Agent Joe Blackwood, Jake Adams, and many more.

---

[5] NY Times Article, *The Colonel Who Wasn't*

64.    The ABC's primary source, "Sir Edward Artis," has repeatedly misrepresented himself for fraudulent reasons. Artis has admitted under oath, that he illegally wore Bronze Star and Silver Star medals for heroism in violation of federal law and which he never earned and was never awarded by the United States Army. Additionally, as previously alleged, Artis has impersonated Special Forces and Navy SEAL commandos and falsified his military records. He has falsely claimed a PhD and a knighthood from the Vatican. Artis has also admitted possessing and using numerous fraudulent passports. He has worn fake medals for heroism at fundraisers for his Knightsbridge companies, and even worn these phony medals to an event at West Point. Plaintiffs further allege that Artis is a master of deception, and an accomplished con man. While in Northern Afghanistan in 2001, Artis attempted to steal official stationary from the personal office of the Minister of State, Dr. Abdullah Abdullah. Idema discovered the documents hidden under Artis' shirt and returned the documents to an official with the United Front. Idema advised H.E. Abdullah of the theft. Artis later claimed his theft was simply the way business was done in Afghanistan. Artis also admitted that he was stealing the documents to forge letters he might need in the future.

65.    Robert Morris has operated behind the scenes as their partner and co-conspirator in a variety of wrongful conduct, and as one of the masterminds of their conspiratorial enterprise. Several false, malicious, fabricated, and or misleading documents used in the story and on the ABC's website were later obtained digitally by Plaintiffs. The source of these ABC story documents was determined to be Morris and positively identified as coming from Morris' computer. The ABC has since removed several of them from online access.

66.    William Hagler is another source and co-conspirator who assisted the Defendants. Another document the ABC purported to be true and accurate was a draft PSI report letter in a 1991 wire fraud case. These documents are sealed by the Court. Furthermore, it was completely inaccurate and false, and later proven in court to be false. Upon information and belief Hagler obtained this document through wrongful acts and provided it to Robert Morris who then provided it to the ABC, who then posted it on their website. It is also believed that Morris and Hagler worked together with Artis to provide an intercepted and altered email to the ABC which was also used in their story. Hagler's conduct and involvement in the conspiratorial enterprise encompasses the commission of more than twenty

felony crimes, including receiving stolen goods, felonious Possession of Stolen Goods (NCGS §14-72(a)), Criminal Conspiracy (NCGS §14-72(c)),  Obtaining Property Under False Pretenses (NCGS §14-100), Illegally Administering Narcotics to Render One Helpless (NCGS §14-401.16), Blackmail and Extortion (NCGS §14-118 and §14-118.4) (which, upon information and belief, Morris and Artis participated in), and will be more fully set forth in an amended complaint.  In essence, Hagler was the instrument of the other conspirators when they required the actual physical commission of a serious criminal act in the furtherance of their conspiratorial enterprise.

67.    Tracy Paul Warrington was a co-conspirator who joined Artis, Cafasso, Morris, and others in first, their destruction of books sales, and then his baseless and false attacks on the *al-Qaida* tapes.  Warrington, a self-proclaimed expert on *al-Qaida*, wrote to news agencies in 2003, that:

"Against international law, Idema used hospitals and aid stations as cover for mortar and machine gun fire against Taliban and Al-Qaida personnel,"

"Idema has no Special Operations experience at all,"

Idema "was kicked out of Special Forces way back in the 70s before he even started his career," and that,

"There are persistent rumors in Afghanistan that he shot and killed surrendering Afghanis."

These statements were not just false, but ludicrous.  His emails to news agencies resulted in numerous promotional appearances for *The Hunt For bin Laden* being cancelled.  Warrington also stated, having joined the conspiratorial enterprise, that Idema "used aid relief organizations in Afghanistan as a means of gaining glory and attention for himself." Warrington later started claiming Plaintiffs' *8mm VideoX al-Qaida Terrorist Training Tapes* were fake.  In essence, Warrington accused Mr. Idema of (a) being a fraud, (b) violating the Geneva Convention, (c) being a murderer, and (d) being a fugitive, and hence, the *The Hunt For bin Laden* book was "all lies," and the *al-Qaida* tapes fake.

68.    Artis, Warrington, and Cafasso, all discussed killing Idema and on numerous occasions.  Yet these were the sources the ABC used for their photos, documents, and story.

69.    In a deposition of Edward Artis, taken in Santa Monica, California, on Monday, March 22, 2004, Edward Artis did not deny this discussion:

> MR. SANDFORD: That was not the question. There was a question after that. Did you ever put in an e-mail that you thought Mr. Idema should have been shot in Afghanistan was the question.
> A  EDWARD ARTIS: I'm not sure. I can't recall.
> Q  BY MR. PIZZULLI: **Did Tracy Warrington and you discuss that topic?**
> A  EDWARD ARTIS: **I'm not sure.**
> Q  BY MR. PIZZULLI: And you were jealous when that book came out, weren't you?
> A  EDWARD ARTIS: Absolutely not. It was fiction, Mr. Pizzulli. Anybody that reads it that knows him, he's the most despised guy in Special Forces. That's a moniker he earned. Special Forces personnel have told me about that about him. I don't have to make that up about him.
> Q  BY MR. PIZZULLI: Who told you that in Special Forces?
> A  EDWARD ARTIS: Many people. Just --
> Q  BY MR. PIZZULLI: Name one.
> A  EDWARD ARTIS: -- do a Google search.
> Q  BY MR. PIZZULLI: Name one.
> A  EDWARD ARTIS: Do what?
> Q  BY MR. PIZZULLI: Name one.
> A  EDWARD ARTIS: I can't offhand.

[Emphasis added]

70.    ABC and their co-conspirators intentionally and knowingly misrepresented Idema's military record, and used falsified documents fabricated by Joseph Cafasso (masquerading as "Colonel Blackwood"), and upon information and belief, Edward Artis, Morris, Hagler, and others, both known and unknown. The ABC considered these charlatans reliable sources and/or experts on various subjects, including Afghanistan and the *8mm VideoX al-Qaida Terrorist Training Tapes*

71.    No _actual_ expert believed the tapes were fabricated. Neither the real Cafasso, nor the fictional Blackwood, actually served in the army, nor ever was employed by the CIA or in Special Forces, but that didn't stop Jackson from using him as a source. Upon information and belief, another ABC source and "expert" was Tracy Paul Warrington, a man who had been out of the military for 15 years, had never been to Afghanistan, or engaged *al-Qaida*, or even seen a terrorist, except on television.

72.    In fact, just some of the actual experts to view the tapes included, Tom
Sanderson Director of the Transnational Threat Initiative at the Center for Strategic &
International studies, who said, "This looks like a *bona fide* training video – that's for sure;"
and General Gary Harrell, a former member of the US Army Special Forces Operational
Detachment Delta (Delta Force), and at the time commander of the Special Operations Task
Force in Afghanistan, came to the opposite conclusion.  ABC had seen this videotape.  Also
appearing in that video, in various programs, such as NBC *Dateline,* where Plaintiffs' *8mm
VideoX al-Qaida Terrorist Training Tapes* were aired, are FBI Supervisor Tom Maxwell, Chief
of the New York Counter-Terrorism Bureau, "Terrorism Expert Bruce Hoffman," "*al-Qaida*
Expert Simon Reeves," and "Washington Post CIA Reporter Dana Priest."  None of which
questioned the authenticity of the *8mm VideoX al-Qaida tapes.*  ABC purposefully ignored
every legitimate expert on the planet.  In other words, not a single KNOWN expert alleged the
tapes were fake, but four people who were defendants in prior cases accused of fraud, among
other things, none of which were experts, and all of which lied about their credentials, were
used by Liz Jackson and the ABC's Media Watch program.

73.    Defendants Artis, Cafasso, Morris, Hagler, and the John Doe Defendants also
made, published, or caused to be published, false, and completely fabricated fictional
statements accusing the Counter Terrorist Group of criminal activity, being charged with
criminal activity, of wrongfully seeking charitable donations in violation of law, mail fraud,
faking (along with Idema) *al Qaida* terrorist training tapes, and other false conduct.

74.    Defendants Artis, Cafasso, Morris, Hagler, and the John Doe Defendants also
made, published, or caused to be published, false, and in many cases completely fabricated
fictional statements accusing Idema of criminal activity, mail fraud, faking both *al Qaida*
training tapes and videotapes of conversations with Department of Defense officials, creating
an imaginary war, falsifying events in the NY Times best-selling book, *The Hunt For Bin
Laden,* stealing books from Random House, and stealing money from bank accounts.

75.    By impugning the integrity of the *8mm VideoX al-Qaida tapes* the ABC, and
their co-conspirators, achieved their ultimate goal, to impeach Plaintiffs'' credibility and
destroy their financial income to assure that Idema was rendered destitute and remained in an
Afghan prison.

## ADDITIONAL FALSE AND/OR MISLEADING STATEMENTS

76.     Defendants have wantonly, knowingly, and repeatedly, published intentionally false or misleading statements to the detriment of Plaintiffs, which they are liable for that distribution in violation of Defendants' verbal and express contracts.

77.     Although Idema commanded Afghan soldiers who were fighting foreign (Arab, Iraqi, Pakistani, Kuwaiti, and Emirates terrorist fighters, Artis has repeatedly made the ridiculously false statement that Idema said his goal upon arriving in Afghanistan was "to kill every Afghan I see." Contrarily to Artis' statement was the fact that Idema repeatedly credited with the saving the lives of Afghan men, women, and children. Artis' statement was designed by Artis to make good copy. Copy so salient, that news organizations, like the ABC, were willing to jump at it. One article stated, "According to Ed Artis, the former Army sergeant who heads *Knightsbridge*, Idema curtly announced on his arrival that he wanted "to kill every fucking Afghan I see."

78.     Artis and Morris both claimed that Idema misrepresented the reasons he was going to Afghanistan to gain the cooperation of their aid groups. They also stated that Idema "would claim, falsely, to be working for *Partners International*, which, like *Knightsbridge*, had severed all ties" with Idema.

79.     Knightsbridge and Partners International were quoted in one article as follows; "while Idema was thumping his chest in this fashion, officials from *Knightsbridge* and *Partners International* tried to warn American authorities that they had a rogue operator on their hands." In fact, Artis who had only been in Afghanistan during the 2001 war for a few weeks, just long enough to get video footage of him handing out blankets and food, sent a letter to the United States Special Operations Command on December 18, 2001, accusing Idema of a wide variety of insanity. ABC not only quoted the letter, but reproduced it on their website as evidence that Idema was indeed a dangerous nut:

> This man is a very dangerous person by virtue of his carelessness and stupidity and before he gets someone killed, possibly me or someone traveling with me inside Afghanistan...He needs to be removed from the area."

> "...Idema has managed to either tarnish or ruin our reputations.... For one reason... to make Keith Idema look like a hero..."

"As long as he remains in the region, I consider my personal threat level and that of those traveling with me to be at a very high level. He is like a wounded animal right now and I feel that given the amount of time that he has been allowed to run around telling people he has been working for the US Embassy, Pentagon, Special Ops under cover or the CIA, that he has garnered or bought enough contacts to pose a real threat to not only me and those near me but the over all mission of the United States and the Coalition that is fighting there.

80.     The ABC Defendants adopted these vicious and false accusations of horrific conduct which was completely fabricated and fictional, and are still being, republished in articles, internet sites, and web blogs throughout the world. These statements also constituted Tortious Interference With Prospective Economic Advantage, Tortious Interference With Contractual Relations, Negligent Misrepresentation, Unfair And Deceptive Trade Practices, and other causes of action.

### ERIC CAMPBELL'S FALSE AND/OR MISLEADING STATEMENTS

81.     Eric Campbell works for the ABC as a correspondent and is the author of "*Absurdistan*," his book about his experiences in Afghanistan in 2001 and 2002. The book is sold on the ABC website through the ABC Online Shop and mentioned in the ABC "Jack of All Trades?" story.

82.     Campbell and Idema made certain agreements during the course of their relationship in Afghanistan. One of those agreements as that Campbell would not use certain information Idema told him in confidence. Another agreement was related to the specific way the ABC and Campbell could use Plaintiffs' *8mm VideoX al-Qaida Terrorist Training Tapes*. And, another agreement was made after Campbell and Idema discussed Campbell writing a book. Campbell entered into an agreement with Idema that he would not use any confidential material or information from Idema in any book or article he wrote, nor would Campbell base any future book on Idema or his exploits in Afghanistan under any circumstances. Idema only agreed to assist Campbell in Afghanistan because Campbell promised not to write about Idema in any book. In spite of that agreement Campbell used Idema and events which Campbell promised not to include Idema in as a primary basis and thread throughout *Absurdistan*.

83.     Equally as important as the breach of agreements between Campbell and Idema is that *Absurdistan* was, just as its title suggests, completely absurd in its description of Idema

related events. *Absurdistan* was not just inaccurate but defamatory and vicious in its attack upon Idema and his associates in Afghanistan.

84.    Campbell portrayed Idema a raving lunatic who was incompetent, fat, idiotic, erratic, and criminal. Most of what Campbell wrote was either false or inaccurate and spanned pages upon pages of the book. Just a few of the false and absurd excerpts are as follows:

84.1.    "Jack came up with a revolutionary idea for entertainment in Kabul – a Beef, Bourbon and Burqa Bar. His plan was to open a Thai-style alcoholic bar with strippers taking off their burqas and everything underneath. "Jack, you will be shot dead the first night," I warned. But he wasn't fazed. He appeared to have no concept that even in Afghanistan there were limits to what a foreigner could get away with. He saw no problem selling alcohol in a country with the highest number of weapons per person in the world. Fortunately, it was one of Jack's long-tem schemes and remained in the conceptual stage."

84.2.    "But nobody had counted on trying to prise a weapon from [Idema] a paid-up member of the National Rifle Association."

84.3.    "Mission accomplished, it should have been time for Jack to go home. But he hadn't come all the way not to kill some Taliban."

84.4.    "At every prayer and pee-stop, Jack sent his soldiers off in pairs to scan the horizon, which they faithfully did until the moment he looked away, when they sat down and smoked."

84.5.    "But Jack clearly relished the chance for some face time with *'ass-wipe terrorists'* and went in with them."

84.6.    "Jack also had visions of stardom and gave Zabi a small digicam to film him. Jack was planning to piece together a documentary about his exploits in Afghanistan."

84.7.    "Instead of filming Jack, Rafi had recorded half an hour's footage of himself, swirling the camera round, puckering his lips and preening in the monitor. Jack wanted to kill him."

84.8.    "Jack's militia was starting to get out of hand. We had grown used to Jack's expansive presence and idiosyncrasies, although Kim was losing

patience with him smoking for hours in the toilet and leaving cans of Pepsi and Snickers wrappers around the bowl."

84.9.    "Jack was determined to make his protection service a going concern and he'd found a Brazilian crew willing to make use of it if they could share the cost with someone.  They were also keen to go to Bamiyan, but for a different reason – they were following someone who was even crazier than Jack was."

84.10.    "Bottom line.  Jack hadn't come here to eat Snickers.  He'd come to kill Taliban.  But weeks of relatively soft living and junk food were blunting his edge.  "In the states I normally eat a couple of cucumbers and a tuna sandwich," he'd often say through a Hershey Bar.  Now he was threatening to burst out of his uniform."

85.    *Absurdistan* goes on to tell story after story of Jack Idema, culminating with Campbell's observation that Idema had been cut loose by the US and Afghan governments and left to languish in an Afghan prison for ten years.  Campbell, who had portrayed Jack Idema and factual events accurately and diametrically opposed to his new *Absurdistan* version had obviously fallen into the same trap as the other Defendants—thinking he could jump on the bandwagon and portray Idema as a psychopath, rewrite the history of the *8mm VideoX al-Qaida Terrorist Training Tapes*, fictionalize events into defamatory and derogatory lunacy, falsify his reporting, violate his agreements, and destroy Idema's credibility and reputation, because, after all, Campbell, like others, never expected Idema to leave an Afghan prison alive, no less in time to file suit.

## CAUSES OF ACTION

1ST CLAIM FOR RELIEF – Copyright Infringement                                     25

2ND CLAIM FOR RELIEF – Contributory Copyright Infringement                        25

3RD CLAIM FOR RELIEF –Breach of Contract                                          25

4TH CLAIM FOR RELIEF –
    Tortious Interference With Prospective Economic Advantage           26

5TH CLAIM FOR RELIEF –
    Tortious Interference With Contractual Relations                     27

6TH CLAIM FOR RELIEF – Civil Conspiracy                                           27

7TH CLAIM FOR RELIEF – Fraud                                                      28

8TH CLAIM FOR RELIEF – Unfair And Deceptive Trade Practices                       29

9TH CLAIM FOR RELIEF – Defamation                                                 29

10TH CLAIM FOR RELIEF – Conversion                                                30

11TH CLAIM FOR RELIEF – Negligent Misrepresentation                              30

12TH CLAIM FOR RELIEF – Breach of Contract and/or Implied Contract               31

13TH CLAIM FOR RELIEF – Breach of Confidentiality                                31

14TH CLAIM FOR RELIEF – Negligent Misrepresentation                              31

## FIRST CLAIM FOR RELIEF
### COPYRIGHT INFRINGEMENT
**(Against The ABC Defendants - 17 U.S.C. Sections §§ et seq.)**

86.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

87.    Defendants, as set forth herein, have directly violated the copyrights of Plaintiffs and engaged in the copyright infringement of Plaintiffs' images by distributing those images to third parties.

88.    As a direct and proximate result of Defendants copyright infringement and/or contributory copyright infringement, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus statutory damages, against each of the ABC Defendants, both jointly and severally.

## SECOND CLAIM FOR RELIEF
### CONTRIBUTORY COPYRIGHT INFRINGEMENT
**(Against All Defendants - 17 U.S.C. Sections §§ et seq.)**

89.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

90.    Defendants have directly violated the copyrights of Plaintiffs and contributed to the copyright infringement of Plaintiffs' through their acts as set forth herein.

91.    As a direct and proximate result of Defendants copyright infringement and/or contributory copyright infringement, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus statutory damages, against each of the Defendants, both jointly and severally.

## THIRD CLAIM FOR RELIEF
### BREACH OF CONTRACT
**(Against The ABC Defendants, Including Eric Campbell)**

92.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

93.    Plaintiffs and the ABC and Eric Campbell, had a series of valid contracts and implied contracts related to the *8mm VideoX al-Qaida Terrorist Training Tapes.* These Defendants repeatedly and wantonly breached the terms of those contracts as set forth herein.

94.     These breaches of contract were material breaches that substantially defeated the purpose of the agreements and in some cases were both a violation of contract and/or a breach of confidence.

95.     The ABC Defendants' actions constitute a breach of the agreements and contracts between Plaintiffs and Defendants under the laws of North Carolina.

96.     As a direct and proximate result of this breach of contract, Plaintiffs have suffered, and will suffer, damages.  Plaintiffs' damages exceed $10,000, exclusive of costs and interest.

## FOURTH CLAIM FOR RELIEF
### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Against All Defendants)

97.     Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

98.     Plaintiffs had economic relationships with major US news networks, and numerous foreign news networks, which were ongoing and had resulted in past economic benefits to Plaintiffs in support of their anti-terrorism efforts, and were fully expected to result in future economic benefits to Plaintiffs.

99.     Defendants had knowledge of most if not all of these business and economic relationships between Plaintiffs and third parties.

100.    The intentional acts of Defendants, as set forth throughout this complaint, such as the false accusations of outrageous conduct, including claims that Plaintiffs committed mail fraud and related crimes, faked and fabricated videotapes, and fabricated events in *The Hunt For Bin Laden* and *Task Force Dagger* books, were intentional acts by Defendants designed to disrupt the relationships between Plaintiffs and third parties and which did in fact disrupt these relationships, causing economic harm to Plaintiffs.

101.    Furthermore, upon information and belief, Defendants induced third parties to refrain from entering into licensing contracts with Plaintiffs for their videotapes and other images.  Plaintiffs have lost valuable royalties from their copyrights and intellectual property as the result of Defendants' wrongful actions more fully set forth herein.

102.    Defendants' actions constitute a tortious interference with the economic advantage of Plaintiffs under the laws of North Carolina and an interference with economic gain under the laws of Afghanistan.

103.    As a direct and proximate result of this wrongful interference, Plaintiffs have suffered, and will suffer, damages.  Plaintiffs' damages exceed $10,000 exclusive of costs and interest.

## FIFTH CLAIM FOR RELIEF
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against All Defendants)

104.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

105.    Plaintiffs had legally binding contracts with major news networks and publishing houses.  Defendants' actions constitute a tortious interference with contract under the laws of North Carolina and disruption of contract under the laws of Afghanistan in that Defendants' false statements, fabricated events, and wrongful conduct, caused others to violate their contracts or cancel planned contracts with Plaintiffs.

106.    As a direct and proximate result of this wrongful interference with contract, Plaintiffs have suffered, and continue to suffer, damages.  Plaintiffs' damages exceed $10,000 exclusive of costs and interest.

## SIXTH CLAIM FOR RELIEF
### CIVIL CONSPIRACY
### (Against All Defendants)

107.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

108.    Defendants and their agents and employees, and each of them, entered into a conspiracy to engage in the wrongful conduct complained of herein, and intended to benefit both individually and jointly from their conspiratorial enterprise.  Defendants and their employees were jointly aware of the others acts, and the acts of their agents in furtherance of the conspiracy, and benefited therefrom.

109.    The purpose of the conspiracy was to intentionally interfere in the contracts between Plaintiffs and others and exercise dominion and control over property to which Defendants had no rights and deprive Plaintiffs of income derived from their *Task Force Saber Videotapes*, the *8mm VideoX al-Qaida Terrorist Training Tapes*, *The Hunt For Bin Laden* and *Task Force Dagger* books, thereby injuring Plaintiffs for Defendants' own profit and gain.

110.    As a direct and proximate result of Defendants' conspiracy and fraudulent misrepresentations, Plaintiffs have suffered damages in excess of $10,000 exclusive of cost and interests, plus punitive damages, under the laws of North Carolina.

### SEVENTH CLAIM FOR RELIEF
#### FRAUD
#### (Against Artis)

111.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

112.    Artis entered into agreements in which he stated he would not continue his conduct and would refrain from further defamatory statements, without the intention to abide by that agreement, and repeatedly made false statements which Plaintiffs relied on to their detriment and loss.

113.    Artis knew or should have known that the statements he had relayed to Plaintiffs were false.  Artis made these statements intending for the Plaintiffs to rely upon them. Plaintiffs reasonably relied upon these statements.

114.    Artis' false representations and/or concealment of material facts, were reasonably calculated to deceive, were made with the intent to deceive, and did in fact deceive, which resulted in damage to Plaintiffs.

115.    As a direct and proximate result of Artis' fraudulent misrepresentations Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, under the laws of North Carolina.

## EIGHTH CLAIM FOR RELIEF
### UNFAIR AND DECEPTIVE TRADE PRACTICES
**(Against All Defendants)**

116.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

117.    Defendants were at all times relevant to this matter, acting in and affecting commerce.  The ABC Defendants operate media businesses, and have used those businesses and their misrepresentations to wrongfully usurp and deprive Plaintiffs financial income from their intellectual property, thereby benefiting third parties, for wrongful purposes.

118.    Defendants' continued misrepresentations were unethical and/or unscrupulous and were deceptive not only because they had the tendency to deceive, but did in fact deceive. As a direct result of their actions, Defendants have damaged Plaintiffs, and are liable to Plaintiffs for those damages. These unfair and deceptive trade practices caused extensive harm to Plaintiffs by subverting and interfering with Plaintiffs' sale and licensing of their *8mm VideoX al-Qaida Terrorist Training Tapes to* broadcast agencies around the world and destroying the sales of *The Hunt for Bin Laden* and *Task Force Dagger* books.

119.    Defendants' actions constitute unfair and deceptive trade practices in violation of Chapter 75 of the North Carolina General Statutes.

120.    As a direct and proximate result of Defendants' unfair and deceptive trade practices Plaintiffs have suffered damages far in excess of $10,000 exclusive of costs and interest, and treble and/or punitive damages are especially warranted.

## NINTH CLAIM FOR RELIEF
### DEFAMATION
**(Against All Defendants)**

121.    Plaintiffs repeat and incorporate by reference, as if fully set forth, the allegations herein.

122.    In their stories and statements which were re-published on internet sites around the world, Defendants (1) made false, defamatory statements about Idema; (2) repeatedly published those statements to third persons; and (3) caused injury to Plaintiff's reputation through those statements.  Further, Defendants acted knowingly and intentionally, with constitutional malice.

123.    Defendants committed libel *per se*, by continually making numerous and repeated false statements, which Defendants knew were false.  These statements accused Idema of committing infamous crimes and impeached him in his trade and profession; and subjected him to ridicule, contempt and/or disgrace, and continued false imprisonment.

124.    The ABC Defendants used their story to impeach Idema's *8mm VideoX Terrorist Training Tapes* which show al-Qaida terrorists training at a terrorist training center in Mir Bacha Kot Afghanistan.  Defendants impugned the credibility and authenticity of the *8mm VideoX Terrorist Training Tapes,* thereby subjecting them and Idema to doubt as to their credibility.

125.    As a direct and proximate result of these false statements above, made negligently and with reckless disregard for the truth, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages and presumed damages, under the laws of North Carolina.

**TENTH CLAIM FOR RELIEF**
**CONVERSION**
**(Against All Defendants)**

126.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

127.    Defendants used Plaintiffs' proprietary images, documents, and emails, and distributed these images to third parties for their own profit and benefit.

128.    As a direct and proximate result of the Defendants conversion of Plaintiffs original proprietary materials, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages.

**ELEVENTH CLAIM FOR RELIEF**
**NEGLIGENT MISREPRESENTATION**
**(Against Eric Campbell)**

129.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

130.    Campbell engaged in negligent misrepresentation for his own profit and benefit.

131.    As a direct and proximate result of Campbell's negligent misrepresentation Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages.

## TWELFTH CLAIM FOR RELIEF
### BREACH OF CONTRACT AND/OR IMPLIED CONTRACT
### (Against The ABC Defendants)

132.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

133.    Campbell engaged in breach of contract, and, or in the alternative, breach of implied contract for his own, and the ABC's profit and benefit.

134.    As a direct and proximate result of Campbell's breach of contract, and, or in the alternative, breach of implied contract, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages.

## THIRTEENTH CLAIM FOR RELIEF
### BREACH OF CONFIDENTIALITY
### (Against Eric Campbell)

135.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

136.    Campbell engaged in breach of confidentiality for his own, and the ABC's profit and benefit.

137.    As a direct and proximate result of Campbell's breaches of confidentiality, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages.

## FOURTEENTH CLAIM FOR RELIEF
### NEGLIGENT MISREPRESENTATION
### (Against Eric Campbell)

138.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

139.    Campbell engaged in breach of confidentiality for his own, and the ABC's profit and benefit.

140.   As a direct and proximate result of Campbell's breaches of confidentiality, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages.

### PRAYER FOR RELIEF

**WHEREFORE,** Counter Terrorist Group and Idema pray that this Honorable Court enter judgment in their favor and against Defendants as follows:

1.   Awarding Plaintiffs damages in excess of $10,000 against Defendants pursuant to each of the claims for relief.

2.   Awarding Plaintiffs punitive damages pursuant to the seventh and eighth claims for relief.

3.   Awarding Plaintiffs treble damages, and attorneys' fees against Defendants pursuant to the eighth claim for relief.

4.   Awarding Plaintiffs special and presumed damages, corrective advertising, and attorneys' fees against Defendants pursuant to the eighth claim for relief.

5.   Entering a Temporary Restraining Order pursuant to the eighth claim for relief as set forth below until such time as a preliminary injunction can be heard and placed in effect until this case is concluded;

(a) adjudge and declare, that the ABC Defendants have contributorily and vicariously infringed Plaintiffs' exclusive rights under the contracts and agreements, and Plaintiffs' rights under North Carolina law;

(b) preliminarily and permanently enjoin, pursuant to Rule 65 (b) of the N.C. Rules of Civil Procedure, the ABC Defendants, their officers, agents, employees and those persons in active concert or participation with them, from directly, contributorily and/or vicariously violating Plaintiffs' rights under the agreements, including but not limited to, any use, exhibition, display or broadcast of Plaintiffs' video and images or from licensing or allowing any other person to do the same;

(c) preliminarily and permanently enjoin the ABC Defendants from possessing any copies of Plaintiffs' images or images;

(d) preliminarily and permanently enjoin, pursuant to Chapter 75 of the North Carolina General Statutes, the ABC Defendants, their officers, agents, servants, employees and those persons in active concert or participation with them, from engaging in one or more unfair and/or unlawful business acts or practices, including but not limited to, their possession, use, and/or display of Plaintiffs' pictures or video;

(e) require the ABC Defendants and their officers, agents, servants, employees and those persons in active concert to cease any activity that encourages others to violate Plaintiffs' exclusive property rights in their images, or that encourages or permits viewers or other news organizations to transmit or possess copies of Plaintiffs' images to other persons;

(f) require the ABC Defendants to engage in corrective advertising specifying the source, ownership, and authenticity of the *8mm VideoX al-Qaida Training Tapes* and the *Task Force Saber Videotapes*, photographs, and events related to Idema's case, and

6.  Awarding Plaintiffs costs and interest against Defendants and

7.  Granting a trial for all issues that are triable.

Respectfully submitted, this 6th day of March 2008,

J.K. Idema, *Plaintiff*
12 Jonathan Lane
Poughkeepsie, NY 12603
Fax:    480/246-5626

For Counter Terrorist Group US, *Plaintiff*
PO Box 691, Fayetteville, NC 28302

_____/s/_____
Vijayant Pawar (VP-7642)
*Counsel for Counter Terrorist Group US*
Law Offices of VIJAYANT PAWAR
35 Airport Road, Suite 330
Morristown, New Jersey 07960
Phone: (973) 267-4800
Fax:    (973) 215-2882
www.pawarlaw.com
Email: vpawar@pawarlaw.com

John Edwards Tiffany, Attorney (JT-7322)
*Lead Counsel for Counter Terrorist Group US*
Law Offices of John E. Tiffany P.C.
The Robert Treat Center
50 Park Place, 10th Floor,
Newark, New Jersey 07102
Tel:  (973) 242-3700
Fax: (973) 242-3799
www.JohnTiffanyLaw.com
Email: Jet@Jet4Law.com

*Complaint*                    *Page 33*                    *Counterr, et al. v. ABC, et al*

Exhibit B

*Judge Hellerstein*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**05 CV 2947**

J. K. Idema, Brent Bennett,
Edward Caraballo, and,
Zorro Rasuli Banderas,
                          *Petitioners,*

    *Vs.*

Condoleezza Rice, Secretary of State,
Zalmay Khalilzad, Ambassador, *and,*
Robert S. Mueller, Director of the FBI,
          *Respondents.*

**PETITION FOR WRIT
OF HABEAS CORPUS
28 U.S.C. §2241**

Case # _____

Assigned Judge: _____

---

**NOW COMES,** Petitioner, J. K. Idema, through counsel, and Petitioners Edward

Caraballo, Brent Bennett, and Zorro Wahid Rasuli Banderas, through their next friend, J.

