UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

COUNTER TERRORIST GROUP US,
COUNTERR GROUP, and J. K. IDEMA,

          Plaintiffs,

   - against -

AUSTRALIAN BROADCASTING CORP.;
a/k/a ABC AUSTRALIA; ABC
CORPORATIONS 1-100; LIZ JACKSON;
ERIC CAMPBELL; JOSEPH A. CAFASSO;
EDWARD A. ARTIS; KNIGHTSBRIDGE
INTERNATIONAL, INC.; KNIGHTSBRIDGE
INTERNATIONAL HUMANITARIAN
RELIEF AND HUMAN IMPROVEMENT
PROGRAMS, INC.; ROBERT C. MORRIS;
PARTNERS INTERNATIONAL
FOUNDATION; WILLIAM JOHN HAGLER,
Both Individually and Severally, and DOES 1
through 7, inclusive,

          Defendants.

------------------------------------------------------- x

08 Civ 2356 (DAB)

**DECLARATION OF ERIC CAMPBELL**

ERIC CAMPBELL declares, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a reporter for defendant the Australian Broadcasting Corporation (the "ABC") in the above-captioned action. I am also the author of a book entitled *Absurdistan* published in Australia in 2005. I am a named defendant in the above-captioned action, although I have not been served with the complaint.

2. I submit this affidavit in support of the ABC's motion to dismiss the complaint on the grounds of lack of subject matter jurisdiction and/or the doctrine of *forum non conveniens*.

3. I am a resident and citizen of the Commonwealth of Australia. I reside in Sydney, New South Wales, Australia, and have resided here since 1960, except for two overseas postings for the ABC in Moscow from 1996 to 2000, and in Beijing from 2001 to 2004. I have never resided in the United States.

DWT 11055465v1 0086510-000001

4.  I have been employed as a reporter for the ABC since 1990. I am employed in the News and Current Affairs division and am primarily responsible for reporting on international topics. Among the many topics I have covered for the ABC are conflicts in the Balkans, political developments in China and Russia, and social issues in Africa.

5.  Among the programs on which I have reported for the ABC are several news programs about Afghanistan, mainly from the period December 2001 to February 2002, when I was based in Kabul. In at least four of those instances, I relied upon and featured on the programs, plaintiff Jack Idema, who purports to be an expert about contemporary affairs in Afghanistan. I also discussed Mr. Idema in my book *Absurdistan*.

6.  In my 20+ year career as a foreign correspondent, I have won several awards for stories I have covered and written, including a Logie Award (the Australian equivalent of a U.S. Emmy Award) for news reporting, and I have twice been a finalist for the Walkley Awards (Australia;'s premiere journalism awards).

7.  I do not now work, nor have I ever worked, for ABC's *Media Watch* program. My only experience with *Media Watch* was its critical assessment of my use of Mr. Idema in a particular story in the *Jack of All Trades* program (the "Program"). Mr. Idema is the "Jack" in that title. I was not personally involved in any way with the development, production, broadcast or distribution of the Program, except that I was asked by the story editor, Anne Delaney, in March 2005, when *Media Watch* was preparing this story, to answer certain questions regarding my relationship with Mr. Idema in Afghanistan.

8.  I did not endorse or support the Program. I certainly did not agree with or condone the message conveyed in the Program, which was, to some extent, critical of my professional judgment in relying on Mr. Idema in my earlier news stories.

## LACK OF CONTACT WITH NEW YORK

9. Although I frequently travel around the world for news reporting purposes, I travel as a reporter and agent of the ABC, and am, at all times, paid as an ABC employee residing in Australia.

10. I conduct no business in the State of New York or, for that matter, in the United States.

11. I do not own any interest in any U.S. business in whole or in part, and I have no investment in any public or private U.S. corporate entity or partnership amounting to 1% or more ownership interest in that entity.

12. I do not maintain an internet website in my individual capacity.

13. I do not reside (nor have I ever resided) in New York, and I do not pay (nor have I ever paid) taxes to the State of New York.

14. I do not maintain any address or possess any real estate in New York, nor do I maintain a telephone number in New York.

15. I do not have a place of business in New York, nor am I registered to do business in New York. I do not have any licensees or distributors who conduct business on my behalf in New York.

16. I do not maintain any office, bank accounts or other financial accounts, or other tangible or intangible assets in New York.

