## UNITED STATES DISTRICT COURT
## For The Southern District Of New York

_____ )
AUSTRALIAN BROADCASTING CORP.;              )
*aka* ABC AUSTRALIA;                        )
ABC CORPORATIONS 1-100;                     )      **J. K. Idema June 26, 2006**
LIZ JACKSON; ERIC CAMPBELL;                 )      **AFFIDAVIT IN SUPPORT**
JOSEPH A. CAFASSO; EDWARD A. ARTIS;         )      **OF Memorandum of Law**
KNIGHTSBRIDGE INTERNATIONAL, Inc.;          )
KNIGHTSBRIDGE INTERNATIONAL                 )
HUMANITARIAN RELIEF AND HUMAN               )
IMPROVEMENT PROGRAMS, INC.;                 )      **Case #: 08-CV-2356** (DAB)
ROBERT C. MORRIS;                           )
PARTNERS INTERNATIONAL FOUNDATION; )
WILLIAM JOHN HAGLER,                        )
Both Individually and Severally,            )
and DOES 1 through 7, inclusive,            )
                          *Defendants.*     )
_____ )

     Filing of Affidavit in Case # 05 CV 7946 for use in the above captioned case in opposition to Australian Broadcasting Corporation's Motion to Dismiss, in support of Plaintiffs' Opposition and to provide factual background in contradiction to ABC's unsupported statements of facts.

     Respectfully submitted, August 18, 2008,

          _____/s/_____
          John E. Tiffany, Attorney (JT-7322)
          Law Offices of John E. Tiffany P.C.
          The Robert Treat Center
          50 Park Place, 10th Floor,
          Newark, New Jersey 07102
          Tel:  (973) 242-3700
          Fax: (973) 242-3799
          www.JohnTiffanyLaw.com
          Email: Jet@Jet4Law.com

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
)
CBS BROADCASTING INC.,                 )
                          *Plaintiffs,*                )
      v.                               )
COUNTERR GROUP, *et al.,*               )
                       *Defendants.*            )
_____ )
)
COUNTERR GROUP, *et al.,*               )     Case # 05 CV 7946   (DAB)
              *Counter-Plaintiffs,*        )
      v.                               )     ECF Case
CBS NEWS,   *et al.,*              )
              *Counter-Defendants.*        )
_____ )

# AFFIDAVIT OF JACK IDEMA

## IN SUPPORT OF COUNTER-PLAINTIFFS' OPPOSITION TO CBS' MOTION TO DISMISS

## THE SEVENTH COUNTERCLAIM - DEFAMATION

1

# AFFIDAVIT OF J. K. IDEMA

I, Jack Idema, under penalty of perjury, declare as follows:

1.    Attached hereto as Exhibit 1 is a true and correct copy of the document commissioned by the International Commission of Jurists, entitled: Afghanistan's Legal System and its Compatibility with International Human Rights Standards, FINAL REPORT, by Dr. Martin Lau.

2.    CBS argues that defendants' "now discontinued" suit in North Carolina supports CBS' continuing defamatory statements— "Idema and Counterr Group"... "are serial litigators who have brought a host of baseless contract and tort claims against various media organization in this Court and other courts through the country." (CBS motion to dismiss counterclaims 1 thru 6[1]).  Nothing could be further from the truth, or more slanted in its explanation.  Counterr Group has been involved in a sparse six litigations in its 28 year existence.  Counterr Group has won 5 of those six; three at trial, including a jury verdict of $1.9 million dollars (with one million dollars in punitive damages) awarded for Breach of Contract, Fraud, and Unfair & Deceptive Trade Practices.[2] *Idema, Counterr Group, et al, vs. Wiggs, et al*, NC Superior Court, C.Cty. 00-CVS-5387, (2001) (I conducted the three-week jury trial *pro se*).  The sixth case will be decided by an appeals court.  In fact, CBS' counsel does not cite a single Counterr Group case to support this vicious ongoing defamation against Counterr Group.  CBS does point the Court to *Idema v. Wager*, 120 F.Supp. 2d 361 (SDNY 2000), which was a defamation case. What CBS fails to point out is that the case focused solely on the use of one word in a caption. The article in question was a 1997 report on Counterr Group winning a multi-million dollar case in a Dutchess County, NY Supreme Court case.  The case settled before the first witness, which was me, finished one hour of testimony.  It was the largest settlement of its kind in New York State history.  I refused to give an interview to a local paper.  The newspaper wrote an article

---

[1] CBS chose to leave several of their pages in the two motions un-numbered to avoid the page limitation rules, therefore we will assume this is page 1, since the next page is numbered "2")

[2] The NCGS § 75 cause of action allows for treble damages, but not co-existing punitive damages, so the $900,000 jury award for actual damages was trebled to $2.7 million dollars.  But the jury's message was clear; neither I nor Counterr Group file "baseless contract and tort claims."

1

with a disparaging headline (using the word "militant" which would understandably upset someone who devoted their live to combating terrorists, and militants).  The resulting case was dismissed on appeal, but CBS fails to point out that when the appeal reply was due, I, acting *pro se*, and was already in Afghanistan, engaged in a war.  I voluntarily chose the freedom of Afghanistan's people over continuing to press my case for defamation.  Yet CBS seeks to paint Counterr Group and myself as serial litigators with nothing but baseless and frivolous nuisance litigation.  By doing this, it appears obvious, that CBS seeks to draw the Court's attention away from the real issues, and attack the man in the hopes of defending against the counterclaims.  It is CBS, not I or Counterr Group who misses "the mark," CBS memorandum on the 1-6 claims, pg. 2) by using disingenuous irrelevant *ad hominem* attacks to defend their breaches of contract, patently false defamatory statements, and other transgressions instead of using facts and case law.  *Idema v. DreamWorks*, was not a "contract" claim, it was a breach of implied contract.  There was no written contract between the four plaintiffs (two of which were renowned award winning journalists, and one who was an author (23 books) and screenwriter (three films), and the defendants.  The case was primarily based on a breach of implied contract and copyright for submitting a treatment for a film.  The 9th Circuit has recently adopted our position in another case, and our case may be reheard based on new implied contract law in the 9th Circuit.  CBS' attacks are nothing more than an attempt to misdirect this Court's attention from the real issues.

     3.     Various other reasons for opposing counsels' statements are addressed more fully in our opposition to CBS' motion to dismiss counterclaims 1-6.  Suffice it to say, that Counterr Group is neither a serial litigator,[3] nor have they ever engaged in bringing "host[s] of baseless contract and tort claims" or "trained their sights on CBS."  Prior to this case, Counterr was involved in only two other cases against national media entities related to its ownership of the *8mm VideoX al-Qaida Training Tapes*.  Both were resolved prior to trial in Counterr Group's favor.  None of the media outlets, including NBC, ABC, BBC, NIPPON TV, ABC Australia, German TV, Italian TV, CBC, MSNBC, US News & World Report, Newsweek, Time, and

---

[3] While Defendants have done no specific research or inquiry into a comparison between the amount of litigation Counterr Group has been involved in as compared to CBS, it is not unlikely that CBS' litigation history is at least 100 times greater in the areas of breach of contract and defamation.

others, who have entered into licensing contracts with myself and/or Counterr Group, have ever disputed the fact that the *8mm VideoX Tapes* are the legal property of myself and Counterr Group.[4]  The only two other breach of contract cases based on similar agreements made in early 2002, were "agreeably reconciled" and "amicably resolved"[5] by Newsweek in 2003 and NBC in June 2006 without any motions being filed by either party.  We settled our differences and they acknowledge the validity of the *8mm VideoX* contract limitations.

4.    But CBS has an ulterior motive in this case; what CBS seeks is now finally clear in their motions.  CBS seeks, through subversion and lies, to acquire that which no party in the world has been able to take by force— unlimited rights to air my and Counterr Group's *8mm VideoX al-Qaida Terrorist Training Tapes* and assume them as the permanent exclusive property of CBS News for their own personal financial gain.

5.    Lastly, as this Court already knows, it was CBS that filed this case literally under cover of darkness during settlement negotiations and in spite of a series of tolling agreements signed by both parties in the interest of avoiding litigation.  In fact, CBS filed their contract[6] injunction case in the drop box at the same time CBS' in-house counsel was assuring me that CBS' May through September 2005 tolling agreements were being extended again to avoid litigation and costs.  After realizing we had been deceived, we found ourselves facing a statute of limitations bar when the tolling agreements were not extended as agreed.  Defrauded again, we were able to file our counterclaim and preserve our causes of action by determination at considerable expense.

6.    Additional acts, to which both Counterr Group and I take issue, are CBS' knowingly false statements about the authenticity of the tapes.  Once a controversy arose as to

---

[4] The two previous suits, which resulted in confidential settlements with Counterr and myself, have been based upon contract violations, similar to these (specifically royalty and other payments), and not disputes over ownership, preemption, or the other issues in this case.

[5] Language required by the confidential settlement agreements.

[6] CBS now alleges this is a preemption case on the original issues, but myself and Counterr Group request this Honorable Court take judicial notice of the original complaint CBS filed.  CBS asserted their jurisdiction to be diversity, not a federal question (copyright), and CBS' novel preemption

3

the authenticity of the *8mm VideoX* tapes, CBS again withheld their specialized knowledge that the tapes were real. Not wanting to bolster my credibility in the hopes of exercising dominion and control over the highly proprietary and valuable *8mm VideoX al-Qaida tapes*, CBS again withheld insider information that only they possessed. As an example, CBS withheld the fact that Khalid Sheikh Mohammed[7] and Abu Musab al-Zarqawi,[8] both known al-Qaida high-ranking terrorists, were on the 7 hours of tape that <u>only</u> CBS possessed or ever viewed, and CBS had independently confirmed the Arabic dialect on the tapes and absence of Farsi/Dari/Pashto (Iranian and Afghan languages). CBS denied their investigation of the Mir Bach Kot al-Qaida terrorist training camp, and denied possessing other proprietary information which they received from me and which verified the authenticity of the tapes. CBS also withheld, and even misrepresented to third parties and potential customers for the *8mm VideoX tapes* the results of their investigation and that the tapes had irrefutable evidence of authenticity on them— evidence of a highly proprietary nature which only CBS had been give access to— such as the identities of captured and killed terrorists on the tapes, al-Qaida mission plans,

---

defense, and now their choice of New York law on defamation, were theories developed long after the filing of their case.

[7] Khalid Sheikh Mohammad, is the Pakistani-Kuwaiti mastermind of the September 11, 2001 attacks. Until his capture in Pakistan in March 2003, he was a top-level architect in Osama bin Laden's al-Qaida organization. He was one of the lead conspirators in a 2002 plot to attack the U.S. Bank Tower, the tallest building in Los Angeles. The 9/11 Commission Report calls him "the principal architect of the 9/11 attacks." He also helped finance his nephew Ramzi Yousef's 1993 World Trade Center bombing. He was indicted in the U.S. District Court SDNY in January 1996. As a member of al-Qaida he participated in the Bali nightclub bombings, the failed bombing of American Airlines Flight 63, the murder of Daniel Pearl, and other militant attacks.

[8] Zarqawi escaped from Afghanistan during OPERATION Anaconda in the Shah-i-Kot valley. In 2004 he became the most wanted man in Jordan and Iraq, having masterminded a number of violent actions against Iraqi, Jordanian and United States targets. The U.S. government offered a $25 million reward for information leading to his capture, the same amount offered for the capture of bin Laden before March 2004. On October 15, 2004, the U.S. State Department added Zarqawi and the Jama'at al-Tawhid wal Jihad group to its "list of Foreign Terrorist Organizations." On February 24, 2006, the FBI also added al-Zarqawi to the "Seeking Information - War on Terrorism" list, the first time that he had ever been added to any of the FBI's three major "wanted" lists. On June 7, 2006, Zarqawi was killed 1.5 miles north of Hibhib, near the city of Baquba, Iraq, by a US Special Forces Laser Guided JDAM airstrike.

4

AFFIDAVIT OF J. K. IDEMA IN SUPPORT OF COUNTER-PLAINTIFFS' OPPOSITION TO
CBS' MOTION FOR JUDGMENT ON THE PLEADINGS

satellite map confirmation that the tapes were made during a very confined period of time in 2001 when Osama bin Laden controlled that specific part of territory and no American forces or advisors had yet deployed to Afghanistan (pre-9/11). These were intentional misrepresentations with a design and purpose to undermine the tapes, defame me and subvert any future legal action against CBS for the sole purpose of obtaining dominion, control, and unlimited free licensing of what was at that time the most valuable[9] videotapes in the world.[10] The income from these videos inured not to the benefit of any one party or private party, but to the oppressed and poverty stricken people of Afghanistan in their war against terror[11] and Counterr Group's operations in Afghanistan against international terrorism.

7.    CBS had special knowledge, including my military records, personnel files, tapes of the terrorist interrogations, and personal knowledge inside the interrogation compound, Counterclaim *id.* ¶¶ 152, 153.

8.    Finally, CBS, in the hopes of increasing profits and market share, began to disseminate other false rumors, this time concerning the *8mm VideoX al-Qaida Training Tapes*, Counterclaim *id.* ¶¶ 150, 151. CBS, possibly for the purpose of limiting their contract damages, began to say that the *8mm VideoX* tapes were fake, making statements which interfered in the prospective economic advantage of myself and Counterr Group and were, on their face, libel *per se*.

---

[9] Of this there is no question. The *8mm VideoX tapes* have garnered extensive royalty payments for video worldwide, eclipsed possibly by only the Rodney King tapes which have a much longer history and were marketed more aggressively than the *8mm VideoX* tapes.

[10] There is no constitutional prohibition against a private cause of action under section § 75 or former G.S. 75-5(b)(3) for the extra-territorial conduct of product disparagement directed respectively toward a North Carolina competitor, North Carolina having a rational interest in each situation. *American Rockwool, Inc. v. Owens-Corning Fiberglas Corp.*, 640 F. Supp. 1411 (E.D.N.C 1986), therefore, Counterr Group and myself seek leave to amend the Counterclaim to include defamation of the *8mm VideoX tapes* in the Unfair & Deceptive Practices claim.

[11] As evidenced by the verified Counterclaims, contracts, and affidavits attached to the contemporaneously filed opposition to CBS' Motion to Dismiss counterclaims 1 through 6, and the secondary receipt and contract for a Kabul payment, attached to our Opposition to CBS' motion to dismiss the 1st through 6th counterclaims.

5

9.      Finally, as specified and verified in the affidavit of Lieutenant Banderas, I was never charged with torture, hanging anyone upside down, beating anyone, burning anyone, or any of the other insanely vitriolic accusations published by CBS.  I was charged with a) entering the country illegally (not guilty verdict in the trial *de novo* when video of me being warmly greeted by top Afghan officials, including the Chief of the National Police and President Karzai's brother, and filling out my entry forms at the VIP/diplomat gate at the Kabul airport was played), b) making an illegal arrest without a warrant, even though the Director of the Afghan National Security Council approved the arrests and sent his NSC security detachment with me, and c) detaining prisoners in private facility, even though the compound was personally authorized by the Afghan Minster of Defence—this charge was also dismissed by the Appeals Court which stated that the evidence showed it was an official office and facility, not a private facility.  I have no animosity or regrets, politics are what they are.  Wrong place, wrong time, such is life.  But CBS knew we were innocent, and misreported the facts, printed knowing lies, and concealed the evidence which would have freed us.  I have personal, professional, and good relationships with virtually every single high-ranking official in the former "Northern Alliance" (America's deserted ally), including the President, and both Vice-Presidents, five different ministers, the entire Afghan National Security Council, and every single military Corps commander in Afghanistan.  We are in prison today (in extremely comfortable accommodations thanks to my friends) solely because the press published these false rumors and it would now be politically incorrect to release me, even in the face of an innocence verdict.  I speak to Ministers and Generals every single day, including the chief of Parliament (similar to Prime Minister), who's life we saved.  I am visited by the top generals of Afghanistan on a regular basis, the generals that fought with America, and are now deserted by the State Department.   If it were not for CBS' and others printing these completely fabricated lies about torture and people hanging upside down, we would be back hunting terrorists again, and saving lives.  These are statements that no lawyer would think were appropriate, but they are true, and they need to be said because I believe this Court wants to know what really happened.  CBS can sling all

6

the mud they want, but it just isn't true, and one day, we will be free, because we are already

vindicated.

The foregoing facts are of my own personal knowledge and I could competently

testify to them. Those legal arguments and facts stated I believe to be true to the best of my

knowledge. Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury under the laws

of the United States of America that the foregoing is true and correct.