K. Idema, acting in their behalf, and move this Honorable Court, pursuant to 28 U.S.C.

§2241, for an ORDER: 1) barring the United States government from intercepting,

delaying, obstructing, or refusing mail between the petitioners and their attorneys,

family, and friends; 2) ordering the Federal Bureau of Investigation to return exculpatory

evidence and personal property confiscated and seized illegally from Petitioners without

jurisdiction, 3) ordering the Respondents to cease all communication, intended to

obstruct justice, with the government of Afghanistan related to the Petitioners' criminal

case in Afghanistan, 4) ordering the Respondents, and/or their agents, from conducting

continuing illegal searches and seizures, 5) ordering the Respondents to acknowledge

protected status and abide by the Geneva Conventions and other protections to which

Petitioners are entitled to, 6) removing all restrictions on liberty which Respondents have

imposed upon Petitioners through their agents, through the use of rendition, 7) ordering

Respondents to cease and desist their privacy violations and release of personal, private,

and privileged information to the public and to the press. In support thereof, Petitioners

show unto this Court the following:

speed their recovery and heal bruises when outside or family inquiries are made as to their whereabouts. One example of this is Haji Daoud Zalmia from Maidanshar, one of Petitioners' cellmates who barely survived Amrullah's bloody torture sessions. Other prisoners, with gruesome cigarette burn scars or electrical burns are threatened with execution if they show their injuries to the Red Cross. Major Ezmerai was threatened with death and the arrest of his family if he showed his electrical burns during Petitioners' court appearances because there were dozens of reporters and cameramen present. Others are threatened with execution if they show their injuries (cigarette burns, bruises, lacerations, electrical burns, etc.) to Red Cross visitors. Recently, after the Red Cross was finally allowed monthly visits, severely tortured prisoners would be transferred back to the secret NDS basement torture chamber in another building just prior to a Red Cross visit.[13] Prisoners who die as the result of torture are secretly removed at night under cover of darkness by placing their bodies in the back of Amrullah's Land Cruisers and taking them to an undisclosed location "for disposal."

24.    Petitioners were eventually charged with various crimes under Afghan law, to include secretly entering the country illegally and with false Indian passports (Idema, Bennett, and Caraballo), running a private and/or illegal jail, and torture. It should be noted that; a) the three Americans held valid U.S. passports, entered the country legally, have never had Indian passports, and were issued visas at the written request of the Department of Defense; b) they maintained a "safe house" for transfer of captured terrorists with full knowledge of Afghan and U.S. government officials; and, c) ironically, they were falsely accused of using the very same torture tactics that NDS had in fact used on Petitioners and continues to use on most persons in NDS custody. In other words, NDS, acting on behalf of the FBI, used their **own** experience with torture and coercion tactics to draft **their** false accusations against Petitioners.

---

[13] The United Nations has never been allowed to inspect NDS *Saderat* and the Red Cross is severely restricted and has admitted that the FBI and Afghan NDS limit access only to those areas where violations cannot be documented.

captured by Petitioners and released at the request of Respondents and/or the Afghan officials named previously. One terrorist, Ghulamsaki, has a brother (Mohammad Asef, an al-Qaida operative) in detention at the Guantanamo Bay terrorist confinement facility (GITMO). Ghulamsaki also has a brother-in-law who is Osama bin Laden's Chief of Security (known as "Daoud"). Ghulamsaki had been unsuccessfully sought by the FBI for months. Petitioners captured Ghulamsaki, and the FBI later interrogated him with Idema acting as the primary interrogator. Ghulamsaki described his group's terrorist plans to attack Bagram Airbase and kill U.S. soldiers with explosive laden fuel trucks. The FBI Field Agents determined and concluded that Ghulamsaki was in fact a terrorist working with others terrorists captured by Petitioners, to murder U.S. citizens. After Respondents arranged the release of Ghulamsaki, the DYNCORP bombing occurred. Intelligence assets for Counterr Group learned shortly thereafter that Ghulamsaki and his brother-in-law had conducted the DYNCORP bombing in Kabul. The FBI has since classified the FBI "302 Field Reports" relating to the interrogation and confession of Ghulamsaki taken by Idema and U.S. government agents. This was the intentional withholding of exculpatory evidence which Petitioners required and had a right to.

41.    By September 15, 2004, the hearings were over and the trial was convened.[22] The entire trial took less than three hours. **No** evidence was, or has ever been, presented against Petitioners to this date. No testimony,[23] no physical evidence, no scientific evidence, no evidence of any kind, only statements by the "former" Taliban prosecutor, Dawari, who heavily relied on newspaper articles as his "physical" evidence. Petitioners were not allowed to call witnesses, and one of the Petitioners' attorneys was ordered to stop reading the defense statement after finishing the first paragraph of a 20+ page defense statement. Caraballo's attorney was threatened with arrest by Bakhtyari during

---

[22] The three Americans and four Afghans were convicted of running a private prison, illegally arresting and torturing suspected terrorists, and secretly entering Afghanistan with forged Indian passports to begin their pursuit of al-Qaida terrorists.
[23] The sole statements by government witnesses were given during the arraignment. They were unsworn, and were categorized as "for informational purposes only for the journalists here" by Bakhtyari.

As the Supreme Court so eloquently stated more than forty years ago; "For when society acts to deprive one of its members of his life, liberty, or property, it takes it's most awesome steps." *See*: *Coppedge v. United States*, 369 U.S. 438, 449 (1962) [emphasis added].

Respondents have defenestrated the United States Constitution and taken actions which are clearly in opposition to the very basis upon which this country is founded. The purpose of the writ is to provide a prompt and efficacious remedy for **whatever society deems to be intolerable restraints upon ones liberty.** *Bland v. Rodgers, supra.* This habeas corpus action is not only warranted and appropriate, but necessary.

## PRAYER FOR RELIEF

**WHEREFORE,** Petitioners pray for an ORDER as set forth below:

1) barring the United States government from intercepting, delaying, obstructing, or refusing mail between the petitioners and their attorneys, family, and friends;

2) ordering the Department of Justice and Federal Bureau of Investigation to return directly to Petitioners all property and exculpatory evidence confiscated and seized illegally from Petitioners and without jurisdiction;

3) ordering Respondents to cease all communication, intended to obstruct justice, with the government of Afghanistan related to the Petitioners' criminal case in Afghanistan;

4) ordering Respondents, and/or their agents, from conducting continued illegal searches and seizures;

5) ordering Respondents to acknowledge protected status and abide by the Geneva Conventions and other protections to which Petitioners are entitled to;

6) removing all restrictions on liberty which Respondents have imposed upon Petitioners through their agents, through the use of rendition, and;

7) ordering Respondents to cease and desist their privacy violations and release of personal, private, and privileged information to the public and to the press.

**8) Petitioners Pray for additional Relief as set forth below;**

    a.  Granting Petitioners immediate POW status with all rights and privileges accorded, for those Petitioners still in custody by Respondents.

    b.  Imposing sanctions against Respondents for repeated, intentional, and grave violations of the Geneva Conventions, international and U.S. laws and treaties.

    c.  An award of attorney fees.

    d.  Other such relief as just and proper.

This 17th Day of March 2005.

John Edwards Tiffany (JT7322)
Attorney for Petitioner Jack Idema,
And  Next Friend for Petitioners
Edward Caraballo, Brent Bennett
And Zorro Rasuli Banderas
P.O. Box 190
55 Washington Street
Bloomfield, NJ  07003
(973) 566-9300 TEL
(973) 566-0007 FAX

**Respondents:**

Robert S. Mueller
Director
Federal Bureau of Investigation
J. Edgar Hoover Building
935 Pennsylvania Avenue, NW
Washington, DC 20535-0001

Condoleezza Rice
Secretary of State
US Department of State
2201 C Street NW
Washington, DC 20520

Zalmay Khalilzad
Ambassador
US Department of State
6180 Kabul Place
Dulles, VA 20189

## VERIFICATIONS OF PETITIONERS

**Pulacharke Prison, Kabul, Islamic Republic of Afghanistan: ss.**
1. I am a Petitioner in the §2241 Case of Idema, *et al.,* v. Rice, *et al., SDNY,*
2. I declare under the penalties of perjury as follows, but expressly not limited thereto:
3. The facts stated in Petitioners Application and Motion For a Writ of habeas Corpus under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
4. Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this ___ Day of March 2005, in the Islamic State of Afghanistan.

_____S_____
J. K. Idema, Declarant/Petitioner

**Pulacharke Prison, Kabul, Islamic Republic of Afghanistan: ss.**
1. I am a Petitioner in the §2241 Case of Idema, *et al.,* v. Rice, *et al., SDNY,*
2. I declare under the penalties of perjury as follows, but expressly not limited thereto:
3. The facts stated in Petitioners Application and Motion For a Writ of habeas Corpus under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
4. Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this ___ Day of March 2005, in the Islamic State of Afghanistan.

_____S_____
Brent Bennett, Declarant/Petitioner

**Pulacharke Prison, Kabul, Islamic Republic of Afghanistan: ss.**
1. I am a Petitioner in the §2241 Case of Idema, *et al.,* v. Rice, *et al., SDNY,*
2. I declare under the penalties of perjury as follows, but expressly not limited thereto:
3. The facts stated in Petitioners Application and Motion For a Writ of habeas Corpus under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
4. Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this ___ Day of March 2005, in the Islamic State of Afghanistan.

_____S_____
Ed Caraballo, Declarant/Petitioner

**Pulacharke Prison, Kabul, Islamic Republic of Afghanistan: ss.**
1. I am a Petitioner in the §2241 Case of Idema, *et al.,* v. Rice, *et al., SDNY,*
2. I declare under the penalties of perjury as follows, but expressly not limited thereto:
3. The facts stated in Petitioners Application and Motion For a Writ of habeas Corpus under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
4. Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this ___ Day of March 2005, in the Islamic State of Afghanistan.

_____S_____
Zorro Rasuli Banderas, Declarant/Petitioner

## VERIFICATIONS OF PETITIONER

**Pulachserke Prison, Kabul, Islamic Republic of Afghanistan ss.**

1. I am a Petitioner in the §2241 Case of Idema, et al., v. Rice, et al., 2007.
2. I declare under the penalties of perjury as follows, but expressly not limited thereto.
3. The facts stated in Petitioners Application and Motion For a Writ of Habeas Corpus under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
4. Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this 7 Day of March 2007, in the Islamic State of Afghanistan.

_____

**Pulachserke Prison, Kabul, Islamic Republic of Afghanistan ss.**

1. I am a Petitioner in the §2241 Case of Idema, et al., v. Rice, et al., 2007.
2. I declare under the penalties of perjury as follows, but expressly not limited thereto.
3. The facts stated in Petitioners Application and Motion For a Writ of Habeas Corpus under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
4. Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this 7 Day of March 2007, in the Islamic State of Afghanistan.

_____
Brent Bennett, Declarant Petitioner

**Pulachserke Prison, Kabul, Islamic Republic of Afghanistan ss.**

1. I am a Petitioner in the §2241 Case of Idema, et al., v. Rice, et al., 2007.
2. I declare under the penalties of perjury as follows, but expressly not limited thereto.
3. The facts stated in Petitioners Application and Motion For a Writ of Habeas Corpus under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
4. Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this 7 Day of March 2007, in the Islamic State of Afghanistan.

_____
J J Caraballo, Declarant Petitioner

**Pulachserke Prison, Kabul, Islamic Republic of Afghanistan ss.**

1. I am a Petitioner in the §2241 Case of Idema, et al., v. Rice, et al., 2007.
2. I declare under the penalties of perjury as follows, but expressly not limited thereto.
3. The facts stated in Petitioners Application and Motion For a Writ of Habeas Corpus under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
4. Further Declarant sayeth not.

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing Application for Writ of Habeas Corpus § 2241 has been duly served upon the below named Respondents by depositing the Writ in the mail in the U.S. Post Office, *via* next day air mail, addressed as follows;

Robert S. Mueller
Director
Federal Bureau of Investigation
J. Edgar Hoover Building
935 Pennsylvania Avenue, NW
Washington, DC  20535

Condoleezza Rice
Secretary of State
US Department of State
2201 C Street NW
Washington, DC  20520

Zalmay Khalilzad
Ambassador
US Department of State
6180 Kabul Place
Dulles, VA  20189

This 17 day of March 2005.

John Edwards Tiffany

Exhibit C

# BBC NEWS

## Afghans free US 'bounty hunter'

**A former US soldier jailed for running a private prison in Kabul and torturing Afghans has been freed, officials say.**

Jack Idema was pardoned by President Karzai in March as part of an amnesty.

A senior prisons official said Idema left jail in early June and flew out of the country. He served less than three years of his original 10-year sentence.

Idema was jailed with two other US men, also since freed. He said his work was approved by the US and Afghan governments, which denied the claim.

The Pentagon said he was a bounty hunter.

### 'Unknown destination'

Jonathan "Jack" Idema was one of many former special forces soldiers working privately in Afghanistan - some to provide security, others acting as bounty hunters attracted by the millions of dollars in rewards offered for Osama Bin Laden and other top al-Qaeda suspects.

A senior prisons official in the Afghan justice ministry said the former soldier had been released at the start of June.

"We escorted him right to the airport and onto a plane", the official, Abdul Salam Asmat, told the AFP news agency.

Idema's Afghan lawyer, Rahim Ahmadzai, told the Associated Press news agency that Idema had been freed on 2 June. He said he did not know where he went.

A US embassy official quoted by the agency said that, according to court documents filed in Washington this week, Idema had left for an "unknown destination".

Idema had his sentence cut by half by a court in Afghanistan in March 2005, although it was not clear why.

His two US accomplices - Brent Bennett and Edward Caraballo - had their sentences cut from 10 years to three and eight years to two respectively.

They were released from Kabul's Pul-e Charkhi prison last year.

### Nato 'duped'

The three men were arrested in July 2004 after Afghan forces raided a house in a Kabul neighbourhood and discovered eight Afghan men being held captive.

Some of the men later testified to having been tortured in the house.

Case 1:08-cv-02556-DAB    Document 12-3    Filed 05/21/2008    Page 12 of 56

Idema said his group was tracking down terror suspects with the co-operation of Afghan and US authorities.

The US said it had received one prisoner from Idema but the Pentagon denied any ties to him.

Nato forces also said they had been duped into helping the group on three occasions.

Correspondents say their trial was often chaotic and marred by poor translation.

Four Afghans working with the Americans were also found guilty and sentenced to between one and five years in jail.

Story from BBC NEWS:
http://news.bbc.co.uk/go/pr/fr/-/1/hi/world/south_asia/6749677.stm

Published: 2007/06/13 15:43:18 GMT

© BBC MMVIII

Exhibit D

# جــک وکیل -Jack Idema

لیسنس تعلیم قانون در تمام محکمه افغانستان

Licensed To Practice Law In the Afghan Primary Courts, National Security Court
Courts of Appeal, Tamiz Courts, and Supreme Court of the Islamic State of Afghanistan

OF COUNSEL
WILLIAM LONDON – NORTH CAROLINA          JOHN E. TIFFANY – NEW YORK & NEW JERSEY
FRANCIS D.T. PIZZULLI – CALIFORNIA          MICHAEL KRAUZ – NEW YORK
CLIFFORD J. BARNARD – COLORADO          WESLEY ROBINSON, JD – FLORIDA

April 29, 2008
Phone:        (910) 678-2919
Via Fax:     (910) 678-2975

Ms. Ellen Hancox
Trial Court Administrator
Cumberland County Courthouse, Suite 307
P.O. Box 363
Fayetteville, NC 28302

Re:          *Spec Ops Expo, et al. v. Reed Elsevier, Inc, et al; Case, No. 06-CVS-10658 (GLL)*
Subject:    *Notice of Motion and Rule 60 Motions (original and amended)*

Dear Ms. Hancox:

Plaintiffs have filed a Notice of Hearing and Rule 60 Motion in the above captioned case. Plaintiffs are also filing an Amended Notice of Hearing to change the incorrect Sunday date to the following Monday, tentatively scheduled for June 23, 2008. Of course this depends on the schedule of Judge Locklear as a Rule 60 Motion can only be heard by the original judge who issued the Order to which the Rule 60 Motion pertains.

Attached you will find, the required Notice to the Trial Administrator, the Notice of Hearing, the Motion, the Amended Notice of Motion, and the Amended Rule 60 Motion (correcting a spelling error and a grammar error- both footnoted for his Honor).

I will seek a stipulation to hear the case in Robeson County if Judge Locklear is not available in Cumberland County for an extended period of time. Since this is a tentative date depending on Judge Locklear's schedule, I would appreciate it if you would advise me by email or fax if you find a date in June or July upon which Judge Locklear will be sitting in Cumberland County.

As you are no doubt aware, under N.C. R.Civ.P., Rule 5(e)(1), we filed the pleadings with the Honorable Judge Jack A. Thompson, who was gracious enough to accept them just prior to midnight on April 28, 2008. All parties have been served by mail with all documents required.

Sincerely,

Jack Idema

cc:     *Hon. Jack A. Thompson and Hon. Gary L. Locklear*
        *John Edwards Tiffany, Esq. (via fax)*
        *All opposing counsel via first class mail*


RECEIVED
MAY 0 1 2008
By_____

Jack Idema, *USSF*

Exhibit E

685—Warranty Deed with Full Covenants, Individual.
Statutory Form A. Photostat Recording.

**1049** PAGE **70**

JULIUS BLUMBERG, INC., LAW BLANK PUBLISHERS
80 EXCHANGE PLACE AT BROADWAY, NEW YORK

**THIS INDENTURE,** made the 17th day of January , nineteen hundred and sixty-one,
**BETWEEN**

H. JOHN IDEMA, residing at 110 Beechwood Avenue, Pough-
keepsie, New York,

part y of the first part, and

H. JOHN IDEMA and MARY B. IDEMA, his wife, residing at
110 Beechwood Avenue, Poughkeepsie, New York, as tenants by the entirety,

parties of the second part,

**WITNESSETH,** that the part y of the first part, in consideration of love and affection

Dollars,

lawful money of the United States,

paid by the part of the second part does hereby grant and release unto the parties of the second part,

their heirs and assigns, forever,

ALL that lot or parcel of land situate on the westerly side of Jona-
than Lane in the Town of Poughkeepsie, County of Dutchess and State of
New York, bounded and described as follows:

BEGINNING at a point in the westerly right of way line of Jonathan
Lane, said point being at distances of 96.7 feet north and 375.52 feet
south of monuments in said westerly right of way line; thence North 85°
38' 19" West 303.78 feet; thence North 01°.11' 50" West 140.4 feet; thence
South 85° 42' 11" East 341.55 feet to a point in the previously mentioned
right of way line; thence South 14° 10' West along said right of way line
142.0 feet to the point or place of beginning.

Containing 1.05 acres more or less.

Being a portion of the premises conveyed to H. John Idema by Roland
S. and Elise F. Child by deed recorded in the Dutchess County Clerk's Of-
fice in Liber 997 of Deeds at page 23 and subject to the restrictions con-
tained in said deed.

Dutchess County Clerk's Office
ed on the ........ day of January 19
2 H. 46 M. P. M. Recorded in
ontr No. 1049 of deeds
......... 70 ....... and examined

CLARC A. SMITH, CLERK



DEED OR SUPPLEMENTAL INSTRUMENT
FEE PD.    NO.
STAMPS PD.    INDEXED BY

**TOGETHER** with the appurtenances and all the estate and rights of the part y of the first part in and to
said premises.

**TO HAVE AND TO HOLD** the premises herein granted unto the

... that we will ex... or procure any further necessary assurance of
... said premises:

**FIFTH.** That the party    of the first part will forever warrant the title to said premises:

**SIXTH.**— That the grantor, in compliance with Section 13 of the Lien Law, covenants that the grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and that the grantor will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

**IN WITNESS WHEREOF,** the party    of the first part ha s    hereunto set    his    hand and
seal    the day and year first above written.

In presence of:

_H. John Idema_                                        L. S.

_____                        L. S.

**STATE OF    NEW YORK    COUNTY OF    DUTCHESS    ss.:**

On the **17th**    day of    **January**    , nineteen hundred and **sixty-one**,
before me came    **H. JOHN IDEMA**

to me known and known to me to be the individual    described in, and who executed, the foregoing instrument, and
acknowledged to me that    he    executed the same.

_Grace K. Traver_

Notary Public
GRACE K. TRAVER
NOTARY PUBLIC IN STATE OF NEW YORK
RESIDING IN DUTCHESS COUNTY
COMMISSION EXPIRES MARCH 30, 1961

---

H. JOHN IDEMA

to

H. JOHN IDEMA and MARY B.
IDEMA, his wife

**Deed**

WARRANTY — FULL COVENANTS

Dated, January 17th, 1961
The land affected by the within instrument
lies in Town of Poughkeepsie

RECORD AND RETURN TO

of Recording Office.

Exhibit F

*4*

NORTH CAROLINA

CUMBERLAND COUNTY

IN THE GENERAL COURT of JUSTICE
SUPERIOR COURT DIVISION
File No.: 06-CVS-10658

---

SPECIAL OPERATIONS AND
EXPOSITION AND CONFERENCE,
*dba* SPECIAL OPERATIONS EXPO &
SPEC OPS EXPO, TOM BUMBACK,
And J. K. IDEMA,
　　　　　　*Plaintiffs,*

　　v.

REED ELSEVIER, INC.,
REED EXHIBITIONS, A DIVISION OF
REED ELSEVIER, INC.,
REED EXHIBITIONS *dba* REED EXPO,
REED EXHIBITIONS USA,
REED EXHIBITIONS COMPANY,
REED EXHIBITION NORTH AMERICA,
REED BUSINESS,
COUNTY OF CUMBERLAND aka
CUMBERLAND COUNTY,
GRAINGER R. BARRETT,
RICK RENO, DIONNE LeBLANC-HILL,
CUMBERLAND COUNTY CIVIC
CENTER, *dba* CROWN CENTER,
CUMBERLAND COUNTY CIVIC
CENTER COMMISSION,
CUMBERLAND COUNTY CIVIC CENTER
COMMISSION, *dba* CROWN CENTER and
CROWN COLISEUM,
CROWN CENTER aka COLISEUM, and,
JOHN DOES 1-12,
In their official and unofficial capacities,
Both jointly and severely,
　　　　　　*Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

NOTICE OF HEARING

Rule 60 Motion

Honorable Gary L. Locklear
(Relief From Order 4-26-2007)

---

　　**NOTICE:** You are hereby notified that Plaintiffs, all inclusive, will bring
Plaintiffs'/Movants' Rule 60 Motion for Relief from the Court's Order of April 26, 2008 on
for hearing at the June 22, 2008 session of Cumberland County Civil Superior Court,

1

beginning at 10:00am or as soon after as the matter may be heard by the Honorable Gary L. Locklear (presiding judge over the original Order and hearing thereof of Defendants' Motion to Dismiss).

Plaintiffs will notify Defendants as to any changes of time or date depending on Judge Locklear's schedule as only the Judge issuing the original order may hear a Rule 60 Motion relevant to that order.

This 27th Day of April, 2008

Thomas R. Bumback
*For All Spec Ops Expo Plaintiffs*
PO Box 691, Fayetteville, NC 28302-0691
Phone:  910/483-5506
US Fax: 910/483-5507

Thomas R. Bumback
*For Bumback Individually*
64 Hardin Reynolds Road
Critz, VA   24082
Ph: 276-694-6683
Fax: 276-694-770

J. K. Idema
12 Jonathan Lane
Poughkeepise, NY 12603
Fax: 480-247-5626

Address Mail for J. K. Idema to:
John Edwards Tiffany, Esquire
The Robert Treat Center
50 Park Place, 10th Floor,
Newark, New Jersey 07102
Tel: 973.242-3700  ●  Fax: 973.242-3799

2

**CERTIFICATE OF SERVICE**

I do hereby certify that a copy of the foregoing NOTICE OF HEARING and the contemporaneously filed RULE 60 MOTION was served on the following parties by depositing a copy of same in an envelope and mailing first class, postage paid to the following addresses, and addressed as follows:

Reginald B. Gillespie, Jr.
Faison & Gillespie
5517 Chapel Hill Blvd, Suite 2000
Durham, NC 27717

Ronnie M. Mitchell
Mitchell Brewer Richardson
PO Box 2917
Fayetteville, NC 28302

Paul K. Sun
Ellis & Winters, LLP
PO Box 33550
Raleigh, NC 27636

DATED: April 29, 2008

By _Rick Lawson_
Rick Lawson

3

... 5

NORTH CAROLINA

CUMBERLAND COUNTY

IN THE GENERAL COURT of JUSTICE
SUPERIOR COURT DIVISION
File No.: 06-CVS- 10658

| | |
|---|---|
| SPECIAL OPERATIONS AND EXPOSITION AND CONFERENCE, *dba* SPECIAL OPERATIONS EXPO & SPEC OPS EXPO, TOM BUMBACK, And J. K. IDEMA, <br>           *Plaintiffs,* <br>    v. <br><br> REED ELSEVIER, INC., <br> REED EXHIBITIONS, A DIVISION OF REED ELSEVIER, INC., <br> REED EXHIBITIONS *dba* REED EXPO, <br> REED EXHIBITIONS USA, <br> REED EXHIBITIONS COMPANY, <br> REED EXHIBITION NORTH AMERICA, <br> REED BUSINESS, <br> COUNTY OF CUMBERLAND aka CUMBERLAND COUNTY, <br> GRAINGER R. BARRETT, <br> RICK RENO, DIONNE LeBLANC-HILL, <br> CUMBERLAND COUNTY CIVIC CENTER, *dba* CROWN CENTER, <br> CUMBERLAND COUNTY CIVIC CENTER COMMISSION, <br> CUMBERLAND COUNTY CIVIC CENTER COMMISSION, *dba* CROWN CENTER and CROWN COLISEUM, <br> CROWN CENTER aka COLISEUM, and, <br> JOHN DOES 1-12, <br> In their official and unofficial capacities, <br> Both jointly and severely, <br>           *Defendants.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> **MOTION** <br> **RULE 60** <br><br><br><br><br><br> **REQUESTING** <br> **RELIEF FROM THE 4-26-2007** <br> **ORDER OF THE HONORABLE** <br> **GARY L. LOCKLEAR** |

     NOW COME, Plaintiffs, and allege and say the following in support of their Motion

for Relief from the Court's Order of April 26, 2007 (attached hereto as Exhibit A):

1

Defendants set for hearing, without proper notice, Defendants' Motion to Dismiss the Complaint in the above captioned case.

Plaintiffs, prior to hearing, filed a dismissal under Rule 41(a) dismissing the complaint and case as to all parties. The dismissal was proper, valid, and timely under the rules and law.

In spite of that dismissal, and the Court's initial removal from the calendar, Defendants' counsel, Ronnie Mitchell, argued to the Court that the Spec Ops Expo Plaintiffs were a North Carolina corporation. Counsel for the Reed Defendants returned from his departure to Raleigh, and based on Mr. Mitchell's assertions to the Court, the Court held the hearing. This was simply the first of many misrepresentations to the Court during the hearing, and in the Order prepared by Defendants counsel.

Rule 60 of the North Carolina Rules of Civil Procedure states, in relevant parts:

**Rule 60. Relief from Judgment or order.**

(a)    Clerical mistakes. – ...

(b)    **Mistakes; inadvertence; excusable neglect; newly discovered evidence; fraud, etc.** – On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:

(1)    **Mistake, inadvertence, surprise, or excusable neglect;**

(2)    Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);

(3)    **Fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;**

(4)    **The judgment is void;**

(5)    The judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or

(6)    Any other reason justifying relief from the operation of the judgment.

The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this section does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to set aside a judgment for fraud upon the court. The procedure for obtaining any

2

relief from a judgment, order, or proceeding shall be by motion as prescribed in these rules or by an independent action.

(All Emphasis Added)

In this instance, the Court has at least three reasons to rescind the Order and/or issue an appropriate corrected order.

First, the Order contains a myriad of <u>mistakes</u> as to what was actually determined and expressed from the bench during the hearing.

Second, the Court was defrauded into believing that the Spec Ops Expo entities named in the Complaint as Plaintiffs were corporations and therefore the dismissal filed prior to the hearing was invalid as to those entities.  They are not corporations, as set forth more fully below.

Third, the judgment was void because the properly filed dismissal prior to the hearing under rule 41(a) was valid and removed any jurisdiction the Court had to hear Defendants motions as filed, as set forth more fully below.