17. I have never been sued in New York, nor have I ever filed suit in New York.

18. I have traveled to New York on only a few occasions for personal vacation with my family, and not for business purposes. The last time I visited New York was in 2000.

19. If I am served in this Action, I would move to dismiss based on lack of personal jurisdiction because I have no continuous or substantial contact with New York, and because my conduct, as alleged in the complaint, has no contact with the State of New York

20. Further, travel to New York to defend this case would cause severe hardship to me in my professional and personal life. I have an active career as a news reporter, and I am constantly traveling. My work on ABC's current affairs program *Foreign Correspondent* necessitates a demanding and time-consuming schedule, involving as many as six international assignments each year. After each trip, I return to Sydney to edit material, participate in planning the next story and prepare for the next trip. It is already extremely difficult to juggle my responsibilities as the parent of a young son, with the demands of my work.

## RELATIONSHIP WITH IDEMA

21. In December 2001, I met Mr. Idema while in Afghanistan, and I eventually permitted him to reside in the ABC's rented house for news correspondents stationed there. I spent approximately five weeks with him while traveling through Afghanistan, including Kabul, Jalalabad, Tora Bora and Bamiyan.

22. At that time, Idema represented that he was a U.S. Special Forces veteran and a counter-terrorism expert.

23. Mr. Idema approached me and other news correspondents with footage he claimed that he had obtained from an Afghanistan jihadist training camp. He never claimed that he had taken the video, only that he had found it. The found footage could only be played on a Video 8 camera. Because of the poor quality of the camera Mr. Idema had, each time the footage was played, it caused additional damage to the footage.

24. I was able to locate a functioning Video 8 camera in Afghanistan that had been hidden from the Taliban. ABC cameraman Sebastian Phua used this Video 8 camera to transfer

the undamaged footage to professional-quality tape and created a 50-minute "highlight" compilation. Mr. Phua did this in Afghanistan. Because he now had this compilation tape, Mr. Idema was, for the first time, in a position to license the footage to various news agencies around the world.

25. In consideration of our assistance to him, Idema granted the ABC a world-wide exclusive first broadcast license and a license to use the footage thereafter in perpetuity for broadcast within Australia. Under this license, the ABC was not permitted to broadcast the Terrorist Training Tapes outside of Australia except through its satellite channel, Australia Network (formerly known as ABC Asia Pacific). The ABC also could not assign its right to broadcast the Training Tapes or sell the footage. This licensing agreement was entered into on or about December 2001 to January 2002, in Afghanistan.

26. When entering into this agreement, Idema was aware that I was a reporter for the ABC and that this agreement pertained to the broadcast of the Terrorist Training Tapes in Australia, and only in Australia.

27. When I entered into this agreement, I was not aware that Idema was a resident and/or citizen of New York, only that he was a citizen of the United States. In entering this agreement, I had no knowledge or reason to believe that a breach of this agreement would cause any effect or impact in the State of New York.

### *ABSURDISTAN*

28. I am the author of the book *Absurdistan*, which is based on my experiences in Afghanistan and the difficulties of traveling and reporting from there.

29. I wrote *Absurdistan* in Australia, China, Russia and Spain. No research, writing, or editing of this book occurred in the United States.

30. *Absurdistan* was released in March, 2005 by Harper Collins Australia. All negotiations for the publishing agreement occurred in Australia. The book (and a related audiotape copy I recorded) are sold through major book chains in Australia and through ABC's on-line store. It is not readily available in the United States. I believe it is only available in the U.S. through foreign on-line retailers, and no U.S. bookstore currently sells *Absurdistan*.

31. To the best of my knowledge, approximately 30,000 copies of *Absurdistan* have been sold as of the date of this affidavit. I know of no significant overseas sales of the book. I have no other books, nor, for that matter, any other business venture, that generates any income outside of Australia. Accordingly, I receive no income from international commerce.

32. *Absurdistan* is not advertised or marketed in the United States. I have never traveled to New York in connection with the book, including *inter alia*, the production, research, or promotion of it.

33. When writing, publishing and promoting the book, I had no reason to believe that Idema was a New York resident, nor, for that matter, that publication of the book would have an impact in New York. I only knew then that Idema was imprisoned in Afghanistan for several years based on allegations that he was running a private prison in Afghanistan.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Sydney, New South Wales, Australia this 20 day of May, 2008.

_____
ERIC CAMPBELL