Executed on June 26, 2006, in the Islamic State of Afghanistan,

Jack Idema,
United Front Military Forces
Pulacharke, Afghanistan

7

AFFIDAVIT OF J. K. IDEMA IN SUPPORT OF COUNTER-PLAINTIFFS' OPPOSITION TO
CBS' MOTION FOR JUDGMENT ON THE PLEADINGS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1

AFFIDAVIT OF J. K. IDEMA IN SUPPORT OF COUNTER-PLAINTIFFS' OPPOSITION TO
CBS' MOTION FOR JUDGMENT ON THE PLEADINGS



**INTERNATIONAL**
**COMMISSION**
**OF JURISTS**

# Afghanistan's Legal System and its Compatibility with International Human Rights Standards

## FINAL REPORT

## BY

## DR. MARTIN LAU

**This report was produced thanks to the generous financial assistance of the Government of Germany.**

**TABLE OF CONTENTS**

**INTRODUCTION**   **3**

**EXECUTIVE SUMMARY**   **4**

**AFGHANISTAN'S LEGAL SYSTEM**   **7**

*THE 1964 CONSTITUTION*   *9*
*THE JUDICIARY*   *12*
*SUMMARY*   *16*
*ACTION*   *16*
*THE OFFICE OF THE PUBLIC PROSECUTOR*   *17*
*ACTION*   *18*
*LEGAL PROFESSIONALS*   *18*
*ACTION*   *19*
*SUBSTANTIVE AND PROCEDURAL LAWS*   *19*
*CRIMINAL LAW*   *21*
*PROCEDURAL LAWS*   *22*
*ACTION*   *23*
*JUVENILE JUSTICE*   *24*
*LEGAL STATUS OF WOMEN*   *24*
*CONCLUSIONS AND RECCOMMENDATIONS*   *26*

**ANNEXES**   **28**

*ANNEX I: AFGHANISTAN: A LEGAL CHRONOLOGY*   *28*
*ANNEX II: UN TREATIES ACCEDED TO BY AFGHANISTAN*   *36*
*ANNEX III: THE BONN AGREEMENT.*   *37*
*SEMINAR PAPERS*
*ANNEX IV: CHILDREN'S RIGHT S*   *45*
*ANNEX V: CRIMINAL LAW.*   *47*
*ANNEX VI: CIVIL COURT REGULATION, IN ACCORDANCE WITH HUMAN RIGHTS*   *50*
*ANNEX VII: STRUCTURE OF THE COURTS*   *52*
*ANNEX VIII: A  BRIEF REVIEW OF WOMEN'S POLITICAL RIGHTS*   *54*
*ANNEX IX: MARRIAGE AND DIVORCE*   *56*
*ANNEX X: CONSULTATIONS*   *58*

# INTRODUCTION

1.  The ICJ mission's objective was primarily to examine the Afghan legal system established under the 1964 Constitution, as well as the 1964 Constitution itself, against the benchmark of international human rights standards. The mission, which took place in the first half of 2002 was carried out in two phases: firstly, information on Afghanistan's laws and legal system as it existed prior to the commencement of the civil war was collected and analysed. In this regard the mission benefited from the collections of the library of the School of Oriental and African Studies, University of London, and the Institute of Advanced Legal Studies, London.[1] Secondly, field-work was carried in Afghanistan. The mission visited Afghanistan in April 2002 and again in May/June 2002I spending a total of about three weeks in the country. In addition to interviews with legal professionals, judges, prosecutors and government officials, the mission also held a seminar on selected legal issues in Kabul, attended by representatives of the Faculty of Law and Political Science of Kabul University, the Lawyers' Association of Afghanistan and the Ministry of Women's Affairs[2]. The mission also visited the city of Mazar-e-Sharif, but due to security problems pertaining at that point in time no other areas could be visited. In Afghanistan the mission received invaluable support from Mr Mohmmad Hamid, a law graduate of Kabul University who acted as interpreter and research assistant in Kabul.

---

[1] A bibliography listing the main sources on Afghanistan's legal developments can be found at Annex .More recent reports on Afghanistan primarily compiled by UN bodies and international human rights organisation are available in electronic form and can be accessed through the internet. I am grateful to Ms Saira Abbassi and name to be supplied for their help in collecting legal materials and information on Afghanistan.

[2] Translations of the papers presented at the Seminar, which took place on 1st and 2nd June 2002 in Kabul, are annexed to this Report. The seminar papers were originally written in Dari and translated into English in Kabul. Some subsequent editing took place in Geneva but every effort has been made to keep the edited versions of these papers as faithful to the original as possible.

# EXECUTIVE SUMMARY

2.    Currently, Afghanistan does not have a uniform legal system. Serious human rights abuses continue to occur on a regular basis and many of the perpetrators remain outside the reach of Afghanistan's transitional government under President Karzai. The legal reality is marked by impunity: not only do past grave violations of human rights remain unpunished but such abuses are continuing without any immediate prospect for a legal system capable of bringing the perpetrators to justice. Formally Hamid Karzai's government is responsible for the implementation of the Bonn Agreement and, representing the state's central and ultimate authority, his government must be enabled to carry out its duties imposed not only by Afghanistan's domestic laws but also the country's international legal obligations. There is no doubt that Hamid Karzai's government is sincere in its efforts to address human rights' abuses. However, Afghanistan must still be regarded as a fragile state whose central government does not enjoy a monopoly on the use of force. In purely practical terms the government has found it difficult to address the issue of basic human rights. Virtually everyone interviewed in the course of the mission gave as his or her highest priority not the guarantee of human rights or economic development but security. The authority of the central government does not extend far beyond Kabul. Thus, an important ingredient for the establishment of the rule of law and a legal system capable of guaranteeing basic fundamental rights is currently not present.

3.    Legal institutions established under the 1964 Constitution and subsequent legal norms continue to exist in Kabul and Mazar-e-Sharif. However, it is uncertain to what extent courts exist and function outside Afghanistan's main cities.  It is equally uncertain what vision of law and human rights informs Afghanistan's judiciary and how the judiciary perceives its own role in the development of Afghanistan's legal system.

4.    Legal and judicial institutions, if they exist, face a host of problems. First and foremost, courts are understaffed and ill equipped. Secondly, neither judges, lawyers, nor educational institutions have access to applicable statutes and associated legal materials. Afghanistan's prolonged civil war has brought with it the destruction or disappearance of most statutes.

5.    Thus, in practice, courts apply Islamic law and not the provisions of the 1964 Constitution or the applicable statutory laws. However, even during the period from 1964 until the outbreak of the civil war caused by the Soviet invasion of Afghanistan in 1979, Afghanistan's framework of constitutional and statutory laws seems to have played only a minor role in the administration of justice. In practice and legal reality, Afghanistan's courts have been applying Islamic and customary laws. Further, non-state fora for the settlement of disputes like jirgas, ie. councils of elders, have always played an important role in the legal system though they do not enjoy any legal status under the provisions of the 1964 Constitution.

4

6.   Part II of the Bonn Agreement commits the Transitional Government of Afghanistan to a interim legal framework until the adoption of a new Constitution which consists of

> '(i) The Constitution of 1964, (a) to the extent that its provisions are not inconsistent with those contained in this agreement [ie. the Bonn Agreement], and (b) with the exception of those provisions relating to the monarchy and to the executive and legislative bodies provided in the Constitution; and, (ii) existing laws and regulations, to the extent that they are not inconsistent with the Bonn Agreement or with international legal obligations to which Afghanistan is a party, or with those applicable provisions contained in the Constitution of 1964, provided that the Interim Authority shall have the power to repeal or amend those laws and regulations.'

In respect of the judiciary the Bonn Agreement provides in Part II (2) that

> 'The judicial power of Afghanistan shall be independent and shall be vested in a Supreme Court of Afghanistan and such other courts as may be established by the Interim Administration. The Interim Administration shall establish with the assistance of the United Nations, a Judicial Commission to rebuild the domestic justice system in accordance with Islamic principles, international standards, the rule of law and Afghan legal traditions.'

7.   The contrast between the requirements to be met by Afghanistan's legal system under the provisions of the Bonn Agreement and the legal reality as it pertains in the country can only be described as dramatic: whereas the provisions of the 1964 Constitution and Afghanistan's international legal obligations can be ascertained without any difficulty, the same does not apply to the existing laws and regulations. The latter have to a large extent physically disappeared and can only be located in foreign libraries and collections. Thus both the Interim Administration and the Transitional Government, which took control over the affairs of the state in June 2002, having been elected by an Emergency Loya Jirgah, are faced with the impossible task of enforcing a legal system that within Afghanistan does not even exist on paper.

8.   The main conclusions and recommendations of the ICJ mission are as follows:

a.   The current legal system as it exists and functions in practice falls short of international human rights standards in many respects.

b.   The legal system as it formally existed under the 1964 Constitution, even if it was uniformly enforced and applied throughout the country, departs from international human rights to a significant degree. It is noted that many other legal systems incorporating religious laws in the spheres of family and/or criminal law are marked

by similar divergences from international human rights' norms.

c.   The co-existence and de facto dominance of Islamic and customary laws with the formal legal system in itself constitutes a significant departure from international human rights standards. Again, Afghanistan shares this issue with many other legal systems like its neighbour Pakistan where there is also a wide gap between official law and de facto legal reality.

d.   The destruction and disintegration of Afghanistan's legal system is such that no assistance programme can focus on any single component of the legal system but has to proceed in an integrated, all-embracing manner. The top priority is the establishment of an effective and properly funded Law Commission able to co-ordinate and prioritise the reform and rebuilding of Afghanistan's legal system. The recently formed Judicial Commission, the Human Rights Commission and the Constitution Commission must and will play an important role in this process. Secondly, the body of applicable laws needs to be determined. Of particular importance in this regard are the procedural laws governing criminal trials including the rights of the accused. Thirdly, the essential institutional manifestations of a legal system including courts, offices of the public prosecutor, the police and jails must be brought under the control of the government and equipped and trained to fulfil their respective roles in a legal system in line with international human rights standards. Institutional capacity building must include both material provisions, such as the payment of salaries, as well as training and development. Fourthly, and in all likelihood most difficult, is the creation of a unified legal system most importantly in the sphere of criminal law.  The rule of law cannot be established and the problem of impunity cannot be addressed without a legal system capable of bringing to justice those guilty of crimes and violations of human rights. Equally, the rights of those suspected of having committed criminal offences cannot be guaranteed without a strong and robust criminal justice system.

e.   The recommended next step is a workshop/conference in which the main political and legal actors (including some from the provinces) would develop a concrete plan of action to implement the needed legal reforms.

6

# AFGHANISTAN'S LEGAL SYSTEM[3]

9.      Like many other developing countries, Afghanistan's official law, i.e. the formal legal system established under the provisions of a constitution, does not represent the de facto norms that govern the lives of the majority of the population. The inability of successive governments to implement statutory laws in a uniform and countrywide manner is as much a reflection of underdevelopment as it is of political constraints. Without exception every single survey of Afghanistan's legal system consulted in the course of this project observed, and frequently lamented, the fact that Afghanistan's statutory laws and regulations existed, for all practical purposes, on paper only.[4]

10.     It is important to note that the limited practical value of Afghanistan's statutory law cannot be attributed solely to the decline and eventual demise of a central political authority in Afghanistan as a result both of more than two decades of civil war and the reign of the Taliban. In a carefully researched article on 'Legal Elites in Afghan Society', published in 1980, M.G. Weinbaum found that even 'where formal statutes exist, judges typically lack the training and research resources required to identify appropriate provisions of the law.' he also finds that 'many are also understandably overwhelmed by the necessity to adjust positive law, often foreign in origin, to the Afghan experience.'[5] The splitting of the legal system into an official law and unofficial law has been a hallmark of Afghan legal history ever since attempts were made to introduce statutory laws. In fact, it is possible to go even further and state with some confidence that past experience would suggest that any attempt to implement and enforce secular statutory laws which depart from customary and/or particular interpretations of Islamic law is liable to be met with protests and perhaps even civil unrest.

11.     The difficulties in implementing statutory laws experienced in the 1960s and 1970s are further compounded by purely practical considerations. First and foremost, many of the statutes framed and passed during that period are currently unavailable in Afghanistan. Not a single court visited in the course of the mission in either Kabul or Mazar-e-Sharif had access to or a collection of Afghanistan's main statutory laws. Even the Ministry of Justice and the University of Kabul do not hold complete sets of Afghanistan's statutory laws and regulations. The International Human Rights Law Group and the American Bar Association collected various Afghan statutes, principally concerned with penal, civil and commercial law, reprinted them in Pakistan and presented them to the Ministry of Justice in early June

---

[3] A chronology of Afghanistan's modern legal history is attached in Appendix 1
[4] See Amin, S.H.: *Law, Reform and Revolution in Afghanistan*, 'for most ordinary villagers and tribesmen, who form the majority of the population, Islamic and tribal law remain more significant than State legislation', p. 66.
[5] See Weinbaum, M.G.: 'Legal Elites in Afghan Society', International Journal of Middle East Studies, vol. 12 (1), 39-57,  p. 51.

2002.[6]

12.    These laws must be regarded as important and their distribution within Afghanistan undoubtedly constitutes a significant step towards the establishment of a formal legal and judicial system. However, it must be noted that even during periods when these laws were presumably more easily available, they were in fact rarely applied and did not offer an accurate representation of Afghanistan's de facto legal system. As noted earlier, even during the 1960s and 1970s judges either had only limited knowledge of them or were reluctant to apply them.[7] The current situation is even more problematic since these laws had not only not been applied but had actually physically ceased to exist in many parts of Afghanistan for long periods of time.

13.    Lack of training, knowledge and purely ideological reasons make it highly unlikely that the redistribution of some of the statutes comprising a significant part of Afghanistan's corpus of codified laws will have any immediate impact on human rights and the rule of law in Afghanistan even in metropolitan areas like Kabul.

14.    Further, irrespective of the availability of printed versions of legal codes, there exists a fundamental difficulty in identifying the applicable law in Afghanistan mainly as a result of rapid political change and concurrent changes in the formal legal system. The Bonn Agreement provides that until the adoption of the new Constitution the following legal framework shall be applicable on an interim basis:

        'The existing laws and regulations, to the extent that they are not inconsistent with this agreement or with the international legal obligations to which Afghanistan is a party, or with those applicable provisions contained in the Constitution of 1964, provided that the Interim Authority shall have the power to repeal or amend those laws and regulations.'

15.    This means that all existing laws are applicable unless they are in violation of the 1964 Constitution, international legal obligations or the Bonn Agreement. Important changes to the law were introduced as a result of political changes in the late 1970s and are reflected in the Law of Criminal Procedure. Whereas the Criminal Procedure Law of May 1965, as amended in 1974, provided that detention of a suspect on whatever grounds cannot exceed one week unless authorized by a court (see articles 26, 28, and 29), this situation changed profoundly in 1981. The Law on the Discovery and Investigation of Crimes and Supervision of the Attorney General on Its Legal Enforcement of March 1979, as amended in 1981, allowed the Attorney

---

[6]The materials comprised the Bonn Agreement, the Penal Code (Books One and Two), the Criminal Procedure Law, the Civil Code, the Commercial Code and the Legal Procedures of Commercial Codes.
[7]Amin observes that 'The texts of Afghan legislation are published in the Rasmi Jarida which is the Official Gazette. This source, first published in 1963, is a reliable means of finding enacted laws. Now a reasonably complete set of this publication can be found though with some difficulty.' op. cit., p. 67.

General much wider powers including the power to detain a suspect for up to six months without any court approval being required.[8] It is not certain which of the two provisions govern at least in theory the detention periods of suspects in criminal investigations. The same degree of legal uncertainty pertains to other areas of law that underwent changes as a result of political transformations. Most prominent are the land reform laws, which were introduced following the coup of April 1978: it has been impossible to establish the fate of these laws or the present status of any measures taken under them.

16.     A careful study of the statutory framework of Afghanistan's legal system is therefore fraught with both practical and theoretical difficulties. On a practical level, it is doubtful whether any wider dissemination of existing laws would result in an improvement of the rule of law or human rights. Secondly, the corpus of statutory laws presents itself in layers, each layer representing particular periods of governance. It is primarily a political task to decide which of these layers should be applied, if at all. The redistribution of laws from a particular period cannot therefore be regarded as a politically neutral exercise since it imposes on the existing courts and institutions a particular choice of laws. Statutory laws were enacted under the Constitutions or Interim Constitutions of Afghanistan of 1964, 1977, 1980, 1987, 1990 and 1992. During all these periods of constitutional rule new statutes were enacted and existing ones amended or superseded. Thus, it is likely to be regarded controversial which laws should now be recognized as valid and applicable.

## The 1964 Constitution

17.     According to the Bonn Agreement, the 1964 Constitution is applicable on an interim basis to the extent that its provisions are not inconsistent with the Agreement itself, with the exception of the provisions relating to the monarchy and to the executive and legislative bodies provided in the Constitution.

18.     Articles 25 to 40 of the 1964 Constitution contain provisions on 'The Basic Rights and Duties of the People'. If properly observed by all authorities and political and military factions these articles would go a very long way towards safeguarding human rights and the rule of law in Afghanistan.