### 1.    <u>FRAUD UPON THE COURT</u>

Nowhere in the Complaint, the summonses, or the caption did the Complaint allege that any Plaintiff was in fact, or had ever been, a corporation.  Defendants' counsel misled the Court by holding up a paper in Court which was purported to be a North Carolina Secretary of State search indicating that Spec Ops Expo was a corporation.  The Complaint named three Spec Ops Expo entities; 1) SPECIAL OPERATIONS AND EXPOSITION AND CONFERENCE, 2) *dba* SPECIAL OPERATIONS EXPO, and 3) SPEC OPS EXPO.  Each had been properly dismissed, and in fact, the dismissal filed stated in the opening paragraph:

> "**NOW COME**, Plaintiffs, SPECIAL OPERATIONS AND EXPOSITION AND CONFERENCE, *dba* SPECIAL OPERATIONS EXPO & SPEC OPS EXPO, TOM BUMBACK, And J. K. IDEMA, and hereby enter this Voluntarily Dismissal WITHOUT Prejudice to all Defendants herein in accordance with the North Carolina Rules of Civil Procedure, Rule 41 (a).  The case is to be dismissed and removed from the Court's calendar."

Mr. Mitchell falsely asserted to the Court that the Spec Ops Expos were corporations, they were not.  Each of the named Spec Ops Expo Plaintiffs were *dba*'s of Plaintiffs Idema and

3

Bumback.  Therefore, both, and either, Bumback or Idema, had the legal authority to dismiss the case on their behalf.

Further, Mitchell argued that they could not represent a corporation and that "the" corporation bringing the action was administratively dissolved by the North Carolina Secretary of State.  On both of those points, Mr. Mitchell was mistaken.

First, while an attorney not admitted to North Carolina (or not admitted *pro hac vice*) cannot represent a corporation; an officer of the Court may represent the corporation for the purposes of filing a complaint or dismissing an action.  In fact, this Court has previously allowed Idema to represent his own corporations at trial on more than one occasion, and have resulted in successful verdicts for his corporations.

Second, the law in North Carolina is clear, a defunct corporation, whether it be administratively dissolved or otherwise, may bring or defend civil actions for the purposes of concluding corporate business.  Therefore, had a corporation been a plaintiff, Mr. Mitchell was still wrong, and his legal theories fail.

Be that as it may, the only Special Operations Expo Corporation ever registered in the State of North Carolina was the "Special Operations Exposition and Trade Show, Inc."  Mr. Mitchell was well aware of this, as were his co-counsel, as each of them held in their hands the actual NC State corporate records indicating that the corporate identity which they shammed to the Court was, is, and encompassed the individual Spec Ops Expo Plaintiffs named in the Complaint and in the Notice of Dismissal.  It was not.  This was tantamount to fraud by officers of the Court who misled the Court during their argument of Defendants' Motion to Dismiss.

## 2.    VALIDITY OF THE DISMISSAL

In spite of the fact that Defendants claimed, and even inserted into the Order, that they had "not yet been served" with the dismissal, the dismissal was valid.  The rules do not require the dismissal be delivered to them simultaneously with filing, only that a copy be mailed or handed to them within a reasonable time.  Defendants' counsel were all properly notified by phone that morning, prior to court, and served with the Notice of Dismissal by mail.

4

The Dismissal under Rule 41(a) was properly signed by both individuals on their behalf and on behalf of the Spec Ops Expo *dba* companies.  Further, the Dismissal clearly stated directly above the signatures, the following:

> "Be that as it may, this action is dismissed as to ALL defendants prior to any hearing or adjudication on any defendants' motions, this 22nd day of April 2007."

The Dismissal was valid, and the validity of that dismissal is without question as a matter of law.  Had it not been for the fraud upon the Court the dismissal would not have been questioned.

3.    **EFFECT OF THE DISMISSAL**

Upon filing a valid dismissal under Rule 41(a), an action is thereby terminated and the court is deprived of jurisdiction to hear any matters relevant to the merits of the case.  Rule 41(a) states, in relevant part:

**Rule 41. Dismissal of actions.**

(a)    Voluntary dismissal; effect thereof. --

(1)    By Plaintiff; by Stipulation. -- Subject to the provisions of Rule 23(c) and of any statute of this State, an action or any claim therein may be dismissed by the plaintiff without order of court (i) by filing a notice of dismissal at any time before the plaintiff rests his case, or; (ii) by filing a stipulation of dismissal signed by all parties who have appeared in the action. Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in any court of this or any other state or of the United States, an action based on or including the same claim. If an action commenced within the time prescribed therefor, or any claim therein, is dismissed without prejudice under this subsection, a new action based on the same claim may be commenced within one year after such dismissal unless a stipulation filed under (ii) of this subsection shall specify a shorter time.

5

4.    **THE ORDER PREPARED BY DEFENDANTS FOR THE COURT'S SIGNATURE DID NOT REFLECT THE ACTUAL STATEMENTS OR FINDINGS DURING THE HEARING**

A)    During the hearing, the Court found that it would treat the dismissal of the action by Idema and Bumback as proper under Rule 41(a). However, in the Order apparently prepared by Mr. Mitchell, Defendants "slipped in" the sentence that stated "but not determining whether such purported dismissals on behalf of Bumback and Idema are effective or valid..."

B)    During the hearing, the Court determined that the dismissal by Spec Ops Expo was invalid because the Court was misled to believe these were corporate entities. However in the Order prepared by Defendants, they failed to list the corporate name, or the reason why the Court did not find the dismissal valid.

C)    During the hearing, the Court did not make a finding that any dismissal was with prejudice, nor did the Court actually hear Defendants 12(b)(6) motions. However, in the Order prepared by Defendants, they couched it as an open interpretation, apparently hoping to one day argue that the dismissal was with prejudice.

5.    **NOTICE OF HEARING WAS IMPROPER AND INVALID**

As stated in the dismissal to preserve the record, the dismissal was necessary because Defendants violated the North Carolina Rules of Civil Procedure in setting he motion for hearing. Rule 6 of the N.C.R.Civ.P requires five days notice of hearing. Defendants filed their notices without the required five day notice, knowing that Idema was out of the country, in Afghanistan and would be returning shortly hereafter, (knowledge which was based, upon information and belief, an Associated Press article), but later confirmed to Defendants counsel by Idema prior to the hearing. Defendants' Notices of Hearing were without proper notice of time as Rule 6 states, in relevant part:

Rule 6. Time.

(a)    Computation. – In computing any period of time prescribed or allowed by these rules, by order of court, or by any applicable statute, including rules, orders or statutes respecting publication of notices, the day of the act, event, default or publication after which the designated period of time begins to run is not to be

included. The last day of the period so computed is to be included, unless it is a Saturday, Sunday or a legal holiday when the courthouse is closed for transactions, in which event the period runs until the end of the next day which is not a Saturday, Sunday, or a legal holiday when the courthouse is closed for transactions. When the period of time prescribed or allowed is less than seven days, intermediate Saturdays, Sundays, and holidays shall be excluded in the computation. A half holiday shall be considered as other days and not as a holiday.

(d)      For motions, affidavits. – A written motion, other than one which may be heard *ex parte*, and notice of the hearing thereof shall be served not later than five days before the time specified for the hearing, unless a different period is fixed by these rules or by order of the court. Such an order may for cause shown be made on *ex parte* application...

(e)      Additional time after service by mail. – Whenever a party has the right to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon him and the notice or paper is served upon him by mail, three days shall be added to the prescribed period.

The envelopes containing the notices were postmarked on April 16, 2007. The Notice of Hearing was filed by the Reed Defendants. Assuming that Paul K. Sun, attorney for Reed, *et al,* actually did mail and postmark his Notice of Hearing on April 16, 2007, the rules are clear, notice requires five working days, the 23rd of April is a Monday, the earliest day a hearing could be set is a Tuesday (April 24th, 2007) because the N.C. Rules of Civ.P. rules state:

Computation. – In computing any period of time prescribed or allowed by these rules, by order of court, or by any applicable statute, including rules, orders or statutes respecting publication of notices, the day of the act, event, default or publication after which the designated period of time begins to run is NOT TO BE INCLUDED. [Emphasis added].

Therefore, the 16th day of April shall NOT BE INCLUDED. Although a court loses jurisdiction to decide motions related to law and facts, or hear the merits of the case, the

7

court does retain jurisdiction to award costs and hear Rule 11 sanction motions, which survive dismissal and can be heard at any time after dismissal.

Plaintiffs request this Honorable Court seriously consider awarding Rule 11 sanctions against Defendants' counsel based on 1) Mr. Sun's misrepresentations to this Honorable Court and intentional disregard of the rules, and 2) Mr. Mitchell's deception of the Court by misrepresenting the actual name on the NC Secretary of State search he held up for the Court during the hearing.  While Plaintiffs have not filed a formal Rule 11 motion, Plaintiffs request this Court consider the facts after reviewing the Court video being provided under separate cover with Plaintiffs' Memorandum of Law and Facts and act *sua sponte* to prevent this sort of behavior by opposing counsel from occurring again.

**WHEREFORE,** Plaintiffs request this Honorable Court rescind the order of April 26, 2007, and enter a corrected order upholding the dismissals as valid under Rule 41(a), and other such further relief as this Honorable Court may deem just and proper.

This 27th Day of April, 2008

Thomas R. Bumback
*For All Spec Ops Expo Plaintiffs*
PO Box 691, Fayetteville, NC 28302-0691
Phone:  910/483-5506
US Fax: 910/483-5507

Thomas R. Bumback
*For Bumback Individually*
64 Hardin Reynolds Road
Critz, VA  24082
Ph: 276-694-6683
Fax: 276-694-770

Address Mail for J. K. Idema to:
John Edwards Tiffany, Esquire
The Robert Treat Center
50 Park Place, 10th Floor,
Newark, New Jersey 07102
Tel: 973.242-3700  ●  Fax: 973.242-3799

J. K. Idema
12 Jonathan Lane
Poughkeepsie, NY 12603
Fax: 480-247-5626

.04/30/2007  14:48    19735898012          PAUL W BERGRIN ESQ              PAGE  01/03

NORTH CAROLINA

CUMBERLAND COUNTY

SPECIAL OPERATIONS AND EXPOSITION AND
CONFERENCE, D/B/A SPECIAL OPERATIONS
EXPO AND SPEC OPS EXPO, TOM
BUMBACK, AND J. K. IDEMA,

Plaintiffs

v.

REED ELSEVIER, INC., REED EXHIBITIONS, A
DIVISION OF REED ELSEVIER, INC., REED
EXHIBITIONS D/B/A REED EXPO, REED
EXHIBITIONS USA, REED EXHIBITIONS
COMPANY, REED EXHIBITION NORTH
AMERICA, REED BUSINESS, COUNTY OF
CUMBERLAND A/K/A CUMBERLAND
COUNTY, GRAINGER R. BARRETT, RICK
RENO, DIONNE LEBLANC-HILL,
CUMBERLAND COUNTY CIVIC CENTER
D/B/A CROWN CENTER, CUMBERLAND
COUNTY CIVIC CENTER COMMISSION,
CUMBERLAND COUNTY CIVIC CENTER
COMMISSION D/B/A CROWN CENTER AND
CROWN COLISEUM, CROWN CENTER
A/K/A COLISEUM, AND, JOHN DOES 1 -
12, IN THEIR OFFICIAL AND UNOFFICIAL
CAPACITIES, BOTH JOINTLY AND SEVERELY

Defendants

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO: 06 CVS 10658
FILE NO:



ORDER GRANTING MOTION TO
DISMISS

THIS MATTER coming on to be heard, and being heard, before the Honorable Gary L.
Locklear, Judge of the Superior Court, presiding at the April 23, 2007, session of Civil Superior
Court, Cumberland County, North Carolina, and, after having seen the purported Rule 41
dismissals filed by Plaintiffs Bumback and Idema, but not determining whether such purported
dismissals on behalf of Bumback and Idema are effective or valid, but having determined that
as to Special Operations and Exposition and Conference, d/b/a Special Operations Expo and
Spec Ops Expo that no purported dismissal was effective as to such party or its cognate; and the
Court conducting a hearing, inter alia, upon the motions of the Defendant County of
Cumberland a/k/a Cumberland County, Cumberland County Civic Center d/b/a Crown Center,

1

Cumberland County Civic Center Commission, Cumberland County Civic Center Commission d/b/a Crown Center and Crown Coliseum, Crown Center and Crown Coliseum, Crown Center a/k/a Coliseum, Rick Reno, Reed Elsevier, Inc., Reed Exhibitions, a division of Reed Elsevier, Inc., Reed Exhibitions d/b/a Reed Expo, Reed Exhibitions USA, Reed Exhibitions Company, Reed Exhibition North America, and Reed Business's Motion to dismiss the complaint of the Plaintiff, Special Operations and Exposition and Conference, d/b/a Special Operations Expo and Spec Ops Expo, pursuant to Rules 12(b) and 41(b);

AND IT APPEARING to the Court that counsel for the Defendants being present and having viewed the document which purported to be a Notice of Voluntary Dismissal, with which Defendants' counsel had not yet been served, Defendants' counsel, though not withdrawing their motions or waiving any such motions or defenses as to any other Plaintiff, elected to proceed with their non-jurisdictional motions only against Plaintiff Special Operations and Exposition and Conference, d/b/a Special Operations Expo and Spec Ops Expo, and the Court allowing the Defendants to proceed on such motions and determining that proceeding with such motions is permitted and that Defendants have not waived any motions or defenses otherwise available in light of the fact that the arguments heard are sufficient to determine the matter and that the Court need not reach other issues, motions or defenses, which have been or might be asserted; and, the Court reviewed the pleadings, the Defendants' motions, and the applicable law, and finds, concludes, and determines that the Defendants' motions are made for good cause and should be allowed, and that Plaintiff's complaint and this action should be dismissed pursuant to Rules 12(b) and 41(b) of the Rules of Civil Procedure; and the Defendants' motions should be granted.

NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED that the complaint of the Plaintiff, Special Operations and Exposition and Conference, d/b/a Special Operations Expo and Spec Ops Expo, and this action is hereby and shall be dismissed; and Defendants' Motions to Dismiss that Plaintiff's complaint are granted.

Entered in open Court, April 23, 2007, signed and ordered filed this 26 day of April, 2007.

Gary L. Locklear
Judge of the Superior Court

2



**Certificate of Service**

The undersigned hereby certifies that in conformity with Rule 5 of the Rules of Civil

Procedure the undersigned has caused a copy of Order Granting Motion to Dismiss to be

served upon all parties entitled or required to be served by mailing a copy of the document

in a properly addressed, postage pre-paid wrapper addressed as set forth below.

Dated: April 26th, 2007

MITCHELL BREWER RICHARDSON

By: _____

Ronnie M. Mitchell
P.O. Box 2917
Fayetteville, NC 28302

Served upon:

Special Operations and Exposition and
Conference, d/b/a Special Operations Expo
and Spec Ops Expo
c/o P.O. Box 691
Fayetteville, NC 28302

Thomas Bumback
c/o 450 Robeson Street
Fayetteville, NC 28301

J.K. Idema
c/o Law Offices of John Edwards Tiffany
50 Park Place, 10th Floor
Newark, NJ 07102

J.K. Idema
c/o Major Mujaheed, UFMF
Joint Task Force Office/HOLD
First Base of Panjshir (Sarisaracha)
Kabul, Afghanistan

3

Exhibit G

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK
### 05 CV 7946

| | |
|---|---|
| **CBS BROADCASTING INC.,** )<br>　　　*Plaintiff,* )<br>　　v. )<br> )<br>**COUNTERR GROUP,** *and* )<br>**J. K. IDEMA,** )<br>　　　*Defendants.* )<br> )<br>────────────────────── )<br> )<br>**Counterclaim and Complaint:** )<br> )<br>**COUNTERR GROUP,** *and* )<br>**J. K. IDEMA,** )<br> )<br>　　　*Counter-Plaintiffs,* )<br>　　v. )<br> )<br>**CBS NEWS, CBS 60 MINUTES,** )<br>**CBS 60 MINUTES II, CBS, Inc.,** )<br>**CBS WORLDWIDE INC., and** )<br>**CBS BROADCASTING INC.,** )<br>　　　*Counter-Defendants.* )<br> )<br>────────────────────── ) | **ANSWER AND**<br>**VERIFIED COUNTERCLAIM**<br><br>**(Jury Trial Demanded)**<br><br>**Injunctive Relief Requested**<br><br>Case # 05 CV 7946 (DAB)<br><br>Judge: Hon. Deborah A. Batts<br><br>**ECF Case**<br>**(Paper Copy Filed 9/15/05)**<br>**(Prior to ECF Activation)** |

**NOW COME,** defendants Counterr Group and J. K. Idema and answer CBS Broadcasting, Inc.'s (hereinafter "CBS") complaint. Defendants Counterr Group and J. K. Idema hereby counterclaim against plaintiff CBS and counter-defendants as set forth herein in this contemporaneously filed counter-complaint. Counterr Group and J. K. Idema (hereinafter "defendants" or "counter-plaintiffs") allege and say the following concerning the plaintiff (CBS) and counter-defendants, and each of them:

## ANSWER

1.      Counterr Group and Idema admit paragraph 1 in that it alleges that CBS is New York Corporation with its principle place of business in New York.

2.      Counterr Group and Idema admit paragraph 2.

3.      Counterr Group and Idema admit paragraph 3.

4.      Paragraph 4 constitutes legal conclusions and/or assertions to which no response is required.  To the extent a response is required; Counterr Group and Idema deny that CBS has a valid claim for relief under the Federal Declaratory Judgment Act.

5.      Paragraph 5 constitutes legal conclusions and/or assertions to which no response is required.  To the extent a response is required, Counterr Group and Idema admit that this Court has jurisdiction based upon diversity and amount in controversy.

6.      Paragraph 6 constitutes legal conclusions and/or assertions to which no response is required.  To the extent a response is required; Counterr Group and Idema deny that they regularly conduct business in the State of New York, or that the specific transaction at issue here took place in the State of New York.  In fact, that specific transaction took place in the Islamic Republic of Afghanistan and by contractual agreement that contract is governed by California law and the other contracts and agreements by North Carolina law.

7.      Counterr Group and Idema admit the first sentence of paragraph 7 in that an actual controversy exists.  Counterr Group and Idema admit the second sentence of paragraph 7 in that they entered into an agreement, but deny that the agreement was limited to only that which is stated in CBS' complaint.  Counterr Group and Idema admit the third sentence of paragraph 7 only in that defendants provided videotapes to CBS, but deny that "CBS broadcast the tapes in accordance with the terms of the" agreements.  Counterr Group and Idema admit the fourth sentence of paragraph 7. Counterr Group and Idema admit the fifth sentence of paragraph 7 but preface that with statement that the suit originally brought, and its subsequent voluntary dismissal without

and Idema's exclusive property rights in the *8mm VideoX Tapes* during CBS' television programming or offered on any television network or station owned and/or operated by CBS, or that encourages or permits viewers or other news organizations to transmit copies of counter-plaintiffs' *8mm VideoX Tapes* to other persons;

(f) require CBS to engage in corrective advertising specifying the source and ownership of the *VideoX Tapes*, the events which took place in the Task Force Saber Compound in Kabul in June and July 2004, and the fact that Idema and all members of Task Force Saber 7 were found innocent of all charges in a trial *de novo* in Afghanistan;

6.  Awarding Counterr Group and Idema costs and interest against plaintiff CBS Broadcasting, Inc. and each of the CBS counter-defendants; and,

7.  Granting a trial for all issues that are triable.

Respectfully submitted, this 14th day of September 2005,

_____/S/JKI/_____

J. K. Idema,
*Defendant/Counter-Plaintiff*
6180 Kabul Place
Dulles, VA 20189-6180
Phone: 011-93-70-054-200
Fax:    910/483-5507


_____/S/TRB/_____

For Counterr Group,
*Defendant/Counter-Plaintiff*
PO Box 691, Fayetteville, NC 28302
Phone:  910/483-5506
Fax:    910/483-5507

9/15/05\_\_\_\_\_S/JET/_____
John Edwards Tiffany, *Esq.* (JT-7322)
Counsel for Counterr Group
Standby Counsel for Idema
PO Box 190, 55 Washington Street
Bloomfield, NJ  07003
Phone:  973/566-9300
Fax:    973/566-0007

# VERIFICATION

I declare under the penalties of perjury as follows, but expressly not limited thereto:

1. The facts stated in the above Answer, Counterclaim, and Counter-Complaint, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.

2. Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this 14th Day of September 2005 in Pulacharke, Afghanistan.

_____ /S/JKI/_____

J. K. Idema, *Counter-Plaintiff*
c/o
PO Box 691, Fayetteville, NC 28302


Thomas R. Bumback, being first duly sworn, deposes and says that he has authority to appear for the plaintiff, Counterr Group in the above action, that he has read the foregoing Answer, Counterclaim, and Counter-Complaint and knows the contents thereof; that the same are true of his own knowledge except as to those matters and things stated upon information and belief, and as to those things, he believes them to be true. Further Declarant sayeth not. Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this 14th Day of September 2005 in Fayetteville, North Carolina.

_____ /S/TRB/_____

Master Sergeant Thomas R. Bumback
US Special Forces (ret.)
For Counterr Group, *Counter-Plaintiff*
PO Box 691,
Fayetteville, NC 28302-0691

Exhibit H

1  RODI, POLLOCK, PETTKER, GALBRAITH
   & CAHILL, A Law Corporation
2  ALLAN E. CERAN (SBN 93303)
   444 South Flower Street, Suite 1700
3  Los Angeles, California 90071-2901
   Telephone: (213) 895-4900
4  Facsimile: (213) 895-4921

5  OF COUNSEL:
   MINTZ & GOLD LLP
6  STEVEN G. MINTZ
   444 Park Avenue South, 11th Floor
7  New York, New York 10016
   Telephone: (212) 696-4848
8  Facsimile: (212) 696-1231

9  Attorneys for Defendants
   FOX NEWS NETWORK LLC and
10 FOX ENTERTAINMENT GROUP, INC.

11

12           SUPERIOR COURT OF THE STATE OF CALIFORNIA

13               FOR THE COUNTY OF LOS ANGELES

14

15 J. KEITH IDEMA,                    CASE NO. BC 296228

16          Plaintiff,                ASSIGNED FOR ALL PURPOSES TO:
                                      THE HON. WILLIAM F. FAHEY
17 v.

18 FOX NEWS NETWORK LLC; FOX          **NOTICE OF ENTRY OF JUDGMENT**
   ENTERTAINMENT GROUP, INC.;
19 EDWARD A. ARTIS; KNIGHTSBRIDGE     D-78
   INTERNATIONAL HUMANITARIAN
20 RELIEF AND HUMAN IMPROVEMENT
   PROGRAMS, INC.; JOSEPH A. CAFASSO;
21 ROBERT C. MORRIS, JR.; PARTNERS    Complaint filed: May 22, 2003
   INTERNATIONAL FOUNDATION; and      Trial Date: None set
22 DOES 1-20,

23          Defendants.

24

25    TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

26         PLEASE TAKE NOTICE that on February 6, 2004, the Court entered Judgment of

27 Dismissal in favor of defendants Fox News Network LLC and Fox Entertainment Group, Inc. and

28 against plaintiff J. Keith Idema, and it awarded to defendants Fox News Network LLC and Fox



MAR 1 0 2004

JOHN A. CLARKE, CLERK

BY A. _____ DEPUTY

ORIGINAL

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

1   Entertainment Group, Inc. costs of suit in the amount of $605.00 and attorney's fees in the amount

2   of $20,000.00.  A true and correct copy of the Judgment of Dismissal is attached hereto as Exhibit

3   A and incorporated by reference herein.

4   DATED: March 9, 2004

                                           RODI, POLLOCK, PETTKER, GALBRAITH
                                         & CAHILL, A Law Corporation

                                         By: _____
                                           ALLAN E. CERAN
                                           Attorneys for Defendants
                                           FOX NEWS NETWORK LLC and FOX
                                           ENTERTAINMENT GROUP, INC.

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE: (213) 895-4900

2

NOTICE OF ENTRY OF JUDGMENT

1

**PROOF OF SERVICE BY MAIL**
(1013a, 2015.5 C.C.P.)

2

3    STATE OF CALIFORNIA                )
                                                    )
4    COUNTY OF LOS ANGELES        )

5        I am employed in the County of Los Angeles, State of California.  I am over the age of
eighteen years and not a party to the within action.  My business address is 444 South Flower
6    Street, Suite 1700, Los Angeles, California 90071-2901.

7        On March 9, 2004, I served the foregoing document described as **NOTICE OF ENTRY
OF JUDGMENT** on the interested parties in this action by placing true copies thereof enclosed in
8    a sealed envelope and addressed as follows:

9
                                    **Please see attached Service List.**
10
        I deposited each envelope in the mail at Los Angeles, California.  The envelopes were
11   mailed with postage thereon fully prepaid.

12       I am "readily familiar" with the firm's practice for collection and processing
correspondence for mailing with the U.S. Postal Service.  Under that practice it would be
13   deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los
Angeles, California in the ordinary course of business.  I am aware that on motion of the party
14   served, service is presumed invalid if postal cancellation date or postage meter date is more than
one day after the date of deposit for mailing in affidavit.
15

16   Executed at Los Angeles, California on March 9, 2004.

17   ☑    STATE        I declare under penalty of perjury under the laws of the State of California
that the foregoing is true and correct.
18

19   ☐    FEDERAL    I declare under penalty of perjury that the foregoing is true and correct.

20

21   Valent Manssourian                                  *Valent Manssourian*
     Type or print name                                  Signature
22

23

24

25

26

27

28

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE: (213) 895-4900

1

## SERVICE LIST

2  Francis C. J. Pizzulli
   718 Wilshire Boulevard
3  Santa Monica, CA  90401-1708

4  Michael L. Sandford
   205 E. Figueroa
5  Santa Barbara, CA  93101

6
   262459_1.doc
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE: (213) 895-4560

1    RODI, POLLOCK, PETTKER, GALBRAITH
     & CAHILL, A Law Corporation
2    ALLAN E. CERAN (SBN 93303)
     444 South Flower Street, Suite 1700
3    Los Angeles, California 90071-2901
     Telephone: (213) 895-4900
4    Facsimile: (213) 895-4921

5    OF COUNSEL:
     MINTZ & GOLD LLP
6    STEVEN G. MINTZ
     444 Park Avenue South, 11th Floor
7    New York, New York 10016
     Telephone: (212) 696-4848
8    Facsimile: (212) 696-1231

9    Attorneys for Defendants
     FOX NEWS NETWORK LLC and
10   FOX ENTERTAINMENT GROUP, INC.

11

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                    FOR THE COUNTY OF LOS ANGELES

14

15   J. KEITH IDEMA,                          CASE NO. BC 296228

16              Plaintiff,                     ASSIGNED FOR ALL PURPOSES TO:
                                              THE HON. WILLIAM F. FAHEY
17   v.

18   FOX NEWS NETWORK LLC; FOX               **JUDGMENT OF DISMISSAL**
     ENTERTAINMENT GROUP, INC.;             [PROPOSED]
19   EDWARD A. ARTIS; KNIGHTSBRIDGE
     INTERNATIONAL HUMANITARIAN
20   RELIEF AND HUMAN IMPROVEMENT
     PROGRAMS, INC.; JOSEPH A. CAFASSO;
21   ROBERT C. MORRIS, JR.; PARTNERS
     INTERNATIONAL FOUNDATION; and
22   DOES 1-20,                               Complaint filed: May 22, 2003
                                              Trial Date: None set
23              Defendants.

24

25          It appearing from the files and records of this action that, while the anti-SLAPP motion to

26   strike of defendants Fox News Network LLC and Fox Entertainment Group, Inc. was pending,

27   plaintiff J. Keith Idema filed with the clerk of this Court a request for entry of dismissal of the

28   entire first amended complaint as to defendants Fox News Network LLC and Fox Entertainment

                                              1

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE: (213) 895-4900

1    Group, Inc. only, and that pursuant thereto dismissal as to defendants Fox News Network LLC

2    and Fox Entertainment Group, Inc. was entered by the said clerk on December 4, 2003, and good

3    cause appearing,

4        IT IS HEREBY ORDERED, ADJUDGED AND DECREED that this action is dismissed

5    as to defendants Fox News Network LLC and Fox Entertainment Group, Inc., that judgment is

6    awarded in favor of defendants Fox News Network LLC and Fox Entertainment Group, Inc. and

7    against plaintiff J. Keith Idema, and that defendants Fox News Network LLC and Fox

8    Entertainment Group, Inc. shall recover against plaintiff J. Keith Idema (1) their costs of suit

9    incurred herein in the amount of $605.00, pursuant to their memorandum of costs, and (2) their

10    attorney's fees in the amount of $20,000.00 as the prevailing parties on their anti-SLAPP motion to

11    strike.

12    DATED: _2-6-04_

                             WILLIAMS FAHEY

13

14    269318_1.doc                    Judge of the Superior Court

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE: (213) 895-4900

1

## PROOF OF SERVICE BY MAIL
(1013a, 2015.5 C.C.P.)

2

3    STATE OF CALIFORNIA          )
                                  )
4    COUNTY OF LOS ANGELES        )

5         I am employed in the County of Los Angeles, State of California.  I am over the age of
eighteen years and not a party to the within action.  My business address is 444 South Flower
6    Street, Suite 1700, Los Angeles, California 90071-2901.

7         On February 6, 2004, I served the foregoing document described as **JUDGMENT OF
DISMISSAL** on the interested parties in this action by placing true copies thereof enclosed in a
8    sealed envelope and addressed as follows:

9

### Please see attached Service List.

10        I deposited each envelope in the mail at Los Angeles, California.  The envelopes were
11   mailed with postage thereon fully prepaid.