19.     Article 25 provides for equality before the law: 'The people of Afghanistan, without any discrimination or preference, have equal rights and obligations before the law.' The article is remarkable in that it is simple, clear and unambiguous. However, as will be seen later, it must be regarded as a programmatic statement rather than a reflection of even the official law. This applies especially to the area of family law, which is governed by Islamic law, and which provides for differential treatment of men and women, especially in the areas of marriage,

---

[8]See Vafai, Gholam H.: *Afghanistan. A Country Law Study*, Washington, Library of Congress, 1988, p. 36.

divorce and inheritance. As observed earlier, the legal reality itself departs significantly from the principles enunciated in Article 25. It should be noted that many other Muslim countries experience similar problems in matching the ideal of equality before the law with particular aspects of Islamic family law.

20.    Article 26 contains a wide range of fundamental rights all concerned with the right to a fair trial, liberty and human dignity. Article 26 provides that:

a.    'Liberty is the natural right of the human being. This right has no limitations except the liberty of others and public interest defined by the law.

b.    The liberty and dignity of the human being are inviolable and inalienable. The State has the duty to respect and protect the liberty and dignity of the individual.

c.    No deed is considered a crime except by virtue of law in force before its commission.

d.    No one may be punished except on the orders of a competent court rendered after an open trial held in the presence of the accused.

e.    No one may be pursued or arrested except in accordance with the provisions of the law.

f.    No one may be detained except on order of a competent court, in accordance with the provisions of the law.

g.    Innocence is the original state; the accused is considered to be innocent unless found guilty by a final judgement of a court of law.

h.    Crime is a personal deed. Pursuit, arrest or detention of the accused and the execution of sentence against him does not affect any other person.

i.    Torturing another human being is not permissible. No one can torture or issue orders to torture a person even for the sake of discovering facts, even if the person involved is under pursuit, arrest or detention or is condemned to a sentence.

j.    Imposing punishment incompatible with human dignity is not permissible.

k.    A statement obtained from an accused or any other person by compulsion is not valid.

l.    Confession of a crime means the admission made by an accused willingly and in full

10

possession of his senses before a competent court with regard to the commission of a crime legally attributed to him. Every person has the right to appoint a defence counsel for the removal of a charge legally attributed to him.

m.    Indebtedness of one person to another cannot cause deprivation or curtailment of the liberty of the debtor. The ways and means of recovering a debt shall be specified in the law.

n.    Every Afghan is entitled to travel within the territory of his State and settle anywhere except in areas prohibited by the law. Similarly, every Afghan has a right to travel outside of Afghanistan and to return to Afghanistan according to the provisions of the law.

o.    No Afghan shall be sentenced to banishment from Afghanistan or within its territory.'

21.    The provisions of Article 26 are strengthened by Article 100 which provides that

'In the courts of Afghanistan trials are held openly and everyone may attend in accordance with the provisions of the law. The court may in exceptional cases specified in the law hold closed trials. However, the judgement shall always be openly proclaimed. The courts are bound to state in their judgements the reasons for their verdicts.'

22.    The fair trial provisions contained in Articles 26 and 100, if properly implemented and reflected in the substantive and procedural laws of the country would go a long way in safeguarding basic human rights in Afghanistan. A closer examination of Afghanistan's criminal laws, below, reveals that some of the constitutional provisions contained in Article 26 remain unimplemented. However, in the current situation this must be regarded as a comparatively small detail, considering that the reality of the criminal justice system as it currently operates in large parts Afghanistan, remains outside the legal system contemplated by the 1964 Constitution.

23.    Article 29 guarantees the right to property, Article 30 provides for freedom and secrecy of communications of persons, while Article 31 provides that freedom of thought and expression are inviolable. Article 27 provides that no Afghan can be extradited to a foreign state. A person's residence is declared inviolable under Article 28. The right to assemble unarmed, without the prior permission of the state, for legitimate and peaceful purposes, in accordance with the provisions of the law, is guaranteed under Article 32, as is the right to form political parties. Apart from these civil and political rights, the 1964 Constitution also provides for limited social and economic rights. These comprise a right to free education

(Article 34) and health, with the limits of its means (Article 36).

24.    What is absent from the 1964 Constitution is a properly defined and guaranteed constitutional mechanism for the enforcement of these rights. Article 33 provides that 'Anyone who, without due cause, suffers damage from the Administration is entitled to compensation and may file a suit in a court for its recovery.' However, this article falls short of providing an effective enforcement mechanism. Also missing are constitutional provisions that afford these rights any higher protection against constitutional amendment or removal than the other parts of the 1964 Constitution. Article 120 provides that only adherence to the basic principles of Islam, Constitutional Monarchy in accordance with the provisions of this Constitution, and the values embodied in Article 8 shall not be subject to amendment.

## The Judiciary

25.    The Bonn Agreement provides that:

> 'The judicial power of Afghanistan shall be independent and shall be vested in a Supreme Court of Afghanistan and such other courts as may be established by the Interim Administration. The Interim Administration shall establish with the assistance of the United Nations, a Judicial Commission to rebuild the domestic justice system in accordance with Islamic principles, international standards, the rule of law and Afghan legal traditions.'

26.    It is a fact that the Bonn Agreement's provisions on the judicial power do not refer directly to the 1964 Constitution. However, since the 1964 Constitution is supposed to provide the legal framework for an interim period 'with the exception of those provisions relating to the monarchy and to the executive and legislative bodies provided in the Constitution' it must be taken as having been intended that the provisions of the 1964 Constitution relating to the judiciary and the courts do apply to the courts established by the Interim Administration.

27.    Articles 97 to 107 of the 1964 Constitution contain detailed provisions on the establishment of courts and the status and independence of the judiciary. Article 97 establishes the judiciary as an independent organ of the State. The only court actually established under the Constitution is the Supreme Court (Article 98) while the number of the other courts is determined by law. The jurisdiction of the courts to hear cases brought before them is exclusive: 'Under no circumstances shall a law exclude from the jurisdiction of the judiciary, as defined in this Title, a case or sphere, and assign it to other authorities' (Article 98). However, Article 98 also provides that this provision does not prevent the establishment of military courts 'but the jurisdiction of these courts is confined to offences related to the armed forces of Afghanistan.'

28.    The Supreme Court is accorded a high degree of supervisory jurisdiction over the lower

judiciary. Charges of misconduct against a judge are heard and decided by the Supreme Court, and all judges with the exception of the judges of the Supreme Court itself, are appointed 'by the King on the recommendation of the Chief Justice.'

29.    Article 105 provides for the appointment of nine persons to the Supreme Court by the King and lays down minimum qualifications consisting of age (having completed 35 years), of being formally eligible for election to the Parliament (see Article 46 of the Constitution for these qualifications) and of having 'sufficient knowledge of jurisprudence, the national objectives and the laws and the legal system of Afghanistan.' The terms of tenure of the nine Supreme Court judges provide for a reasonably high degree of judicial independence: once appointed the King can review the appointment of the judges of the Supreme Court only ten years after their respective dates of appointment and they can otherwise only be removed from office in accordance with Article 106. The latter article provides that after an initial demand of one third of the members of Parliament for the impeachment of a judge of the Supreme Court 'on a charge of a crime stemming from the performance of their duty', two thirds of the members of Parliament have to approve this demand. Should this happen the accused judge is suspended from office and a meeting of the Loya Jirgah is called to appoint a Commission of Enquiry. Should the report of the Commission indict the accused judge then a two-thirds majority of the Loya Jirgah can authorize the prosecution of the accused judge. A special tribunal appointed by one of the members of the Loya Jirgah then tries the accused in accordance with the criminal procedures of the Supreme Court.

30.    Except in cases of dismissal under Article 106, the judges of the Supreme Court shall, after their tenure in office, enjoy for the rest of their lives all the financial privileges pertaining to the term of their services.

31.    The Supreme Court as the country's apex court is also constitutionally charged with the organization and functions of the Courts and the judicial affairs of the State in accordance with the provisions of the Constitution and the law. This duty extends to the organization of the administrative affairs of the other courts, including the administration of the budget of the judiciary. The latter is prepared by the Chief Justice in consultation with the Government and, after the approval of the Supreme Court, is presented by the government to the Parliament as part of the State budget. The budget of the judiciary is administered directly by the Supreme Court.

32.    The service conditions of judges are identical to those of civil servants but 'their appointment, promotion, dismissal, retirement and calling to account shall be within the competence of the Supreme Court, in accordance with the law' (Article 107).

33.    Thus the Supreme Court occupies a strong position in the constitutional framework of Afghanistan. Once appointed its judges enjoy a high degree of independence and a high

degree of control and supervisory jurisdiction over the lower judiciary and courts. The re-establishment of a formal judicial system has been difficult. In the metropolitan areas of Mazar-e-Sharif and Kabul civil and criminal courts appear to be functioning, as does the Supreme Court. However, it is far from clear who originally appointed the judges to these courts and to what extent they have ever enjoyed the exclusive jurisdiction over all trials as provided in Article 98 of the 1964 Constitution.

34.    The Law of the Jurisdiction and Organization of the Courts of Afghanistan of  (Muslim Year) 1346 [1968] [the 1968 Law] contains detailed provisions on the hierarchy and organization of courts. It establishes the following courts:

> General Courts, which include the Supreme Court, the Court of Cassation, the High central Court of Appeal, Provincial Courts and Primary Courts; and

> Specialized Courts that include juvenile courts, labour courts, and other specialized courts established by the Supreme Court when needed.

35.    Field-work revealed that in Kabul at least these courts are in operation though the number of cases heard by them and the exclusivity of their jurisdiction could not be ascertained.  The Supreme Court itself consists of four departments: the department of the Administration of the Judiciary, the department of Judicial Inspection, the department of Research and Investigation, and the Public Prosecutor's Office of the Judiciary. The 1968 Law contains detailed provisions on the judicial jurisdiction of the Supreme Court as well as its administrative powers and also establishes a Court of Cassation centred in the Supreme Court. The Court of Cassation functions as an administrative court of appeal and is divided into three 'Collegiums': the Collegium of Civil and Commercial cases, the Commercial Collegium and the Public Rights Collegium. The Court of Cassation can either annul the judgement of a lower court or confirm it. In case of the former a re-trial is ordered.

36.    The next level of the court structure consists of the High Central Court of Appeal. It consists of three Collegiums similar to those of the Court of Cassation and its main function is to hear appeals against judgements pronounced by provincial courts. Each province has one Provincial Court which enjoys appellate jurisdiction over decisions made by primary courts and a limited original jurisdiction primarily involving cases relating to charges against public officials, press offences[9] and smuggling.

37.    The Chief Justice of Afghanistan determines the number of primary courts in each province. In 1980, there were about 220 primary courts and 28 provincial courts. Article 60 provides that the provincial courts are duty bound to provide the primary courts, located within their jurisdiction, with the necessary administrative services and assist in organizing their

administrative affairs. All cases are in the first instance decided by a primary court but its decision is considered final only if in civil cases the value of the subject of the dispute does not exceed the amount of 500 Afghanis and in criminal cases, if the sentence does not exceed one month's imprisonment. In the absence of an appeal by the contesting parties, a primary court's decision becomes binding with the exception of cases involving minors, capital punishment, *quisas*,[10] and life imprisonment.

38.    In addition to the 1968 Law, the Law of the Administration of the Courts of Justice of 1355 [1977] provides, in 279 Articles, much greater detail on the organization of lower courts and the High Court. It deals with the making of the complaint, court proceedings and maintenance of discipline, the appearance of contesting parties and the manner of hearing a case and finally the pronouncement of judgements and the lodging of appeals. By far the most remarkable feature of this law is its insistence on open trials. Article 57 provides that 'In the Courts of Justice, all trials are held open'.

39.    In practice, it appears that the conduct of open trials is rare. The mission visited the High Court in Kabul both in April and at the end of May to observe a trial. In both instances the mission was asked to return to the High Court on a specific date so that arrangements for an open trial could be made by the High Court.  In the event the mission was unable to witness a single civil or criminal trial due to organizational difficulties experienced by the court itself. News reports indicate that more recently there have been several open criminal trials in Kabul.

40.    A Law of Statutory Limitations for Primary, Appellate and Review Hearings of Civil and Criminal cases in Afghanistan of 1324 [1946], and a Law Concerning the Administration of Government Cases of 1343 [1965] provide further detailed provisions on court procedure and the administration of justice.

41.    A review of these laws, read together with the relevant constitutional provisions, suggests a developed and functioning system of courts modelled closely on civil law jurisdiction, but incorporating some elements of Islamic procedural and substantive laws and some Islamic rules of evidence, as for instance, the central position of the oath in criminal and civil trials.

42.    The Interim Authority appears to have continued the system of courts as they existed prior to the seizing of power of the Taliban in 1996. Under the Taliban, the pre-existing courts remained in place but it appears that in practice their powers and jurisdiction over both civil and criminal cases was limited: religious courts established by the Taliban on an ad hoc basis frequently heard and decided cases. Certainly both in Kabul and in Mazar-e-Sharif primary

---

[9] It could not been ascertained what offences are included in the category of 'press offences'.
[10]*Quisas*, literally translated 'retaliation', denotes the right of the heir of a victim to demand the capital punishment.

courts, provincial courts and, in the case of Kabul, a High Court and the Supreme Court exist and are hearing cases. However, it is not known whether the same situation obtains in other parts of Afghanistan or in fact in other urban areas. In April 2002, the judges of the Provincial Court in Mazar-e-Sharif had not received a salary since the defeat and expulsion of the Taliban. The exact number of cases heard by these courts could not be determined.

43.    Some of those interviewed also mentioned the existence of District Courts which were supposed to be located at a level between primary courts and the provincial courts. However, the writer was unable to identify any District Courts or locate any legislation establishing them.

## Summary

44.    The main structures of the judicial system as established under the 1964 Constitution and the laws mentioned above appear to have survived the political upheavals of the past 23 years, at least in Kabul and Mazar-e-Sharif. A number of courts exist and those visited appeared to be functioning, i.e. there were judges, administrators, and clerks as well as litigants. As a general rule, there appear to be no open trials. The legal profession is dealt with below but it should be mentioned at this stage that in none of the courts visited were any lawyers, nor indeed were there any facilities for lawyers. However, it is uncertain to what extent even the courts that appear to be functioning represent a true reflection of the legal landscape. Who has access to these courts; what proportion of civil and or criminal cases are heard by them; to what extent were the judges appointed in accordance with the law, and equally important, under which law; how independent are they; which procedural laws do they follow and what substantive law do they apply are all questions which cannot be answered with any degree of certainty. Those judges interviewed had no access to Afghan statutes or any of the several constitutions, let alone the 1964 Constitution nor did they seem to know much about the procedural laws on the organization of courts. It was equally difficult to ascertain how judgements were enforced and by whom.

## Action

45.    None of the judges interviewed expressed any significant interest in education or training or the provision of statutory materials to which none of them had access. Invariably, judges referred to copies of the Holy Quran and stated that it contained all the laws that were needed. Judging by the observations made by Weinberg, referred to earlier, it appears likely that at the very least Afghanistan's lower judiciary has never applied the country's statutory laws with any degree of consistency but has relied on its personal and individual interpretations of Islamic law. It is thus reasonably certain that at least the present judiciary has little interest in the re-introduction of Afghanistan's statutory laws and might even

oppose them as un-Islamic. Any decision taken by aid agencies and the Transitional Government to reform both the substantive criminal and laws needs to be informed by this potential for opposition and protest. Immediate action should be confined to the provision of material support of courts, salaries and the establishment of training facilities. In tandem with this there is an urgent need for intensive qualitative and quantitative research on the size and structure of the current system of courts, its staffing and training levels, workload and detailed case studies of representative courts. What exists in terms of research and assessment must be regarded as being in the nature of snapshots, which give an indication of the bigger picture but cannot accurately represent it.

## The Office of the Public Prosecutor

46.     The constitutional position of the public prosecution service established by the 1964 Constitution is defined as follows: 'Investigation of crimes shall be conducted, in accordance with the provisions of law, by the Attorney General, who is part of the Executive organ of the State' (Article 103). This constitutional arrangement was continued in the 1977 Constitution (Article 106). This meant that in practice the public prosecutor's office was located in the Ministry of Justice. However, in the Interim Constitution of 1980 the Attorney General became an independent organ answerable to the Revolutionary Council. This pattern was also reflected in the 1987 Constitution (Article 119). Currently, the Attorney General's office continues to be independent of the Ministry of Justice. The Law of *Saranwali*, i.e. the public prosecutor of 1345 [1966], which at least in theory regulates the Office of the Public Prosecutor, places his office under the supervision of the Ministry of Justice. According to Article 10 of this law ' the public prosecutor and the police shall perform the duties of detection, investigation and the prosecution of crimes through their own professional members.' The law contemplates that the original investigation of a crime, once commenced by the police, has to be transferred to the public prosecutor within 24 hours. After completion of an investigation the public prosecutor either closes the file or refers the matter to a court. The Criminal Procedure Law of 1344 [1965] confers an exclusive power on the public prosecutor to file and prosecute a criminal action.