12        I am "readily familiar" with the firm's practice for collection and processing
correspondence for mailing with the U.S. Postal Service.  Under that practice it would be
13   deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los
Angeles, California in the ordinary course of business.  I am aware that on motion of the party
14   served, service is presumed invalid if postal cancellation date or postage meter date is more than
one day after the date of deposit for mailing in affidavit.

15

16   Executed at Los Angeles, California on February 6, 2004.

17   ☒    **STATE**        I declare under penalty of perjury under the laws of the State of California
that the foregoing is true and correct.

18

19   ☐    **FEDERAL**      I declare under penalty of perjury that the foregoing is true and correct.

20

21    Valent Manssourian                               *Valent Manssourian*
     Type or print name                                Signature
22

23

24

25

26

27

28

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE: (213) 895-4900

1

## SERVICE LIST

2    Francis C. J. Pizzulli
3    718 Wilshire Boulevard
     Santa Monica, CA  90401-1708

4    Michael L. Sandford
     205 E. Figueroa
5    Santa Barbara, CA  93101

6

    262459_1.doc

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE: (213) 895-4900

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 02/04/04

HONORABLE WILLIAM F. FAHEY    JUDGE

HONORABLE
#10
          LORNA GUERRRERO,C/A    Deputy Sheriff

DEPT. 78

KIM SILVY    DEPUTY CLERK

JUDGE PRO TEM    ELECTRONIC RECORDING MONITOR

MARY STOLL    CSR#2573    Reporter

9:30 am   BC296228

J KEITH IDEMA
VS
FOX NEWS NETWORK LLC ET AL

Plaintiff
Counsel    FRANCIS PIZZULLI (X)

Defendant
Counsel    ALLAN CERAN (X)

**NATURE OF PROCEEDINGS:**

MOTION BY DEFENDANTS, FOX NEWS NETWORK LLC AND FOX
ENTERTAINMENT GROUP, INC., FOR AWARD OF ATTORNEY'S
FEES;

The matter is called for hearing.

Argument is heard and the matter is taken under
submission.

Later:

The Court having read the papers and having read the
arguments rules as follows:

The motion is GRANTED. The court finds that pursuant
to Coltrain v. Shewalter 66 Cal.App 4th 94,107 (1998)
attorney's fees may be awarded to the defendants
after the plaintiff voluntarily dismissed the action
while a motion to strike under the anti-SLAPP
statute was pending provided that the defendant
was likely to prevail on the special motion to
strike. Here, the defendants were likely to prevail
on the unopposed special motion to strike. Plaintiffs
opposition to this motion, which relies on an
unauthenticated, hearsay documents, does not show a
liklihood that plaintiff would have prevailed on the
anti-SLAPP motion.

The court, however, awards fees in an amount less

Page   1 of   2   DEPT. 78

MINUTES ENTERED
02/04/04
COUNTY CLERK

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 02/04/04                                               **DEPT.** 78

| | | |
|---|---|---|
| HONORABLE WILLIAM F. FAHEY | JUDGE  KIM SILVY | DEPUTY CLERK |
| HONORABLE #10 | JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| LORNA GUERRRERO,C/A | Deputy Sheriff MARY STOLL | CSR#2573  Reporter |

| | | |
|---|---|---|
| 9:30 am | BC296228 | Plaintiff Counsel    FRANCIS PIZZULLI (X) |
| | J KEITH IDEMA VS FOX NEWS NETWORK LLC ET AL | Defendant Counsel    ALLAN CERAN (X) |

**NATURE OF PROCEEDINGS:**

than requested. The court finds that the requested
amount of fees is excessive and was not reasonably
incurred in connection with the filing of the anti-
SLAPP motion. The declaration of Allan E. Ceran does
not adequately show that is was necessary to incur
over $30,000 in attornys fees for filing a very
short SLAPP motion. Hence, the court awards the
defendants attorneys fees in the amount $20,000
plus costs.

Notice to be given by the moving party.

A copy of this minute order is sent this date via U.S.
Mail to the following:

ALLAN CERAN
RODI,POLLACK,PETTKER,GALBRAITH & CAHILL
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CA 90071-2901

MINUTES ENTERED
02/04/04
COUNTY CLERK

Exhibit I

UNITED STATES DISTRICT COURT
For The Southern District Of New York



COUNTER TERRORIST GROUP US,        )
COUNTERR GROUP, *and* J. K. IDEMA,   )
          *Plaintiffs,*             )
                                    )
    **v.**                          )
                                    )
NEW YORK MAGAZINE;                  )
NEWYORKMETRO.COM;                   )
NEW YORK MAGAZINE HOLDINGS, LLC,    )
LAWRENCE C. BURSTEIN;               )
STACY SULLIVAN;                     )
JOSEPH A. CAFASSO; EDWARD A. ARTIS;  )
TRACY PAUL WARRINGTON,              )
TOD ROBBERSON;                      )
Both Individually and Severally,    )
and DOES 1 through 7, inclusive,    )
          *Defendants.*             )
                                    )

**COMPLAINT**

(Jury Trial Demanded)
Injunctive Relief Requested

07 # CIV    9516

**Assigned Judge**

RECEIVED
OCT 2 4 2007
U.S.D.C. S.D.N.Y.
CASHIERS

**NOW COME,** Plaintiffs, and allege and say the following concerning Defendants, and each of them:

### JURISDICTION

1.      This is an action for copyright infringement, contributory copyright infringement, and vicarious liability for Copyright Infringement, arising under the Copyright Acts of 1909 and 1976, 17 U.S.C. §§ 101 et seq., and includes various state claims.  This Court has subject matter jurisdiction over these federal question claims pursuant to 28 U.S.C. §§ <u>1331</u> and <u>1338(a) & (b)</u>.  This complaint also alleges violations of New York, and North Carolina law to include; Breach of Contract, Theft, Civil Conspiracy, Fraud, Conversion, Breach of Implied Contract, Breach of Confidence, Tortous Interference with Economic Prospective, interference with contractual relations, interference with prospective economic advantage, negligent misrepresentation, unfair and deceptive trade practices, defamation, copyright infringement, and contributory copyright infringement, and includes a claim for declaratory

relief. This Court has jurisdiction over these state law claims pursuant to its supplemental jurisdiction, 28 U.S.C. § 1367(a), and has further jurisdiction over the declaratory relief claim pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

## VENUE

2.      Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(a) because the copyright infringement, contributory copyright infringement, and many of the other wrongful acts that give rise to these claims occurred in this district, and because the majority of Defendants, reside or can be found here.  In addition, Defendants regularly transact business here, the infringing photographs were distributed from here, and throughout the world, and the infringing publication has its principal place of business within this district.  The New York Magazine Defendants have extensive commercial activities in this State and their principle place of business is in this district.  Additionally, this Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 in that the matters in controversy exceed the sum or value of $75,000, exclusive of interest and costs, and are between citizens of different states, as well as citizens or subjects of a foreign state.

## CASE OVERVIEW

3.      This case is primarily about the theft of the most valuable commodity in the news and media businesses— images.  This is about the theft of images which were the protected property of the Plaintiffs.  Those protected images were stolen, and published with the full knowledge of their copyright infringement by the New York Magazine Defendants, and others.  This case demonstrates how theft has become a way of doing business by the media. Steal now, pay later; if you get caught, if the plaintiff can afford a lawyer, and if your victim is still breathing or in business… then consider paying.  This *modus operandi* by the industry not only deprives copyright owners of profits, but also deprives them of credits and future work and sales.  In this case, Defendants went far beyond the mere copying and distribution of protected images.  These Defendants accused other images belonging to Plaintiffs of being faked and fabricated, and engaged in a carefully planned and orchestrated conspiratorial enterprise designed to defame Plaintiffs, cause Idema to remain illegally imprisoned, sway public support by publishing a completely fictional narrative of events that would cause him to be abandoned by friends, attorneys, and relatives, and destroy him financially.  That specific

purpose, Plaintiffs' financial destruction, was paramount in Defendants' conspiracy. It was consummated through the vicious and false article titled "Operation Desert Fraud." The front cover of the October 25, 2004 New York Magazine touted a bold and vicious headline:

> **Our Con Man in Kabul**
> How Keith Idema Faked Out CBS and
> Random House with His Fantasy War
> By Stacy Sullivan

4.      Between 2004 and the present day, Defendants have engaged in an ongoing pattern of disingenuous subterfuge, defamation, conspiracy, fraud, and copyright infringement. Defendants have intentionally and knowingly made, and caused to be republished by third parties around the world, statements which were patently false and/or misleading, and in bad faith, designed to interfere with Plaintiffs' prospective economic advantage. They have also distributed protected images which were the rightful property of Plaintiffs.

5.      Upon information and belief, each of the Defendants was empowered to act as the agent, servant, employee and/or co-conspirator of each of the other Defendants, and that the acts alleged herein to have been done by each defendant were authorized, approved and/or ratified and/or known by each of the other Defendants. To this end, they engaged in a conspiratorial enterprise, which spanned multiple countries, and over a dozen states. They illegally accessed files, intercepted private emails, stole documents, forged documents and evidence, fabricated events, broke into and entered cars and residences, and knowingly orchestrated the financial demise of Plaintiffs.

6.      The pinnacle of Defendants' conspiratorial enterprise was the October 25, 2004 article, headlined on page 35 of the New York Magazine as:

> **Operation Desert Fraud**
> How Keith Idema Marketed
> His Imaginary Afghan War

It was perhaps the most vicious and false article ever written related to America's War on Terror and the liberation of Afghanistan. Using pictures stolen from Plaintiffs as the source of its credibility, New York Magazine, Sullivan, and the other Defendants, were able to present a believable and "fact based" article literally destroying the Plaintiffs and causing permanent and

irreparable harm which cannot be overstated.  The problem was that the entire article was based on fiction— it was, quite simply, fantasy from the mind of Sullivan and her sources.

## PARTIES

7.      Plaintiffs, Counter Terrorist Group US (hereafter "CTG" or Counterr Group) and Counterr Group are North Carolina companies engaged in the support of US counter-terrorist initiatives, located in Cumberland County, NC.

8.      Plaintiff J. K. Idema is United States citizen formerly employed by the Counter-Terrorist Group, residing in New York.

9.      Defendant **NEW YORK MAGAZINE, aka** Defendant **NEW YORK METRO.COM,** is a monthly magazine published by Defendant **NEW YORK MAGAZINE HOLDINGS, LLC.** and Defendant **LAWRENCE C. BURSTEIN,** (hereafter jointly referred to as the "New York Magazine Defendants").

10.     The New York Magazine Defendants are located at 444 Madison Avenue, New York, NY 10022.

11.     **STACY SULLIVAN** is alleged to be the author of the defamatory and infringing article printed in New York Magazine on October 25, 2004.  She is believed to be a resident of New York.

12.     **JOSEPH A. CAFASSO,** is a source of the defamatory and infringing article printed in New York Magazine.  He is a resident of Carteret, New Jersey.

13.     **EDWARD A. ARTIS,** is a source of the defamatory and infringing article printed in New York Magazine.  He is believed to be a resident of the Philippines.

14.     **TRACY PAUL WARRINGTON,** is a source of the defamatory and infringing article printed in New York Magazine.  He is believed to be a resident of Texas.

15.     **TOD ROBBERSON** is a co-conspirator and source of the defamatory and infringing article printed in New York Magazine who, among other wrongful acts, illegally entered a private room with fake identification and stole documents and photographs from the room. Robberson admitted to third parties that he was working with Sullivan on the story, and they had planned a future book based on the Leonardo DeCaprio film *Catch Me If You Can.* The New York Magazine article was to be the lynchpin of the sale of an Idema conman

book/film which would, or was, upon information and belief, be presented to Jerry Bruckheimer.  Robberson is believed to be a resident of Dallas, Texas.

16.    **JOHN DOES 1-7,** are persons yet unknown whose identities are believed will be determined during the course of discovery.  Plaintiffs do not know the true names and capacities of those Defendants sued herein as DOES 1 through 7, inclusive, and therefore sues these Defendants by such fictitious names.  Plaintiffs will amend this complaint to allege their true names and capacities when such are ascertained.  Plaintiffs are informed and believe, and on that basis allege, that each of the Defendants sued herein as DOES 1 through 7, inclusive, is in some manner legally responsible for one or more of the wrongful acts set forth herein.

**BACKGROUND FACTS**

17.     In the 1980's Idema and Counterr Group assisted the United Front Military Forces (hereinafter the "UFMF"), often referred to improperly as the "Northern Alliance" by the press, in their struggle against the Soviets. In 2001-2002, Idema was a military advisor to Commander Ahmad Shah Massoud's UFMF.

18.     Shortly after Massoud's assassination on September 9, 2001, and the subsequent September 11 attacks, Idema joined with the UFMF (*aka* Northern Alliance) in Northern Afghanistan and remained with their forces until June 2002, upon which time he returned to the United States. He continued working with the UFMF and the transitional Afghan MOD (Ministry of Defence) in an advisory capacity.

19.     On July 5, 2004, Karzai government forces captured Idema during his anti-terrorist operations on behalf of the United Front Military Forces and other official governmental agencies.

20.     Thereafter, Defendants committed the acts complained of herein.


**FACTS**

21.     Stacy Sullivan, writing an article for the New York Magazine Defendants, contacted Idema's attorney several times between August 2004 and October 2004. When she spoke to his attorney she constantly talked about how she was appalled by human rights aspect of case, the violations of human rights by the Afghan courts, and the treatment that Idema and his team were receiving at the hands of the Taliban judges and prosecutors. Sullivan feigned sympathy and concern, all in an effort to conceal her true motive and her involvement in the already ongoing conspiratorial enterprise with the other Defendants.

22.     During the conversations with Idema's attorney Sullivan agreed that New York Magazine would not attempt to use or print or distribute any images which belonged to Plaintiffs unless they were licensed through Polaris Images in New York, and that any photographs used would be obtained from Plaintiffs' photo agency, Polaris Images in New York.

23.     Sullivan agreed that if any photographs (still images or frame grabs) taken from videos supplied by Idema's attorney were used or republished, they would also be licensed

through Polaris Images. This was a valid contract. The New York Magazine Defendants agreed to pay for the photographs prior to publishing and then engaged in the subsequent theft and conversion of Plaintiffs' photographs and videos and breached that contract.

24.    Sullivan agreed, on behalf of the New York Magazine Defendants, to properly license ALL photos belonging to Plaintiffs, which was a contract, and therefore the subsequent theft and/or conversion, of Plaintiffs' photographs was not only a copyright violation, but a breach of contract, and in the case of frame grabs and intercepted emails, a breach of implied contract, conversion, and invasion of privacy. Unlike a violation for copyright infringement, this breach was predicated on a violation of trust or confidence—a breach of confidentiality, related to but distinguishable from a trust relationship, because Sullivan's breach of confidence involved an additional element.

25.    Sullivan assurances to Plaintiffs, through their attorney, that New York Magazine would not use any of Idema's materials or images for any story unless licensed from Polaris, was an intentionally false statement, made to deceive, which did in fact deceive, and to which Plaintiffs relied on to their detriment.

26.    Further, in September 2004, when Sullivan received the *Task Force Saber Videotapes* from an attorney, Sullivan agreed that the video Plaintiffs supplied them would only be used for corroborating statements made in court or by Idema or to contradict false statements made by Sullivan's "sources." It was also agreed that the New York Magazine Defendants would NOT use any photos or video without Plaintiffs' written permission or a proper license from Polaris Images in New York. The New York Magazine Defendants have published and distributed those pictures third parties in further violation of contracts, breach of confidentiality agreements and in breach of confidence.

27.    Idema's attorney later met Mariah Blake who defended Sullivan and told him that the article Sullivan wrote was completely different from the article printed in NY Magazine, and said that it was a true and accurate report which was later re-written by the NY Magazine article to convey an elaborate con by Plaintiffs. Blake stated that her article would set the record straight and track Sullivan's original truthful article. However, Blake's statements were intentional lies on behalf of Sullivan, designed to deceive, which did in fact deceive.

Case 1:08-cv-02356-DAB    Document 12-4    Filed 05/21/2008    Page 9 of 40

28.     After the initial publication of the New York Magazine article, on December 7, 2004, Idema wrote to Lawrence Burstein, the publisher of the New York Magazine requesting that this conduct cease and that the photos and tapes be returned and proper licenses or licensing contracts for the infringing photographs be provided to Plaintiffs if he had them, and that a retraction be made of the false statements.

29.     Additionally the December 2004 letter from Idema to New York Magazine put Defendants on notice that litigation would be forthcoming and made a clear and plain demand that Defendants preserve all notes, conversations, tapes, and/or documents, including emails, and informed the New York Magazine Defendants that; "[d]ocuments, or evidence, or materials in the possession of Ms. Sullivan, or New York Magazine, and/or related persons or entities, is hereby asserted to be discoverable evidence."

30.     In spite of the fact that the letter stated, "…this letter is to inform you that these evidentiary materials must be preserved until such time as litigation is concluded, and are not subject to any document destruction procedure or policy your organization may have or may institute in the future until such time as you receive written notification from me that all related litigation has ceased, upon information and belief, the New York Magazine Defendants, and others, destroyed documents, evidence, and emails.  Upon information and belief, this spoliation included, but was not limited to, the destruction of emails and photographs from Joseph Cafasso, a source who has fraudulently misrepresented himself as, among other false identities, both a US Army Delta Force Colonel with numerous Silver Star awards for heroism, and a CIA agent who was working for the White House.  The New York Magazine Defendants knew, or should have known, that Cafasso was a fraud, because the NY Times had previously run a story exposing Cafasso (*The Colonel Who Wasn't* – Jim Rutenberg, April 29, 2002). Upon information and belief, the emails destroyed contained evidence of the fabrication of events, theft of images, illegal access to private email accounts, and conspiracy to infringe copyrights and violate property rights.

31.     This destruction of notes, conversations, tapes, and/or documents, including emails was in violation of law and intentionally meant to conceal evidence of wrongdoing by Defendants, and/or their agents, which constituted the spoliation of evidence and an obstruction of justice.

## SPECIFIC COPYRIGHTED IMAGES – WRONGFUL USE

32.     Some of the known wrongful uses of specific images by the New York
Magazine Defendants are as follows:

32.1.    **Page #37- Wanted Poster photo.  The poster on page #37** is a copyright
violation as it is Plaintiffs' photo of the poster.  This was a picture Idema took of a
document which was not yet available to the public and which was published in
violation of copyright law because Idema created the photo.  This photo was also only
for release under a very specific set of contractual terms.  When the New York
Magazine Defendants were unable to license the photo through Polaris Images, they
published the photo and ignored all rights and privileges which were intentional and
knowing violations of law.  Upon information and belief, the New York Magazine
Defendants, or their co-conspirators, attempted to use a photo editing program to
remove certain identify marks and characteristics to conceal the source of the photo.

32.2.    **Page #37- Group Standing in Front of Helicopter.**  The Task Force Saber
picture in front of the Northern Alliance MI-8 Helicopter on page #37 is a copyright
violation as it Plaintiffs' photo.  This was a picture taken which was not yet available to
the public and which was a violation of copyright law because Plaintiffs created the
photo. This photo was also only for release under a very specific set of contractual
terms.  When the New York Magazine Defendants were unable to license the photo
through Polaris Images, they published the photo and ignored all rights and privileges
which were intentional and knowing violations of law.

32.3.    **Page #37- EPW[1] Monk Photo During Interrogation.**  The New York
Magazine Defendants have previously alleged that they received a copy of this photo
from Polaris Images, however, this was false.  Polaris Images did not possess that
photo during that time period.  The New York Magazine Defendants obtained the
photo from a confidential email, and not only violated Plaintiffs' copyright by
publishing it, but also, upon information and belief, intercepted private and confidential
correspondence, thereby violating a right to privacy and electronic communication
laws.  The original version of the "page 37 EPW Monk  Photograph" was being sold as

an exclusive picture in a licensed article in another magazine, and the New York
Magazine Defendants' publication of this picture caused significant damages when that
article was cancelled.

32.4.    **Page #37- Hunt For Bin Laden Book.** The New York Magazine Defendants
never attempted to license this photo or cover, both of which Plaintiffs hold the
copyright to.

32.5.    **Page #37- The picture of Jack Idema and Dan Rather.** Upon information and
belief, the New York Magazine Defendants took this picture from a videotape supplied
in confidence to Defendants without obtaining a license. Although this picture is
believed to be the copyright protected image of CBS News, the picture is restricted by
contract from any other use other than the original program, and therefore damaged
Plaintiffs in that it could not be licensed from CBS, nor was permission obtained from
Plaintiffs.

33.    While the New York Magazine Defendants did license other photographs for the
article from Polaris Images, they did not license these photos. Further, on page 37 of the
October 25th, 2004 New York Magazine issue, the New York Magazine Defendants
intentionally left out photo credits for the Idema article. This failure to credit photos was an
intentional effort to conceal Defendants' copyright violations and the criminal liability derived
from the interception of electronic communications (including their civil liability for violations
of privacy).

**DEFENDANTS' INTENTIONAL AND NEGLIGENT VIOLATIONS OF THE COPYRIGHTS**

34.    First, New York Magazine Defendants knew that Plaintiffs' photos were being
licensed through Polaris Images in New York.

35.    Second, New York Magazine Defendants engaged in conversations about
licensing images and videos from Polaris Images, and Defendants inquired into licensing those
images prior to their wrongful use. Therefore, the New York Magazine Defendants made a
conscious and knowing decision to forgo proper licensing and simply steal the images.

36.    Third, Defendants intentionally and knowingly concealed the source of the
photos by omitting photo credits and marks to conceal their theft.

---

[1] EPW- *Enemy Prisoner of War*

37.     Fourth, the New York Magazine Defendants intentionally cropped and altered still photographs to conceal their source and credits.

38.     Fifth, the New York Magazine Defendants knowingly published images that were being reserved for an exclusive story rights sale, thereby depriving Plaintiffs of substantial income, which could have been used for Idema's legal defense. .

39.     Sixth the New York Magazine Defendants had a responsibility to properly license the images, to know copyright law, and to correctly report the facts and refrain from those intentional copyright violations which these Defendants and their co-conspirators engaged in.

### NEW YORK MAGAZINE'S INTENTIONALLY FALSE REPORTING

40.     The New York Magazine Defendants exercised property rights and ownership in violation of the agreements apparently relying on the hope that if Idema remained in an Afghan prison for twenty years he would be unable to engage in legal recourse against these Defendants.

41.     To this end, the New York Magazine Defendants intentionally misreported the facts of stories and used questionable sources which they knew, and/or should have known, were providing false information.

42.     The New York Magazine Defendants knowingly and negligently republished false statements with a reckless disregard for the truth and used Plaintiffs' stolen images to increase the distribution of those false statements and aid their fraud.  The stolen images gave the impression that the New York Magazine Defendants had exclusive, special access, and insider knowledge of the story.  By illegally using those images the New York Magazine Defendants were able to make their story appear as though it was credible and true.

43.     The purpose of this false reporting was to assert permanent dominion and control over a variety of images, and their false version of the Idema story, which the New York Magazine Defendants and their co-conspirators could profit from, intentionally raise the controversy surrounding the events and turn the story into a torrid tale of torture and crime which all of the Defendants could thereby profit from both financially and politically.

44.     In her article, Sullivan alleged, among other vicious and false statements, that Idema had hung innocent Afghan men upside down in a basement by their feet and tortured

them. However, Associated Press reporters admitted to Idema that they had been to the Task Force Saber compound in Kabul and found no evidence of anyone ever hanging upside down, torture, or other crimes alleged. Further, they freely admitted that there was no basement in the house and that the allegation of men hanging upside down in a basement was obviously false.

45.    What was particularly egregious in this instance, was that while the New York Magazine Defendants were selling their magazine and profiting from their distribution of Plaintiffs copyrighted images, at the same time Sullivan was intentionally omitting the exculpatory nature of the video from her story and continuing to propagate the vicious myth that Idema had been hanging Afghans upside down in a non-existent basement and torturing them. This was remarkably similar to the conduct of journalists who falsely claimed American soldiers at GITMO, Cuba had flushed Korans down toilets. In sum, it was a complete fabrication of facts and events born from the imagination of a questionable journalist who had knowingly joined in a conspiratorial enterprise for the purpose of destroying Plaintiffs.

46.    As an example, by reporting the horrifying story that "three prisoners found in Idema's custody during the raid were blindfolded and beaten and strapped to the ceiling by their feet; five others were tied to chairs with rope in a small, dark room down a hall that was littered with bloodied clothing," the New York Magazine Defendants insured a heavy readership for their story during a time when news reporting in Afghanistan was at an all time low. During this time, Stacy Sullivan and her co-conspirators were able to use these false statements to undermine the US allied relationship with the United Front, lift their sagging careers and raise their international profile, thereby profiting from their intentionally false statements. At the same time, by disseminating what at least four Afghan high court and appeals court judges later called "propaganda" and "lies," Sullivan and her co-conspirators were able to wrongfully use Plaintiffs' images and documents without fear of reprisal believing that Idema would be imprisoned for many years, certainly longer than the statute allowed for filing of civil actions in U.S. courts.

47.    To this end, Sullivan, and others, both known and unknown, entered into a conspiratorial enterprise, the purpose of which was to create a story so shocking, and so vicious, that it would encircle the globe in one of the largest and far-reaching stories related to the War on Terror in 2004. A story which, although completely false, helped alter foreign

policy and the Pentagon's strategic plan against terrorism in Afghanistan. The false accusations against Idema and his men were, upon information and belief, a carefully engineered propaganda campaign covertly orchestrated by an Associated Press reporter named Amir Shah on behalf of his terrorist co-conspirators to release those terrorists which plotted to, and later succeeded, in altering the political course of Afghanistan through assassinations, bombings, and murder. Shah's conspiracy with *al-Qaida* resulted in the deaths of hundreds, if not thousands, of innocent people through their bombing rampage. Sullivan used Shah's false statements without independently verifying the veracity of those statements, and without exercising due diligence to report events in a foreign country which were unprotected by any Fair Reporting Privilege.

48.    This conspiratorial enterprise is further addressed herein, and was responsible for thousands of false articles throughout the world, which continue to be republished to this day.

### INTENTIONAL WITHHOLDING OF EXCULPATORY EVIDENCE AND RECKLESS DISREGARD FOR THE TRUTH

49.    In April 2004, Idema's counter-terrorist team, known as Task Force Saber, and later TF Saber 7, was back in Afghanistan working closely with U.S. and Afghan military and intelligence activities.

50.    All of Idema's team members were officially employed by the Ministry of Defense or Afghan CIA, except one, who was an Emmy award-winning journalist who had worked for AP, ABC, NBC, and CNN, now working as an embedded journalist with Task Force Saber a story about the *al-Qaida* terrorists in Afghanistan, the Taliban infiltration of the new government, and the ineffectiveness of conventional military operations against the growing terrorist resistance and attacks.

51.    In June 2004, Idema and his team had captured the brother-in-law of bin Laden's chief of security and the terrorists responsible for the murder of Canadian ISAF Corporal Jamie Brendan Murphy. Corporal Murphy had been murdered in a bombing on Darlaman Road in Kabul on January 27, 2004.

52.    On July 5, 2004, Idema was arrested by anti-UFMF forces. It has since been learned that this was orchestrated by persons, both known and unknown to, among other things,

prevent the exposure of a plot to assassinate Hamid Karzai's primary political opponents who were former U.S. allies. Idema and his team were falsely accused by the press of "running a torture chamber," "torturing innocent Afghans," and other illegal conduct. Three other false claims allegedly made were that Idema had "innocent Afghans hanging from the ceiling in his basement," that the terrorists were being "abused, tortured, and starved," and that Idema and his men were simply "rounding up innocent Muslims with long beards" (only 3 of 11 had any beards at all). The New York Magazine Defendants republished these false statements in modified forms, as more particularly set forth hereafter.

53.    In spite of that, the New York Magazine Defendants had information disproving the false allegations they intentionally and knowingly withheld this information from their reporting. As an example, Sullivan saw pictures inside Idema's compound and, upon information and belief, interviewed eye witnesses, and was thus aware that there was NO basement and no evidence of anyone ever being hung upside down or any other way—so therefore, any claims that terrorists "were hanging from the ceiling in a basement" or "by their feet in a basement" or other similar statements repeated by the New York Magazine Defendants were made negligently and with reckless disregard of the truth. The New York Magazine Defendants also had video evidence directly refuting the charges that ANY terrorists were hanging from anything, or tortured, or beaten.

54.    Furthermore, the New York Magazine Defendants had or should have had either actual disbelief or serious doubts that any torture had been conducted. The New York Magazine Defendants had seen Idema's questioning techniques on video and the level of terrorist cooperation during the questioning and was aware there was no torture being conducted. The New York Magazine Defendants also had knowledge that these "innocent Afghans" were in fact terrorists. Prior to publishing the article, the New York Magazine Defendants had videotapes in their possession that confirmed, among other things, that: a) the detainees were terrorists, b) there was no torture, and c) Idema and his men were innocent of the false charges alleged.

55.    The New York Magazine Defendants withheld this exculpatory information and continued to falsely report the same story of mythical torture; rooms littered with non-existent bloody cloth, fabricated tales of boiling water, and ludicrous fictional accounts of a *Marquis de*

*Sade* torture chamber which other new agencies and internet sites then republished throughout the world and have continued to republish time and again throughout the last three years and even now.

56.     The New York Magazine Defendants published false, and in many cases completely fabricated fictional statements about Idema negligently and with a reckless disregard for the truth. At the same time, the New York Magazine Defendants intentionally and knowingly withheld exculpatory evidence, which would have aided Idema and his men who had been falsely accused of horrific crimes. Upon information and belief, the New York Magazine Defendants believed that the "torture version," regardless of how disingenuous it was, was in line with AP's and major networks Abu Ghraib reporting and therefore a better story for New York Magazine, and better chance for Sullivan, Robberson, and others, to sell a book or film based on this fictional fabricated story about Idema.