47.     The Office of the Public Prosecutor appears to have been abolished by the Taliban but has been resurrected by the current Government of President Karzai. However, there seems to be a certain degree of competition between the public prosecutor's office and the Ministry of Justice. In Kabul, the Office of the Public Prosecutor appeared to be functioning well. According to the CRAFT report 'Filling the Vacuum: Prerequisites to Security in Afghanistan' [March 2002], Kabul Province has 184 staff and had by early March 310 cases pending, 42 of which had been submitted to the relevant courts. According to the same report, in 1980 nearly 100 districts had no public prosecutor at all.

48.     As in the case of the judiciary little is known about the functioning of the public prosecutor

offices outside Kabul province. The Office of the *Saranwali* in Mazar-e-Sharif had only the most basic equipment, consisting of an old desk and a few chairs, no access to procedural or substantive criminal laws, and was staffed at the time of the visit by just one public prosecutor. He described his function as being very limited since military commanders in charge of various sectors of the city were also in full control of the investigation and prosecution of crimes, which were conducted by their own militias.

## Action

49.    Initial material assistance combined with basic training in Afghanistan's procedural laws appears to be the most important initial requirement. A responsible and well- trained prosecution service is an essential ingredient in the rule of law whilst an ill trained, poorly supervised prosecution service can also be the source of human rights violations and miscarriages of justice. More research, especially in respect of the situation in the provinces, is of equally high priority.

## Legal Professionals

50.    The only law that could be located as being directly concerned with the legal profession is the Law for Organizing Affairs of Defence Attorneys of 1351 [1972]. As stated above, according to the 1964 Constitution, 'Every person has the right to appoint defence counsel for the removal of a charge legally attributed to him.'(Article 26). This is reflected in Articles 1 and 2 of the 1972 Law which provide that 'A defence attorney has the right to defend deputor before all courts and before the S*aranwali* in accordance with the provisions of this law and other laws.' and 'Either of the parties to a suit has the right to assign a defence attorney for acting in his defence.' The 1972 Law provides in Article 10 for the provision of defence attorneys to destitute persons to be paid from the state budget if so ordered by the relevant trial court.

51.    The 1972 Law regulates the admission to the bar of defence attorneys as well as their minimum qualifications. A Control Committee in the Ministry of Justice consisting of representatives of the Supreme Court, the law school, the *Saranwali's* office and three senior defence lawyers has the duty to accept or reject the requests for engaging in the profession of defence attorney. The qualifications stipulated by the act are basic: a minimum age of 25 years, a law degree from a college of *shariat*, a college of law or an official *sharia madrassa* provided that the candidate has not been deprived of his or her political rights by a court's verdict. There is no added requirement or indeedfacility for vocational legal training or continuing professional development of members of the legal profession.

52.    The 1972 Law stipulates the basic rights and duties of lawyers and also contains some provisions on professional ethics and disciplinary provisions. The 1972 Law is contained in

the collection of Afghan laws compiled by Robert Hager in 1975. No reference to this law could be located in Afghanistan itself and it appears to have been temporarily lost and thus not applied.

53.    During the visit to Kabul the writer was able to make contact with the Lawyers' Association of Afghanistan, a voluntary body of Afghan lawyers formed in 1985. Its President, Mr. Shah Mahmmod Kerad, stated that in the late 1980s the association had about 5,000 members but that the Taliban closed it down in 1996. It reopened its offices only in November 2001. A Women's Bar Association was formed in Peshawar several years ago. It has about 40 members and is planning to open an office in Kabul. However, the impression gained through visits to courts was marked the glaring absence of criminal defence lawyers. Weinbaum confirms this impression in his article 'Legal Elites in Afghan Society'. He observes that 'By official count there are 162 defence attorneys, although not all are licensed for comprehensive practice or are fully active' (op. cit., p. 40). These figures confirm the writer's impression that defence lawyers have never featured very prominently in recent Afghan legal experience. Law students and graduates spoken to were all reluctant to enter the legal profession since they did not feel sufficiently well trained - after all in practice courts apply Islamic law - and in any event thought that they would not be able to make a living as legal professionals.

## Action

54.    There is little doubt that the existence of a strong, well-trained and independent bar constitutes an important element in the rule of law and the safeguard of the rights of an accused. However, this cannot be achieved in any shape or form in the short term but requires long-term planning so as to create institutional and legal frameworks that would allow a community of legal professionals to emerge on a sustainable basis. In the meantime, the existing structures, such as the Lawyers' Association of Afghanistan and Women's Bar Association ought to be supported.

## Substantive and Procedural Laws

55.    Article 102 of the 1964 Constitution provides that

'The courts in the cases under their consideration shall apply the provisions of this Constitution and the laws of the State. Whenever no provision exists in the Constitution or the laws for a case under consideration, the courts shall, by following the basic principles of the Hanafi Jurisprudence of the Shariaat of Islam and within the limits set forth in this Constitution, that in their opinion secures justice in the best possible way.'

56.     The Bonn Agreement provides for the wholesale resurrection of the existing laws subject to the proviso that these laws are not inconsistent with the Agreement, the 1964 Constitution or Afghanistan's international legal obligations. By a decree dated 5 January 2002 the Interim Authority officially repealed all 'decrees, laws, edicts, regulations and mandates, which are inconsistent with the 1964 Constitution and the Bonn Agreement'. It is interesting to note that the decree does not expressly repeal laws that are inconsistent with Afghanistan's international legal obligations. These are contained in a number of international treaties including the Convention of the Rights of the Child, the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment, the Convention on the Elimination of all Forms of Discrimination against Women, the International Convention on the Elimination of all Forms of Racial Discrimination, the International Covenant on Civil and Political Rights and, finally, the International Covenant on Economic, Social and Cultural Rights[11].

57.     The Ministry of Justice has been assigned the task of identifying the inconsistent laws in the course of a comprehensive legislative assessment. I was told by the officer in charge of the assessment project that their work was hampered by the fact that the Ministry of Justice had no access to the majority of Afghan laws: most of them were destroyed in the course of the civil war and as a result the Ministry itself had to rely on some monthly Gazettes found in the basement of the Ministry.

58.     The relative obscurity of Afghanistan's statutory laws is not a new phenomenon. In the introduction to the most comprehensive collection of translated Afghan laws, Robert Hager remarked, in 1975, that 'in a country where Islamic law study is the basic training for judges and where the written laws remain uncompiled and are not widely distributed, the actual relationship between written law and the law of Islam is a matter for inquiry' [p. iii].

59.     Thus there is little doubt that in current legal practice the written laws are of very limited importance. This fact was reflected in the legal workshops conducted in Kabul in late May and early June 2002. Though the participants had been asked to conduct factual inquiries into the state of civil and criminal law, both substantive and procedural, the legal position of women, and the state of human rights in Afghanistan, none of the participants referred to any great extent to legislation. Even the Law Faculty of Kabul University does not hold a comprehensive set of Afghan laws but has in its possession only copies of some laws, such as, for instance, the civil code. These few copies do not seem to be used by either members of the faculty or students but have been allowed to gather dust in a largely neglected faculty library. The library of the University of Kabul has a modest collection of legal materials, most of them concerned with foreign laws. There was no evidence of any systematic destruction of books as such but one of general neglect and lack of maintenance.

---

[11] A complete list of international treaties entered into by Afghanistan can be found in Appendix II.

## Criminal Law

60.    Substantive criminal law in Afghanistan continues to be governed in large part by Islamic law. The first comprehensive codification was enacted as the Penal Code of 1925. This was followed by the Criminal Law of September 1976. I have not been able to obtain a translation of this Code but a comprehensive description of it is contained in Gholam Vafai's "Afghanistan. A Country Law Study". It appears that the Criminal Law of 1976 introduces a quasi secular system for all *tazir* offences - i.e. offences which attract under Islamic criminal law only discretionary punishments administered by the state - but retains the system of Islamic *hadd* punishments, retaliation and payment of fines for 'Islamic' crimes, which are to be punished according to the principles of the Hanafi school of Islam. Depending on the nature of the evidence available against an accused, *hadd* punishments will be imposed on those who have been found guilty of theft, highway robbery, adultery, rape and fornication.

61.    Some of the punishments awarded for hadd offences, such as, for instance, the stoning to death of an adulterer if certain evidential requirements are met, do conflict with both the 1964 Constitution, which prohibits the imposition of punishments 'incompatible with human dignity' (Article 31) and Afghanistan's international legal obligations. However, it is not known whether the present administration intends to modify these aspects of Islamic criminal law. Apart from Islamic punishments, the remaining provisions of the Criminal Law of 1976 are modelled on European principles of criminal law and are thus unremarkable. It is in the area of Islamic punishments that the most flagrant conflicts with international human rights standards exist. This is also the area of law that is likely to be the most sensitive to reform.

62.    The question of reform of these aspects of Afghanistan's criminal law has to be considered as forming part of two inquiries both linked but nevertheless distinct. Firstly, the Criminal Law of 1976, such as it is, is not widely applied or enforced. In practice virtually all courts, including the Supreme Court of Afghanistan, rely on Islamic law directly. It is essentially a political question whether or not this situation should continue to exist and a practical question whether or not it would be possible, even if regarded as desirable, to replace the de facto law of the land. Secondly, any formal commitment to the enforcement of a codified criminal law, be it in the form of a new law or through the re-enactment or distribution of the existing law of 1976, would entail as of necessity the need to deal with Islamic punishments either removing them or de facto affirming them. Both scenarios are problematic courses of action. Any failure to distance itself from the radical interpretation and ruthless imposition of their particular brand of Islamic law by the Taliban will bring the Government into conflict with the international community and the emerging human rights community of Afghanistan. However, any radical project to remove Islamic punishments, and thus crimes, from the statute book is liable to be considered controversial by the vast majority of the population.

63.     In the writer's opinion, the Islamic punishments for *hadd* offences constitute clear and unambiguous violations of international human rights law, in particular the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment. The Government will have to take a stand if it wants to be in compliance with international human rights norms even if this attracts domestic opposition from some quarters. In fact, there is without any doubt little the Government can currently achieve since it has been unable to extend its writ to all of Afghanistan. As was observed by Amin: 'owing to the political conditions, in most areas the State law of Afghanistan still remains unenforceable. What is in force is either the religious law in the form of traditional Islamic law or the customary and tribal practices' [p. 80]. Any change to this situation will require far more than just the reprint and distribution of statutes. Put simply, the 'modernization' of Afghanistan's legal system must be seen as an integral part of political, social and economic development in the country. Understood and viewed from this perspective it is both a condition and a reflection of development. In this context the role of the government extends beyond the drafting and implementing of laws compatible with international human rights' norms. The government has to play a critically important role in the areas of education and leadership. A human rights culture and the rule of law are unlikely to emerge in Afghanistan without the total commitment of all levels of government to such a vision for Afghanistan's future.

## Procedural Laws

64.     The gap between procedural reality and theory is as wide as the one observed in respect of Afghanistan's substantive laws. Professor Nasrulah Stanekzai states in his seminar paper that not only are there inconsistencies in the law caused by successive amendments but that courts are very slow, do not conduct their hearings in public, litigants do not know the law or do not have access to trained lawyers and that there was excessive bureaucracy. In his opinion, the legal system did not encourage people to ask for their own rights.

65.     In theory, criminal procedure laws are governed by at least two laws. Firstly, the Criminal Procedure Law of 1965, as amended in 1974. According to Vafai, it follows the pattern of the French Penal Code. As noted above, the 1965 law was substantially amended by the Law on the Discovery and Investigation of Crimes and Supervision of the Attorney on its Legal Enforcement of 1979.  The latter underwent further amendments in 1981. The sweeping powers accorded to the Attorney General and the secret services under these laws are most disturbing. The latter enjoys exclusive jurisdiction to investigate crimes against external security, crimes against internal security and certain political crimes, as well as kidnapping and the taking of hostages.

66.     Generally, a person arrested by the police must be reported within 72 hours to the public prosecutor, who has a further 72 hours to decide whether to release the suspect or press

charges. Further detention has to be authorized by a judge and should normally not exceed two months though the public prosecutor may extend the period of detention in special circumstances.

67.   On the conclusion of the investigation, the examining authority must issue an indictment that must be presented to the competent trial court.  There is no jury system but the law provides for an open trial. The accused has the right to be represented by counsel or by a member of his family. Perhaps somewhat more unusually, the victim of a crime has the right to petition the trial court for the recovery of damages suffered as a result of the crime.

68.   Apart from minor sentences, where the verdict is final, a convict can file an appeal against conviction and sentence within ten days after the pronouncement of the sentence. Since the first level of appeal courts is the provincial court, a convict has to be transferred to the provincial capital for his appeal to be heard. The appeal hearing includes a rehearing of the evidence and the provincial court is also permitted to call new evidence and to conduct its own investigation. Cases appealed to the Supreme Court arising out of the original jurisdiction of the provincial court allow the Supreme Court to hear the evidence again. In all other appeals the Supreme Court reviews the legality of the conviction but does not in effect retry the case. The execution of a sentence cannot be carried out except by order of a competent court.

69.   It is unclear which of the procedural laws currently, at least de jure, apply in Afghanistan. The CRAFT report, compiled in March 2002, states that the public prosecutor can detain a suspect for up to seven days, after which the case must go to Court (p. 24). Neither the 1974 nor the 1981 law provides for a seven-day detention period and thus there is either in existence another procedural law passed after 1981, or the information given by the Public Prosecutor was inaccurate. In any event, the inability to even determine with any degree of certainty how long a suspect can be held before being produced in court is in itself disconcerting.

70.   It must be concluded that the laws establishing the framework of criminal procedure are marked by uncertainty. The laws that could be reviewed in the course of this mission at times give excessive powers of detention to the prosecuting authority.

## Action

71.   The law of criminal procedure needs urgent reform and subsequent dissemination. Unlike substantive and procedural criminal law, laws governing detention and their reform are unlikely to be objected to on religious grounds. At the same time, they constitute essential prerequisites for a fair trial.

## Juvenile Justice

72.   The 1976 Criminal Law makes provision for juvenile justice: a child under the age of seven years cannot be guilty of any criminal offence, and between the ages of seven and 13 a child, though presumed to be incapable of committing a crime, will be considered a juvenile delinquent and may be held in a correctional institution or put under the supervision and probation of parents or relatives. However, for persons between the ages of 13 and 18, a punishment of confinement in a correctional institution can be imposed.

73.   Ms. Justice Anisa Rasoli, a female judge in Kabul's special juvenile court, stated that procedures in the juvenile court were always in camera, and that juveniles used to be taken to a 'punitive school' rather than prison. A punitive school for male children was opened in 1970 and a female section became functional in 1974. However, all juvenile delinquents are currently confined in ordinary prisons. The juvenile court exercises exclusive jurisdiction over children between the ages of seven and 15 years. There is no right of appeal against a verdict pronounced by a juvenile court.

74.   According to the Ministry of Justice there are plans to build a new correctional facility for children. No figures of the number of children detained in jails in Kabul province were available during my field trips, but according to CRAFT, quoting UNICEF officials, the number is believed to be very small.

## Legal Status of Women

75.   Whilst the 1964 Constitution contains an equality-before-the-law provision that does not differentiate between men and women, the legal system nevertheless does. Many aspects of Islamic family law as applied in Afghanistan accord differential rights to men and women. A Civil Code promulgated in 1977 did, however, introduce some significant reforms.[12] The new Civil Code repealed the law of marriage of 1960 and reformed several aspects of Hanafi family law. According to Dariz, under the 1977 Civil Law women are now permitted to choose a husband without needing the prior consent of their guardian, a divorce pronounced by a husband while intoxicated is no longer recognized as valid, and it establishes a minimum age of 15 years for a female to enter into a valid marriage. The legal capacity to marry is 18 years for boys and 16 years for girls. There is a registration requirement for all marriages and unlike the provisions of the 1960 Marriage Law non-registration does not affect the marriage's validity. The practice of polygamy has not been outlawed but has been regulated by the 1977 Civil Code. In order for a husband to enter into a second marriage he must prove that there is no fear of injustice to any wife, he must be able to provide the basic

necessities for all the wives, such as food, clothing, housing and health care, and a lawful reason must exist for the second marriage, such as the first wife being barren or sick with an illness requiring difficult treatment. A court can refuse to register a marriage that contravenes any of these conditions and an aggrieved wife can file a suit for divorce. Further, the 1977 Civil Code allows a woman to stipulate a right to divorce should her husband take a second wife irrespective of any compliance with the three conditions outlined above.