57.     The New York Magazine Defendants also published false, and in many cases completely fabricated fictional statements accusing the Counter Terrorist Group of criminal activity, and being charged with criminal activity, wrongfully seeking charitable donations in violation of law, mail fraud, faking (along with Idema) al Qaida terrorist training tapes, and other false conduct.

58.     The New York Magazine Defendants also published false, and in many cases completely fabricated fictional statements accusing Idema of criminal activity, mail fraud, faking both al Qaida training tapes and videotapes of conversations with Department of Defense officials, and creating an imaginary war, falsifying events in the NY Times best-selling book, *The Hunt For Bin Laden,* stealing books from Random House, and stealing money from bank accounts.

59.     Further, the withholding of information and knowingly false reporting by the New York Magazine Defendants caused other news agencies and magazines, such as the Columbia Journalism Review and hundreds of internet news sites, to continue to rely on false information and anonymous sources instead of facts and the New York Magazine Defendants intentionally concealed the identity of those sources, such as Joseph Cafasso, so they could not be refuted or disputed, and/or, in at least one case, so that they could not be proven to be fictitious and non-existent.

60.    One of New York Magazine's sources was Lutfallah Mashal, whom Carlotta Gall at the NY Times described as the most unreliable source in Afghanistan and who Gall stated had "repeatedly lied" to her. Mashal's unreliability was widespread knowledge and Defendants not only knew Mashal was an unreliable source, but were in possession of actual evidence completely contradicting Mashal's statements. Yet, the New York Magazine Defendants, negligently and with reckless disregard for the truth, falsely reported the story and published statements they knew were false, misleading, and defamatory.

61.    By falsely reporting the events in the case against Idema and his team, The New York Magazine Defendants, and their co-conspirator sources stood to profit immensely. In essence, New York Magazine needed a hot salient and torrid story of abuse in Afghanistan to compete with CBS' scoop on the Abu Ghraib incidents—Sullivan, Robberson, and other co-conspirators needed a tale of con men and vicious behavior to sell their book and film. To meet this need, like AP, the New York Magazine Defendants created their own exclusive torture story; the completely fabricated story of Jack Idema's non-existent torture chamber, in a non-existent basement and a charlatan in the image of the *Flim Flam Man* and DeCaprio in *Catch Me If You Can*.

62.    The New York Magazine Defendants "added value" to this story with an angle of a fraudster con man mercenary who had faked the *8mm VideoX al-Qaida Terrorist Training Tapes* for profit and prestige, created his own "imaginary war," and fabricated events in the Hunt for Bin Laden book about the 2001-2002 war in Afghanistan.

63.    These false claims by the New York Magazine Defendants, Edward Artis, Joseph Cafasso, Tracy Paul Warrington, and other co-conspirators, both known and unknown, have caused serious and devastating financial lost to Plaintiffs in lost revenues from the *Hunt From Bin Laden* book, other associated books, and the *8mm VideoX al-Qaida Terrorist Training Tapes*.

64.    The New York Magazine Defendants had a duty to disclose the exculpatory information they withheld and to include this information in their story about Plaintiffs.

65.    Defendants acted wrongfully and engaged in defamation, libel, slander, and libel *per se*, by negligently and recklessly republishing false statements by Mashal, Jalali, terrorists, fictitious non-existent sources, and others, which the New York Magazine Defendants knew

firsthand to be false, and in some cases, were the simply the fabrications of Amir Shah's vivid imagination.

## NEW YORK MAGAZINE'S SOURCES

66.     The New York Magazine Defendants' article was in most part based entirely on fiction.  Fiction so damaging and so horrific, that it has been reprinted around the world time and again for three years in thousands of forums, web blogs, internet chat rooms, reports, and books.  The description of innocent men, hanging upside down in a bloody basement, was perhaps the most shocking revelation of inhumanity in the War on Terror since its beginning. Who was responsible for this fiction that traveled the world?  At the creative level, it was two AP reporters, one of which is linked to the Taliban in Afghanistan and who is vehemently anti-US and anti-liberty forces Islamic fundamentalist—Amir Shah.  At the managing level, it was at a minimum AP Bureau Chiefs.

67.     This fiction was used as the foundation of Sullivan's *Operation Desert Fraud* article in New York Magazine—but Sullivan, and her co-conspirators, took it to another level with fiction so twisted and bizarre that it would shock the conscience of anyone who actually had the true facts.

68.     The Fair Report privilege does apply to an illegal Afghan Court, and certainly not statements made outside the official court proceedings.  Here, the statements printed by Defendants, alleging extreme torture, beatings, immersion in boiling water—without so much a single mark on any terrorist as evidence of this extreme abuse, men hanging upside down from ceilings in a non-existent basement, and other unsupported nefarious conduct, were not contained in any official report. They were not made at any official press conference or during testimony. They were made by a) an American citizen, former Minister of Interior, b) his former spokesman— both acting outside their official duties, c) the Associated Press, d) her co-conspirators, e) an "anonymous source" – none of which were involved in the indictment, prosecution, or trial, f) a fictitious source fabricated by Shah, and, g) others not protected by an Fair Report privilege.  In fact, the then Minister of Justice, Abdul Kareem Karimi, now Ambassador Karimi, discounted all of these statements within days, saying they were "simply not true."  Defendants intentionally withheld this information.

69.    Defendants' statements imputed far more serious conduct than the actual charges reflected, and were not based on any official report, because there was no such report.

70.    It was eventually discovered that the New York Magazine Defendants used a real con man named Joseph Cafasso as their primary anonymous source for the article. Cafasso had been previously fired from FOX News for impersonating a Colonel in the US Army Special Forces' Delta Force. Cafasso falsely claimed to have three Silver Stars and been the hero that rescued a flight crew from a burning plane during the Iranian hostage rescue attempt in 1979. In reality, Cafasso had 44 days in the army, and was discharged as a private.[2]

71.    In 2004, Cafasso reinvented himself as Colonel Gerry Blackwood, a member of the White House staff who was CENTCOM's top intelligence commander in the Gulf War, a pilot and nuclear physicist who spoke six languages, and was a DIA and CIA agent who was on special assignment to the FBI. The entire "Blackwood" persona and background was of course, transparently phony. In July 2006, plaintiffs discovered that Cafasso, *aka* the new Colonel Blackwood, was speaking regularly at a university, and was on the Committee for Concerned Journalists. Cafasso, posing as CIA/DIA/FBI operative Colonel Blackwood, worked closely with Sullivan and Mariah Blake (the Columbia article writer who co-conspired with Sullivan) and others to orchestrate the fake and fabricated New York Magazine article.

72.    It was also discovered in July 2006, that Cafasso/Blackwood was the anonymous source running a blog site called "stuporpatriots" and using it to stalk and harass Bennett, Idema, their civil attorneys in California, New York, and North Carolina, and witnesses against Cafasso and his co-conspirators. Cafasso/Blackwood was also identified as the person posting defamatory and vicious information across the internet under of hundreds of alias names, false identities, and email pseudonyms. Women were being stalked and threatened with assault, called whores, lying whores, frauds, con-artists, psychotic and homicidal, and other extreme slurs, such as "poster-gal…for the justification of spousal abuse," by Cafasso/Blackwood, upon information and belief, with the help of his New York Magazine and other co-conspirators.

73.    Idema never misrepresented his military record and Defendants do not have, have never had, and never will have, any proof or evidence to the contrary (other than rumor and innuendo). In fact, it was New York Magazine and their co-conspirators that intentionally

and knowingly misrepresented Idema's military record, and used falsified documents fabricated by Joseph Cafasso (masquerading as "Colonel Blackwood"), and upon information and belief, Edward Artis, including an obviously fake military DD-214 form which was forged by Cafasso, and others, both known and unknown.

74.     As a bold faced header in the New York Magazine article, Sullivan stated;

**"But the Intelligence experts analyzed the CBS tapes and "determined they were staged," one source says.**

Further stating in the article:

"Another retired Special Forces soldier, and a longtime acquaintance of Keith Idema's, contacted CIA sources and learned the Agency had similar concerns about the tapes authenticity. "The CIA ran voice analysis on the tapes and concluded they were staged," he says, adding that the agency didn't publicize its findings because it "didn't want to waste its time on someone it considered harmless."

No <u>actual</u> expert believed the tapes were fabricated. New York Magazine's anonymous Special Forces and CIA source was the phony Colonel, Joseph Cafasso, *aka* Colonel Jerry Blackwood, both fake *personas*. Neither the real Cafasso, nor the fictional Blackwood, ever having actually served in the army, nor ever been employed by the CIA or in Special Forces, but that didn't stop Sullivan from using them as a source. The other "expert" was Tracy Paul Warrington, a man who had been out of the military for 15 years, had never been to Afghanistan, or engaged *al-Qaida*, or even seen a terrorist, except on television. In fact, just some of the actual experts to view the tapes included, Tom Sanderson Director of the Transnational Threat Initiative at the Center for Strategic & International studies, who said, "This looks like a *bona fide* training video – that's for sure;" and General Gary Harrell, a former member of the US Army Special Forces Operational Detachment Delta (Delta Force), and at the time commander of the Special Operations Task Force in Afghanistan, came to the opposite conclusion. New York Magazine had been supplied this videotape. Also appearing in that video, in various programs, such as NBC *Dateline*, where Plaintiffs' *8mm VideoX al-Qaida Terrorist Training Tapes* were aired, are FBI Supervisor Tom Maxwell, Chief of the

---

[2] NY Times Article, *The Colonel Who Wasn't*

New York Counter-Terrorism Bureau, "Terrorism Expert Bruce Hoffman," "*al-Qaida* Expert Simon Reeves," and "Washington Post CIA Reporter Dana Priest." None of which questioned the authenticity of the *8mm VideoX al-Qaida tapes*. New York Magazine purposefully ignored every legitimate expert on the planet. In other words, not a single KNOWN expert alleged the tapes were fake, but four people who were defendants in prior cases accused of fraud, among other things, none of which were experts, and all of which lied about their credentials, were given a soap box by New York Magazine, which then jointly conspired with these individuals to commit cyberstalking, defamation, interference with prospective economic advantage, and the other torts complained of herein.

75.    By impugning the integrity of the *8mm VideoX al-Qaida tapes* New York Magazine, and their co-conspirators achieved their ultimate goal, to impeach Plaintiffs'' credibility and destroy their financial income to assure that Idema was rendered destitute and remained in an Afghan prison.

### NEW YORK MAGAZINE'S FALSE AND/OR MISLEADING STATEMENTS

76.    Over the past three years, starting in or about July 2004, Defendants have wantonly, knowingly, and repeatedly, published intentionally false or misleading statements to the detriment of Plaintiffs, for which they are liable for that distribution in violation of Defendants' verbal and express contracts.

77.    Some of those most egregious statements in the article are as follows:

Paragraph #1 –

States "in January 2002…

    A. "…Keith – was more than a little dubious."
    B. "Idema claimed to be working as an advisor to the Northern Alliance."
    C. "…Ex-con…Federal Prison…and had a criminal record in three states."

Paragraph #3 –

    A. "Tracy-Paul Warrington… says the tapes are not an intimate look at anything – except clumsy military playacting."
    B. "Eight-five percent of terrorists attacks in the last decade have been bombings, "Warrington says." In this film we see raids. This was a method that went out in the seventies, when Idema was in the Army."

C. "I was looking at seven hours of tape of something that al-Qaida doesn't do."

D. "Another retired Special Forces soldier, and a longtime acquaintance of Keith Idema's, contacted CIA sources and learned the Agency had similar concerns about the tapes authenticity.  "The CIA ran voice analysis on the tapes and concluded they were staged," he says, adding that the agency didn't publicize its findings because it "didn't want to waste its time on someone it considered harmless.""

Paragraph #4 –

A. "That could well change soon, as many things concerning the life and career of Keith Idema already have.  Among other things, it is now clear that Idema was anything but harmless."

B. "When Afghan police arrested the trio on July 5, they said they saw a smaller-scale version of the gruesome prisoner-abuse photos from the Baghdad interrogation cells in Abu Ghraib."

C. "Early press reports indicated that three prisoners found in Idema's custody during the raid were blindfolded and beaten and strapped to the ceiling by their feet; five others were tied to chairs with rope in a small, dark room down a hall that was littered with bloodied clothing."

D. "All of the prisoners in Idema's custody were subsequently released; none was shown to be connected to Al Qaeda."

Paragraph #5 –

A. "CBS News received a video feed from this same Kabul house of horrors, featuring Idema in U.S. Army fatigues and brandishing an assault rifle…"

Header between ¶ 5 and 6 –

**"But the Intelligence experts analyzed the CBS tapes and "determined they were staged," one source says.**

Paragraph #6 –

A. "But the question remains:  How does a freelance torturer claiming false military credentials turn up in American living rooms as an expert on the War on Terror?"

B. "The short answer is that, like other con men, Keith Idema made a very powerful impression."

C. "The anchor might also have added that Idema has made himself at home in all sorts of places: On military bases, at the head of a fictional company, in Lithuanian police training camps, in dealing with U.S. embassies, and – as Idema now alleges – with American military officialdom.  And at every stop

along the way, Keith Idema increased his mastery of the fine art of press manipulation."

Paragraph #8 –

    A. "The Keith Idema story is a fable of fame, macho swagger, and opportunism in the age of Terror; fueled most of all by the craving for ever more vivid and dramatic kinds of media attention. It's the kind of tale that Joseph Conrad might concoct if he were reincarnated as a screen writer for '*Fear Factor*' or '*The Apprentice*.'"

Paragraph #9 –

    A. "Much about Idema's life and times is disputed. But this much is clear: well before he became a pariah, he was a military enthusiast and a media hound."
    B. "Recruits for Special Forces – a.k.a. the Green Berets – were thinning, and despite his diminutive height (five foot nine) and bad eyesight, the young man was accepted."
    C. But military records do not indicate that Idema was all that special a soldier. One particularly harsh evaluation, written by Captain John D. Carlson near the end of Idema's three-year tour, read: "[He] is without a doubt the most unmotivated, unprofessional, immature enlisted man that I have ever known."

Paragraph #10 –

    A. "post-enlistment career was none too distinguished either. He entered the Army Reserves, and then drifted around Poughkeepsie."
    B. "He'd displayed new equipment and technologies while circulating among the shows regulars: active Special Forces personnel, Defense Ministers, and Police Chiefs from abroad, together with mercenaries and Para-Military hangers-on of the '*Soldier of Fortune*' stripe."

Paragraph #11 –

    A. "In 1993, not long after his arrival, Idema claimed to have stumbled onto a Russian mafia plot to smuggle nuclear materials out of the country."

Paragraph #12 –

    A. "Unfortunately, he was losing his grip on his civilian life. Returning stateside to find his business in serious financial trouble, Idema devised an ingenious albeit illegal scheme to set up a dummy company to procure additional supplies that he never paid for."

Paragraph #13 –

    A. "A *Soldier of Fortune* convention, meanwhile, spurred the national news
        media to dig into Idema's original allegations about the Lithuanian nukes
        traffic."
    B. "Ted Kavavau, a retired TV-News executive who was one of the founding
        partners of *CNN*, spoke with some conventioneers about Idema.

Header between ¶ 15 and 16 –

      **"According to an aid director, Idema announced that**
      **his aim in the country was "to kill every Afghan I see."**

Paragraph #17 –

    A. "Idema was intending to work with *Knightsbridge International* and the
        *Partners International Foundation,* two aid groups run by former military
        personnel.  (Each group now says that Idema misrepresented the reasons he
        was going to Afghanistan to gain their cooperation)."

Paragraph #19 –

    A. "Instead, says Long, Idema's behavior "Changed 180 degrees;" he set about
        tracking the movement of the *Northern Alliance* troops then fighting the
        Taliban and gave little input in discussions of medical care and food
        supplies."
    B. "According to Ed Artis, the former Army sergeant who heads *Knightsbridge*,
        Idema curtly announced on his arrival that he wanted "to kill every fucking
        Afghan I see."

Paragraph #20 –

    A. "Idema was more than simply obsessed with the Afghan war – he was, as
        other journalists on the scene have recounted, absurdly keen to capture
        dramatic war 'footage', even if it meant fudging the record of events."
    B. "Idema left the group, again hoping to find Northern Alliance troops to hang
        out with."
    C. "Scurka was hit with shrapnel in his right leg. As the group helped Scurka
        down the hill, and set about dressing his wound, Scurka's cameraman was
        capturing the scene on film. And this was when Idema returned, trailing
        clouds of camera-ready military glory: "Just when we finished [dressing
        Scurka's leg], Keith runs up screaming," Friend recalls. "He rips off the
        bandages and redresses the wounds. Basically, he was acting in front of the
        camera."

Paragraph #21 –

    A. "So Scurka finished still another documentary including no footage of Idema or his exploits. The publicity hungry soldier on the make was suddenly adrift in a war zone without a cameraman. But with his unusual brio, he reinvented himself again."

    B. He began calling himself Jack and telling journalists that he was working as an adviser to Northern Alliance troops; he also described himself as a Green Beret and claimed he was helping Special Forces round up Taliban and Al Qaeda suspects.

Paragraph #22 –

    A. "Before long, Idema was turning up regularly, via satellite telephone, on American television."

    B. "And sometimes he would claim, falsely, to be working for *Partners International*, which, like *Knightsbridge*, had severed all ties with Idema."

    C. "Mainly, though, he characterized himself in tellingly vague terms, even as he boasted about his high-octane military credentials: 'You must be held in high regard,' he told *Fox News* host Linda Vester via SAT phone in November 2001."

Paragraph #23 –

    A. "While Idema was thumping his chest in this fashion, officials from *Knightsbridge* and *Partners International* tried to warn American authorities that they had a rogue operator on their hands."

Paragraph #24 –

    A. "But Jack Idema, in his new incarnation as quote-ready ground warrior, was about to hit the media jackpot, in a moment of serendipity that would seem utterly implausible in a work of fiction. Robin Moore, the bard of the Green Berets, arrived in Afghanistan in December, and Idema wasted little time in tracking him down and nominating himself as a source for Moore's new book, to be titled '*The Hunt for Bin Laden*.'"

    B. "... – moving slowly across Afghan war zones with the aid of a cane – was shadowing a group of Special Forces called A-Team tiger 02, ..."

Paragraph #25 –

    A. "Moore and Idema didn't spend much time in the field together – it behooved Idema to keep a low profile among active Special Forces, for obvious reasons."

B. "He boasted to war correspondents about the many al-Qaida suspects he had apprehended, and embroidered his banter with tales of Special Forces daring in Central America."

C. "One heated argument over war coverage at a party ended with Idema's firing a pistol at Dallas Morning News' correspondent Tod Robberson and barely missing his left arm."

D. "...when he produced the Al Qaeda training videos, all appeared to be forgiven: under representation from the photo agency Polaris, Idema sold the footage to '60 Minutes II' for a undisclosed fee..."

Paragraph #28 –

A. "One thing is certain: regardless of who claims ultimate authorship of the book, *The Hunt for Bin Laden*' teems with characterization of Idema as a titanic military presence in the Afghan war."

B. "It asserts outright that Idema was the only Green Beret gathering intelligence on the ground. And Idema routinely storms to the center of the book's action to perform heroic feats of bravery."

Paragraph #30 –

A. "Moore and Thompson, meanwhile, maintain that Idema overtook the narrative because *Random House* wanted it that way. The publisher 'wanted an action hero in the book,' Thompson says ..."

B. Moore says that it was also Random House's decision to put Idema on the book's cover.

Paragraph #31 –

A. "The next promotional twist concerning 'The Hunt for Bin Laden' was either poetic or perverse, depending on one's view of the publishing world."

B. "Having at the very least finagled a portrait of himself as the prime mover in the Special Forces' Afghan war, Idema now was tapped to stand in for the Parkinson's-weakened Moore in bookstore readings and media appearances for the title."

Paragraph #32 –

A. "Moore's book—the first allegedly insider account of the Afghan war—rocketed up the best-seller lists. But early reviews were harsh, and some called the book's reliability into question."

B. "Moore was troubled by the claims and asked some Special Forces officers to review it for corrections in later editions."

Paragraph #33 –

    A. "When Idema got wind of Moore's efforts to change the text, he retaliated in what was becoming a reflexive fashion: He … declared that a shadowy group of Special Forces soldiers, jealous of the attention lavished on Idema, 'allegedly threatened and coerced 77-year-old Robin Moore"

Paragraph #34 –

    A. "Moore and Thompson say they soon learned that they were victims of financial chicanery as well as what appeared to be an enormous media scam."

Paragraph #35 –

    A. "In a deposition, Thompson said that Idema destroyed the interior of his own house with a samurai sword, that he choked his girlfriend in a fight, and that he forged a letter to on Fox News stationery for use as evidence in his lawsuit against the network."
    B. "A subpoena from the U.S. Attorney's office also arrived, followed by a letter from North Carolina's postal inspector, charging Idema with mail fraud for using a post-office box registered to the company to solicit funds for the US Counter-Terrorist Group."
    C. "… $18,000 from the company had gone missing…"
    D. "… Idema followed [Thompson to the bank] and threatened to kill both him and his girlfriend."

Paragraph #36 –

    A. "Moore, meanwhile, learned that Idema had ordered hundreds of copies of '*The Hunt for Bin Laden*' from Moore's account with *Random House* and never paid for them."

Paragraph #38 –

    A. "He set up shop in a rented house in Kabul, telling the landlord he intended to start a rug-exporting business. Instead, he founded a paramilitary outfit called Task Force Saber 7, complete with its own fatigues and military insignia… They hired four Afghans, and began rounding up Afghan civilians to interrogate about ties to Al Qaeda."

Paragraph #39 – (pg. 131)

    A.  "Idema's new Afghan campaign was all the more brazen, since Knightsbridge and Partners International had greatly stepped up their efforts to alert American authorities –"

Paragraph #40 –

    A.  "Finally Afghan police forces surrounded Idema's house on July 5, when, they claim, they discovered the infamous chamber of civilian abuse within."

Paragraph #42–

    A.  "The tape could, of course, have been faked – Idema's other exploits certainly cannot rule out such an explanation."

Paragraph #45–

    A.  "Long before he arrived on the scene in Afghanistan, Idema was in destructive thrall to the notions of solitary, Rambo–style heroism."

    B.  It seems clear as well that as Idema plied his peculiar brand of combat make-believe before more and more media outlets, the stakes became incalculably higher. Even when he began to realize his cross-media strategy of self-promotion was unraveling as *The Hunt for Bin Laden* came in for serious critical scrutiny, Idema did not run for cover, as more sensible con men might. Instead, he replenished his morale with another tour of far more dubious duty on the Afghan fronts. There's a certain tragic symmetry in Idema's goading himself into ever greater and more reckless acts of self-dramatizing valor; in that sense, Idema was very much his own worst enemy.

78.    Further, that these vicious and false accusations of horrific conduct by the New York Magazine Defendants, conduct which was completely fabricated and fictional, have been, and are still being, republished in thousands of articles, internet sites, and web blogs throughout the world. And, that these statements also constituted Tortious Interference With Prospective Economic Advantage, Tortious Interference With Contractual Relations, Negligent Misrepresentation, Unfair And Deceptive Trade Practices, and other causes of action.

## CAUSES OF ACTION

**1ST CLAIM FOR RELIEF** – Breach of Contract                                          29

**2ND CLAIM FOR RELIEF** –
   Tortious Interference With Prospective Economic Advantage         29

**3RD CLAIM FOR RELIEF** –
   Tortious Interference With Contractual Relations                        30

**4TH CLAIM FOR RELIEF** – Civil Conspiracy                                    31

**5TH CLAIM FOR RELIEF** – Fraud                                                       31

**6TH CLAIM FOR RELIEF** – Unfair And Deceptive Trade Practices     32

7TH CLAIM FOR RELIEF – Defamation                                             33

**8TH CLAIM FOR RELIEF** – Breach of Confidence                           34

**9TH CLAIM FOR RELIEF** – Conversion                                           35

**10TH CLAIM FOR RELIEF** – Negligent Misrepresentation                35

**11TH CLAIM FOR RELIEF** – Copyright Infringement                       36

**12TH CLAIM FOR RELIEF** – Contributory Copyright Infringement    36

## FIRST CLAIM FOR RELIEF
### BREACH OF CONTRACT
### (Against The New York Magazine Defendants)

79.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

80.    Plaintiffs and the New York Magazine Defendants had a series of valid contracts and implied contracts.  The New York Magazine Defendants repeatedly and wantonly breached the terms of those contracts as set forth herein.

81.    These breaches of contract were material breaches that substantially defeated the purpose of the agreements and in some cases were both a violation of contract and/or a failure to perform.

82.    The New York Magazine Defendants' actions constitute a breach of the agreements and contracts between Plaintiffs and Defendants under the laws of North Carolina, and Afghanistan.

83.    As a direct and proximate result of this breach of contract, Plaintiffs have suffered, and will suffer, damages.  Plaintiffs' damages exceed $10,000, exclusive of costs and interest.

## SECOND CLAIM FOR RELIEF
### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Against All Defendants)

84.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

85.    Plaintiffs had economic relationships with each of the major US news networks, and numerous foreign news networks, all of which were ongoing and had resulted in past economic benefits to Plaintiffs in support of their anti-terrorism efforts, and were fully expected to result in future economic benefits to Plaintiffs.

86.    Defendants had knowledge of most if not all of these business and economic relationships between Plaintiffs and third parties.

87.    The intentional acts of Defendants, as set forth throughout this complaint, such as the false statements related to innocent men hanging upside down, and other false

accusations of outrageous conduct, including claims that Plaintiffs committed mail fraud and related crimes, faked and fabricated videotapes, created an imaginary war, and fabricated events in *The Hunt For Bin Laden* book, were intentional acts by Defendants designed to disrupt the relationships between Plaintiffs and third parties and which did in fact disrupt these relationships, causing economic harm to Plaintiffs.

88.    Furthermore, by withholding knowledge of exculpatory evidence, falsely reporting the facts of Idema's Afghan criminal case, making false and unsupported statements, repeatedly misquoting pro-Idema sources, and distorting those events, negligently and with reckless disregard for the truth, Defendants induced third parties, including other news agencies to refrain from entering into licensing contracts with Plaintiffs. Plaintiffs' licensing of their *8mm VideoX al-Qaida Terrorist Training Tapes* to U.S. news networks has virtually ceased because of these false allegations against Idema. Further, Plaintiffs have lost valuable royalties from their copyrights and intellectual property as the result of Defendants' wrongful actions more fully set forth herein.

89.    Defendants' actions constitute a tortious interference with the economic advantage of Plaintiffs under the laws of North Carolina and an interference with economic gain under the laws of Afghanistan.

90.    As a direct and proximate result of this wrongful interference, Plaintiffs have suffered, and will suffer, damages. Plaintiffs' damages exceed $10,000 exclusive of costs and interest.

### THIRD CLAIM FOR RELIEF
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against All Defendants)

91.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

92.    Plaintiffs had legally binding contracts with major news networks and publishing houses. Defendants' false reporting of events caused networks and publishers to violate their contracts. Defendants' actions constitute a tortious interference with contract under the laws of North Carolina, and disruption of contract under the laws of Afghanistan in that Defendants' false statements and fabricated events caused others to violate their contracts with Plaintiffs.

93.    As a direct and proximate result of this wrongful interference with contract, Plaintiffs have suffered, and continue to suffer, damages.  Plaintiffs' damages exceed $10,000 exclusive of costs and interest.

**FOURTH CLAIM FOR RELIEF**
**CIVIL CONSPIRACY**
**(Against All Defendants)**

94.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

95.    Defendants and their agents and employees, and each of them, entered into a conspiracy to engage in the wrongful conduct complained of herein, and intended to benefit both individually and jointly from their conspiratorial enterprise.  Defendants and their employees were jointly aware of the others acts, and the acts of their agents in furtherance of the conspiracy, and benefited therefrom.

96.    The purpose of the conspiracy was to intentionally violate the contracts between Defendants and Plaintiffs and exercise dominion and control over property to which Defendants had no rights and deprive Plaintiffs of income derived from their *Task Force Saber Videotapes*, the *8mm VideoX al-Qaida Terrorist Training Tapes,* and *The Hunt For Bin Laden* book, thereby injuring Plaintiffs for Defendants' own profit and gain.

97.    Further, to intentionally report the news falsely, and withhold exculpatory information for the purpose of concealing evidence and facts related to Idema's innocence, thereby damaging Plaintiffs.

98.    As a direct and proximate result of Defendants' conspiracy and fraudulent misrepresentations, Plaintiffs have suffered damages in excess of $10,000 exclusive of cost and interests, plus punitive damages, under the laws of North Carolina.

**FIFTH CLAIM FOR RELIEF**
**FRAUD**
**(Against All Defendants)**

99.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

100.    Defendants, and their agents, repeatedly made false statements and assurances and Plaintiffs relied on those statements and assurances to their detriment and loss.

101.    On numerous occasions Sullivan made intentionally false statements intended to deceive Plaintiffs.

102.    Sullivan knew or should have known that the statements they had relayed to Plaintiffs were false.  Sullivan made these statements intending for the Plaintiffs to rely upon them.  Plaintiffs reasonably relied upon these statements.

103.    Sullivan's' false representations and/or concealment of material facts, were reasonably calculated to deceive, were made with the intent to deceive, and did in fact deceive, which resulted in damage to Plaintiffs.

104.    As a direct and proximate result of Sullivan's' fraudulent misrepresentations Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, under the laws of North Carolina.