76.     The right of divorce of women continues to be restricted to a judicial divorce whilst a husband can divorce his wife through the extra-judicial pronouncement of a divorce either orally or in writing. The grounds for judicial separation include the husband suffering an incurable disease, his failure or inability to maintain his wife, his absence from his wife without reason for more than three years or his imprisonment for ten years or more, in which event the wife can ask for a divorce after the first five years imprisonment.

77.     It appears that the Islamic law in respect of inheritance and custody of children continues to be governed by Hanafi law with certain exceptions. For instance, it is possible for a court to extend the age for the transfer of the custody of children from mother to father by an extra two years, if the extension serves the benefit of children. It appears that the 1977 Civil Law also established a family court but none was in operation at the time of writing.

78.     In actual legal practice the provisions of the 1977 Civil Law no longer appear to be applied. The demise of governmental institutions across Afghanistan means that marriages are generally no longer registered. This would render them void under the 1977 Law. In practice, however, unregistered marriages are regarded as valid. The withering away of the 1977 Civil Law has reintroduced largely unreformed Hanafi family law and customary law into the sphere of family law. There appears to exist a large degree of confusion over the exact rights of women and their legal status. In June 2002, there were about 30 women confined in Kabul jail. Some of them were accused of criminal offences but the majority were, according to the Law Section of the Ministry of Women's Affairs, now headed by Professor Mahboba Haqoq Mal, who has succeeded Mrs. Sima Samar, detained for a variety of offences related to family law such as refusing to live with their husbands, refusing to marry a husband chosen by their parents, or for having run away from either the parental or the matrimonial home.

79.     It appears that these women have no access to lawyers, have no information on their rights, if any, and are generally left in jail until their respective relatives intervene. The most astonishing aspect of my findings was the profound uncertainty surrounding the legality of their detention. Even the female lawyers attached the Ministry of Women's Affairs were unsure about the rights of women.

---

[12]See G.M. Dariz: 'Afghanistan', in: Sihombing, Judith and Finlay, H.A.: *Lawasia Family Law Series (Volume One)*, Singapore, 1979, pp. 13 - 21.

80.   There is no doubt that the legal position of women has improved since the demise of the Taliban, at least in the metropolitan areas of Kandahar, Mazar-e-Sharif and Kabul: women are allowed to work, to move freely and to pursue education. Female students are now registered at the Law Faculty, are employed mainly in administrative functions in courts, in the Offices of Public Prosecutors and the Ministry of Justice. A dedicated Ministry for Women's Affairs has been created.

81.   However, even in the legal sphere the situation remains highly unsatisfactory. The legal status of women is uncertain, as are their rights under both the 1964 Constitution and Islamic family law. The outgoing Minister for Women's Affairs, Mrs. Sima Samar, has recently been charged with blasphemy though it is not known whether these charges are being pursued. Irrespective of the fate of this particular charge, her case must serve as a reminder that women who stand up for their rights take very real risks even in the post-Taliban legal order of the safe haven of Kabul.

82.   The legal problems faced by women are compounded by severe health problems caused by a shortage of health facilities and an inability to provide for women's physical and emotional needs, domestic violence, and sexual abuse. The long period of confinement of women under the Taliban means that many women cannot compete successfully for jobs with men and are consequently economically disadvantaged. Most women continue to wear the *burqua* even in Kabul, in some cases prompted by fear rather than choice.

83.   The improvement of the status of women is closely linked to the status of Islamic and customary values in Afghanistan as well as their economic, social and political position in society. Any change will have to take place in the context of all these factors. As far as the legal status of women is concerned what is urgently needed is a thorough investigation combined with a programme of education and training. Despite many apparent discriminatory provisions, Islamic law, if progressively interpreted, could nevertheless lead to an improvement of the legal position of women. This will require research and education. Professor Haqoq Mal's seminar paper contains the following observation:

> 'We know our country is a traditional society so we cannot ignore our traditions and customs and so it is not possible to do all these things but I am sure that with patience and tolerance we can change the life of women in our country and if God is willing we'll make a difference in the life of Afghan women in all possible ways and endeavours.' (See Appendix)

## Conclusion and Recommendations

84.   Any reform of the legal system to bring it in line with international human rights standards, or indeed with the provisions of the 1964 Constitution, requires as an essential prerequisite the existence of stable state structures able and willing to enforce laws. Only when this basic

foundation has been established will it be possible to initiate any significant reforms. Currently, the rule of the state is for all practical purposes confined to Kabul and its immediate surroundings. Legal reform will therefore have to go hand in hand with the gradual expansion of state structures to rural areas and other cities.

85.   The main source for any legal reform has to be Afghanistan itself. Experience has shown that the wholesale import of foreign laws hardly ever succeeds in improving human rights standards or the rule of law. The impetus for change and reform thus has to come from within. The Judicial Commission and the Human Rights Commission already provide institutional mechanisms for initiating legal reform. The implementation of these reforms depends as much on the existence of institutional capacity as it does on political will and power.

86.   The international community can assist Afghanistan in a number of ways. First and foremost is the continued support in establishing a secure environment where militias are disarmed and local commanders operate within the rule of law. Secondly, and in parallel, is the need for institutional support and capacity building in the legal sector. This task ought to prioritize the inclusion of women and other vulnerable groups in the reform of the legal system. Whereas the reform and implementation of criminal procedural laws is in itself not controversial the reform of substantive criminal law without any doubt is. Any departure from Islamic law is likely to be viewed with suspicion and distrust by the majority of the population. However, reform is possible within Islamic law through reinterpretation and a strengthening of procedural and evidential safeguards contained in the corpus of Islamic law itself.

87.   A recommended next step would be to establish an action plan by the key political and legal actors in order to implement the needed reforms. Such an action plan could be undertaken through the holding of a workshop/conference consisting of key actors. Such actors should include: the Attorney-General, the Minister of Justice, the Judicial Commission, the Constitution Commission, the Human Rights Commission the Law Society, the Public Prosecutor's Office, members of the judiciary (not only in Kabul but also the provinces), human rights NGOs in Kabul and some donor agencies. The 2-3 day conference should work to create a concrete plan of action in the form of a public declaration. Such a conference need not necessarily be held in Kabul, but could be held in a neighbouring country.

**Geneva**
**November 2002**

# ANNEXES

## Annex I: Afghanistan: A legal chronology

| | |
|---|---|
| 1919 | Amanullah builds on Abdur Rahman's (1880-1901) reforms (institutionalized ßarmy, civil bureaucracy) and wrestles from the British Afghanistan's right to control its own foreign affairs. |
| 1919-1923 | Legal, judicial and administrative reforms. |
| 1923 | Afghanistan's first constitution is promulgated and a hierarchy of courts is established under the General Law on Courts. Secular codes for criminal, civil and commercial law are promulgated. The legal reforms are carried out with the help of Turkish and French advisers and thus it was French law that formed the basis of much of Amanullah's legislation. Most of the laws contained in Amanullah's Code are lost but more than 60 individual laws were passed.[13] Until the early 1920s there was not a single Afghan lawyer trained in secular jurisprudence. |
| 1929 | The rule of the brothers Nadir Khan, Hashim Khan and Shah Wali Khan begins. A contemporary observer notes that: |
| | "Throughout the country the advantages of anarchy seem to have been better appreciated than its drawbacks, and the tribes were asking themselves why they should resign the freedom which they had enjoyed for the past year, and submit again to a central authority which would inevitably demand payment of land revenue, customs duties and bribes for its officials, and possibly the restoration of the arms looted from the government posts and arsenals."[14] |
| | All of Amanullah's secular legislation is repealed, including those governing women's rights, and the enforcement of Islamic law by religious courts continues as it already had under Bacha's rule. However, the structure of courts established under Amanullah's rule survives. |
| 1931 | Nadir's Constitution of Afghanistan. |
| 1933-73 | Reign of King Zahir Shah. |
| 1934 | Afghanistan joins the League of Nations and is also officially recognized by the United States. |
| 1940 | Afghanistan issues a proclamation of Afghan neutrality at the beginning of World War II. |
| 1949 | Election reforms result in a liberal parliament and political activities by groups opposed to the government. |
| 1951 | Crackdown on nascent opposition and the end of the liberal experiment. |

---

[13] See Leon B. Poullada, *Reform and Rebellion in Afghanistan 1919-1929*, Cornell University Press, 1973, p. 99.

[14] Richard Maconachie, British Minister in Kabul, writing in 1931, quoted in Martin Evans, *Afghanistan A New History*, London: Curzon, 2001, p. 101.

| | |
|---|---|
| 1949 | Marriage Law passed. |
| 1950 | Helmand Valley dam building and agricultural development project commences with US support. It had been inaugurated in 1945. |
| 1953 | Daoud becomes Prime Minister. Though described as an authoritarian he introduces tentative steps towards the liberalisation of women. |
| 1956 | Law of Court Administration. |
| 1957 | Law of Civil Procedure. |
| 1960 | Marriage Law. |
| 1963 | Daoud is forced to resign largely as a result of his Pashtunistan policy which had severely affected Afghanistan's economy, as, for much of the 1950s and early 1960s, Afghanistan's border with Pakistan was closed. |

The 'Constitutional' Period

| | |
|---|---|
| 1963-1973 | Constitutional Monarchy under King Mohammad Zahir. The constitutional system of this period has been re-instated by the Bonn Agreement. However, it ought to be noted that one of the most authoritative observers of Afghanistan's political developments during this period concluded that: |
| | "The ten-year experiment in constitutional monarchy had failed, primarily because the ex-king, advised by conservative members of his family and staff, neither took the steps necessary to implement the constitution nor suppressed the growing opposition."[15] |
| | In fact, political parties had never been legalized during the period of constitutional monarchy. |
| 1964 | Constitution of Afghanistan, Article 69 defines 'law' as resolution passed by both Houses and signed by the King. At least in theory since then statutory laws take precedent over Islamic law. However, Article 64 restricts the legislature from enacting any laws repugnant to Islamic law. Kamali observes that "Essential conflict in some of the provisions of the 1964 Constitution thus enabled both reformist and anti-reformist forces to find support for their arguments."[16] Very little legislation is enacted under the 1964 Constitution. |
| 1965 | Law of Criminal Proceedings. |
| 1965 | 'Khalq' is founded by Nur Mohammad Taraki. |
| 1967 | Law of Judicial Authority and Organization establishes general and special courts. The general courts are Sharia courts which apply Islamic law according to the principles of Hanafi jurisprudence. |
| 1968 | A judicial training centre opens at the Supreme Court. |
| 1968 | The first bill legalising political parties is passed by Parliament but not signed by King Zahir Shah. |
| 1971 | Guiding Rules on Criminal Affairs (issued by the Supreme Court) which, |

---

[15]Louis Dupree, "Towards Representative Government in Afghanistan: Part I", *American Universities Field Staff Reports*, LD-1-1978, Asia, p. 1.

[16]Mohammad Hashim Kamali, *Law in Afghanistan*, Leiden: Brill, 1985.

following Hanafi jurisprudence, divide all offences into three categories, namely hadd offences, quisas/diyat offences and tazir offences. Article 16 states that 'the execution of penalties shall be in accordance with the provisions of the Law of Criminal Proceedings.' The latter does not contain any reference to hadd punishments in its range of Islamic penal sanctions. Effectively, hadd punishments like amputation of a limb for theft or the stoning to death for adultery can no longer be awarded by courts.

| | |
|---|---|
| 1971 | Marriage Law. |
| 17 July 1973 | Coup d'etat by Mohammad Daoud who becomes the country's President. 'Parcham', the political party which supported the coup, was used to implement Daoud's reform agenda. However, attempts to take reforms to the rural areas failed and by the mid-1970s a fragmented Parcham joined hands with another leftist group, 'Khalq', which under the name Democratiqi-Khalq set out to oppose Daoud's regime. In 1975 there were several insurgencies against Daoud's regime. |
| 1973 | Judiciary comes under direct control of the Ministry of Justice. |
| 1977 | Elections for a Loya Jirga take place. The newly constituted Loya Jirga debates and amends a new constitution which had been drafted by a Constitutional Consultative Committee which had been formed in March 1976. The amendments enhanced the independence of the judiciary and transferred police investigative powers to the Attorney General's office. |
| 1975-78 | A large number of laws are promulgated affecting five key areas: land reform, land taxation, criminal law, civil law and civil service laws. The penal code of 1976 was the first attempt since the time of King Amanullah to produce a codified largely secular criminal law. Dupree defined the Penal Code as primarily secular document 'which defines crimes, criminals, and punishments in such a way that the qazi (judge) can no longer (in theory, at least) impose arbitrary punishments on individuals accused of crimes' and concluded that "The first step has been taken toward creating a government based on law, not simply on the whims of those in the judiciary."[17] The main references to Islamic law are found in the prohibition of gambling and drinking of alcohol though these remained unimplemented: |

"Although the Penal Code has been in effect for more than a year, the above articles are more violated than observed. Nightly diplomatic parties ply Afghans of all walks of life with free booze and most Kabul restaurants catering to upper and middle-class Afghans still serve a variety of alcoholic drinks."[18]

The new Civil Code in four volumes (over 2000 Articles) covers virtually all fields of civil law including such diverse items as marriage and mortgages. It gives women equal rights with men to institute divorce cases. The family law provisions were to be applied by newly constituted Family Courts which allowed for mediation between the parties.

| | |
|---|---|
| 1977 | Penal Code (based on Shari'a but no hadd punishments), Civil Code. |
| 27 April 1978 | Coup against Daoud's regime ["the Saur Revolution"]: President Daoud and about 30 men, women and children of his family are killed as well as about 1,000 soldiers and civilians. The new Khalq-Parcham regime represented by Prime Minister Nur Mohammad Taraki, the Secretary |

---

[17]Louis Dupree, 'Towards Representative Government in Afghanistan: Part II', *American Universities Field Staff Reports*, LD-2-1978, Asia, p. 4.

[18]Ibid.

General of the PDPA (People's Democratic Party of Afghanistan), almost immediately disintegrated: the leader of the Parcham party, Babrak Karmal was 'exiled' to an ambassadorial post. Shortly afterwards a sustained clampdown on Parcham began with arrests. The Parcham ambassadors were dismissed from their posts but many decided not to return home. The coup was very much an impromptu and improvised affair:

'April 27 happened to be a Thursday, and at noon a half-holiday began. The Afghan government and most private firms give their employees Thursday afternoon and Friday off, Friday being Juma, the Muslim equivalent of Sunday. So, at noon, just as the fighting intensified, Kabul offices emptied into the streets. Despite the danger, people queued up for buses - even in the firefight zone! Taxis honked for tanks to move over, and drove in and out as the fighting continued. At some corners, traffic policemen motioned the tanks to pull over to the curb. The tanks ignored the gestures, and rumbled on to their objectives, and the police finally ignored the tanks and sat on the curbs to watch the action. Only British moviemakers could do justice to such a tragic economic scene.'[19]

| | |
|---|---|
| May 1978 | The Revolutionary Council issues Decree No. 3 which whilst abrogating Daoud's 1977 Constitution preserves the existing legal system but imposes on the judiciary a military court 'to try persons who have committed offences against the Revolution'. Several other decrees follow including Decree No 7 which confirms equal rights to women, regularizes dowry and marriage expenses and forbids forced marriages. Decree No. 8 introduces further land reforms limiting a family to a maximum of 30 hectares irrigated land. |
| Oct. 1978 | Amnesty International in its first ever mission to Afghanistan concludes that widespread violations of human rights exist.[20] |
| 1979 | A new law called 'The Law Regulating Duties and Legislative Procedures of the Revolutionary Council' is in fact a new constitution and effectively gives unlimited power to the Revolutionary Council to govern. The USSR is the first country to recognize the new regime. |
| Autumn 1979 | Revolts, largely uncoordinated, erupt all over Afghanistan. Dupree identifies about ten separate rebel groups ranging from the secular left to the monarchical right. More significantly they also include several religiously oriented groups like Hezb-i-Islam. The insurgencies lead to a first wave of Afghan refugees: by mid-August 1979 about 150,000 Afghans have fled to Pakistan and about 30,000 to Iran. The DRA regime institutes several purges against 'enemies of the revolution' and up to 10,000 'dissidents' are executed. However, by summer of 1979 the Mujahidin controls most of Afghanistan's countryside. |
| 15 Sept. 1979 | Hafizullah Amin overthrows Taraki. Afghan prisons are overflowing with between 30 to 50,000 prisoners considered to be opposed to the regime. The legal reforms initiated by Taraki remain largely unimplemented. |
| 24 Dec 1979 | Russian invasion of Afghanistan which is to last for nine years: within a week about 50,000 Soviet troops enter the country. |

---

[19]Louis Dupree, 'Red Flag over the Hindu Kush: Part II', *American Universities Field Staff Reports*, LD-3-1979, p. 8.