## SIXTH CLAIM FOR RELIEF
### UNFAIR AND DECEPTIVE TRADE PRACTICES
### (Against All Defendants)

105.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

106.    Defendants were at all times relevant to this matter, acting in and affecting commerce.  The New York Magazine Defendants operate media businesses, and have used those businesses and their misrepresentations to wrongfully usurp and deprive Plaintiffs of their *Task Force Saber Videotapes* and the *8mm VideoX al-Qaida Terrorist Training Tapes*, thereby benefiting third parties, for wrongful purposes.

107.    Defendants' continued misrepresentations were unethical and/or unscrupulous and were deceptive not only because they had the tendency to deceive, but did in fact deceive. As a direct result of their actions, Defendants have damaged Plaintiffs, and are liable to Plaintiffs for those damages. These unfair and deceptive trade practices caused extensive harm to Plaintiffs by subverting and interfering with Plaintiffs' sale and licensing of their *8mm VideoX al-Qaida Terrorist Training Tapes to* broadcast agencies around the world.

108.    Defendants' actions constitute unfair and deceptive trade practices in violation of Chapter 75 of the North Carolina General Statutes.

109.    As a direct and proximate result of Defendants' unfair and deceptive trade practices Plaintiffs have suffered damages far in excess of $10,000 exclusive of costs and interest, and treble and/or punitive damages are especially warranted.

## SEVENTH CLAIM FOR RELIEF
### DEFAMATION
### (Against All Defendants)

110.    Plaintiffs repeat and incorporate by reference, as if fully set forth, the allegations herein.

111.    Defendants intentionally misreported the facts of Idema's arrest in July 2004 and thereafter by repeatedly making and republishing false statements.

112.    In their article which was re-published on internet sites around the world, Defendants (1) made false, defamatory statements about Idema; (2) repeatedly published those statements to third persons; and (3) caused injury to Plaintiff's reputation through those statements.

113.    Defendants committed libel *per se*, by continually making numerous and repeated false statements, which Defendants knew were false. These statements accused Idema of committing infamous crimes and impeached him in his trade and profession; and subjected him to ridicule, contempt and/or disgrace, and continued false imprisonment.

114.    Defendants falsely reported that Idema, Captain Brent Bennett, and Lieutenant Zorro Rasuli Banderas had abused eight prisoners and that Idema had the prisoners "hanging… by their feet." Originally it was thought that AP attributed this to "anonymous" Afghan official sources to conceal the identities of Jalali and Mashal. Even if that were fact, AP knew these sources were of questionable reliability and that this was untrue because AP had spoken to sources that had been in the Task Force Saber compound throughout that week and seen the conditions and treatment of the prisoners. However, it was just recently learned that AP's anonymous source for the accusation of hanging prisoners upside down may not have even existed, and it is alleged that it may have been simply a figment of Amir Shah's vivid imagination. In March 2007, Shah confided in an Afghan that his description of torture victims

hanging upside down was based on a scene in an Indian Bollywood film that had been released in Afghanistan just prior to his articles.  Shah also said that he thought Americans could identify with this because he had seen evidence of Americans hanging prisoners from the ceiling in another film—The Punisher, which had come out just weeks before.  Unfortunately, Shah's beliefs were based upon Hollywood fiction derived from the adaptation of a comic book.  It would be difficult to believe that the other individual Defendants did not have knowledge of this fabrication.

115.    In spite of Defendants' knowledge that the statements were false, the New York Magazine Defendants printed and published statements, and caused statements to be reprinted and republished around the world.

116.    The New York Magazine Defendants used their story to impeach Idema's *8mm VideoX Terrorist Training Tapes* which show al-Qaida terrorists training at a terrorist training center in Mir Bacha Kot Afghanistan.  By writing these stories, Defendants impugned the credibility and authenticity of the *8mm VideoX Terrorist Training Tapes,* thereby subjecting them and Idema to doubt as to their credibility.

117.    The New York Magazine Defendants' statements were made negligently and with a reckless disregard for the truth.  Further, Defendants acted knowingly and intentionally, with constitutional malice, continuing their false statements, which were repeated time and again by other news agencies when in fact New York Magazine had a legal and ethical obligation to present a true and accurate report to the public.

118.    As a direct and proximate result of these false statements above, made negligently and with reckless disregard for the truth, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages and presumed damages, under the laws of North Carolina.

## EIGHTH CLAIM FOR RELIEF
### BREACH OF CONFIDENCE
### (Against All Defendants)

119.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

120.    As a direct and proximate result of Defendants' violations of the confidentiality agreements and breaches of confidence, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages.

## NINTH CLAIM FOR RELIEF
### CONVERSION
### (Against The New York Magazine Defendants)

121.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

122.    Defendants used Plaintiffs' proprietary images and distributed these images to third parties for their own profit and benefit. Defendants engaged in conversion because Defendants failed to return the *Task Force Saber Videotape* to Plaintiffs' attorney in violation of the agreement, thereby depriving Plaintiffs of the property.

123.    As a direct and proximate result of the Defendants conversion of Plaintiffs original proprietary materials, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages.

## TENTH CLAIM FOR RELIEF
### NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

124.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

125.    The bulk of the statements made by Defendants constituted fraud, other statements, and those falling outside intentional fraud and/or constructive fraud, were negligent misrepresentations.

126.    Those statements, which may not have been intentional, were made by Defendants in the course of their business and profession. Defendants failed to exercise the care and competence in communicating that information that Plaintiffs justifiably expected.

127.    The duty owed by Defendants was a greater scope of duty in that they had a public duty to provide accurate and truthful information.

128.    As a direct and proximate result of Defendants misrepresentations Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, against each of the Defendants, both jointly and severally.

## ELEVENTH CLAIM FOR RELIEF
### COPYRIGHT INFRINGEMENT
**(Against The New York Magazine Defendants - 17 U.S.C. Sections §§ et seq.)**

129.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

130.    Defendants, as set forth herein, have directly violated the copyrights of Plaintiffs and engaged in the copyright infringement of Plaintiffs' images by other third parties by distributing those materials to their clients.

131.    As a direct and proximate result of Defendants copyright infringement and/or contributory copyright infringement, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus statutory damages, against each of the Defendants, both jointly and severally.

## TWELFTH CLAIM FOR RELIEF
### CONTRIBUTORY COPYRIGHT INFRINGEMENT
**(Against All Defendants - 17 U.S.C. Sections §§ et seq.)**

132.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

133.    Defendants, as set forth herein, have directly violated the copyrights of Plaintiffs and contributed to the copyright infringement of Plaintiffs' images by other third parties by distributing those materials to their clients.

134.    As a direct and proximate result of Defendants copyright infringement and/or contributory copyright infringement, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus statutory damages, against each of the Defendants, both jointly and severally.

### PRAYER FOR RELIEF

**WHEREFORE,** Counter Terrorist Group and Idema pray that this Honorable Court enter judgment in their favor and against Defendants as follows:

1. Awarding Plaintiffs damages in excess of $10,000 against Defendants pursuant to each of the claims for relief.

2. Awarding Plaintiffs punitive damages pursuant to the fifth and sixth claims for relief.

3. Awarding Plaintiffs treble damages, and attorneys' fees against Defendants pursuant to the sixth claim for relief.

4. Awarding Plaintiffs special and presumed damages, corrective advertising, and attorneys' fees against Defendants pursuant to the seventh claim for relief.

5. Entering a Temporary Restraining Order pursuant to the seventh claim for relief as set forth below until such time as a preliminary injunction can be heard and placed in effect until this case is concluded;

(a) adjudge and declare, that the New York Magazine Defendants have contributorily and vicariously infringed Plaintiffs' exclusive rights under the contracts and agreements, and Plaintiffs' rights under North Carolina law;

(b) preliminarily and permanently enjoin, pursuant to Rule 65 (b) of the N.C. Rules of Civil Procedure, the New York Magazine Defendants, their officers, agents, employees and those persons in active concert or participation with them, from directly, contributorily and/or vicariously violating Plaintiffs' rights under the agreements, including but not limited to, any use, exhibition, display or broadcast of Plaintiffs' images or from licensing or allowing any other person to do the same;

(c) preliminarily and permanently enjoin the New York Magazine Defendants from possessing any copies of Plaintiffs' images;

(d) preliminarily and permanently enjoin, pursuant to Chapter 75 of the North Carolina General Statutes, the New York Magazine Defendants, their officers, agents, servants, employees and those persons in active concert or participation with them, from engaging in one or more unfair and/or unlawful business acts or practices, including but not limited to, their possession, use, and/or display of Plaintiffs' pictures or video;

(e) require the New York Magazine Defendants and their officers, agents, servants, employees and those persons in active concert to cease any activity that encourages others to violate Plaintiffs' exclusive property rights in their images, or that encourages or permits viewers or other news organizations to transmit or possess copies of Plaintiffs' images to other persons;

(f) require the New York Magazine Defendants to engage in corrective advertising specifying the source, ownership, and authenticity of the *8mm VideoX al-Qaida Training Tapes and the Task Force Saber Videotapes*, and events related to Idema's case, and

6. Awarding Plaintiffs costs and interest against the New York Magazine Defendants and

7. Granting a trial for all issues that are triable.

Respectfully submitted, this 24th day of October 2007,


J. K. Idema, *Plaintiff*
12 Jonathan Lane
Poughkeepsie, NY 12603
Phone:  910/338-0107
Fax:      480/246-5626
Email: jack@counterterroristgroup.us


For Counter Terrorist Group US, *Plaintiff*
PO Box 691, Fayetteville, NC 28302
Phone:  910/483-5506
Fax:      910/483-5507
Email: Bumback@counterterroristgroup.us


_____/s/_____
Vijayant Pawar (VP-7642)
Lead Counsel for *Counter Terrorist Group US*
Law Offices of VIJAYANT PAWAR
35 Airport Road, Suite 330
Morristown, New Jersey 07960
Phone: (973) 267-4800
Fax:      (973) 215-2882
www.pawarlaw.com
Email: vpawar@pawarlaw.com


John Edwards Tiffany,
Attorney (JT-7322)
*Counsel For Counter Terrorist Group US*
Law Offices of John E. Tiffany P.C.
The Robert Treat Center
50 Park Place, 10th Floor,
Newark, New Jersey 07102
Tel:  (973) 242-3700
Fax: (973) 242-3799
www.JohnTiffanyLaw.com
Email: Jet@Jet4Law.com

Exhibit J

1

Francis C.J. Pizzulli, State Bar No. 67151
718 Wilshire Boulevard
Santa Monica, CA 90401-1708
(310) 451-8020

4

**FILED**
LOS ANGELES SUPERIOR COURT

JUL 1 4 2003

JOHN A. CLARKE, CLERK

BY JENNY CHEN, DEPUTY

Attorney for Plaintiff
J. Keith Idema

6

7

8

9

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10

**FOR THE COUNTY OF LOS ANGELES**

11

12

| | |
|---|---|
| J. KEITH IDEMA, | ) Case No. BC 296228 |
| 13    Plaintiff, | ) Assigned to Hon. Laurie D. Zelon |
| 14    v. | ) |
| 15    FOX NEWS NETWORK LLC; FOX | ) **FIRST AMENDED COMPLAINT** |
| ENTERTAINMENT GROUP, INC.; | ) 1.    Breach of Contract |
| 16    EDWARD A. ARTIS; KNIGHTSBRIDGE | ) 2.    Breach of Contract |
| INTERNATIONAL HUMANITARIAN | ) 3.    Misrepresentation |
| 17    RELIEF AND HUMAN IMPROVEMENT | ) 4.    Interference with Contract |
| PROGRAMS, INC.; JOSEPH A. CAFASSO; | ) 5.    Interference with Prospective |
| 18    ROBERT C MORRIS, JR.; PARTNERS | )    Economic Advantage |
| INTERNATIONAL FOUNDATION; and | ) 6.    Cal. Bus. & Prof. Code § 17200 |
| 19    DOES 1-20, | ) 7.    Cal. Bus. & Prof. Code § 17200 |

Plaintiff,

v.

FOX NEWS NETWORK LLC; FOX
ENTERTAINMENT GROUP, INC.;
EDWARD A. ARTIS; KNIGHTSBRIDGE
INTERNATIONAL HUMANITARIAN
RELIEF AND HUMAN IMPROVEMENT
PROGRAMS, INC.; JOSEPH A. CAFASSO;
ROBERT C MORRIS, JR.; PARTNERS
INTERNATIONAL FOUNDATION; and
DOES 1-20,

Defendants.

20

21

22

23

24

25

26

1
FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

PARTIES...................................................................................................................... 3

GENERAL ALLEGATIONS........................................................................................ 4
 *Preface – Network Redux...... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...* 4
 *Idema's Commentator Relationship with Fox in Los Angeles ... ... ... ... ... ... ... ...* 4
 *Idema's Afghanistan Mission....................................................................... ...5*
 *The Inception of the Fox/Cafasso-Artis-Morris Relationship.................................5*
 *Idema's Commentator Relationship with Fox in Afghanistan.................................6*
 *The Formation of the Fox/Cafasso-Artis-Morris Conspiracy................................... ...7*
 *The 8mm Videoˣ al-Qaida Training Tapes........................................................ 8*
 *Heart of Darkness... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...... ... ....9*
 *Heart of Darkness Revisited - Colonel Kurtz... ... ... ... ... ... ... ... ... ... ....10*
 *The Defrocking of Cafasso and Artis................................................................10*
 *The Sham Ariana Film License......................................................................11*
 *Interference in Connection with THE HUNT FOR BIN LADEN.............................12*

FIRST CAUSE OF ACTION
 Breach of Contract
 Plaintiff Idema Against Defendant Fox News...................................................... 13
SECOND CAUSE OF ACTION
 Breach of Contract
 Plaintiff Idema Against Defendant Fox News......................................................13
THIRD CAUSE OF ACTION
 Misrepresentation
 Plaintiff Idema Against Defendants Fox Entertainment Group, Fox News and Does 1-20....14
FOURTH CAUSE OF ACTION
 Interference with Contract
 Plaintiff Idema Against Defendants Artis, Knightsbridge, Cafasso, Morris, Partners
 International Foundation and Does 1-20................................................................15
FIFTH CAUSE OF ACTION
 Interference with Prospective Economic Advantage
 Plaintiff Idema Against Defendants......................................................................15
SIXTH CAUSE OF ACTION
 Cal. Bus. & Prof. Code § 17200
 Plaintiff Idema Against Defendants Fox Entertainment Group, Fox News, and Does 1-20... 16
SEVENTH CAUSE OF ACTION
 Cal. Bus. & Prof. Code § 17200
 Plaintiff Idema Against Defendants Artis and Knightsbridge International.....................16

Plaintiff J. Keith Idema alleges for his first amended complaint as follows:

## PARTIES

1.     Plaintiff J. Keith Idema, a.k.a. Jack Idema, is an individual who transacts business in the County of Los Angeles, State of California.

2.     Defendant Fox News Network LLC ("Fox News") is a business entity organized under the laws of the State of New Jersey, doing business in the County of Los Angeles and State of California.  Fox News operates the Fox News Channel on cable television.

3.     Defendant Fox Entertainment Group, Inc. is a corporation organized under the laws of the State of Delaware, doing business in the County of Los Angeles and State of California.  Fox News Network LLC is owned and operated by Fox Entertainment Group, Inc. (collectively, "Fox").

4.     Defendant Edward A. Artis is a resident of the County of Los Angeles and a citizen of the State of California.

5.     Defendant Knightsbridge International Humanitarian Relief and Human Improvement Programs, Inc. ("Knightsbridge") is a corporation organized under the laws of the State of California. Artis is a principal of Knightsbridge (collectively, "Artis").

6.     Defendant Joseph A. Cafasso is an individual residing at times in the State of New Jersey.

7.     Defendant Robert Clinton Morris, Jr. is an individual residing at times in the State of Georgia.  Colonel Morris, at all relevant times alleged herein, was and is an active duty officer in the United States Army Infantry assigned to Fort Benning, Georgia.

8.     Defendant Partners International Foundation is a business entity organized under the laws of the State of Connecticut.  Defendant Morris is a principal of Partners International Foundation (collectively, "Morris").

9.     Plaintiff is ignorant of the true names and capacities, whether individual, corporate, associate, or otherwise, of defendants sued herein as Does 1-20, inclusive, and therefore sues these defendants by such fictitious names.  Plaintiff will amend his complaint to allege their true names and capacities when ascertained.

10.     At all times herein mentioned each defendant, including Defendants Does 1-20, was the agent, servant, employee and/or co-conspirator of each of the remaining defendants, and in doing the things hereinafter alleged were acting within the purpose and scope of their authority as such

agent, servant, employee and/or co-conspirator, and with the knowledge, permission and consent, express or implied, of each of the remaining defendants.

## GENERAL ALLEGATIONS

### *Preface – Network Redux*

11.    During the U.S. Military conflict in Afghanistan, which Fox hoped would prove its Persian Gulf War, vaulting it ahead of CNN in the ratings, J. Keith Idema entered into an agreement with Fox News to provide expert commentary for Fox News Channel. Fox later terminated that agreement, while Idema was in Afghanistan, and failed to compensate Idema for his time and expenses while in its employ. Morris and Cafasso had successfully lobbied Cafasso's Fox superiors to renege on its contract with Idema. Each with his own vendetta against Idema, Cafasso, Morris and Artis worked tirelessly to impugn Idema's credibility, thereby sabotaging his relationship with media, business and military contacts. More saliently, Fox, *et al.* colluded to expropriate Idema's ownership of a unique and valuable set of film footage, the 8mm VideoX Tapes, which show al-Qaida terrorist training activities. Since August of 2002, Fox News Channel has repeatedly broadcast excerpts from these tapes without once compensating Idema, a practice which has irrevocably damaged not only the value of the tapes in terms of licensing, but which has also unfairly deprived Idema of his legal right to compensation for use of his property.

### *Idema's Commentator Relationship with Fox in Los Angeles*

12.    Idema is also Green Beret (and a former member in the U.S. Army Special Forces) with an extensive background in special operations, hostage rescue, and counter-terrorism. In the private sector, Idema has trained members of various organizations, including the FBI, U.S. Treasury Department, Secret Service, U.S. Customs, DEA, U.S. Navy SEALs, and British, German, and French anti-terrorist units in hostage rescue, tactical shooting, special operations, and counter-terrorism.

13.    Idema is also an accredited journalist, and shared a 2001 National Press Club award for online journalism.

14.    In the days following September 11, 2001, Idema and Fox Entertainment Group's subsidiary, Fox Television Stations, Inc. entered into an oral contract, in the County of Los Angeles, in which they agreed that Idema would provide expert commentary on terrorism and counter-terrorism issues on KTTV-11 in Los Angeles, California.  Pursuant to such agreement, Idema provided televised commentary for Fox Channel 11 from its Los Angeles studio on a *pro bono* basis.

*Idema's Afghanistan Mission*

15.    Immediately after the September 11 attacks, Idema attempted to return to duty with the U.S. Army Special Operations Command.  At the age of 45, however, he was told that he was too old to be rapidly deployed to Afghanistan.

16.    On October 11, 2001, President George W. Bush invited support for the war on terror as follows:  "If you want to join the coalition against terror, we'll welcome you in. ...all I ask is for results... If you say you want to join us militarily...do so...If you're interested in sharing intelligence, share intelligence."  In October, 2001, Idema entered Afghanistan to join the anti-terrorism effort.  He remained in Afghanistan until June 2002.

17.    During his nine-month tenure in Afghanistan, Idema engaged in extensive humanitarian efforts as well as combat and counter-terrorist operations.  Initially, Idema's efforts included support for Partners International, a non-government humanitarian aid organization operated by his friend Morris. While in Afghanistan, Idema led several humanitarian efforts, uncovering and correcting serious problems involving the alleged Taliban poisoning of food drops from the United States military to the Northern Alliance, operating on wounded Afghan soldiers, rescuing victims during the 2002 Nahrin earthquake, averting a major disaster in the Salang tunnel north of Kabul, and delivering medicine and toys to wounded children.

18.    Idema became a Special Advisor to several factions of the United Front Military Forces, and eventually to the United Front (a.k.a. the Northern Alliance) itself.  Some of his activities are recounted in Robin Moore's *The Hunt for Bin Laden: Task Force Dagger*, published by Random House, Inc. in March 2003.

*The Inception of the Fox/Cafasso-Artis-Morris Relationship*

5

19.    Shortly after his arrival in Afghanistan, Idema met "Sir" Edward Artis of Knightsbridge. Artis proclaims himself to be a Knight of Malta, a Ph.D., a former U.S. Army Special Forces Medic and Master Sergeant, and to possess a long list of awards for heroism in combat, including the Silver Star. Artis publicly represented in interviews on CNN and PBS that Knightsbridge had donated many millions of dollars worth of aid in international zones of conflict. Based on Artis' representations, Idema also began to help Knightsbridge in Afghanistan. Moreover, he introduced, by e-mail, his longtime friend Morris to Artis.

20.    In or about November 2001, Cafasso was hired by Fox as a military expert on the Afghanistan conflict and the U.S. Special Operations Forces. Fox represented that Cafasso was a highly decorated retired Green Beret Lieutenant Colonel. Cafasso also claimed to have been awarded three Silver Stars.

21.    Cafasso operated under the auspices of Fox. He was an employee of Fox News. He was given a Fox News e-mail address with the domain name FoxNews.com, Fox News stationery, and a business card listing Cafasso as "Military/ Counter Terrorism Advisor" at the Fox News Washington, D.C., bureau address. Cafasso was listed on the Fox Washington Bureau Confidential Phone List. In his role at Fox, Cafasso came in contact with Morris and Artis.

*Idema's Commentator Relationship with Fox in Afghanistan*

22.    On or about November 20, 2001, Fox retained Idema in an expert commentator position pursuant to an oral agreement. In light of the fact that there were no embedded journalists in the Afghanistan conflict, Idema was in a unique position to provide Fox News with "ground truth," and Fox repeatedly requested that he go to hostile areas into which other journalists could or would not go. Fox stated: "there aren't many things that we DON'T want you to do – except perhaps spend time in cities that are already peaceful." Fox made an oral agreement to pay Idema for his services, payments which Idema designated to be used for medical supplies for American allies in Afghanistan.

23.    Idema was first interviewed on Fox News Channel in Afghanistan on November 22, 2001 by Linda Vester.

24.    While Fox requested Idema to release them of responsibility should he be injured or killed, they reassured him in writing that they were not "fair weather friends."

*The Formation of the Fox/Cafasso-Artis-Morris Conspiracy*

25.    While in Afghanistan with Idema, Artis engaged in an activity with which Idema disagreed. Idema reported Artis' action to the U.S. government. Later, when Artis and Morris failed to obtain a large grant they had requested from the U.S. government, they attributed that rejection to Idema's actions.

26.    On or about December 6, 2001, Idema reported for Fox News on the events surrounding the tragic American casualties in Kandahar. Prior to describing the incident on the air, Idema had informed a Fox correspondent and the U.S. Army as to what he would say: *i.e.*, that a U.S. Army officer had mistakenly called in the wrong coordinates, and that enemy forces were in close proximity, resulting in a B-52 bomber dropping a JDAM bomb on Special Forces personnel and Afghan soldiers. The mistake led to the deaths of, *inter alia*, J.D. Davis, Dan Petithory and Brian Prosser. Idema's version of events conflicted with Fox's previous on-air announcement that the tragedy was due to a mechanical problem. Idema stood by what he knew was true and went on the air saying the incident was due to human error, contrary to Fox's statement. Idema also stated that the initial ground intelligence indicated that the Special Forces team may have intentionally called the airstrike near their position, but that it was not a mechanical failure.

27.    This conflict was the culmination of a series of disagreements between Fox and Idema about journalistic ethics. In the course of consulting with Fox News Network's office in Kabul, Afghanistan, Idema became aware of Fox's practice of making cash payments to, *inter alia*, former members of the Taliban for interviews and other information. Idema repeatedly advised Fox's local representative and other Fox officials against such payments. In particular, Idema objected to the payments to former Taliban members because, *inter alia*, such payments could be used to materially support Taliban and al-Qaida activities. Fox rejected Idema's advice and continued to pay significant sums of cash to Taliban sympathizers. Idema also refused to give Fox information on military operations which were classified.

28.    Fox thereupon terminated Idema's consultancy. Fox then refused to compensate Idema and reimburse his expenses, in direct violation of the express terms of the parties' agreement.

29.    Fox, however, did not stop at simple breach of its agreement with Idema. Fox entered into a conspiracy with the disgruntled Artis and Morris (the Fox/Cafasso-Artis-Morris Conspiracy). Pursuant to this conspiracy, Fox's Cafasso informed co-conspirator Morris that he had spoken with

John Moody (Senior Vice President, News Editorial), Dianne Brandi (Vice Counsel) and other Fox News executives about Idema. He alternately referred to Idema as "Rambo" and "Colonel Kurtz" (of *Apocalypse Now*/Conrad's *Heart of Darkness*). The conspirators were concerned that Idema's unique position in the war zone would make him an attractive asset to competitive news organizations.

30.    Cafasso and Morris knew that Idema was short on funds as a result of his mission to Afghanistan. Fox refused to pay Idema what it owed him for his appearances, and refused to reimburse his satellite phone bills, which were very high. The refusal of Fox to pay Idema what he was owed was intended to result in his satellite communications being disconnected, therefore cutting him off from those other news organizations – to "keep him off the air with everyone else."

31.    Fox's refusal to reimburse Idema had more than its intended effect. Idema's wife was forced to use her rent money to purchase medical supplies Idema had promised the anti-Taliban forces and she was left short of the funds to pay the rent on their North Carolina house. She was evicted.

32.    Cafasso reported to Morris that Kim Hume, the Washington, D.C. News Bureau Chief, had advised the Fox News Kabul office to put out the word that Idema was fired for "questionable ethics, endangering U.S. Forces and being linked to the Taliban." A poster was then distributed in Afghanistan of a photo of Idema, a still taken from a Fox News video. Idema, whom already had a bounty on his head from the Taliban/al-Qaida, was placed in further jeopardy by this public display of his image.

*The 8mm VideoX al-Qaida Training Tapes*

33.    In November and December 2001, Idema, in his role with Northern Alliance Forces, captured and obtained as spoils of war what are known as the 8mm VideoX al-Qaida Training Tapes (the "8mm VideoX Tapes"). These unique and highly valuable 8mm VideoX Tapes show al-Qaida recruits learning the specifics of such terrorist tactics as drive-by assassinations and building assaults for hostage-taking purposes and training to assassinate the President of the United States and other world leaders. They also identified numerous al-Qaida members. Idema informed the U.S. government of the 8mm VideoX Tapes and ensured that a copy was duly delivered to an intelligence agency.

34.    In Afghanistan, the 8mm VideoX Tapes are recognized to be Idema's property. They are recognized to be Idema's property around the world by major media organizations, including ABC, BBC, the *Boston Globe*, CBS, CNBC, CNN, MSNBC, NBC, *Newsweek*, and *Time*. Idema retained an agent to license the tapes to support humanitarian and combat operations in Afghanistan.

35.    Given their focus on coverage of the Afghanistan conflict, the 8 mm VideoX Tapes became a high priority issue for Fox. A senior executive of Fox News telephoned Idema's wife directly in an attempt to persuade her and Idema to license the tapes to Fox.

36.    Meanwhile, in or about early January 2002, Morris commenced preparation of maliciously false suggested on-air dialogue for use by a Fox military analyst. This dialogue implied that Idema staged various scenes depicted on the 8mm VideoX Tapes and fraudulently staged the terrorist training.

37.    Contemporaneously, Fox's Morris and Cafasso plotted to engage in what they termed "psychological warfare" with Idema's wife. Their plan was to use Morris's friendship with her to obtain information regarding the competition for access to the 8 mm VideoX Tapes.

38.    On January 9, 2002, a telephone conversation occurred between Kevin Magee, Vice President of News Programming for Fox News, and Wayne Kabak, Idema's agent and Senior Vice President of William Morris Agency, Inc. In that conversation, Magee and Kabak discussed Fox's obtaining of a copy (the "Sample Tape") of a 56-minute clip reel that had been made from the 8 mm VideoX Tapes. Magee agreed that were Kabak to deliver the Sample Tape to Fox: (a) no copies would be made of it; (b) it would be promptly returned; and (c) no broadcast or other use of the footage would be made unless terms were agreed upon. Based on said representations, William Morris Agency released a copy of the Sample Tape to Fox.

*Heart of Darkness*

39.    On January 16, 2002, *60 Minutes II* broadcast a segment entitled "Heart of Darkness," in which Dan Rather interviewed Idema in Afghanistan. The segment showed excerpts from the Sample Tape.

40.    After Dan Rather's report, the proposed dialogue prepared by Morris with Cafasso, for Fox, discrediting the 8mm VideoX Tapes, was never used. The story in progress about Idema, which had been slugged for a prominent Fox News show, was dropped.

*Heart of Darkness Revisited - Colonel Kurtz*

41.    The conspirators were frustrated by the validation of Idema's 8 mm VideoX Tapes by not only Dan Rather and CBS but also the *Boston Globe*, which ran a feature story on the tapes doing so on January 13, 2002. Morris expressed his distress to various Fox News executives and reporters. Correspondence between Cafasso and Morris continued to refer to Idema as "Colonel Kurtz" – an allusion to the film *Apocalypse Now* – and even asked "where is Martin Sheen when you need him?" (In the film Martin Sheen played a character dispatched to "terminate with prejudice" the problematic Colonel Kurtz.)

42.    Cafasso recommended to his superiors at Fox that they have Idema arrested, but also stated that the best way to solve the problem of Idema would be to get the Army to "permanently stop him."

43.    Idema licensed the 8mm VideoX tapes to various media outlets. While in Afghanistan Idema used those licensing fees for medical supplies, food, and other relief efforts for the Northern Alliance and Afghani families and to support his own operations against the Taliban and al-Qaida terrorists.