[20]AI, *Violations of Human Rights and Fundamental Freedoms in the Democratic Republic of Afghanistan*, London, 1979.

| | |
|---|---|
| 27 Dec. 1979 | Amin is overthrown and Babrak Kamal, who returned with Russian troops to Kabul, is installed as the new President. |
| 1980 | Babrak Kamal promulgates The Interim Constitution of Afghanistan ['The Fundamental Principles of the Democratic Republic of Afghanistan']. |
| 1980 | Afghanistan signs, but does not ratify, the International Convention on the Elimination of all Forms of Discrimination against Women. |
| 1980s | The Mujahidin receives more or less open support from the US and seven Mujahidin groups, mostly based in Pakistan, emerge. Four of them are Islamist in outlook, i.e. with the principle aim of establishing an Islamic state. Several Shia groups are supported by Iran. The Afghan government's writ is de facto confined to urban areas but even main lines of communication between these areas are not in complete governmental control. |
| 1982 | Diego Cordovez is appointed the UN Secretary-General's Personal Representative for Afghanistan. |
| 1983 | Afghanistan accedes to the International Covenant on Economic, Social and Cultural Rights and the International Covenant on Civil and Political Rights with reservations to the effect that all states should be allowed to become members of the two Covenants. |
| 1983 | Afghanistan accedes to the International Convention on the Elimination of all Forms of Racial Discrimination but does not recognize the jurisdiction of the International Court of Justice. |
| 1984 | Almost a third of Afghanistan's population has by now left the country as refugees. Information on Afghanistan is by now very patchy since most Western visitors and journalists have left the country. |
| March 1985 | UN Human Rights Commission receives a report by Felix Ermacora, adopted by UNCHR resolution of 13 March 1985, citing 'serious and widespread' human rights abuses. |
| April 1985 | Babrak Karmal convenes a Loya Jirga in Kabul followed by 'sham' elections in August 1985. |
| Nov. 1985 | Karmal is replaced as President by Mohammed Chamkani but effectively Mohammed Najibullah is in charge of the country. |
| 1986 | The USSR indicates willingness to negotiate and pulls some troops out of Afghanistan. |
| Nov. 1987 | A Loya Jirga appoints Najibullah as President and another Constitution is promulgated ['The Constitution of Afghanistan 1987'] |
| Feb. 1988 | Gorbachov announces a staged withdrawal of Russian troops. |
| 14 April 1988 | Signing of the Geneva Accords. |
| 15 May 1988 | Soviet troops begin to withdraw whilst at the same time the Afghan army is supplied with MIG-27 jets and SCUD B surface-to-surface missiles. |
| 15 Feb. 1989 | Soviet troops complete withdrawal. Kabul is now under severe pressure from the Mujahidin which sporadically cuts food supplies. |
| March 1989 | Resistance groups launch sustained attack on Jalalabad but meet heavy resistance from government troops. |

| | |
|---|---|
| May 1989 | Najibullah calls another Loya Jirga. By now some areas of Afghanistan are under permanent control of resistance groups whilst only urban areas remain in Najibullah's control. Commander Massoud and his Jamiat-i-Islam convene a shura and establish an autonomous civil administration in the North. |
| March 1990 | A coup against Najibullah lead by General Shah Nawaz Tanai, the defence Ministers, fails and Tanai escapes to Pakistan where he teams up with Hekmatyar's Hezb-i-Islami. |
| May 1990 | Another Loya Jirga is convened which endorses another Constitution [The Constitution of Afghanistan 1990] providing for a multi-party system. The ruling party PDPA is re-named Hezb-i-Watan. |
| 27 Sept. 1990 | Afghanistan signs the Convention on the Rights of the Child subject to the observation that the Government of Afghanistan reserves the right to express, upon ratification, reservations on all provisions which are incompatible with the laws of Islamic Shari'a and local legislation. However, no reservation is entered when Afghanistan ratifies the Convention. |
| 1991 | Iraq's invasion of Kuwait and the break-up of the USSR reduce both superpowers' interest in Afghanistan. The Islamist parties support Iraq whereas the traditionalists side with the US and even send troops to Saudi Arabia. Meetings between Massoud and Pakistan-based resistance groups take place. |
| 1 Jan 1992 | Russia and US agree to cut off arms supplies to Afghanistan and to resistance groups. Dostum's Usbek militia and Massoud's forces jointly occupy Mazar-i-Sharif. |
| 18 Mar 1992 | Najibullah agrees to step down and the UN representative Benon Sevan forms a 'pre-transition council' of 15 neutral politicians. |
| 15 April 1992 | Najibullah attempts to leave the country and when unsuccessful hides in the UN compound. The central government collapses whereas in the rest of the country local governments still in power surrender to local Mujahedin forces. Massoud advances against Kabul from the North whereas Hekmatyar's troops infiltrate the city from the South. A battle ensues with Hekmatyar retaining the South of the city whilst Massoud is in control of the rest. |
| 28 April 1992 | A Mujahedin government under the Presidency of Sebghatulla Mujadidi and with Massoud as Defence Minister accepts the formal surrender of the Najibullah regime. Hekmatyar refuses to participate. All plans of a transition to a representative government collapse and fighting erupts with Hekmatyar shelling Kabul. |
| June 1992 | Rabbani takes over as President. |
| 1992/93 | Kabul is progressively destroyed by Hekmatyar's rocket attacks. An estimated 30,000 Kabulis are killed in the year following the collapse of Najibullah's government. However, with the exception of Kabul and Kandahar relative peace prevails in the rest of the country now controlled principally by Ismail Khan based in Herat and Dostum in the North. |
| 1994 | Dostum and Hekmatyar join forces and attack Kabul but fail to take it. Rabbani's government is still formally in power. |
| 28 Mar. 1994 | Afghanistan ratifies the Convention on the Rights of the Child without any reservations. |

| | |
|---|---|
| 1994/95 | The Taliban emerges assisted by Pakistan and begins to make territorial gains including the capture of Kandahar. A radical version of orthodox Islamic law is imposed. |
| 1995 | The UN intensifies its efforts to bring about a settlement. By then the Taliban has emerged at the gates of Kabul. An attempt to capture the city in March, accompanied by intensive shelling of Kabul, does, however, not succeed. |
| Sept 1995 | The Taliban conquers Herat. Ismail Khan flees to Iran. |
| Oct. 1995 | Taliban forces re-launch their attack of Kabul again pounding the city with bombs and rockets. |
| Jan 1996 | The UN airlifts 1,000 tons of food into Kabul. |
| 1996 | Osama Bin Laden arrives in Afghanistan and establishes a training base for his Al Qaeda terrorist organization. |
| Sept. 1996 | The Taliban capture Kabul and kill Najibullah. They proclaim the 1964 Constitution to be force and repeal all laws passed during the Communist regime. |
| Oct. 1997 | The Taliban re-name the country to the 'Islamic Emirate of Afghanistan'. Effectively the country is run by a small *shura* headed by Kandahar-based Mullah Omar. |
| 1997-98 | The Taliban makes more territorial gains but is unable to hold Mazar-i-Sharif. Effectively two-thirds of the country are now controlled by the Taliban, the remaining third by the Northern Alliance headed by Rabbani and principally consisting of Massoud and Dostum's forces. |
| 7 Aug. 1998 | Terrorist bomb attacks against the US embassies in Kenya and Tanzania kill over 250 people. The US retaliates by bombing Bin Laden's training camps in Afghanistan. |
| Sept. 1998 | Saudi Arabia withdraws its diplomatic presence from Kabul and demands Bin Laden's extradition to stand trial in Saudi Arabia. |
| Oct. 1999 | The UN Security Council demands Osama Bin Laden's extradition. |
| 1999/2000 | The Taliban succeed in controlling most of the country but are still denied international recognition. |
| 11 Sept 2001 | Terrorist attack on the World Trade Center in New York. |
| 7 Oct 2001 | The US-led military operation 'Enduring Freedom' commences. Principally US and UK troops reinforce the Northern Alliance and push the Taliban out of all urban centres. By the end of the year the Taliban administration has disappeared though US troops continue to operate inside Afghanistan. The whereabouts or fate of Taliban leader Mullah Omar and Al Qaeda head Osama bin Laden remain unknown. |
| 5 Dec 2001 | Bonn Agreement. Hamid Karzai becomes Head of the Interim Authority. |
| 6 Dec 2001 | UN Resolution 1383 declaring willingness to support the Interim Authority. |
| 22 Dec 2001 | Interim Authority assumes office. It consists of an Interim Administration (headed by Chairman Karzai, five Vice-Chairmen and 23 other members), a Special Independent Commission for the Convening of an Emergency Loya Jirga and a Supreme Court of Afghanistan. |

| 8 Jan 2002 | Pashtu Islamic scholar, Fazal Hadi Shinwari, is appointed as new Chief Justice of the Supreme Court. |
|---|---|
| 18 June 2002 | More than 1,500 delegates, including 1,000 elected in local elections, attend the Emergency Loya Jirga and agree on an Interim Government to be headed by Hamid Karzai. |
| 4 Nov 2002 | The Constitution Commission, consisting of nine members, is appointed. |
| Summer '02 | While the ISAF ensures security and normality in Kabul, the Interim Government finds it difficult to extend its control over other parts of Afghanistan. Consequently human rights violations committed by warlords continue with impunity. |

## Annex II: UN treaties acceded to by Afghanistan

*Economic, Social and Cultural Rights*: **acceded to on 24 January 1983, only reservations in respect of membership provisions (Articles 26(1) and (3)).**

*Civil and Political Rights*: **acceded to on 24 January 1983, only reservations in respect of membership provisions (Articles 48(1) and (3)).**

*Racial Discrimination*: **acceded to on 6 July 1983, only reservations in respect of membership and jurisdiction of International Court of Justice (Articles, 17, 18 and 22).**

*Discrimination against Women*: **signed 14 August 1980 but not ratified.**

*Torture*: **signed 4 February 1985, ratified 1 April 1987, reservations as above (Articles 20 and 30).**

*Rights of the Child*: **signed 27 September 1990, ratified 28 March 1994, no effective reservations.**

## Annex III: The Bonn Agreement

**AGREEMENT ON PROVISIONAL ARRANGEMENTS IN AFGHANISTAN PENDING THE RE-ESTABLISHMENT OF PERMANENT GOVERNMENT INSTITUTIONS**

The participants in the UN Talks on Afghanistan,

In the presence of the Special Representative of the Secretary-General for Afghanistan,

*Determined* to end the tragic conflict in Afghanistan and promote national reconciliation, lasting peace, stability and respect for human rights in the country,

*Reaffirming* the independence, national sovereignty and territorial integrity of Afghanistan,

*Acknowledging* the right of the people of Afghanistan to freely determine their own political future in accordance with the principles of Islam, democracy, pluralism and social justice,

*Expressing* their appreciation to the Afghan mujahidin who, over the years, have defended the independence, territorial integrity and national unity of the country and have played a major role in the struggle against terrorism and oppression, and whose sacrifice has now made them both heroes of jihad and champions of peace, stability and reconstruction of their beloved homeland, Afghanistan,

*Aware* that the unstable situation in Afghanistan requires the implementation of emergency interim arrangements and expressing their deep appreciation to His Excellency Professor Burhanuddin Rabbani for his readiness to transfer power to an interim authority which is to be established pursuant to this agreement,

*Recognizing* the need to ensure broad representation in these interim arrangements of all segments of the Afghan population, including groups that have not been adequately represented at the UN Talks on Afghanistan,

*Noting* that these interim arrangements are intended as a first step toward the establishment of a broad-based, gender-sensitive, multi-ethnic and fully representative government, and are not intended to remain in place beyond the specified period of time,

*Recognizing* that some time may be required for a new Afghan security force to be fully constituted and functional and that therefore other security provisions detailed in Annex I to this agreement must meanwhile be put in place,

*Considering* that the United Nations, as the internationally recognized impartial institution, has a particularly important role to play, detailed in Annex II to this agreement, in the period prior to the establishment of permanent institutions in Afghanistan,

Have agreed as follows:

THE INTERIM AUTHORITY

I. <u>General provisions</u>
1)An Interim Authority shall be established upon the official transfer of power on 22 December 2001.

2)The Interim Authority shall consist of an Interim Administration presided over by a Chairman, a Special Independent Commission for the Convening of the Emergency Loya Jirga, and a Supreme Court of Afghanistan, as well as such other courts as may be established by the Interim Administration. The composition, functions and governing procedures for the Interim Administration and the Special Independent Commission are set forth in this agreement.

3)Upon the official transfer of power, the Interim Authority shall be the repository of Afghan

sovereignty, with immediate effect. As such, it shall, throughout the interim period, represent Afghanistan in its external relations and shall occupy the seat of Afghanistan at the United Nations and in its specialized agencies, as well as in other international institutions and conferences.

4)An Emergency Loya Jirga shall be convened within six months of the establishment of the Interim Authority. The Emergency Loya Jirga will be opened by His Majesty Mohammed Zaher, the former King of Afghanistan. The Emergency Loya Jirga shall decide on a Transitional Authority, including a broad-based transitional administration, to lead Afghanistan until such time as a fully representative government can be elected through free and fair elections to be held no later than two years from the date of the convening of the Emergency Loya Jirga.

5)The Interim Authority shall cease to exist once the Transitional Authority has been established by the Emergency Loya Jirga.

6) A Constitutional Loya Jirga shall be convened within eighteen months of the establishment of the Transitional Authority, in order to adopt a new constitution for Afghanistan. In order to assist the Constitutional Loya Jirga prepare the proposed Constitution, the Transitional Administration shall, within two months of its commencement and with the assistance of the United Nations, establish a Constitutional Commission.

## II. Legal framework and judicial system

1) The following legal framework shall be applicable on an interim basis until the adoption of the new Constitution referred to above:

i)The Constitution of 1964, a/ to the extent that its provisions are not inconsistent with those contained in this agreement, and b/ with the exception of those provisions relating to the monarchy and to the executive and legislative bodies provided in the Constitution; and

ii)existing laws and regulations, to the extent that they are not inconsistent with this agreement or with international legal obligations to which Afghanistan is a party, or with those applicable provisions contained in the Constitution of 1964, provided that the Interim Authority shall have the power to repeal or amend those laws and regulations.

iii) The judicial power of Afghanistan shall be independent and shall be vested in a Supreme Court of Afghanistan, and such other courts as may be established by the Interim Administration. The Interim Administration shall establish, with the assistance of the United Nations, a Judicial Commission to rebuild the domestic justice system in accordance with Islamic principles, international standards, the rule of law and Afghan legal traditions.

## III. Interim Administration

A. *Composition*
1) The Interim Administration shall be composed of a Chairman, five Vice Chairmen and 24 other members. Each member, except the Chairman, may head a department of the Interim Administration.

2) The participants in the UN Talks on Afghanistan have invited His Majesty Mohammed Zaher, the former King of Afghanistan, to chair the Interim Administration. His Majesty has indicated that he would prefer that a suitable candidate acceptable to the participants be selected as the Chair of the Interim Administration.

3) The Chairman, the Vice Chairmen and other members of the Interim Administration have been selected by the participants in the UN Talks on Afghanistan, as listed in Annex IV to this agreement. The selection has been made on the basis of professional competence and personal integrity from lists submitted by the participants in the UN Talks, with due regard to the ethnic, geographic and religious composition of Afghanistan and to the importance of

the participation of women.

4) No person serving as a member of the Interim Administration may simultaneously hold membership of the Special Independent Commission for the Convening of the Emergency Loya Jirga.

B. *Procedures*
1) The Chairman of the Interim Administration, or in his/her absence one of the Vice Chairmen, shall call and chair meetings and propose the agenda for these meetings.
2) The Interim Administration shall endeavour to reach its decisions by consensus. In order for any decision to be taken, at least 22 members must be in attendance. If a vote becomes necessary, decisions shall be taken by a majority of the members present and voting, unless otherwise stipulated in this agreement. The Chairman shall cast the deciding vote in the event that the members are divided equally.

C. *Functions*
1) The Interim Administration shall be entrusted with the day-to-day conduct of the affairs of state, and shall have the right to issue decrees for the peace, order and good government of Afghanistan.

2) The Chairman of the Interim Administration or, in his/her absence, one of the Vice Chairmen, shall represent the Interim Administration as appropriate.

3) Those members responsible for the administration of individual departments shall also be responsible for implementing the policies of the Interim Administration within their areas of responsibility.

4) Upon the official transfer of power, the Interim Administration shall have full jurisdiction over the printing and delivery of the national currency and special drawing rights from international financial institutions. The Interim Administration shall establish, with the assistance of the United Nations, a Central Bank of Afghanistan that will regulate the money supply of the country through transparent and accountable procedures.

5) The Interim Administration shall establish, with the assistance of the United Nations, an independent Civil Service Commission to provide the Interim Authority and the future Transitional Authority with shortlists of candidates for key posts in the administrative departments, as well as those of governors and uluswals, in order to ensure their competence and integrity.