44.    Idema's licensing the 8mm VideoX Tapes to competitors was perceived as being so bad that Cafasso called CENTCOM (U.S. Central Command in Tampa, Florida) and threatened that unless they did something about Idema immediately that Fox would go public with information that they had previously suppressed about the friendly fire incident near Kandahar. Cafasso asked CENTCOM why they did not just take him out and end it now. Cafasso's personal recommendation was to use a suppressor.

*The Defrocking of Cafasso and Artis*

45.    On April 29, 2002, the *New York Times* published a story by Jim Rutenberg entitled "At Fox News, the Colonel Who Wasn't." It was revealed that Cafasso's total military experience was 44 days of boot camp in 1976. Thus, he did not win a Silver Star for bravery in Vietnam, or anywhere else, as he had represented, and had never been a Green Beret or a Lieutenant Colonel.

46.    In a similar vein, Idema is informed and believes that Artis is a self-styled knight; purchased his Ph.D. from an online university in Russia that no longer exists; was never awarded the

Silver Star; was never a Master Sergeant; was never Special Forces qualified; and never served a single day in the U.S. Army Special Forces. Moreover, his Knightsbridge organization, which publicly promotes itself as donating millions of dollars in aid to war-torn areas, actually only donated an average of less than $40,000 per year on its federal tax returns before the Afghanistan conflict.

*The Sham Ariana Film License*

47.    Fox has failed to return the copy of the Sample Tape delivered to it on January 9, 2002. Beginning in early August of 2002, and continuing into the present, Fox has televised hundreds of minutes of footage from Idema's 8mm VideoX Tapes.

48.    The 56-minute video tape (from which the Sample Tape was made) had been delivered to William Morris Agency on or about January 8, 2002 by a magazine reporter whom Idema had entrusted in Kabul to deliver the tape directly to his agents in New York City. The reporter and his magazine signed a strict confidentiality agreement with Idema that prohibited the making of any copies of the tape. Idema was subsequently informed that the reporter and his magazine violated this agreement by making copies of the tape prior to delivery to Idema's agents.

49.    Shortly after commencement of Fox's broadcasts in August 2002, the supervising editor of the aforementioned reporter (who had transported a videotape to the United States) began appearing on Fox News Channel as a commentator. The reporter himself also subsequently appeared in a similar capacity. At least two of the editor's appearances included broadcast of excerpts from the 8mm VideoX Tapes.

50.    Fox has refused to honor its January 9, 2002 representations to Idema's agent at William Morris Agency. Fox has failed to otherwise license the 8mm VideoX Tapes or to pay for its commercial broadcast of the footage. Fox is the only network or broadcast company which airs said footage without acknowledging Idema's rights to it. Fox has refused Idema's request to cease and desist broadcast of excerpts from the 8mm VideoX Tapes.

51.    Fox asserts that it obtained rights to copies of portions of the 8mm VideoX Tapes from an Afghani company, Ariana Film. However, Idema has never granted any rights to Ariana Film to sell footage from the 8mm VideoX Tapes. In any event, Ariana Film maintains that it has no al-Qaida training footage in its archive, nor has it ever sold any al-Qaida film to Fox.

*Interference in Connection with THE HUNT FOR BIN LADEN*

52.    In March 2003, Artis, Knightsbridge, Cafasso, Morris and Partners Int'l. Foundation continued their interference with Idema's interests by making and causing to be published maliciously false oral and written statements to various persons and media to the effect that Idema was never a Green Beret and/or that he was involuntarily dismissed from the U.S. Army Special Forces, and that the recounting of his activities in Robin Moore's *The Hunt for Bin Laden* was fictitious. These statements were false and made with the intent to injure Idema. The statements have interfered with the licensing of the 8mm VideoX Tapes and other business opportunities, and have otherwise caused damage to Idema.

53.    In July 2003, Morris continued his interference with Idema's interests, and began an obsessive campaign to rewrite history, and write Idema out of it. In a Stalinistic-type purge of revisionist history, Morris began to rewrite *The Hunt for bin Laden*, using his U.S. Army computer and his official U.S. Army e-mail address.

54.    Morris made threats to effectuate his submission of rewrites. Morris's changes and rewrites were then submitted to Robert Loomis, Vice President and Executive Editor of Random House, Inc. Among the 101 pages of rewrites that Morris submitted in Adobe PDF files and faxes to Moore and Loomis, was a total removal of Idema from the entire *Hunt for bin Laden*, including the removal of his photo from the cover of the book, and all references to him removed from the entire body of the text.

55.    Morris also wanted to rewrite history with the additions of his relationship with FOX News, adding in a section as follows: "*The Milawa scenario, which virtually every media organization, except an insightful FOX News virtually ignored, is supported by...*"

56.    In the copious notes written by Morris, which accompanied the changes to Moore and Loomis were numerous references to FOX News being the source of his information for his revisionist rewrite, including references to obtaining tapes from Fox News' Washington Bureau for his rewrite of *The Hunt for bin Laden*.

57.    In addition to authoring revisionist and biased history, Morris made an addition to the book's Appendix. Morris removed the Counter-Terrorist Relief Fund section and added in Point of Contact info for his, and his co-conspirator's organizations, namely Partners' International and Knightsbridge.

**FIRST CAUSE OF ACTION**

**(Breach of Contract)**

**(Plaintiff Idema Against Defendant Fox News)**

58.    Plaintiff hereby incorporates by reference the allegations of paragraphs 1-52 above.

59.    In or about November 2001, Fox and Idema entered into a consulting agreement whereby Idema agreed to provide expert commentator services from Afghanistan. Fox subsequently agreed to compensate Idema, and reimburse certain expenses.

60.    In breach of this agreement, Fox has failed to compensate Idema for twelve days of services rendered and for expenses incurred.

61.    Idema has performed all of his obligations to Fox except those obligations he was prevented or excused from performing as a result of Fox's actions.

62.    Idema has suffered consequential damages in a sum to be proved at trial.

**SECOND CAUSE OF ACTION**

**(Breach of Contract)**

**(Plaintiff Idema Against Defendant Fox News)**

63.    Plaintiff hereby incorporates by reference the allegations of paragraphs 1-52 above.

64.    On or about January 9, 2002, Fox and Idema entered into an agreement that if Idema gave a copy of the 8mm VideoX footage to Fox that no copies would be made of it, that the original would be returned to him promptly, and that no broadcast or other use of the footage would be made unless terms were agreed upon.

65.    On numerous occasions in 2002 and 2003, Fox has breached the agreement by repeatedly broadcasting significant and substantial portions of the 8mm VideoX Tapes without obtaining an agreement from Idema to do so. They have also failed to return the Sample Tape.

66.    Idema has performed all of his obligations to Fox except those obligations he was prevented or excused from performing as a result of Fox's actions.

67.     Idema has suffered direct and consequential damages in a sum in excess of $2.4 million, to be proved at trial.

68.     Fox's continued breaches of the agreement threaten to waste the licensing value of the 8mm VideoX Tapes and to cause irreparable injury. It would be extremely difficult to ascertain the amount of compensation which would afford adequate relief. Therefore, Idema is entitled to injunctive and equitable relief ordering the return of the Sample Tape copy given to Fox, and restrain Fox and its affiliates and any person obtaining a copy thereof from Fox from any further broadcast of material taken from the 8mm VideoX Tapes. Such relief is also necessary to prevent a multiplicity of judicial proceedings.

## THIRD CAUSE OF ACTION

### (Misrepresentation)

**(Plaintiff Idema Against Defendants Fox Entertainment Group, Fox News and Does 1-20)**

69.     Plaintiff hereby incorporates by reference the allegations of paragraphs 1-52 above.

70.     On or about January 9, 2002, Kevin Magee of Fox orally represented to Idema's agent, William Morris Agency, Inc., that if they gave a copy of the 8mm VideoX footage to Fox that no copies would be made of it; that the origin would be returned promptly; and that no broadcast or other use of it or any part of it would be made unless terms were agreed upon. On January 9, 2002, in reliance upon such representations and agreement, Idema's agent, William Morris Agency, released a copy of the sample footage to Fox subject to a written confirmation of the agreement.

71.     Fox has never returned the copy of the 8mm VideoX footage that was delivered to it on January 9, 2002.

72.     At the time Idema's agent arranged the delivery of the copy of the 8m VideoX footage to Fox, Idema did not know Fox's representations were false, but rather believed them to be true.

73.     Idema acted in justifiable reliance upon the truth of Fox's representations.

74.     Moreover, Fox concealed or suppressed the material facts concerning the Fox/Cafasso-Artis Conspiracy. At the time Idema's agent delivered such copy to Fox, Idema was not aware of the concealed or suppressed facts and would not have delivered the copy if he had known of such facts.

75.     Fox's frequent broadcast of significant and substantial portions of the 8mm VideoX

Tapes has depressed the licensing value of such tapes.  As a result of Idema's justifiable reliance upon Fox's representations, Idema has suffered compensatory damages in a sum in excess of $4 million, to be proved at trial.

76.    Fox has acted, pursuant to its misrepresentations and in participation in the Fox/Cafasso-Artis Conspiracy, with the requisite degree of malice, fraud and oppression so as to entitle Idema to an award of exemplary and punitive damages in a sum to be proved at trial.

## FOURTH CAUSE OF ACTION

### (Interference with Contract)

**(Plaintiff Idema Against Defendants Artis, Knightsbridge, Cafasso, Morris, Partners International Foundation and Does 1-20)**

77.    Plaintiff hereby incorporates by reference the allegations of paragraphs 1-52 above.

78.    Defendants Artis, Knightsbridge, Cafasso, Morris, Partners International Foundation and Does 1-20 had knowledge of: (a) Fox's agreement with Idema regarding his expert commentator services, and of (b) Fox's January 9, 2002 agreement with Idema regarding delivery of a copy of the Sample Tape as set forth above.

79.    Said defendants induced Fox to breach each of the two agreements, including publication of maliciously false allegations regarding Idema.

80.    Said defendants' interference with the Fox agreements has caused Idema to suffer consequential and compensatory damages in a sum in excess of $2.4 million, to be proved at trial.

81.    Said defendants acted with the requisite degree of malice, fraud and oppression so as to entitle Idema to an award of exemplary and punitive damages in a sum to be proved at trial.

## FIFTH CAUSE OF ACTION

### (Interference with Prospective Economic Advantage)

### (Plaintiff Idema Against Defendants)

82.    Plaintiff hereby incorporates by reference the allegations of paragraphs 1-52 above.

83.    Defendants have knowledge of Idema's economic opportunity with respect to licensing the 8mm VideoX Tapes to other broadcast companies and competitors of Fox, and to other

media as well.

84.     Defendants intended to interfere with such prospective economic advantage of Idema, including pursuant to the Fox/Cafasso-Artis Conspiracy.

85.     Defendants intentionally, recklessly and/or negligently interfered with such prospective economic advantage by: (a) Fox's indiscriminate, repetitive, unlicensed broadcasting of significant and substantial portions of the 8mm VideoX Tapes, to the extent that they have come to be associated with Fox, and (b) the publication of maliciously false allegations about Idema and the legitimacy of such tapes.

86.     As the alleged result of Defendants' interference, Idema has lost licensing opportunities for, and licensing value of, the 8mm VideoX Tapes. Defendants' interference has allegedly caused compensatory damages in a sum in excess of $4 million, to be proved at trial.

87.     Defendants acted with the requisite degree of malice, fraud and oppression so as to entitle Idema to an award of exemplary and punitive damages in a sum to be proved at trial.

### SIXTH CAUSE OF ACTION

### (Cal. Bus. & Prof. Code § 17200)

### (Plaintiff Idema Against Defendants Fox Entertainment Group, Fox News, and Does 1-20)

88.     Plaintiff hereby incorporates by reference the allegations of paragraphs 1-52 above.

89.     Defendant Fox's actions constitute unlawful, unfair, and fraudulent business acts and/or practices, as prohibited by C. Bus. & Prof. Code § 17200 *et seq.*

90.     Idema is entitled to temporary, preliminary and permanent injunctive and equitable relief, pursuant to C. Bus. & Prof. Code § 17203.

91.     Idema is entitled to his reasonable attorneys' fees and costs incurred herein.

### SEVENTH CAUSE OF ACTION

### (Cal. Bus. & Prof. Code § 17200)

### (Plaintiff Idema Against Defendants Artis and Knightsbridge International)

92.     Defendants' actions constitute unlawful, unfair, and fraudulent business acts and/or

practices, and unfair, deceptive, untrue or misleading advertising as prohibited by C. Bus. & Prof. Code § 17200.

WHEREFORE, Plaintiff J. Keith Idema prays for judgment on his complaint as follows:

1.      On his first cause of action, for an award of consequential damages in a sum to be proved at trial;

2.      On his second cause of action, for an award of consequential damages in a sum in excess of $2,400,000 to be proved at trial, and for temporary, preliminary and permanent injunctive and equitable relief;

3.      On his third cause of action, for an award of compensatory damages in a sum in excess of $4,000,000 to be proved at trial, and for an award of exemplary and punitive damages in a sum to be proved at trial;

4.      On his fourth cause of action, for an award of compensatory damages in a sum in excess of $2,400,000 to be proved at trial, and for an award of exemplary and punitive damages in a sum to be proved at trial;

5.      On his fifth cause of action, for an award of compensatory damages in a sum in excess of $4,000,000 to be proved at trial, and for an award of exemplary and punitive damages in a sum to be proved at trial;

6.      On his sixth cause of action, for temporary, preliminary and permanent injunctive and equitable relief;

7.      On his seventh cause of action, for temporary, preliminary and permanent injunctive and equitable relief;

8.      For an award of prejudgment interest;

9.      For an award of reasonable attorneys' fees and costs incurred herein; and

10.      For such other relief as the Court deems proper.

Dated: July ___, 2003

By: _____

Francis C.J. Pizzulli

Attorney for Plaintiff J. Keith Idema

17
FIRST AMENDED COMPLAINT

## PROOF OF SERVICE
### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 718 Wilshire Blvd., Santa Monica, CA 90401-1708.

On July 14, 2003, I served the foregoing document described as

**FIRST AMENDED COMPLAINT**

on the interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

| | |
|---|---|
| Allan E. Ceran, Esq.<br>Rodi, Pollock, Pettker, Galbraith & Cahill<br>444 South Flower Street, Suite 1700<br>Los Angeles, CA 90071-2901 | Attorneys for Fox News Network LLC and<br>Fox Entertainment Group, Inc. |

| | |
|---|---|
| Edward A. Artis<br>24343 Vanowen Street<br>West Hills, CA 91307-2848 | Joseph A. Cafasso<br>29 Swarthmore Drive<br>Carteret, New Jersey 07008 |
| Knightsbridge International Humanitarian Relief and<br>Human Improvement Programs, Inc.<br>Post Office Box 4394<br>West Hills, CA 91308-4394 | Colonel Robert C. Morris, Jr.<br>605 Baltzell Avenue<br>Fort Benning, GA 31905 |
| | Partners International Foundation<br>41 Cedar Hill Road<br>Newtown, CT 06470 |

___xx___ **BY U.S. MAIL** I am readily familiar with the practice of collection & processing of correspondence for mailing at Santa Monica, California in the ordinary course of business. I so deposited the above-referenced documents, postage prepaid, for collection and mailing to the above address(es).

_____ **BY U.S. MAIL** I am readily familiar with the business' practice of collection & processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Santa Monica, California in the ordinary course of business. I so deposited such envelope for collection and mailing.

_____ **BY TELECOPIER** I telecopied such document to the addressee at the telecopier number listed for each addressee.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct and that this declaration was executed on July 14, 2003 at Santa Monica, California.

_Allegra McBane_
Allegra McBane

1

1  Michael L. Sandford, State Bar No. 67442
   LAW OFFICES OF MICHAEL L. SANDFORD, INC.
2  205 East Figueroa Street
   Santa Barbara, CA   93101
3  Tel. (805) 962-4413
   Fax. (805) 568-1641
4  Email: mls@silcom.com

**FILED**
LOS ANGELES SUPERIOR COURT

FEB 1 4 2006

JOHN A. CLARKE, CLERK

BY K. MASON, DEPUTY

5  Attorneys For Defendants and Cross-Complainants
   EDWARD ARTIS, KNIGHTSBRIDGE INTERNATIONAL
6  HUMANITARIAN RELIEF AND HUMAN
   IMPROVEMENT PROGRAMS, INC.
7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9         FOR THE COUNTY OF LOS ANGELES- CENTRAL DISTRICT

10

11 J. KEITH IDEMA,                    ) CASE NO.  BC 296228
                                      )
12      Plaintiff,                    ) [Assigned For All Purposes to
                                      )    Judge Irving S. Feffer]
13                                    )
                                      )
14      vs.                           )
                                      ) ORDER DENYING PLAINTIFF'S MOTION
15 FOX NEWS NETWORK,LLC; FOX          ) FOR RECONSIDERATION RE PRIOR
   ENTERTAINMENT GROUP, INC.;         ) MONETARY DISCOVERY SANCTIONS
16 EDWARD A. ARTIS; KNIGHTSBRIDGE     ) ORDERED IN FAVOR OF DEFENDANTS
   INTERNATIONAL HUMANITARIAN         ) ARTIS AND KNIGHTSBRIDGE
17 RELIEF AND HUMAN IMPROVEMENT       ) INTERNATIONAL
   PROGRAMS, INC.; JOSEPH A.          )
18 CAFASSO; ROBERT C. MORRIS,         ) First Amended Complaint Filed:
   JR.; PARTNERS INTERNATIONAL        )       July 14, 2003
19 FOUNDATION; and DOES 1-20,         )
                                      ) Final Status Conf.: June 15,2005
20                                    ) Trial Date: August 2, 2005
        Defendants.                   ) Department: 51
21 _____  ) Motion Date: January 11, 2006
                                      ) Time: 9:00 a.m.
22 AND RELATED CROSS-ACTION           ) Dept. 51
                                      )
23 _____  )

24      The motion filed by plaintiff J. KEITH IDEMA ("IDEMA") for

25 reconsideration of the Court's prior order dated July 18, 2005

26 awarding monetary discovery sanctions in favor of defendants and

27 cross-complainants EDWARD A. ARTIS ("ARTIS") and KNIGHTSBRIDGE

28 INTERNATIONAL HUMANITARIAN RELIEF AND HUMAN IMPROVEMENT PROGRAMS,

                                    - 1 -        ORDER DENYING PLAINTIFF'S MOTION FOR
                                                 RECONSIDERATION OF MONETARY SANCTIONS
ORIGINAL

1  INC. ("KIH") against IDEMA came on regularly for hearing after

2  being continued from a prior hearing date in November 2005.  Francis

3  Pizzulli, Esq. appeared fo the moving party IDEMA and Michael L.

4  Sandford appeared for the opposing parties ARTIS and KIH.

5      After considering the contents of the moving papers, the

6  opposition filed to the motion, the lack of a memorandum of points

7  and authorities or declarations filed with the motion, the contents

8  of the Court's file, the prior dismissal of this case entered by the

9  Court in August 2005 as to ARTIS and KIH, and the arguments of

10 counsel, the Court enters the following Order.

11     IT IS HEREBY ORDERED AS FOLLOWS:

12     1.  Plaintiff IDEMA's motion for reconsideration of the Court's

13 prior order dated July 18, 2005 awarding monetary discovery

14 sanctions in favor of defendants and cross-complainants EDWARD A.

15 ARTIS ("ARTIS") and against plaintiff J. KEITH IDEMA is denied in

16 its entirety.

17     2.  The request for monetary sanctions by defendants and cross-

18 complainants ARTIS and KIH in said motion is denied.  No further

19 monetary sanctions will be awarded by the Court with respect to this

20 motion.

21     IT IS SO ORDERED.

22

23

24 Dated: ~~January~~ ___, ~~2006~~    FEB 1 4 2006

25                                     Irving S. Feffer
                                       Judge of the Superior Court
26

27

28 \\Mlsxp\wp\Artis\Idema\Pleadings\OrderArtis2.pld.wpd

ORDER DENYING PLAINTIFF'S MOTION FOR
RECONSIDERATION OF MONETARY SANCTIONS

1

**PROOF OF SERVICE**
SUPERIOR COURT OF THE STATE OF CALIFORNIA

2

FOR THE COUNTY OF LOS ANGELES - CENTRAL DISTRICT
Idema vs. Fox News Network LLC, et al.

3

CASE NO. BC296228

4

    I, the undersigned, state that I am a citizen of the United

5

States, am over 18 years of age, and am not a party to the within
action. My business address is 205 East Figueroa Street, Santa
Barbara, California 93101. On January 27, 2006, I served the **ORDER**

6

**DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION RE PRIOR MONETARY**
**DISCOVERY SANCTIONS ORDERED IN FAVOR OF DEFENDANTS ARTIS AND**

7

**KNIGHTSBRIDGE INTERNATIONAL** on the interested parties in this
action listed below to the following persons at the following

8

addresses:

9

Francis C.J. Pizzulli, Esq.    John E. Tiffany, Esq.
Francis C.J. Pizzulli, Inc.    Law Offices of John E. Tiffany

10

718 Wilshire Boulevard      P.O. Box 190
Santa Monica, CA 90401-1708   Bloomfield, NJ 07003

11

310-458-6156

12

13

(x)  **(By U.S. Mail)** I am readily familiar with the firm's

14

practice of collection and processing of correspondence and
document(s) on the same day with fully prepaid postage thereon
for mailing at Santa Barbara, California in the ordinary course

15

of business. I caused the foregoing documents to be deposited in
the United States Mail in a sealed envelope, First-Class postage

16

fully prepaid addressed to each of the persons listed above as
designated receiving a copy of said papers by mail.

17

18

(x)  **(By FAX)** I caused such document(s) to be sent via facsimile
transmission to the persons listed above at the facsimile number or

19

numbers shown above. If no facsimile number is indicated, then the
documents were served only by mail.

20

( ) **(Via Overnight/Express Delivery)** I caused such document(s) to

21

be delivered to and deposited with Federal Express in a sealed
envelope for overnight/next business day delivery, with all fees

22

fully prepaid, addressed to each of the persons as noted and listed
above for overnight delivery.

23

(x)  **(State)** Executed on January 27, 2006, at Santa Barbara,

24

California.  I declare under penalty of perjury pursuant to the
laws of the State of California that the foregoing is true and

25

correct.

26

27

Nicole Olmstead

28

1 | Michael L. Sandford, State Bar No. 67442
LAW OFFICES OF MICHAEL L. SANDFORD, INC.
2 | 205 East Figueroa Street
Santa Barbara, CA  93101
3 | Tel. (805) 962-4413
Fax. (805) 568-1641
4 | Email: mls@silcom.com

5 | Attorneys For Defendant
JOSEPH A. CAFASSO
6 | (Special Appearance Only)

**FILED**
LOS ANGELES SUPERIOR COURT

APR 03 2006

John A. Clarke, Executive Officer/Clerk

By _R. Arango_ , Deputy
R. Arango

7

8 |         SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 |        FOR THE COUNTY OF LOS ANGELES- CENTRAL DISTRICT

10

11 | J. KEITH IDEMA,                    ) CASE NO.  BC 296228
                                       )
12 |                                   ) [Assigned For All Purposes to
         Plaintiff,                    ) Judge Irving S. Feffer]
13 |                                   )
                                       ) NOTICE OF ENTRY OF ORDER (1)
14 |        vs.                         ) GRANTING DEFENDANT CAFASSO'S
                                       ) MOTION FOR RECONSIDERATION OF
15 |                                   ) PRIOR ORDER DENYING MOTION TO
     FOX NEWS NETWORK,LLC; FOX         ) QUASH SUMMONS AND DISMISS CASE
16 | ENTERTAINMENT GROUP, INC.;        ) (2) QUASHING SUMMONS ISSUED ON
     EDWARD A. ARTIS; KNIGHTSBRIDGE    ) FIRST AMENDED COMPLAINT (3)
17 | INTERNATIONAL HUMANITARIAN        ) GRANTING RELIEF FROM DEFAULT (4)
     RELIEF AND HUMAN IMPROVEMENT      ) DENYING REQUESTS FOR MONETARY
18 | PROGRAMS, INC.; JOSEPH A.         ) SANCTIONS AND (5) DISMISSING CASE
     CAFASSO; ROBERT C. MORRIS,        ) AS TO DEFENDANT CAFASSO
19 | JR.; PARTNERS INTERNATIONAL       )
     FOUNDATION; and DOES 1-20,        )
20 |                                   ) First Amended Complaint Filed:
                                       )            July 14, 2003
21 |      Defendants.                  )
     ──────────────────────────────   )
22 |                                   ) Date:  January 11, 2006
     AND RELATED CROSS-ACTION          ) Time:  9:00 a.m.
23 | ──────────────────────────────   ) Place: Department 51

24

25 |      TO: All PARTIES AND THEIR ATTORNEYS OF RECORD:

26 |      PLEASE TAKE NOTICE that, on March 28, 2006, the Court entered

27 | an ORDER (1) GRANTING DEFENDANT CAFASSO'S MOTION FOR RECONSIDERATION

28 | OF PRIOR ORDER DENYING MOTION TO QUASH SUMMONS AND DISMISS CASE (2)

ORIGINAL

- 1 -

NOTICE OF ENTRY OF ORDER

1   QUASHING SUMMONS ISSUED ON FIRST AMENDED COMPLAINT (3) GRANTING

2   RELIEF FROM DEFAULT (4) DENYING REQUESTS FOR MONETARY SANCTIONS AND

3   (5) DISMISSING CASE AS TO DEFENDANT CAFASSO.  A copy of the Order

4   entered by the Court is attached hereto as Exhibit "A".

5

6   Dated: March 30, 2006        LAW OFFICES OF

7                                MICHAEL L. SANDFORD, INC.

8

9

10                  By: _____

11                       Michael L. Sandford
                         Attorneys for Defendant
12                       JOSEPH A. CAFASSO
                         (Special Appearance Only)

13

14

15

16

17

18

19

20

21

22

23

24

25   \\Mlsxp\wp\Cafasso\NoticeEntryCafassoOrder.pld.wpd

26

27

28

1  Michael L. Sandford, State Bar No. 67442
   LAW OFFICES OF MICHAEL L. SANDFORD, INC.
2  205 East Figueroa Street
   Santa Barbara, CA   93101
3  Tel. (805) 962-4413
   Fax. (805) 568-1641
4  Email: mls@silcom.com

5  Attorneys For Defendant
   JOSEPH A. CAFASSO
6  (Special Appearance Only)

```
┌────────────────────────┐
│    ORIGINAL FILED      │
│       Dept. 51         │
│                        │
│     MAR 2 8 2006       │
│    LOS ANGELES         │
│   SUPERIOR COURT       │
└────────────────────────┘
```

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9           FOR THE COUNTY OF LOS ANGELES- CENTRAL DISTRICT

10

11 J. KEITH IDEMA,                  ) CASE NO.  BC 296228
                                    )
12             Plaintiff            ) [Assigned For All Purposes To
                                    )  Judge Irving Feffer]
13                                  )
                                    )
14     vs.                          ) ORDER (1) GRANTING DEFENDANT
                                    ) CAFASSO'S MOTION FOR
15 FOX NEWS NETWORK, LLC; FOX       ) RECONSIDERATION OF PRIOR ORDER
   ENTERTAINMENT GROUP, INC.;       ) DENYING MOTION TO QUASH SUMMONS
16 EDWARD A. ARTIS; KNIGHTSBRIDGE   ) AND DISMISS CASE (2) QUASHING
   INTERNATIONAL HUMANITARIAN       ) SUMMONS ISSUED ON FIRST AMENDED
17 RELIEF AND HUMAN IMPROVEMENT     ) COMPLAINT (3) GRANTING RELIEF
   PROGRAMS, INC.; JOSEPH A.        ) FROM DEFAULT (4) DENYING
18 CAFASSO; ROBERT C. MORRIS,       ) REQUESTS FOR MONETARY SANCTIONS
   JR.; PARTNERS INTERNATIONAL      ) AND (5) DISMISSING CASE AS TO
19 FOUNDATION; and DOES 1-20,       ) DEFENDANT CAFASSO
                                    )
20                                  ) [CCP Sections 473, 1008 and
                                    )      418.10]
21             Defendants.          )
                                    ) (Special Appearance To Challenge
22                                  )  Personal Jurisdiction of Court)
                                    )
23 _____ ) Date:  January 11, 2006
                                    ) Time:  9:00 a.m.
24                                  ) Place: Dept. 51

25     The motions filed by defendant JOSEPH A. CAFASSSO ("CAFASSO") (1)

26 for reconsideration of the Court's prior order entered in November

27 2005 denying CAFASSO's motion for  an order quashing the Summons and

28          Exhibit _A_
   _____
                                    ORDER RE RECONSIDERATION
                         - 1 -

1  dismissing this case (2) for relief from default (3) for an order
2  quashing the Summons and dismissing this case (4) for an award of
3  monetary sanctions and (5) for an order striking the opposition in
4  this case came on regularly for hearing after being continued from a
5  prior hearing date in November 2005.   Michael L. Sandford, Esq.
6  appeared for CAFASSO as the moving party and Francis Pizzulli, Esq.
7  appeared for plaintiff IDEMA as the opposing party.

8      After considering the contents of the moving papers, the untimely
9  opposition filed to the motion, the reply papers, the contents of the
10  Court's file, the transcript of the hearing on the prior motion and
11  the arguments of counsel, the Court enters the following Order.

12      IT IS HEREBY ORDERED:

13      1.   Defendant CAFASSO's motion for reconsideration is granted.
14  The Court will consider, and did reconsider, its prior denial of his
15  motion to quash the Summons and dismiss this case.

16      2.   Defendant CAFASSO's motion for relief from default for his
17  non-appearance at the prior hearing is granted and the Court will
18  consider his reconsideration motion.