6)The Interim Administration shall, with the assistance of the United Nations, establish an independent Human Rights Commission, whose responsibilities will include human rights monitoring, investigation of violations of human rights, and development of domestic human rights institutions. The Interim Administration may, with the assistance of the United Nations, also establish any other commissions to review matters not covered in this agreement.

7) The members of the Interim Administration shall abide by a Code of Conduct elaborated in accordance with international standards.

8) Failure by a member of the Interim Administration to abide by the provisions of the Code of Conduct shall lead to his/her suspension from that body. The decision to suspend a member shall be taken by a two-thirds majority of the membership of the Interim Administration on the proposal of its Chairman or any of its Vice Chairmen.

9) The functions and powers of members of the Interim Administration will be further elaborated, as appropriate, with the assistance of the United Nations.

IV. <u>The Special Independent Commission for the Convening of the Emergency Loya Jirga</u>
1) The Special Independent Commission for the Convening of the Emergency Loya Jirga shall be established within one month of the establishment of the Interim Authority. The Special Independent Commission will consist of twenty-one members, a number of whom should have expertise in constitutional or customary law. The members will be selected from lists of

39

candidates submitted by participants in the UN Talks on Afghanistan as well as Afghan professional and civil society groups. The United Nations will assist with the establishment and functioning of the commission and of a substantial secretariat.

2) The Special Independent Commission will have the final authority for determining the procedures for and the number of people who will participate in the Emergency Loya Jirga. The Special Independent Commission will draft rules and procedures specifying (i) criteria for allocation of seats to the settled and nomadic population residing in the country; (ii) criteria for allocation of seats to the Afghan refugees living in Iran, Pakistan, and elsewhere, and Afghans from the diaspora; (iii) criteria for inclusion of civil society organizations and prominent individuals, including Islamic scholars, intellectuals, and traders, both within the country and in the diaspora. The Special Independent Commission will ensure that due attention is paid to the representation in the Emergency Loya Jirga of a significant number of women as well as all other segments of the Afghan population.

3) The Special Independent Commission will publish and disseminate the rules and procedures for the convening of the Emergency Loya Jirga at least ten weeks before the Emergency Loya Jirga convenes, together with the date for its commencement and its suggested location and duration.

4) The Special Independent Commission will adopt and implement procedures for monitoring the process of nomination of individuals to the Emergency Loya Jirga to ensure that the process of indirect election or selection is transparent and fair. To pre-empt conflict over nominations, the Special Independent Commission will specify mechanisms for filing of grievances and rules for arbitration of disputes.

5) The Emergency Loya Jirga will elect a Head of the State for the Transitional Administration and will approve proposals for the structure and key personnel of the Transitional Administration.

V. <u>Final provisions</u>
1) Upon the official transfer of power, all mujahidin, Afghan armed forces and armed groups in the country shall come under the command and control of the Interim Authority, and be reorganized according to the requirements of the new Afghan security and armed forces.

2) The Interim Authority and the Emergency Loya Jirga shall act in accordance with basic principles and provisions contained in international instruments on human rights and international humanitarian law to which Afghanistan is a party.

3) The Interim Authority shall cooperate with the international community in the fight against terrorism, drugs and organized crime. It shall commit itself to respect international law and maintain peaceful and friendly relations with neighbouring countries and the rest of the international community.

4) The Interim Authority and the Special Independent Commission for the Convening of the Emergency Loya Jirga will ensure the participation of women as well as the equitable representation of all ethnic and religious communities in the Interim Administration and the Emergency Loya Jirga.

5) All actions taken by the Interim Authority shall be consistent with Security Council resolution 1378 (14 November 2001) and other relevant Security Council resolutions relating to Afghanistan.

6) Rules of procedure for the organs established under the Interim Authority will be elaborated as appropriate with the assistance of the United Nations.

This agreement, of which the annexes constitute an integral part, done in Bonn on this 5th day of December 2001 in the English language, shall be the authentic text, in a single copy which shall remain deposited in the archives of the United Nations. Official texts shall be provided in Dari and Pashto, and such other languages as the Special Representative of the Secretary-General may designate. The Special Representative of the Secretary-General shall send certified copies in English, Dari and Pashto to each of the participants.

**For the participants in the UN Talks on Afghanistan:**

Ms. Amena Afzali
Mr. S. Hussain Anwari
Mr. Hedayat Amin Arsala
Mr. Sayed Hamed Gailani
Mr. Rahmatullah Musa Ghazi
Eng. Abdul Hakim
Mr. Houmayoun Jareer
Mr. Abbas Karimi
Mr. Mustafa Kazimi
Dr. Azizullah Ludin
Mr. Ahmad Wali Massoud
Mr. Hafizullah Asif Mohseni
Prof. Mohammad Ishaq Nadiri
Mr. Mohammad Natiqi
Mr. Yunus Qanooni
Dr. Zalmai Rassoul
Mr. H. Mirwais Sadeq
Dr. Mohammad Jalil Shams
Prof. Abdul Sattar Sirat
Mr. Humayun Tandar
Mrs. Sima Wali
General Abdul Rahim Wardak
Mr. Pacha Khan Zadran

**Witnessed for the United Nations by:**
Mr. Lakhdar Brahimi
Special Representative of the Secretary-General for Afghanistan

**Annex I: International Security Force**

1. The participants in the UN Talks on Afghanistan recognize that the responsibility for providing security and law and order throughout the country resides with the Afghans themselves. To this end, they pledge their commitment to do all within their means and influence to ensure such security, including for all United Nations and other personnel of international governmental and non-governmental organizations deployed in Afghanistan.

2. With this objective in mind, the participants request the assistance of the international community in helping the new Afghan authorities in the establishment and training of new Afghan security and armed forces.

3. Conscious that some time may be required for the new Afghan security and armed forces to be fully constituted and functioning, the participants in the UN Talks on Afghanistan request the United Nations Security Council to consider authorizing the early deployment to Afghanistan of a United Nations mandated force. This force will assist in the maintenance of security for Kabul and its surrounding areas. Such a force could, as appropriate, be progressively expanded to other urban centres and other areas.

4. The participants in the UN Talks on Afghanistan pledge to withdraw all military units from Kabul and other urban centers or other areas in which the UN mandated force is deployed. It would also be desirable if such a force were to assist in the rehabilitation of Afghanistan's infrastructure.

* * *

**Annex II: Role of the United Nations during the Interim Period**

1. The Special Representative of the Secretary-General will be responsible for all aspects of the United Nations' work in Afghanistan.

2. The Special Representative shall monitor and assist in the implementation of all aspects of this agreement.

3. The United Nations shall advise the Interim Authority in establishing a politically neutral environment conducive to the holding of the Emergency Loya Jirga in free and fair conditions. The United Nations shall pay special attention to the conduct of those bodies and administrative departments which could directly influence the convening and outcome of the Emergency Loya Jirga.

4. The Special Representative of the Secretary-General or his/her delegate may be invited to attend the meetings of the Interim Administration and the Special Independent Commission on the Convening of the Emergency Loya Jirga.

5. If for whatever reason the Interim Administration or the Special Independent Commission were actively prevented from meeting or unable to reach a decision on a matter related to the convening of the Emergency Loya Jirga, the Special Representative of the Secretary-General shall, taking into account the views expressed in the Interim Administration or in the Special Independent Commission, use his/her good offices with a view to facilitating a resolution to the impasse or a decision.

6. The United Nations shall have the right to investigate human rights violations and, where necessary, recommend corrective action. It will also be responsible for the development and implementation of a programme of human rights education to promote respect for and understanding of human rights.
* * *

**Annex III: Request to the United Nations by the Participants at the UN Talks on Afghanistan**

The participants in the UN Talks on Afghanistan hereby
1. Request that the United Nations and the international community take the necessary measures to guarantee the national sovereignty, territorial integrity and unity of Afghanistan as well as the non-interference by foreign countries in Afghanistan's internal affairs;

2. Urge the United Nations, the international community, particularly donor countries and multilateral institutions, to reaffirm, strengthen and implement their commitment to assist with the rehabilitation, recovery and reconstruction of Afghanistan, in coordination with the Interim Authority;

3. Request the United Nations to conduct as soon as possible (i) a registration of voters in advance of the general elections that will be held upon the adoption of the new constitution by the constitutional Loya Jirga and (ii) a census of the population of Afghanistan.

4. Urge the United Nations and the international community, in recognition of the heroic role played by the mujahidin in protecting the independence of Afghanistan and the dignity of its people, to take the necessary measures, in coordination with the Interim Authority, to assist in the reintegration of the mujahidin into the new Afghan security and armed forces;

5. Invite the United Nations and the international community to create a fund to assist the families and other dependents of martyrs and victims of the war, as well as the war disabled;

6. Strongly urge that the United Nations, the international community and regional organizations cooperate with the Interim Authority to combat international terrorism, cultivation and trafficking of illicit drugs and provide Afghan farmers with financial, material

and technical resources for alternative crop production.

* * *

### Annex IV: Composition of the Interim Administration

**Chairman:**
Hamid Karzai

**Vice Chairmen:**

Vice-Chair & Women's Affairs:
Dr. Sima Samar

Vice-Chair & Defence:
Muhammad Qassem Fahim

Vice-Chair & Planning:
Haji Muhammad Mohaqqeq

Vice-Chair & Water and Electricity:
Shaker Kargar

Vice-Chair & Finance:
Hedayat Amin Arsala

**Members:**

Department of Foreign Affairs:
Dr. Abdullah Abdullah

Department of the Interior:
Muhammad Yunus Qanooni

Department of Commerce:
Seyyed Mustafa Kazemi

Department of Mines & Industries:
Muhammad Alem Razm

Department of Small Industries:
Aref Noorzai

Department of Information & Culture:
Dr. Raheen Makhdoom

Department of Communication:
Ing. Abdul Rahim

Department of Labour & Social Affairs:
Mir Wais Sadeq

Department of Hajj & Auqaf:
Mohammad Hanif Hanif Balkhi

43

Department of Martyrs & Disabled:
Abdullah Wardak

Department of Education:
Abdul Rassoul Amin

Department of Higher Education:
Dr. Sharif Faez

Department of Public Health:
Dr. Suhaila Seddiqi

Department of Public Works:
Abdul Khaliq Fazal

Department of Rural Development:
Abdul Malik Anwar

Department of Urban Development:
Haji Abdul Qadir

Department of Reconstruction:
Amin Farhang

Department of Transport:
Sultan Hamid Sultan

Department for the Return of Refugees:
Enayatullah Nazeri

Department of Agriculture:
Seyyed Hussein Anwari

Department of Irrigation:
Haji Mangal Hussein

Department of Justice:
Abdul Rahim Karimi

Department of Air Transport & Tourism:
Abdul Rahman

Department of Border Affairs:
Amanullah Zadran

# Annex IV: Children's rights

Written by: Ms.Anisa Rasoli
Translated by: M. Hamid Sabory

Generally when we talk about children, it is as future owners and society makers of every nation. But the climate of every nation is different; there is crime and conflict in varying degrees in our world.

To keep children out of harm's way, our responsibility is to provide facilities that will help them to stay away from crime and social ills, and create a peaceful environment to make their future bright and let them live in a world of prosperity and peace.

When there is social breakdown, we can be sure that children will become involved in criminal activities and instead of punishing them we must look at the reasons why they broke the law and how we can re-educate them.

There is a special court for children in Afghanistan, and it is the only court whose decision is final.

The main purpose of this court is to protect, prevent and re-educate children who have committed a crime.

**Procedure of the juvenile special court**

As noted, the juvenile special court is independent and has its own regulations. Its procedure is also different from the other courts.

Whenever a case comes before this court, lawyers study the case carefully and evaluate the case for possible problems. They then register the case with the court's administrative office, before bringing it before the judge for verdict.

The judge, together with his or her two assistants, thoroughly evaluates the case before making a judgment.

The difference between the juvenile court and other courts is that the verdict and even the procedure are in camera. If the accused is found guilty, there is no prison sentence;  the child to taken to a punitive school for reeducation.

If the judge is of the opinion that the child's family can take care of the child and reform it, then it will be put under the control of the family rather than being sent to the punitive school.

The punitive school was established in 1970 for male criminals, with a female section added in 1974.

The years of war in Afghanistan destroyed most of the infrastructure and currently there is no punitive school in the country. Young criminals have therefore been kept in the same prison as adults, which clearly will affect their future.

The main causes of adolescent crime in Afghanistan are:

1.   Poverty and a weak economy.
2.   Abnormal family situations.
3.   Families' neglect of their children.
4.   Poor moral education.
5.   Child labour.
6.   Illiteracy and civil war.

7.   Orphaned children who are forced to work.


**The punitive regulations of the juvenile court**

1.   This court is authorized to hear cases of children over 7 and under 15.
2.   Children under 7 are never prosecuted.
3.   If any child is involved in a crime together with other young criminals, its case can only be heard in the juvenile court.
4.   The court must have evidence such as an identity card to prove the child's age.
5.   The court is allowed to hear cases in camera; the only people allowed to be present at the court's discretion are close relatives, lawyers and witnesses.
6.   If a child who is 15 or less commits a minor or serious crime, the recognized punishments are as follows:

   1.   The court must give him (Tazir) Islamic punishment if he is not an habitual criminal, the severity of the punishment decreasing the younger the child.

   2.   If the court decides that it is not necessary to send the child to prison, the child must be put in the custody of the law or close relatives (wali, wasi, qauim).

1.   The court is not authorized to sentence to death any person who is 15 years of age or more.
2.   The victim of a child's crime is not allowed to attend the court proceedings, but he can ask for compensation for the crime committed against him.
3.   The prosecution must make a case against a child under the regulations of the Ministry of Justice.
4.   The judge must visit the punitive school every three months and advise those in charge of the school before presenting a report to the Supreme Court.
5.   The decision of the children's court is final and there is no other court of appeal.

# Annex V: Criminal law

## The Elements that Constitute a Crime in Afghan Criminal Law

Written by: Gul Ahmad Madad Zai
Translated by: M Hamid Sabory

A review of the elements that constitute a crime requires research and knowledge of the 1976 Constitution.

The main issues discussed here are the legal elements of crime in both theory and practice.

### The Legal Elements of Crime

According to Afghan criminal law a crime only exists if it is enshrined in the law. A person cannot be found guilty of a crime if the crime is not covered by the law or by Islamic law.

The definition of the legal element in Afghan criminal law is that the legal element of crime indicates the crime and the punishment.

The most important element of a criminal office is that it is identified as a crime in the law.

The third element in Afghan criminal law is the notion that: "no person can be punished contrary to the elements of a law which was not in effect before the commission of the crime."

According to the Article 21 of criminal law:

" A person who perpetrates a crime when a law is in effect can be punished. If a new law came into effect before the final verdict of the court and the verdict is a sentence, the latest law will be the active law, otherwise the new law will be the active law."

In Afghan criminal law there are some conditions under which the person committing a crime will not be punished. These are known as equal conditions.

The existence of these conditions makes lawful what otherwise would have constituted a crime.

The acquittal condition divides into three conditions:

1. Using one's right to obtain one's rights.
2. Legitimate self-defence.
3. Acting on duty.

According to Article 53 of the criminal law:  "Commission of a crime for personal welfare or exercise of one's own rights is guaranteed to all persons by Islamic and written law."

According to Article 55 of the criminal law: "Commission of a crime while on government duty, according to the elements of the law, is not a crime."

According to Article 57 of the criminal law: "Commission of a crime to obtain one's own rights is not a crime."

### Substantive Elements of Crime

Generally no action will become a crime unless it is recognized as a crime by law. Ignorance of the law is not a defence.

There are two types of crime:

1.   Crimes of commission.
2.   Crimes of omission.

Crimes of commission have a direct link between the action and the end-result.  However, a crime can be committed with an outcome being sought. For example, two men fight with each other and one becomes injured and requires hospitalization. On the way to the hospital, an accident takes place and the man's situation becomes critical or there is neglect in the hospital and he dies.

This outcome was not expected from the fight between the two men.

In Article 28 of criminal law:

" 1. A person who commits a crime the outcome of which has no connection with the crime is not responsible for the crime.
  2.  A person who commits a crime for the sake of committing the crime will be responsible for the crime, even if they do not know what the final outcome is.
  3. If the reason alone is the motive of the crime, the perpetrator will be responsible for his own crime."

In forced crimes, a person cannot commit a crime under duress.

In Afghan criminal law there is an issue of "attempting" in a crime, and this "attempt" has two conditions:

1.   "Attempt" in perpetrating a crime.
2.   The criminal stops his crime because of some external reason.

The meaning of "attempt" in criminal law is that a person physically starts a crime, but the second condition is that he stops the crime because of police involvement or some other reason.

If during the commission of a crime, a person experiences remorse then he will not be guilty of the crime.

In this latter case, two other conditions apply:
1.   Voluntary dispensation.
2.   Involuntary dispensation.