19      3.   Defendant CAFASSO's motion for an order quashing the
20  Summons on the Fist Amended Complaint is granted.   The Court hereby
21  orders that the Summons on the First Amended Complaint is quashed as
22  to defendant CAFASSO and any service thereof on him is hereby revoked
23  and is void.   The Court finds that it has no personal jurisdiction
24  over defendant CAFASSO in this case and plaintiff IDEMA failed to
25  demonstrate any basis for the exercise of personal jurisdiction over
26  defendant CAFASSO in this case.

27      4.   Defendant CAFASSO's motion for an award of monetary sanctions
28  is denied.   No sanctions are awarded by the Court in favor of or

ORDER RE RECONSIDERATION

1  against either party in this motion.

2      5.   This cases is dismissed as to defendant CAFASSO.  With the

3  dismissal of defendant CAFASSO, coupled with the prior dismissals of

4  the other parties to this case, this case is now dismissed in its

5  entirety.

6      IT IS SO ORDERED.

7

8

9  Dated: January 3/28, 2006           **IRVING S. FEFFER**
                                        _____
10                                      Irving S. Feffer
                                        Judge of the Superior Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  \\Mlsxp\wp\Cafasso\ORDERCafReconsider.pld.wpd

27

28

_____

                                        ORDER RE RECONSIDERATION

                              - 3 -

PROOF OF SERVICE

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES - CENTRAL DISTRICT
<u>Idema vs. Fox News Network LLC, et al.</u>

CASE NO. BC296228

    I, the undersigned, state that I am a citizen of the United States, am over 18 years of age, and am not a party to the within action. My business address is 205 East Figueroa Street, Santa Barbara, California 93101.  On March 6, 2006, I served the ORDER **(1) GRANTING DEFENDANT  CAFASSO'S MOTION FOR RECONSIDERATION OF PRIOR ORDER DENYING MOTION TO QUASH SUMMONS AND DISMISS CASE (2) QUASHING SUMMONS ISSUED ON FIRST AMENDED COMPLAINT (3) GRANTING RELIEF FROM DEFAULT (4) DENYING REQUESTS FOR MONETARY SANCTIONS AND (5) DISMISSING CASE AS TO DEFENDANT CAFASSO** on the interested parties in this action listed below to the following persons at the following addresses:

Francis C.J. Pizzulli, Esq.          John E. Tiffany, Esq.
Francis C.J. Pizzulli, Inc.          Law Offices of John E. Tiffany
718 Wilshire Boulevard               P.O. Box 190
Santa Monica, CA 90401-1708          Bloomfield, NJ 07003

(x)  (By U.S. Mail) I am readily familiar with the firm's practice of collection and processing of correspondence and document(s) on the same day with fully prepaid postage thereon for mailing at Santa Barbara, California in the ordinary course of business.  I caused the foregoing documents to be deposited in the United States Mail in a sealed envelope, First-Class postage fully prepaid addressed to each of the persons listed above as designated receiving a copy of said papers by mail.

( )  (By FAX) I caused such document(s) to be sent via facsimile transmission to the persons listed above at the facsimile number or numbers shown above.  If no facsimile number is indicated, then the documents were served only by mail.

( )  (Via Overnight/Express Delivery)  I caused such document(s) to be delivered to and deposited with Federal Express in a sealed envelope for overnight/next business day delivery, with all fees fully prepaid, addressed to each of the persons as noted and listed above for overnight delivery.

(x)  (State) Executed on March 6, 2006, at Santa Barbara, California.  I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct.

Nicole Olmstead

1

## PROOF OF SERVICE
2
### SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES - CENTRAL DISTRICT
3
Idema vs. Fox News Network LLC, et al.
CASE NO. BC296228

4          I, the undersigned, state that I am a citizen of the United
States, am over 18 years of age, and am not a party to the within
5    action. My business address is 205 East Figueroa Street, Santa
Barbara, California 93101. On March 31, 2006, I served the NOTICE
6    OF ENTRY OF ORDER (1) GRANTING DEFENDANT CAFASSO'S MOTION FOR
RECONSIDERATION OF PRIOR ORDER DENYING MOTION TO QUASH SUMMONS AND
7    DISMISS CASE (2) QUASHING SUMMONS ISSUED ON FIRST AMENDED COMPLAINT
(3) GRANTING RELIEF FROM DEFAULT (4) DENYING REQUESTS FOR MONETARY
8    SANCTIONS AND (5) DISMISSING CASE AS TO DEFENDANT CAFASSO on the
interested parties in this action listed below to the following
9    persons at the following addresses:

10   Francis C.J. Pizzulli, Esq.      John E. Tiffany, Esq.
Francis C.J. Pizzulli, Inc.      Law Offices of John E. Tiffany
11   718 Wilshire Boulevard           P.O. Box 190
Santa Monica, CA 90401-1708      Bloomfield, NJ 07003
12

13

14   (X)   (By U.S. Mail) I am readily familiar with the firm's
practice of collection and processing of correspondence and
15   document(s) on the same day with fully prepaid postage thereon
for mailing at Santa Barbara, California in the ordinary course
16   of business.  I caused the foregoing documents to be deposited in
the United States Mail in a sealed envelope, First-Class postage
17   fully prepaid addressed to each of the persons listed above as
designated receiving a copy of said papers by mail.
18

19   ( ) (By FAX) I caused such document(s) to be sent via facsimile
transmission to the persons listed above at the facsimile number or
20   numbers shown above.  If no facsimile number is indicated, then the
documents were served only by mail.

21   ( ) (Via Overnight/Express Delivery)  I caused such document(s) to
22   be delivered to and deposited with Federal Express in a sealed
envelope for overnight/next business day delivery, with all fees
23   fully prepaid, addressed to each of the persons as noted and listed
above for overnight delivery.

24   (x)   (State) Executed on March 31, 2006, at Santa Barbara,
25   California.   I declare under penalty of perjury pursuant to the
laws of the State of California that the foregoing is true and
26   correct.

27

28                                Nicole Olmstead

ORIGINAL

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address)*:<br>Francis C. J. Pizzulli -- State Bar No. 067151<br>718 Wilshire Blvd.<br>Santa Monica, CA 90401-1708 | TELEPHONE NO.:<br>(310) 451-8020 | FOR COURT USE ONLY |
|---|---|---|

ATTORNEY FOR *(Name)*: Plaintiff J. Keith Idema

Insert name of court and name of judicial district and branch court, if any:

### Superior Court of California, County of Los Angeles

PLAINTIFF/PETITIONER: J. Keith Idema

DEFENDANT/RESPONDENT: Fox News Network LLC; Fox Enterntainment Group, Inc.; Edward A. Artis, et al.

**FILED**
LOS ANGELES SUPERIOR COURT
DEC 0 8 2003
JOHN A. CLARKE, CLERK
*Lorna Urbina*
BY LORNA URBINA, DEPUTY

**REQUEST FOR DISMISSAL**

- [ ] Personal Injury, Property Damage, or Wrongful Death
  - [ ] Motor Vehicle   [ ] Other
- [ ] Family Law
- [ ] Eminent Domain
- [✓] Other *(specify)*: Breach of Contract, etc.

CASE NUMBER:   78
BC 296228

— A conformed copy will not be returned by the clerk unless a method of return is provided with the document. —

1. **TO THE CLERK: Please dismiss** this action as follows:
   a. (1) [ ] With prejudice   (2) [✓] Without prejudice
   b. (1) [ ] Complaint   (2) [ ] Petition
   (3) [ ] Cross-complaint filed by *(name)*:                           on *(date)*:
   (4) [ ] Cross-complaint filed by *(name)*:                           on *(date)*:
   (5) [ ] Entire action of all parties and all causes of action
   (6) [✓] Other *(specify)*:* First Amended Complaint as to Defendants Robert C. Morris, Jr. and Partners International Foundation - ONLY.

Date: Dec. 5 , 2003

Francis C. J. Pizzulli
(TYPE OR PRINT NAME OF [✓] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)
* If dismissal requested is of specified parties only, of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

▶ *(SIGNATURE)*
Attorney or party without attorney for:
[✓] Plaintiff/Petitioner   [ ] Defendant/Respondent
[ ] Cross-complainant

2. **TO THE CLERK: Consent** to the above dismissal is hereby given.**
Date:

▶
*(SIGNATURE)*

(TYPE OR PRINT NAME OF [ ] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)
** If a cross-complaint—or Response (Family Law) seeking affirmative relief—is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581(i) or (j).

Attorney or party without attorney for:
[ ] Plaintiff/Petitioner   [ ] Defendant/Respondent
[ ] Cross-complainant

*(To be completed by clerk)*
3. [✓] Dismissal entered as requested on *(date)*: DEC 0 8 2003
4. [ ] Dismissal entered on *(date)*:                as to only *(name)*:
5. [ ] Dismissal **not entered** as requested for the following reasons *(specify)*:

**JOHN A. CLARKE**

6. [ ] a. Attorney or party without attorney notified on *(date)*:
   b. Attorney or party without attorney not notified.  Filing party failed to provide
   [ ] a copy to conform   [ ] means to return conformed copy

*Lorna Urbina*

Date: DEC 0 8 2003
Clerk, by                                    , Deputy

Form Adopted by the
Judicial Council of California
982(a)(5) [Rev. January 1, 1997]

**REQUEST FOR DISMISSAL**

Code of Civil Procedure, § 581 et seq.
Cal. Rules of Court, rules 383, 1233

LORNA URBINA

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the Count of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 718 Wilshire Blvd., Santa Monica, CA, 90401-1708.

On December 4, 2003, I served the foregoing document described as:

**REQUEST FOR DISMISSAL, WITHOUT PREJUDICE, OF THE FIRST AMENDED COMPLAINT AS TO DEFENDANTS ROBERT C. MORRIS, JR. AND PARTNERS INTERNATIONAL FOUNDATION**

on the interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

Allan E. Ceran, Esq.                    Attorneys for Fox News Network LLC and Fox
Rodi, Pollock, Pettker, Galbraith & Cahill    Entertainment Group, Inc.
444 South Flower Street, Suite 1700
Los Angeles, CA 90071

Michael L. Sandford, Esq.               Attorney for Edward A. Artis, Knightsbridge
205 E. Figueroa                         International Humanitarian Relief and Human
Santa Barbara, CA 93101                 Improvement Programs, Inc., Colonel Robert C.
                                        Morris, Jr., and Partners International
                                        Foundation

Joseph A. Cafasso
29 Swarthmore Drive
Carteret, NJ 07008

_____BY U.S. MAIL  I deposited such document(s), postage prepaid, for collection by the U.S. Postal Service at Santa Monica, CA, for delivery to the address(es) listed above.

_____BY U.S. MAIL  I am readily familiar with the business practice of collection and processing of correspondence for same business day mailing with the U.S. Postal Service. Under that practice I deposited for collection such document(s), postage prepaid, in the ordinary course of business, for delivery to the address(es) listed above.

_____BY PERSONAL SERVICE  I caused such document(s) to be personally delivered to the address(es) listed above.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct and that this declaration was executed on December 4, 2003, at Santa Monica, CA.

_____
Liliana R. Hernandez

1

51

1   Francis Pizzuli, Esq., State Bar No. 167151
    Francis Pizzuli, Inc.
2   718 Wilshire Blvd.
    Santa Monica, CA 904091-1708
3   Tel. (310) 451-8020
    Fax. (310) 458-6156
4
    *Attorneys For Plaintiff J.*
5   *KEITH IDEMA*

6   Michael L. Sandford, State Bar No. 67442
    LAW OFFICES OF MICHAEL L. SANDFORD, INC.
7   205 East Figueroa Street
    Santa Barbara, CA    93101
8   Tel. (805) 962-4413
    Fax. (805) 568-1641
9   Email: mls@silcom.com

10  *Attorneys For Defendants EDWARD ARTIS and*
    *KNIGHTSBRIDGE INTERNATIONAL HUMANITARIAN*
11  *RELIEF AND HUMAN IMPROVEMENT PROGRAMS, INC.*

12

13              SUPERIOR COURT OF THE STATE OF CALIFORNIA

14          FOR THE COUNTY OF LOS ANGELES- CENTRAL DISTRICT

15  J. KEITH IDEMA,                ) CASE NO.   BC 296228
                                   )
16          Plaintiff,             ) [Assigned For All Purposes to
                                   )  Judge Irving Feffer]
17                                 )
                                   )
18          vs.                    )
                                   )
19                                 ) NOTICE OF ENTRY OF DISMISSALS
    FOX NEWS NETWORK,LLC; FOX      ) BY PLAINTIFF AND CROSS-
20  ENTERTAINMENT GROUP, INC.;     ) COMPLAINANTS
    EDWARD A. ARTIS; KNIGHTSBRIDGE )
21  INTERNATIONAL HUMANITARIAN     )
    RELIEF AND HUMAN IMPROVEMENT   )
22  PROGRAMS, INC.; JOSEPH A.      ) [Unlimited Case - Complaint
    CAFASSO; ROBERT C. MORRIS,     )  Exceeds $25,000]
23  JR.; PARTNERS INTERNATIONAL    )
    FOUNDATION; and DOES 1-20,     )
24                                 )
                                   )
25      Defendants.                ) Complaint Filed:  May 22,2003
                                   ) Trial Date:       August 2, 2005
26  _____)
    AND RELATED CROSS-ACTION       )
27                                 )

28

ORIGINAL    NOTICE OF ENTRY OF DISMISSALS BY PLAINTIFF AND CROSS-COMPLAINANTS

TO ALL PARTIES AN THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT, on August 2, 2005, the following dismissals, without prejudice, were filed by the following parties as to the referenced claims:

1. Plaintiff J. KEITH IDEMA filed a voluntary Request for Dismissal, without prejudice, of the First Amended Complaint on filed herein against defendants EDWARD A. ARTIS and KNIGHTSBRIDGE INTERNATIONAL HUMANITARIAN RELIEF AND HUMAN IMPROVEMENT PROGRAMS, INC., only.

2. Cross-Complainants EDWARD A. ARTIS and KNIGHTSBRIDGE INTERNATIONAL HUMANITARIAN filed a voluntary Request for Dismissal, without prejudice, of the Cross-Complaint on filed herein as to cross-defendants J. KEITH IDEMA and GARY SCURKA.

3. A true and correct copy of the aforementioned Request for Dismissals is attached hereto as Exhibit "A". Based on the filing of the aforementioned Request For Dismissals, and on August 2, 2005, the Clerk of the Court entered the Dismissals on the register and docket of the Court.

Dated: August 11, 2005          LAW OFFICES OF
                                MICHAEL L. SANDFORD, INC.

                        By: _____
                                Michael L. Sandford
                                Attorneys for Defendants
                                and Cross-Complainants
                                EDWARD A. ARTIS, KNIGHTSBRIDGE
                                INTERNATIONAL HUMANITARIAN
                                RELIEF AND HUMAN IMPROVEMENT
                                PROGRAMS, INC.

\\Mlsxp\wp\Artis\Idema\Pleadings\NoticeOfDismissal.pld.wpd

---

**NOTICE OF ENTRY OF DISMISSALS BY PLAINTIFF AND CROSS-COMPLAINANTS**

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address): For Plaintiff Idema TELEPHONE NO: (805) 962-4413
Michael L. Sandford    (SBN 67442)
Law Offices of Michael L. Sandford, Inc.    Francis Pizzulli (SBN 97151)
205 E. Figueroa Street    718 Wilshire Blvd.
Santa Barbara, CA 93101    Santa Monica, CA 90402

ATTORNEY FOR (Name): Defendant and Cross-Complainants Artis and Knightsbridge

Insert name and name of judicial district and branch court, if any:
Superior Court of California, County of Los Angeles- Central District

PLAINTIFF/PETITIONER: J. Keith Idema

DEFENDANT/RESPONDENT: Fox News Network, LLC, et al.

FOR COURT USE ONLY

**FILED**
LOS ANGELES SUPERIOR COURT
AUG 0 2 2005
JOHN A. CLARKE CLERK
KANISON
BY V. MASON DEPUTY

**REQUEST FOR DISMISSAL**

☐ Personal Injury, Property Damage, or Wrongful Death
  ☐ Motor Vehicle    ☐ Other
☐ Family Law
☐ Eminent Domain
☑ Other (specify): Interference Claims

CASE NUMBER:

BC 296228

— A conformed copy will not be returned by the clerk unless a method of return is provided with the document. —

1. TO THE CLERK: Please dismiss this action as follows:

  a. (1) ☐ With prejudice    (2) ☑ Without prejudice

  b. (1) ☑ Complaint    (2) ☐ Petition
    (3) ☑ Cross-complaint filed by (name): Knightsbridge International    on (date): March 9, 2004
    (4) ☑ Cross-complaint filed by (name): Edward A. Artis    on (date): March 9, 2004
    (5) ☐ Entire action of all parties and all causes of action
    (6) ☑ Other (specify):* Complaint dismissed as to Defendants Edward A. Artis and Knightsbridge International only.

Date: July ——, 2005
  August 2

Francis C. Pizzulli
(TYPE OR PRINT NAME OF ☑ ATTORNEY ☐ PARTY WITHOUT ATTORNEY)
* If dismissal requested is of specified parties only, of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

▶ _Francis C. Pizzulli_ (SIGNATURE)
Attorney or party without attorney for:
  ☑ Plaintiff/Petitioner    ☐ Defendant/Respondent
  ☐ Cross-complainant

2. TO THE CLERK: Consent to the above dismissal is hereby given.**
Date: July 2, 2005
  August

Michael L. Sandford
(TYPE OR PRINT NAME OF ☑ ATTORNEY ☐ PARTY WITHOUT ATTORNEY)
** If a cross-complaint—or Response (Family Law) seeking affirmative relief—is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581(i) or (j).

▶ (SIGNATURE)
Attorney or party without attorney for:
  ☐ Plaintiff/Petitioner    ☐ Defendant/Respondent
  ☑ Cross-complainants Artis and KIH

(To be completed by clerk)
3. ☐ Dismissal entered as requested on (date): AUG 0 2 2005
4. ☐ Dismissal entered on (date):    as to only (name):
5. ☐ Dismissal not entered as requested for the following reasons (specify):

6. ☐ a. Attorney or party without attorney notified on (date):
  b. Attorney or party without attorney not notified. Filing party failed to provide
    ☐ a copy to conform    ☐ means to return conformed copy

Date: AUG 0 2 2005    Clerk, by _____, Deputy

Form Adopted by the
Judicial Council of California
982(a)(5) [Rev. January 1, 1997]

**REQUEST FOR DISMISSAL**

Code of Civil Procedure, § 581 et seq.
Cal. Rules of Court, rules 383, 1233

**Exhibit A**

1

2

3

**PROOF OF SERVICE**
SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES - CENTRAL DISTRICT
<u>Idema vs. Fox News Network LLC, et al.</u>
CASE NO. BC296228

4

5

6

7

    I, the undersigned, state that I am a citizen of the United
States, am over 18 years of age, and am not a party to the within
action. My business address is 205 East Figueroa Street, Santa
Barbara, California 93101. On August 16, 2005, I served the **NOTICE
OF ENTRY OF DISMISSALS BY PLAINTIFF AND CROSS-COMPLAINANTS** on the
interested parties in this action listed below to the following
persons at the following addresses:

8

9

10

Francis C.J. Pizzulli, Esq.
Francis C.J. Pizzulli, Inc.
718 Wilshire Boulevard
Santa Monica, CA 90401-1708

Gary Scurka
One Franklin Town Blvd.
Philadelphia, PA 19103

11

12

Joseph A. Cafasso
29 Swarthmore Drive
Carteret, NJ 07008

John E. Tiffany, Esq.
Law Offices of John E. Tiffany
P.O. Box 190
Bloomfield, NJ 07003

13

14

15

16

17

18

**(x)    (By U.S. Mail)** I am readily familiar with the firm's
practice of collection and processing of correspondence and
document(s) on the same day with fully prepaid postage thereon
for mailing at Santa Barbara, California in the ordinary course
of business. I caused the foregoing documents to be deposited in
the United States Mail in a sealed envelope, First-Class postage
fully prepaid addressed to each of the persons listed above as
designated receiving a copy of said papers by mail.

19

20

**( ) (By FAX)** I caused such document(s) to be sent via facsimile
transmission to the persons listed above at the facsimile number or
numbers shown above. If no facsimile number is indicated, then the
documents were served only by mail.

21

22

23

**( ) (Via Overnight/Express Delivery)** I caused such document(s) to
be delivered to and deposited with Federal Express in a sealed
envelope for overnight/next business day delivery, with all fees
fully prepaid, addressed to each of the persons as noted and listed
above for overnight delivery.

24

25

26

**(x)    (State)** Executed on August 16, 2005, at Santa Barbara,
California. I declare under penalty of perjury pursuant to the
laws of the State of California that the foregoing is true and
correct.

27

28

Nicole Olmstead

# DVD Exhibit

Exhibit L

Mediawatch: Jack of all trades? (07/03/2005)                    Page 1 of 5

Case 1:08-cv-02356-DAB     Document 12-6     Filed 05/21/2008     Page 3 of 11



**ABC1:** Mondays 9:20pm; Wednesdays 12:20am     **ABC2:** Tuesdays 8:45am



# Jack of all trades?

**Presented by Liz Jackson**                         First screened 7 March 2005

The media has enormous power to create and promote the experts we rely on, just by putting them on a TV screen. What follows is a cautionary tale.

An Afghan court has found three Americans guilty of torture and illegal detention and sentenced them to up to 10 years in prison.

The three men, including a former US Green Beret, were accused of running a freelance private prison in central Kabul.

They were arrested in July after Afghan security forces raided a house and found eight people who claimed to have been tortured by them.

The former green beret Tony Jones is talking about is Jonathan Keith Idema or Jack Idema as he's usually known.

Since September 11 Jack has been used by the international media as an expert on terrorism in hundreds of interviews including stories on your own ABC.

Idema has also shown a remarkable talent for glorifying and financing his exploits through the media. Even his private prison venture was at least in part a media stunt.

Media Watch has obtained photos of what Idema was up to. (See: Links and Resources.)

We've been told he's the one who scrawled across them, NOT FOR RELEASE — at least, it appears, not until you pay. (See: Links and Resources.)

In the weeks preceding his arrest, Idema was actually sending footage of himself interrogating prisoners to a major US network, hoping to sell a world exclusive.

He sent this email to Dan Rather at American '60 Minutes' (See also: Links and Resources.):

For Dan Rather's eyes only
"...we now have so many terrorists we need to a rent a jail..."
"...only money and resources has kept us from catching them all..."

The 'Columbia Journalism Review' reports that Idema was asking for a cool $250,000 for the exclusive use of his footage, and access to his Afghani victims

The 'CJR' is America's longest running, media-watchdog journal, and in it's January edition it accuses the media, including the ABC, of creating a monster, of recklessly giving a man who was a liar, a thug and a con man, credibility and glory he could then turn into cold hard cash. (See: Links and Resources.)

Let's go back to early 2002 when Jack Idema made his first appearance on the ABC.

When the guys come in, right, we'd come in like this and come up — they'd use a kind of Israeli method and they came and stepped into the room — Bang, bang bang…

Jack featured in a series of stories that won ABC correspondent Eric Campbell a Logie for the best news stories of 2002.

The stories contained a world exclusive — video of Islamic fanatics training in Afghanistan.

Here revealed for the first time the frightening extent of Al Qaeda's terrorist ambitions. At an abandoned school near Kabul dozens of Al Qaeda's fanatics train in close quarters fighting, hostage taking, psychological warfare and assassination. [Gunfire]

Jack Idema was the source of those videos, and in Eric Campbell's stories he was also presented as the counter terrorist expert we could trust to tell us what the tapes revealed about Al Qaeda.

JKI: The danger is that everybody thinks that the face of al Qaeda is bin Laden. And we saw in this tape, the faces of Al Qaeda are from children at two years old all the way up to instructors at 50 years old.

EC: So a problem for many decades to come?

JKI: A problem for many decades to come.

But Jack Idema was a controversial figure even back then.

Sir Edward Artis, the head of aid group Knightsbridge International, faxed this warning to the US authorities in late 2001. (See also: <u>Links and Resources</u>.)

This man is a very dangerous person by virtue of his carelessness and stupidity, and before he gets someone killed, possibly me or some-one travelling with me inside Afghanistan, he needs to be removed from the area.

By the end of 2001 Idema had a reputation for violence, recklessness and self-aggrandisement around media circles in Kabul. The ABC's Eric Campbell was aware of this before his story went to air.

Jack is basically a nut, and none of the Special Forces guys in Kabul wanted anything to do with him.

But there was nothing to suggest any reservations about Jack's character or credibility in Eric Campbell's stories.

We obtained the tapes through a US Special Forces veteran now advising the Afghan military. [slide]

We toured the camp with a US Special Forces veteran, known as J.K Idema. He's spent the past three months in Afghanistan as an adviser to the Northern Alliance.

Jack liked to tell people he was a 20 year Green Beret who'd been on secret missions around the world, but he never saw combat with the special forces. His active service was for just 3 years, nearly thirty years ago, and he was refused permission to re-enlist. He then spent a further three years in the reserves.

In 1977 a military evaluation described him as:

…without a doubt the most unmotivated, unprofessional, immature enlisted man I have known…

This less-than-glorious record emerged during Idema's US trial for a quarter million dollar fraud — he spent three years in prison.

Eric Campbell says he knew Jack was a convicted conman but told Media Watch that his criminal past was irrelevant to the story and Idema's credibility as an expert.

In war zones…the people you deal with and from whom you glean information are very often mass murderers, rapists, thieves and charlatans… On that scale dealing with someone convicted of business fraud in the US eight years earlier was not something to be unduly shocked by…Jack's past business dealings in the US were irrelevant to the story.

Eric says that he made checks on Jack's background as a counter terrorism expert and was told that despite Idema's unsavoury past, he was

…one of the best people in the world to be talking about this.

Checking the CV of a conman like Jack is tricky.

None of the controversy made it into the TV stories, but in his just published book, Eric Campbell is more forthcoming.

To confirm the footage was genuine, we made two trips out to the village …to see if we could match the

landscape and buildings to the tapes. Given Jack's penchant for self promotion, I also needed to make absolutely sure he hadn't staged the footage.

Campbell and his colleagues spoke to villagers to confirm the validity of the tapes — but he still had doubts about Jack.

It was tempting to simply dismiss Jack as a fantasist and a con man. After a couple of uncomfortable days, I decided that it was safe to go ahead with the story — the footage was just too good to ignore.

The footage was good, but was Jack Idema the right choice to assess its significance?

Jack was in the middle of auctioning the world rights to the tapes, and had a financial interest in talking up their value.

I think that releasing their faces can only help us to uncover them throughout the world.

More importantly, it can help people understand what Al Qaeda's all about and why this war needs to continue, why we need to bring it to their doorstep wherever they may be.

Though the ABC didn't pay for the tapes, Eric Campbell knew about the media auction.

But perhaps he didn't realise that his story would also help give Jack the credibility he craved.

Media Watch has discovered that Idema used the ABC story to assist in his sales pitch…

A few days before it went to air Jack's agents sent this letter to Fox News:

The tape feature extraordinary footage showing Al Qaeda fighters learning to mount terrorist attacks…For your convenience, I am enclosing copies of a working script from the Australian report which gives some additional background…

Mr Idema will reserves the right to reject bids that are under $150,000.

An American print journalist who knew Idema in Kabul told Media Watch he was relieved when his editors turned down Jack's pictures.

He's a relentless self-promoter — I want to be in this, I want to be in that…but the tapes were the story, not him… He wouldn't increase the credibility of the product. You put that guy in and everyone would say 'This guy's a nut.

Some media turned down the tapes, but of course there were eager buyers.

America's '60 Minutes' sent Dan Rather to cover the story of Jack and his tapes.

But Rather's report used Idema sparingly and described him with caution.

60 Minutes II got these tapes from Keith Idema, a former member of the US Military special forces. He is a Green Beret. He is brash and controversial, a man who's murky past makes him perfectly at home in Afghanistan's freewheeling wild west atmosphere.

Once the footage was out there, most outlets took the view they could not afford to be left behind NBC, MSNBC, BBC and ABC America all used the tapes.

Media atch: Jack of  l trades? (07/( )/2005)                                    Pa  5 of 5

Case 1:08-cv-02356-DAB    Document 12-6    Filed 05/21/2008    Page 7 of 11

And the more the tapes aired, the more Idema became an accepted and credible media expert on anything and everything connected with terror. His appearances peaked in the lead up to the war on Iraq.
True to form he lied…

So who do you work for?

It's an interesting story. I was in the Army Special forces for 20 years…

And, as usual, the media let him continue his fantasy. Could Jack tell us about the connection between Iraq and Al Qaeda? Absolutely, first hand:

Q: Is it a good idea to go into Iraq?

JI: We have to go to Iraq. I mean I don't know why we're not telling the American public. He definitely has weapons of mass destruction.

Q: And the connection with Al Qaeda?

JI: Oh yes. Absolutely.

When a viewer had the temerity to ring in and suggest that Jack was a fraud, he was dismissed with contempt.

Jack not genuine? What'd he mean? Jack had been on 60 Minutes.

Genuine…

I mean it's just laughable.

Between October 2001 and June 2002 the stories about jack and his exploits have appeareed in over 1000 US newspapers and over 250 TV shows. Even Dan rather went to Afghanistan just to interview him for 60 Minutes.

As Idema's media profile grew, Sir Edward Artis, the man who'd tried to warn them, watched in anger and despair:

The media gave him a licence… they ran story after story that furthered the cachet of a self-serving, self-aggrandising criminal.

And, according to recent reports, even an Afghani prison can't stop Jack Idema spruiking his tales.

IDEMA: I STOPPED HUGE PLOT TO KILL GI'S IN AFGHANISTAN — Says He Used Loud Melissa Ethridge [sic] Music To Make Terrorist Confess

Exhibit M