Voluntary dispensation occurs if a criminal, during commission of a crime without any pressure or external motive, regrets his action.

Involuntary dispensation occurs when the criminal stops his activities for extraneous reasons.

Crimes without an outcome can be divided into two categories:
1.   Impossible crimes (killing a person who is already dead).
2.   Crimes of consanguinity.

There is no punishment for the first crime, but according to the law the second crime must be punished.


**Ideal Elements of a Crime**

Beside these two elements, an action can become a crime if a person is willing and intent on committing a crime.

Ideally, there are two kinds of crime: pre-determined crimes and non-determined crimes.

In pre-determined crimes both intention and will are the purpose of the criminal.

There is a difference between motive and intention; the motive sometimes creates crimes but sometimes even if a person knows that his action is a crime, there will be no punishment for the crime. Examples are self-defence and using one's rights.

All the preceding is enshrined in the law, but in the provinces of Afghanistan, and sometimes even in the cities, in practice people respect tradition and custom.

## Annex VI: Civil court regulation in accordance with Human Rights.

Written by: Professor Nasrulah Stanekzai
Translated by: Mohammad Hamid Saboory, Project Assistant

**Preface**

Civil court regulations are a collection of provisions at the disposal of both parties in a case, to either reach a conviction or a dismissal, in addition to carrying out justice in accordance with the law.

In Afghanistan, the law was the main resource for civil court regulations. Before 1935, all civil cases were settled by Islamic law. During the time of former king Abdul Rahman Khan, there were some laws and regulations that specifically addressed civil cases.

For example, there were regulations for judges during Abdul Rahman Khan's rule in the name of (sarajea), during Habibullah Khan's rule (tamasok ul qaza), during Amman Ullah Khan's rule.

The first legal regulations in the High Court and Supreme Court concerning allegations came into effect in 1935. After 1975, criminal and civil procedure courts came into existence which since then have regulated the procedures of the High and Supreme Courts.

Unfortunately, these rules were abolished after the enforcement of civil law in 1976.

But these regulations and laws are currently part of our civil courts.

1. Structure and authorized regulations of the court.
2. Criminal law.
3. Civil court law.
4. Merchant's court regulations.

All these regulations are in accordance with Afghanistan's 1964 Constitution.

Also these laws give both parties the right to defend their own cases on both civil and criminal charges.

The laws also created rules for lawyers. Unfortunately, these laws were misinterpreted, even after their implementation in 1964.

Since then, various Governments changed the laws in 1964, 1972 and 1986.


**Practice**

There are two kinds of court in Afghanistan.

1. General courts, which include ordinary courts (more than 425) and High Courts (31 in all Afghanistan), and Supreme Courts which have the key role in leading and assessing the activities of the other two courts.

2. Special courts: these courts are also part of the judicial system, and the Supreme Courts evaluate their activities.

According to the system all persons have the right to go to the any of these courts and appeal for their rights if mistakes made by any of these courts.

In practice, there are many problems in the system:

1. The courts are slow and take more time than necessary. Even a simple case has a long procedure, lasting months, and even years.

2. Courts and their verdicts must be public. But in Afghanistan these rules are not observed. Sometimes, neither party knows what is going on behind closed doors.
3. The plaintiff and the defendant have difficulty finding counsel, though defence and prosecution lawyers are available.
4. Bureaucracy is the scourge of Afghanistan's legal system.

Finally, this system provides no assistance to peoples seeking defence of their rights.
In the last 23 years of war, Governments created courts for their own aims and more than 100,000 people were killed or imprisoned for their political or Islamic ideas.

How can the system be reformed? Here are my recommendations:

1. According to the Bonn treaty, the judicial system can be reformed, but this commitment should not become a problem for the people and make the system more complicated.
2. For a good judicial system to operate, the judges must be educated in human rights and international law in addition to Islamic law.
3. The group of judicial interpreters must overcome the defects of the system by interpreting the laws clearly and intelligently.

## Annex VII: Structure of the courts

Written by: Zaman Ali Behsodi
Translated by: M Hamid Sabory

During the past 100 years, the courts and especially the judicial power, were completely independent, although under certain Governments this was not always the case, as will be seen below.

During this period, this structure essentially remained the same.

In the past there were three kinds of courts in the system: ordinary, higher (Morafaua) and High Court. The Supreme Court was added to this list and the higher court removed.

In the ordinary court there is one judge, two assistants (Muftie) and two clerks, whose duty is to replace the assistants in case of absence.

The High Courts were in Kabul and the provinces; they had one judge, two Mufties and one clerk; their duty was to review the verdicts of the ordinary court in case of appeals within the ten-day limit.

The Supreme Court structure was different: one chief justice with four members, who had the same duty to evaluate the verdicts of the High Court in case of appeals within the ten-day limit.

This court was allowed to pass sentences of death or life imprisonment, but the decision was not final. The king or the President had the power to overturn a verdict if it was necessary for the will of the people or the policy of the government.

Military courts were also part of this structure, divided into branches as follows:

1.   Permanent military courts.
2.   Temporary military courts.
3.   Governmental military courts.
4.   Military Supreme Court.

In 1964, a remarkable change occurred in the judicial system, which for the first time became completely independent with a Supreme Court.

The new Supreme Court had nine members and of these, selected by the King or the President, one became the chief justice and others the members of the Court.

But soon the Judiciary replaced the Supreme Court, after the Government drafted the new constitution in 1964. New branches were added, for civil and criminal cases, for instance, a civil and criminal bureau, and a business bureau for business cases and deals, as well as a national rights and security bureau for national rights and security,.

In addition the judicial society was authorized to control all these new branches. For the first time a children's court was established in Kabul to look after the cases of those children who were under 15 years of age, with their verdict final and binding.

Family courts were established in every province, to avoid the need for villagers to come from long distances to the capital. A new branch was also created in every province for those who were using illegal drugs.

After the 1973 revolution, the judicial power became part of the Justice Ministry, but by 1976 had become independent and the Supreme Court started working independently again.

Again in 1990 the Government drafted new regulations regarding the structure of the court, and, in according to them the Supreme Court, raised it to an authorized judicial organization

in the judicial system.

The new structure of the Supreme Court was:
1.   The higher council.
2.   General and criminal divisions.
3.   National and security divisions.
4.   The divisions for civil cases.
5.   The divisions for military cases.

The structure of the members of the high council of the High Court was:
1.   Chief justice.
2.   Assistants to the chief justice.
3.   Chairmen of the other branches.
4.   Director of the High Court high council, who was also a member of the Supreme Court.

The structure was a little different at this time:
1.   National security branch.
2.   Commerce and business branch.
3.   National rights bureau.
4.   Internal and external security branch.

The authority to look after internal and external crimes was given to a special court known as the national security court, but this branch has been omitted from the structure.

The military court had two branches:
1.   School officers' and soldiers' crime branch.
2.   Military solders' crime branch.

**Structure of the High Court**

Every province in Afghanistan has a High Court, with a head of the court, an assistant, head of every branch, and other administrative employees.

The High Court consists of:
1.   General crime section.
2.   National security section.
3.   Civil and national right section.
4.   Commerce section.


In addition, in Kabul and other main provinces, there is another section for traffic crimes. Every section has a head and two members.

**Structure of the ordinary court**

According to the 1990 Constitution there should be an ordinary court in the centre of every city, province, military organization, and district.

In the ordinary court structure there is one head and two members. In the first step of the legal process, all cases are evaluated by the ordinary courts, especially civil and criminal cases, but serious cases cannot be considered by the ordinary court, which has no authority in this respect.
The ordinary military court is allowed to follow up these cases:

1.   Crimes committed by solders or military officers during their duty.
2.   Crimes of those working on military bases and compounds but not officially part of the military,  and if the crime is covered by military law.
3.   Crimes about the absence of purchased things, robbery on a military base, weapons smuggling, not respecting military rules.

Finally, the above review indicates that the judicial system and its structure was unstable in this period of time and was employed for the benefit of successive governments.

## Annex VIII: A Brief Review of Women's Political Rights

Written by: Ms Mahboba Haqoq Mal
Translated by: M Hamid Sabory

Women in Afghanistan have their own rights and responsibilities by which they can serve society and their people.

Women represent half of the population and any decision taken by any responsible individual or organization must respect the rights and the will of women in our society. In this context, there is no aspect of our life, be it political, economic, social or cultural that can deny the existence of women in society.

In terms of women's rights during three decades of war, anarchy and conflict their basic rights have been undervalued. Their legal and Islamic rights came under heavy pressure from fundamentalists, extremists and other external influences.

We need to take radical steps to bring a change in the life of Afghanistan's women by adopting new ways and ideas.

Looking at history, we find that women's political rights were recognized for the first time in 1899-1907, during the reign of King Amanullah Khan.

After this historic move, women started to go to school and university, worked in the government, and some even women won scholarships to abroad for their higher education.

A women's magazine (Irshadul Naswan) was established.

But unfortunately the enemies of our country  -- both internal and foreign  --  combined in the 1907 Loya Jirga and the regime collapsed.

For about nine months nothing was said about rights, law and constitution. When Noder Khan became the king, the voice of women was raised for their rights, but in his was a conservative rule.

During Zahir Shah's time,  women continued their activities and they succeeded in creating the first women's political movement in Afghanistan; the majority of members of this movement were educated women and it was soon recognized by peer movements around the world.

Another major step was taken in 1964 when four women became members of the Loya Jirga; another major step was taken when an Afghan woman, Ms. Kobra Noor Zai, became a minister in the government.

These major steps changed the life of women in Afghanistan. Once again foreign countries took interest in our country. Many scholarships and fellowships were awarded to women and Afghan students even joined the military.

We cannot ignore these steps but in reality, beside all this development in the life of women in our country,  only a small minority could take the advantage of these privileges. In the provinces women were not allowed even to go to the primary schools nor join any movement. There were severe restrictions on women.

Political rights together with participation in the government can only be established by political independence. This will ensure that every individual obtains their rights.

A condition must be provided to help society understand women's rights in every aspect of life.

In our society there are two kinds of people: those who are against the freedom of women

and  want them to be at home and not be able to work outside; and those who want them to actively participate in every possible area for the development of  society.

 Now Afghanistan is free and the world has given another chance to the women of our country to prove themselves. The peace conference in Bonn has allowed two women to become ministers in the interim administration and three women have become members of the emergency Loya Jirga committee.

A commission will be chosen after the end of the interim administration to draft the new constitution for Afghanistan. We want women not only to participate but also to be given a real and active role n all aspects and in every issue of their community.

We know our country is a traditional society and we cannot ignore our traditions and customs. It is therefore not possible to do all these things but I am sure that with patience and tolerance we can change the life of women in our country and if God is willing we will make a difference in the life of Afghan women.

# Annex IX: Marriage and divorce

Written by: Ms Mukarama Akrami
Translated by: M Hamid Sabory

## Marriage

The word used for "marriage" in Afghanistan is derived from the Arabic. It means that when a man accepts a woman as his wife or a women wants a man to become her husband, they become man and wife following a legal, traditional, and religious ceremony in the presence of witnesses.

Marriage is mutual acceptance. In Islam, before the marriage treaty (Nikah), both the man and the woman express their willingness to be married, following which two more things are necessary (Aejab and Qabol).

These two words are the principles of a marriage. Both parties must ask and accept the will of the other before the treaty can become acceptable.

In Afghan civil law marriage is a treaty and the main aim is to legally enjoy sexual relations, procreate and give birth to a new generation, and live together as a family in society.

There are two conditions for the complete marriage treaty in civil law and Islamic law:

1. Special conditions.
   • Both sides must express their will personally or through their lawyers or in Islam (wali).
   • Two male witnesses or one male and two female witnesses, who are sound of body and mind and Muslims, must be present.
   • The couple must not be close relatives.

2. General conditions.
   • The couple must be young and understand the meaning of marriage.
   • They must express their will in the Aejab and Qabol.
   • There must be no pressure or restrictions on the couple in the treaty.
   • They must not be close relatives.
   • The lawyers or wali must be present at the ceremony.
   • There must be two witnesses.
   • The couple must be young and sound of body and mind.
   • The witnesses must be legally qualified.
   • The Nikah procedure must be correctly completed.

Marriage is a natural need for every person. It is a method of ensuring a new generation to replace the old.

In Islamic law, extramarital sex is forbidden; marriage is therefore a natural solution to sexual needs.

The couple's rights in marriage are as follows:

• Marriage creates common rights for a couple.
• A husband has special rights that the wife must observe.
• A wife has special rights that the husband must observe. For instance, the husband must financially support his wife, respect equality, give her the money (Maher) which was specified during the marriage treaty, provide food, clothes and a house for her, and provide for her every need.

## Divorce

The meaning of divorce in civil and Islamic law is that if the husband repeats the word "divorce" three times to his wife without any pressure, unless he has lost his self-control or is drunk, or has

mental problems or an illness, then after using these words, his wife is divorced and their relationship is over.

According to the article 136 of civil law:
"A women can be divorced if she is legally the wife of someone or in the 'return' period.

A 'return' divorce is when a husband uses the divorce word only once to his wife and has three months to return to her, otherwise she will be automatically divorced.

According to the article 138 of civil law:
" A husband can divorce his wife orally, in writing, or, if he can't write, point to a part of his body to indicate divorce."

Article 141 of civil law:
"According to the civil law any word in Afghan culture and tradition meaning divorce can be used to divorce a women. A father-in-law cannot divorce his son's wife."

According to article 141, divorce is not legal if the man is:

1.    Mad or insane.
2.    Under pressure.
3.    A teenager.
4.    Mentally ill.
5.    Without self-control and incapable of understanding his own words.

The motives for divorce can be:

• Emotional marriages: especially teenagers and young lovers.
• Marriages for personal aims like money, fame, etc.
• Imposed marriages.
• Mental and physical incompatibility.
• A marriage that is not consummated.
• Marriage below the legal age.
• Sexual incompatibility.
• Incompatibility between the couple.
• Jealousy.
• Impossible demands.
• Not giving birth to a son.

According to Islam, a man who divorces his wife without legal, logical or Islamic reason will be punished by God.

When a man divorces his wife, she is not allowed to re-marry for three months as during these three months the husband may change his mind and return to his wife. If she is pregnant, she cannot marry until the birth and the husband is responsible for her until then.

Generally, it is the husband who has the right to divorce and not the wife in Islamic law. But in some circumstances, the woman has the right to go to court and ask for a divorce:

• If the husband has been sick for a long time.
• If he cannot have sexual relations with his wife.
• If he has been away from home for a long time.
• If he does not feed her.

## Annex X: Consultations

The following is a partial list of the persons and institutions which were consulted in the drafting of this report. The author would like to apologise for any omissions or errors.

**Kabul**

Ministry of Women's Affairs
Sima Samar, Minister of Women's Affairs
Female Lawyers' Association

Ministry of Justice
Abdul Rahim Karimi, Minister of Justice
Said Yousef Hallem, Director, Ministry of Justice, Institute of Legislative Affairs

Office of the Public Prosecutor
Abdul Mohammed Daqiq, General Director of the Public Prosecutor's Office

Supreme Court of Afghanistan
Molavi Hamad Shinwerii, Chief Justice

Juvenile Court
Anisa Rasooli

Ministry of Foreign Affairs
Reena Nurulla

The Lawyers' Association of Afghanistan
Sh.M.Kherad

Kabul University
Mohammed Akbar Popal, Chancellor, Kabul University
Members of the Law Faculty

Emergency Loya Jirga
Ms. Mahbooba Haquqmal, Vice Vhair of the Emergency Loya Jirga Commission
Alex, Afghan Centre/Aiina

**Mazar-e-Sharif**

Public Prosecutor's Office
Mohammad Zahir, Chief Prosecutor

**International Organisations and Others**

Lt.Col.David G.Reddin, ISAF Legal Adviser
Craig Mukhbir, Human Rights Adviser to the SRSG
Dr.Katja Schemionek, WHO, Kabul
Afzal Rashid, International Development Law Institute, Rome
Colleen McLaughlin, Project Director Asia, Equal Access
Aiden Cox, AACA/UNDP
Thomas Ruttig, Political Affairs Officer, UNSMA
Douglas Birch, The Baltimore Sun
Knut Osby, Senior Deputy Resident Representative, UNDP
Amin Medani, UNAMA
Reena Ghlenai, Protection Officer, UNAMA, Mazar-e-Sharif
Mohamad Nafez, WHO, Kabul
Frank Zimmermann, Third Secretary, Political Affairs, German Embassy, Kabul

Carlotta Gall, The New York Times
Waseem Mahmood, Balic Media Centre
Kawun Kakar, Civil Affairs Officer, UNAMA Jalalabad
Helmut Reifeld, Konrad Adenauer Stiftung, Kabul
Ms. Hicronymus, German Embassy, Kabul
Dominico Giorgi, Ambassador, Italian Embassy, Kabul
Jamal Benamar, UNAMA, Kabul