UNITED STATES DISTRICT COURT
For The Southern District Of New York

————————————————————— )
AUSTRALIAN BROADCASTING CORP.;              )
*aka* ABC AUSTRALIA;                        )
ABC CORPORATIONS 1-100;                      )      **Jack K. Idema- August 2008**
LIZ JACKSON; ERIC CAMPBELL;                  )      **AFFIDAVIT IN SUPPORT**
JOSEPH A. CAFASSO; EDWARD A. ARTIS;          )      **of Memorandum of Law**
KNIGHTSBRIDGE INTERNATIONAL, Inc.;           )      **In Opposition To ABC's**
KNIGHTSBRIDGE INTERNATIONAL                  )      **Motion To Dismiss**
HUMANITARIAN RELIEF AND HUMAN                )
IMPROVEMENT PROGRAMS, INC.;                  )      **Case #: 08-CV-2356** (DAB)
ROBERT C. MORRIS;                            )
PARTNERS INTERNATIONAL FOUNDATION; )
WILLIAM JOHN HAGLER,                         )
Both Individually and Severally,             )
and DOES 1 through 7, inclusive,             )
                        *Defendants.*        )
————————————————————— )


STATE OF NEW YORK          )
                           )      ss.:
COUNTY OF NEW YORK         )

I, Jack K. Idema, being duly sworn, deposes and says:

1.      I am a party in this action, and a former US Army Special Forces soldier who currently resides at 12 Jonathan Lane, Poughkeepsie, New York, and I am familiar with all the facts and circumstances in this action.

2.      I have obtained from a source inside the US Army Special Operations Command a letter written by Eric Campbell to the Media Watch Program. The source describes the Eric Campbell letter as a "Harpoon into [my] enemy's heart." The two letters confirm that Edward Artis and Robert Morris were the sources of the documents and photos used by ABC. Furthermore, they confirm that Morris, Cafasso, and Artis, did engaged in Unfair and Deceptive Trade Practices, and most likely committed the predicate acts of copyright infringement, acts which were most certainly done in the United States. Equally important is that ABC's Eric Campbell advised ABC, and provided evidence to

ABC that the Media Watch Story was false, misleading, and fraudulent.  **I implore this Court to carefully read these two letters, true and correct copies of which are attached hereto as EXHIBITS 1 and 2.**

      3.      As stated in the Declaration of Eric Campbell filed by ABC in support of their motion to dismiss, (Campbell Decl. ¶¶25-27), although I dispute Mr. Campbell's memory about some of things in that Declaration (*i.e.,* I did not grant a worldwide first broadcast license to ABC), Eric and I agreed to allow CBS 60 Minutes to broadcast first in January 2002, and we modified the agreement to reflect that change, and other later changes), ABC and I entered into a contract, and in fact, several contracts, both written and verbal.  One of the things we agreed upon was that whatever disputes arose later on, "United States copyright law" would control.

      4.      At the time, Campbell was my friend, or at least I thought he was, and Campbell agreed with me that I should be protected in case ABC terminated him, or he quit, or they used my videos or pictures against Eric's objections.  ABC has refused to provide copies of those contracts entered into by Mr. Campbell personally and on behalf of ABC which specified that disputes between ABC/Campbell and myself and Counterr Group would be governed by Ninth Circuit law and in the United States.  Specifically, I believe it stated North Carolina and California law.  Although I am not sure about the Ninth Circuit law being specified in exact terms, as I do not have the original contract which appears to have been lost in Afghanistan over the years during some rather difficult times.  However, there were other similar, almost identical contracts with other news organizations which I do have, and I am absolutely certain that a choice of law was in the ABC contracts and was in all contracts I did during December 2001 and 2002.  Additionally, **EXHIBIT 2**, a letter written and signed by Eric Campbell to ABC clearly lays out the existence of these contracts in paragraph numbered "2."  Furthermore, Campbell's letter contradicts a wide variety of claims ABC attorneys make in their disingenuous and knowingly false affidavits and motions.

5.      I have currently requested several people attempt to locate those contracts. One of those individuals is Francis C. Pizzulli, who was my attorney on copyright issues between 2001-2006.  Although Mr. Pizzulli is a well-renowned copyright and defamation attorney, unfortunately he has had severe medical problems the last few years.  In Francis Pizzulli's own words, much of that was caused by the intense harassment he was subjected to by four co-defendants in this case— Cafasso, Artis, Morris, and Hagler, who were relentless in their harassment, stalking, and defamation of him personally.  Mr. Pizzulli's current medical situation has prevented him from accessing documents he has in storage, including the ABC contracts, emails, and notes—those same documents are being withheld by ABC's attorneys, in spite of the fact that have promised me on more than four occasions to provide them to me.

6.      I take great exception to being painted as a vagabond stateless citizen, when in fact, I am a citizen of the United States and have served my country for many years and undergone significant hardships and pain the best interests of the American people.  I was born in Poughkeepsie New York and my father built our family's current house in 1963. My mother and father continuously lived at 12 Jonathan Lane in Poughkeepsie, New York since 1963.  My mother died while I was in Afghanistan in 2002, and I returned to Poughkeepsie to bury her.  I have a New York mailing address.  I have a New York Drivers License, I have various licenses related to my profession in New York, my pilot's license lists New York as my home of record, and I maintain a residence at 12 Jonathan Lane in Poughkeepsie, NY.  My personal belongings, including my clothes, uniforms, and personal effects are in Poughkeepsie, NY.  This Court is free to have my residence inspected at any time to confirm my domicile.

7.      The United States Department of State has recently issued me a new non-restricted ten year passport.  My passport address was 12 Jonathan Lane, Poughkeepsie. The passport was delivered to me at 12 Jonathan Lane, Poughkeepsie.   One of the Department of State letters, recognizing my home address and permanent residence as "12 Jonathan Lane Poughkeepsie, NY 12603" and written on April 29, 2008, is attached hereto

3

as **EXHIBIT 3**.  My passport was issued in the name of Jonathan Keith Idema, although I go by Jack K. Idema (my fathers name is also John).

8.      I have and have had, multiple residences, but I have only one domicile, the same place I grew up in.  For more than 14 years it was my home of record for the United States Army Special Forces.  In December 2001 I lost my house in Fayetteville, North Carolina while I was advising the United Front Military Forces in Afghanistan.  Although I have never complained of it, a large part of that loss was caused by three defendants in this case.  I have not owned, rented, or had a permanent residence since that time other than 12 Jonathan Lane. Poughkeepsie, New York.

9.      My intentions are to remain in Poughkeepsie, New York and my intentions have always been to settle there, even while I was wrongfully imprisoned in Afghanistan— during which time I had Geneva Convention Prisoner of War status.  I am prepared to provide overwhelming proof of this at a hearing or trial.  Many of the claims regarding my prisoner status and the reasons for it have been completely misstated by ABC's attorneys and the events in Afghanistan have been completely distorted and falsified by ABC's attorneys.  Proof of this is contained in Eric Campbell's letter (**EXHIBIT 2**) and Lieutenant Rasuli Banderas' affidavit as previously filed in this Court in a CBS case (attached hereto as **EXHIBIT 4**).

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge, information and belief;

Dated: Poughkeepsie, New York,
August 18, 2008

Jack Keith Idema
12 Jonathan Lane,
Poughkeepsie, NY 12603





**Memo To:** █████████                    **27 NOV 2005**
Reference:   ABC Australia                **Confidential & Personal**
             Undisclosed Letter/Edward Artis

Jack;

The following letter was obtained from a confidential source. We are actively seeking other similar documents for you. This letter is not a SAM-7; this is a Harpoon into your enemy's heart.

While at first look you may see one or two defamatory statements ("nutty" – isn't anyone that jumps out of a perfectly good airplane "nutty" to the rest of the world we protect?), upon closer evaluation you will see that Eric Campbell is honest and an avid supporter of you.

The letter contains a completely different viewpoint of your activities in Afghanistan. Campbell risked his entire career at ABC Australia to write this. Although he states that he knows you personally over a long period, what you may not know is that he is one of the most highly regarded award-winning journalists in Australia and in Asia. He is currently working in the ABC Beijing office in China. Neuffer's Pentagon contacts he refers to were none other than the Assistant SecDec SO/LIC, General John Keane, and another sensitive high-level source.

This letter is irrefutable proof that Ed Artis was the source and driving force behind this, and all of the stories, which were done to discredit you. The woman it is written to has also stated in a conversation to Eric's wife that Robert Morris provided all the documents and information and was a confidential source for the story and worked together with Ed Artis. You should also know that FOX News provided a FOX memo/report written by Joe Cafasso and Bob Morris which concluded that your al-Qaeda tapes were fake. █████████

Fox News lawyers met with Artis and Morris during an Army Award ceremony for Fox's Linda Vester, during this time they discussed how best to discredit you and how to establish the tapes were fake and made to defraud Fox and others. This was to be one of their defenses in you case against Fox and the others. In our opinion, this letter is perhaps one of the most important pieces of evidence not just in your cases against news agencies, but also in your defense against the allegations that you were a fraud.

Stay Safe,



US Army Special Forces                    **Exhibit # 1**

Anne Delaney
Story Editor
Media Watch
ABC TV

March 4, 2005

Dear Anne,

I am puzzled as to where this is heading. Last week you were preparing a story based on the claim that the al-Qaeda tapes were faked. I gave you considerable detail pointing out how I concluded beyond doubt that the tapes were genuine. Moreover, I pointed out the logistical impossibility of them being faked either while the village was under Taliban control or after the Taliban and their Arab allies fled.

You now appear to be trying to piece together some other story based on my dealings with someone who was typical of the characters journalists have to deal with in war zones.

I take my reputation seriously, and will certainly take you and your program to task for any errors of fact or defamatory imputations against me.

I put you and other staff on notice to keep all research material related to this story, including all emails and notes of phone conversations.

To answer your questions in order:

1. **Did you or the ABC give any undertakings to Jack Idema to broadcast the tapes?**

No.

2. **Can we see the contract signed by the ABC to use the Idema material? If not, why not?**

I can't show you the contract because I don't have it. The only document I signed related solely to rights usage, giving the ABC unlimited rights to broadcast the material but not to on-sell it.

3. **Other media claim that Jack insisted on being used as talent in any story that featured the tapes. Did Jack Idema make that part of his deal with the ABC?**

No. And your assertion is not correct. The BBC did not use Jack.

4. **Were you aware that Ed Artis from Knightsbridge International was warning people about dealing with Idema? If so when did you become aware of those warnings?**

**Exhibit # 2**

No. I had never met him or heard of him.

5. **Did you know that your working script was used by Idema's agents to market the tapes? How did they get hold of those scripts?**

No, and I still don't know. I have never had any communication with Jack's agents.

6. **You told us that you regarded Jack Idema as "basically a nut". Why did you use him as a serious commentator and "counter terrorism expert" in your stories?"**

If I told you Jack was "basically a nut" it was in the context of him being the kind of person who goes to wars looking for something to do. War zones are full of them. However, I also gave you a copy of the chapters I wrote about Jack that give a broader and more considered description of the many complexities and contradictions of his character. In short, I made perfectly clear to you that I regard Jack as far more than "basically a nut". That you disingenuously focus on this gives me further reason to conclude you are trying to selectively fit facts to a pre-conceived notion.

There were certainly aspects to Jack's character that I would call crazy or nutty. In some ways he was also intelligent and gifted. He could be aggressive and obnoxious, as well as boyish and obsessively loyal. At times, he displayed breath-taking cynicism. At other times he was astonishingly innocent. This may not fit with the simple profile you seem to be looking for, but unlike the commentators you're relying on I actually knew him.

One thing Jack knew about in stultifying detail was weapons and military tactics. It was his passion in life as well as his expertise and he bored us stupid with his descriptions of it.

He had not only served in the US Special Forces, he had also run a private security training school in the US and had been hired by the Lithuanian government to train their new security forces. He was also training Afghan soldiers to protect convoys of journalists and aid workers from terrorist attacks.

I worked closely with several journalists checking out the tapes and Jack's background and qualifications. One of my colleagues was Elizabeth Neuffer, an experienced and highly regarded correspondent with the Boston Globe. She had impeccable contacts in the US military, and volunteered to check out his credentials to comment on the tapes. Her conclusion was that he was a highly unsavoury character but was "one of the best people in the world to be talking about this." Elizabeth was later killed in Iraq, but the articles she wrote about the tapes and about Jack attest to her conclusions about him.

I chose to include Jack in the stories as he had been central to obtaining the tapes, he had viewed them in their entirety, he had the expertise to comment on them and his dealings with the Northern Alliance gave him a good sense of the military situation in Afghanistan and the activities of foreign militants.

To state the obvious, the conclusion Jack drew from the tapes ... that al-Qaeda was training militants for kidnapping foreigners and conducting urban warfare ... has turned out to be perfectly correct in Iraq, something the "expert" quoted in the Columbia Journalism Review chooses to ignore. You mentioned you were going to check out his qualifications for asserting that the tapes were faked, and ask him whether he had considered the logistical impossibility of an American filming a staged video with Arab extras in a village under Taliban control. Could you tell me what you found? (If not, why not?)

As to whether or not he was "serious", Jack had a blind and passionate belief in the rightness of the US cause. I argued with him several times over this, but he had an unshakeable conviction that he was hunting down "the bad guys". He was utterly serious and sincere when he talked about the danger he believed the tapes revealed and the need to continue pursuing the militants who appeared in the tapes.

In short he had a typically American tendency to make black and white assessments, rather like the commentators on whom you appear to be relying.

7. **You have told us that you heard that Jack Idema had been previously convicted of fraud two weeks before your story was broadcast. Did that information alter your view of his credibility? If not, why not? Why was his conviction not disclosed in your stories?**

As I attempted to explain to you, this was a war zone. Afghanistan had been at war for 23 years. In war zones, particularly Afghanistan, the people you deal with and from whom you glean information are very often mass murderers, rapists, thieves and charlatans who also happen to be generals, ministers and governors. On that scale, dealing with someone convicted of business fraud in the US eight years earlier was not something to be unduly shocked by.

When you report wars you work on the assumption that everyone is running some agenda and could be mixing truth with fiction. The job of a journalist is to try to separate the two. This is something people who have never worked in war zones may find hard to comprehend. But it's the reality you deal with.

Jack's fraud conviction, as well as his occasionally bizarre behaviour, obviously made me and the other journalists working on the story look harder at the authenticity of the tapes. But we established that authenticity beyond doubt. We also established with certainty that Jack was an adviser to the Northern Alliance and that he was qualified to comment on military training techniques. From that point on, Jack's past business dealings in the US were irrelevant to the story. As in any stories with time constraints, I presented the most important information in the limited time available.

**8. In the stories you describe Jack Idema as "a special forces veteran". What was your understanding then of Idema's special forces record?**

My understanding then was the same as it is now ... that he became a Green Beret (a title soldiers continue to use in retirement), spent three years training in Special Forces and continued in the SF as a reserve.

**9. Did Idema tell you he had been working for the US embassy, the Pentagon, the CIA or any other unit within the US Department of Defense? If so, did you accept those claims at the time of your stories?**

Jack told me he came to Afghanistan under the auspices of the humanitarian aid group Partners International to carry out a civilian project for the Pentagon, namely finding out why Afghans were falling sick from eating food parcels. He never pretended to me that he was anything other than a civilian. He never mentioned anything about working for the CIA or US embassy.

I didn't see any reason to doubt his story about the food parcels. But since he no longer claimed to be involved with the project by the time I met him and it had nothing to do with the stories I was looking at, I really didn't give it much thought.

You should take the time to read the chapter "Holy and Other Warriors" in the book "The Lion's Grave" by the respected *New Yorker* writer Jon Lee Anderson. (I can lend you a copy). He was with me on the trip Jack took us on to Tora Bora and wrote about Jack in great detail. His observations about Jack, including about the food parcels story, were similar to mine. If you know anything about international correspondents, you would be foolish to dismiss Jon as naïve or gullible.

Jack was often trying to contact people from the Pentagon to share information, and certainly had contact with the US Army Counter-Terrorism Group (I saw emails he sent and received) but it was always on the basis of being a civilian working with the Northern Alliance.

**10. In the story you described Idema as an adviser to the Northern Alliance. What was the basis for that claim?**

It is not a claim, it is a fact, unlike the speculative assertions from the distant and ignorant sources you seem to be relying on. I spent more than five weeks with the man in Kabul, Jalalabad, Tora Bora and Bamiyan. I saw the work he did, the people he mixed with and the resources he was given. I spoke at length to his soldiers and to his main liaison with the Northern Alliance, Syed Idris and had no doubt he was a formal and senior advisor.

How exactly do you imagine an American civilian gets assigned more than a dozen Panjshiri soldiers under his direct command? How does he get lodgings in the Northern Alliance military barracks? How does he have daily meetings with Northern Alliance officials, who Jack claimed and his soldiers confirmed included the Defence Minister Mohamed Fahim and the Interior Minister Yunnis Qanuni? How does he get to know and be welcomed by the Northern Alliance's most powerful commanders,

including the chief of the Eastern Shura, Hazrat Ali and the Hazara leader, Karim Khalili? How does he know to take us to a residence of Osama bin Laden's before it has even been searched by the US military. (The *New Yorker* writer, Jon Lee Anderson, describes this in great detail in "The Lion's Grave").

**11. Were you surprised when you heard that Idema had been caught running a torture centre in Afghanistan?**

As I mentioned in my book, I was surprised and appalled to learn last year that he had been running a private prison, though he denied press reports of torture and from my reading of the case no hard evidence of this was presented in court.

I was also shocked by the farcical nature of the trial, and the cynical way in which the US embassy abandoned him to his fate, distancing itself from any possible further scandal in the wake of Abu Ghraib. (The US government also made blatant attempts to discredit him and appears to have pressured the Afghan government to falsely deny any connection to him ... assertions some gullible journalists have taken as fact.)

But what exactly does that have to do with stories I did nearly three years earlier? I was no more in a position to judge what Jack might do in the future or how Afghanistan might affect him than I could predict that some Special Forces soldiers would return from Afghanistan and shoot themselves or their wives, as has happened frequently.

Afghanistan literally had hundreds of private prisons run by Afghan commanders and entrepreneurs, many of them senior figures in the Northern Alliance funded by the US government. At the time I knew Jack I did not believe he was the sort of person who could sink to that level.

**In order to give proper consideration to your response and to meet our production deadlines we would appreciate your response by 5pm Friday 4th March 2005.**

I presume this means you have already made the decision to run this story (on Monday) before even hearing my response, suggesting you have pre-determined your angle without checking the facts. That is extraordinary given that the initial angle you were taking proved to be false and that you appear to be sailing into similarly shallow waters regarding Jack's association with the Northern Alliance.

Yours sincerely

Eric Campbell



United States Department of State
**Charleston Passport Center**
**1269 Holland St. Building 643**
**Charleston, SC 29405**
1-877-487-2778

April 29, 2008



Jonathan Keith Idema
12 Jonathan Lane
Poughkeepsie, NY 12603

Dear Mr. Idema:

We have received your recent passport application. However, we need your help in providing acceptable photographs.

- The photographs you submitted cannot be used because they were not taken in normal street or travel attire.

- Also, the photographs you submitted cannot be used because the image is not properly centered.

- And, the photographs you submitted cannot be used because the computer-generated image appears as though composed of grain-like particles. This effect may occur as a result of printing an image, the pixel resolution of which is too coarse, or as a result of using a printer with poor dot resolution.

Please submit two new passport photographs, and print your name and date of birth on the back of each photo Photographs must be recent, taken within the last six months, and must reflect your current appearance. They must be 2 x 2 inches. The image size (from top of the head, including hair, to the bottom of the chin) must be between 1 inch and 1 3/8 inches. Photographs must have a light (white or off-white) background. They must be clear with a full-face front view. Photographs must be taken in normal street attire. Headgear, which obscures the hairline, is only allowed if it is worn for religious or medical purposes. Uniforms must not be worn in passport photographs. Your eyes must be open and visible and glasses with dark or tinted lenses can only be worn if a medical certificate accompanies the request.



Th... is denied unless you adequately address the requirements stated above for ...port. If we do not receive a response within thirty (30) days, your ...e filed without further action. Any special return postage will be returned

...N THIS LETTER WITH YOUR REPLY.

I. 1-Photo

: any questions regarding this letter or your passport application, contact the National Passport
...) toll-free at 1-877-487-2778 (TTY/TDD: 1-888-874-7793). Customer Service Representatives are
o midnight, ET, Monday through Friday, excluding Federal holidays. We have limited weekend hours
...: assist customers traveling within the next 7 days ... For a wealth of passport and travel
information visit us on-li...

**Exhibit # 3**

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____  )
                                          )
CBS BROADCASTING INC.,                    )
            *Plaintiffs,*                )
    v.                              )
COUNTERR GROUP, *et al.,*                  )
            *Defendants.*                )
_____  )
                                          )
COUNTERR GROUP, *et al.,*                  )    Case # 05 CV 7946   (DAB)
            *Counter-Plaintiffs,*         )
    v.                              )    ECF Case
CBS NEWS,  *et al.,*                        )
            *Counter-Defendants.*         )
_____  )

## AFFIDAVIT OF AFGHAN CIA
## LIEUTENANT WAHID RASULI BANDERAS

IN SUPPORT OF COUNTER-PLAINTIFFS' OPPOSITION TO CBS' MOTION TO DISMISS

**Exhibit # 4**

اظهارنامه تورن وحید رسولی بندریس
## AFFIDAVIT OF LIEUTENANT WAHID RASULI BANDERAS

Affiant, states under oath, that I have personal knowledge of all the facts stated herein, and that they are true, except to those stated as upon information and belief, to which I believe to be true, and have been confirmed by either events or other reliable sources and information;

1.  My name is Wahid Rasuli Banderas.  I am a citizen and resident of the Islamic State of Afghanistan.  I read, write, and speak fluent English at an extraordinary level.  I also speak Arabic, French, Indian (Hindustan), and Urdu.

2.  I work directly for the commander of the 7th Corps Command of the Afghan Ministry of Defence, General Atta, who has now assumed the governorship of Mazar-i-Sharif province.  I was loaned to the Counter Terrorist Group (Counterr Group) by the Ministry of Defence to act as an operational interpreter, liaison, and aide.  I am also employed as an Afghan CIA agent and operative.  My CIA rank is Master Sergeant and my MOD rank is Lieutenant.  I have worked and fought with French, British, and US Forces since the United States invaded Afghanistan in 2001.  My father was killed during the Taliban resistance, and my brother was killed while working with US Special Forces against the Taliban and al-Qaida terrorists.

3.  In September 2003 I asserted combatant Prisoner of War status under the 1949 Geneva Convention, and was waiting for status conformation by the Geneva Convention Central Bureaux in Switzerland.  Until such time as a military tribunal met I was, under the law, afforded all rights, privileges, and protections as a Prisoner of War.  In December 2004, I was found innocent of all charges by the Afghan Appeals Court and ordered released.  I elected to stay with Jack Idema and my other team members.  Contrary to CBS' statements to this Court which are false, the Appeals court held a new trial and found Jack Idema, Brent Bennett, and all others

اظهارنامه تورن وحید رسولی بندریس
AFFIDAVIT OF LIEUTENANT ZORRO WAHID RASULI BANDERAS–AFGHAN CIA
IN SUPPORT OF COUNTER-PLAINTIFFS' OPPOSITION TO CBS' MOTION TO DISMISS

completely innocent of all crimes alleged.  They were not released because they were re-categorized as political prisoners for reasons not relevant here.

4. Attached hereto as **Banderas Exhibit 1** is a true and correct copy of the Afghan NDS indictment cover sheet listing the names and charges against Jack Idema and his men.

5. Attached hereto as **Banderas Exhibit 2** is translation of Exhibit 1 from Dari to English. Note: the English is not good because Dari translates to English poorly, and the person that wrote the document was not well educated or competent in his writing and word skills.  This is also true with Exhibit 3.

6. Attached hereto as **Banderas Exhibit 3** is a true and correct copy of the official Afghan NDS list of charges against Jack Idema and his men, and the list of charges which he was convicted of in the first trial in Afghanistan.  On the second half of the page is a true and correct translation of the charges, showing that neither Jack Idema nor any of his men were ever charged with torture, which is a charge under Article 416 of the Afghan Penal Code: "Coercion, Threat, or Torture."

7. Attached hereto as **Banderas Exhibit 4** is an article from the Afghan Bar Association, written by the United States Peace Commission about the justice system in Afghanistan.

8. No prosecution witness ever testified during any of our trials, and the only person to ever take an oath upon the Koran and testify in the trial which CBS wrote about, was Jack Idema.  No other person gave any testimony or made any official statements.

9. We were never charged or convicted of torture, or "operating a private torture chamber," (CBS memo. Preliminary Statement), or "abused, tortured, and starved innocent Afghani citizens."  Jack Idema was never accused of or had charges brought against him which ever stated he "had innocent Afghans hanging from the ceiling in his basement" or any of the other ridiculous lies which CBS writes as though there is some truth to them.  We were never officially or unofficially accused of these things.  These were statements made to journalists which were not part of any official proceeding and some of which were made by Ahmad Ali Jalali, and Lutfullah

اظهارنامه تورن وحید رسولی بندریس

AFFIDAVIT OF LIEUTENANT ZORRO WAHID RASULI BANDERAS–AFGHAN CIA
IN SUPPORT OF COUNTER-PLAINTIFFS' OPPOSITION TO CBS' MOTION TO DISMISS

Mashal, who had no official involvement in our case or trial, but were politically against Commander Ahmad Shah Massoud's United Front Military Forces (incorrectly referred to by the press as the "Northern Alliance").  Because Jack fought with the UFMF during the wars, he was Jalali and Mashal's adversary.

10. Just days after the statements about torture and hanging people upside down were made, the Minister of Justice, Abdul Rahim Karimi, a cabinet level official, announced that these statements were false, and that there were no people hanging from ceilings and there was no evidence of torture.

11. I was not allowed to translate for him during the trial, or correct intentional mistranslations made by a court interpreter who was a former Communist KGB officer in the Afghan government during the Soviet occupation.  When I did try to warn him about the incorrect translations of court statements, and of his own statements, I was later beaten, tortured, and kept in leg chains and handcuffs for approximately 45 days for 24 hours a day as punishment.

12. Since that time the Court of Appeals has found Jack Idema innocent of all charges, and in June 2006, the Afghan Parliament Justice Commission found all of us innocent again after a two-month investigation into our case and trials.  We are currently waiting for Parliament to return to session to vote on our Justice Commission verdict.

13. CBS reports were completely false and were not in any way accurate, fair, or even the slightest bit truthful as to our charges, convictions, or the actual crimes alleged.  The formal charges were,

1) entering the country illegally (dismissed with a verdict of actual innocence in December 2004), § 130 of the Afghan Constitution, covering unspecified crimes act of entering Afghanistan without visa;

2) running a private jail (dismissed by the appeals court in March 2005 with a verdict of actual innocence), § 415 of the Afghan Penal Code, specifically "Illegal Arrest and Detention," the arrest act.;

3) making an arrest without a valid warrant and without authorization (dismissed by the appeals court in March 2005 with a verdict of actual innocence, and later upheld by the Third Court *in absentia*), § 415 of the Afghan Penal Code, specifically "Illegal Arrest and Detention," the detention act.

Further, Declarant says not. The foregoing facts are of my own personal knowledge and I could competently testify to them. I declare under penalty of perjury under the laws of the Islamic State of Afghanistan and the United States of America that the foregoing is true and correct. Executed upon the Koran this 25th day of June 2006, at Pulacharke, Afghanistan.

اظهارنامه تورن وحید رسولی بندریس

Wahid Rasuli Banderas
Lieutenant, Islamic State of Afghanistan

اظهارنامه تورن وحید رسولی بندریس
AFFIDAVIT OF LIEUTENANT ZORRO WAHID RASULI BANDERAS–AFGHAN CIA
IN SUPPORT OF COUNTER-PLAINTIFFS' OPPOSITION TO CBS' MOTION TO DISMISS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# BANDERAS EXHIBIT # 1

اظهارنامه تورن وحید رسولی بندریس

AFFIDAVIT OF LIEUTENANT ZORRO WAHID RASULI BANDERAS–AFGHAN CIA
IN SUPPORT OF COUNTER-PLAINTIFFS' OPPOSITION TO CBS' MOTION TO DISMISS

حل : ریاست څارنوالی ابتدایی

څارنوال موظف : اسدالله "بری"

مورخ ۶/۱/ ۱۳۸۲/۷

صورت دعوی

حضور محترم رئیس و اعضای محترم محکمۀ قضایی محکمۀ استیناف حکام

علیه امنیت داخلی و خارجی !

اینجانب اسدالله "بری" ، څارنوال موظف استیناف که ...

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# BANDERAS EXHIBIT # 2

اظهارنامه تورن وحيد رسولی بندريس
AFFIDAVIT OF LIEUTENANT ZORRO WAHID RASULI BANDERAS–AFGHAN CIA
IN SUPPORT OF COUNTER-PLAINTIFFS' OPPOSITION TO CBS' MOTION TO DISMISS

Location: Presidency of NDS Prosecution
Prosecutor in charge: Assadullah Amiri
Date: 19/7/1383
Date of issuance

Fame of Defendants

1- Mr. Jack, US citizen
2- Ed Ward s/o Carrabolla son of Hezo, 42 years old US citizen [sic]
3- Brent s/o Nett, 28 years old US citizen [sic]
4- A. Wahid s/o A. Razaq, 20 years old, Resident of Mazar I sharif-Translator [sic]
5- Suhail s/o A. Razaq s/o Mir A. Wahed, 15 years old [sic]
6- Ezmerai s/o Muhammed Latif resident of Panshir, body guard of Jack 28 years old [sic]
7- Sherzai s/o Ahmed resident of Par wan, 22 years old home maker of Jack [sic]

## Indictment

To presence of honorable chief and honorable members of Judicial session of Appeals Court, crimes against internal and external security.

This is Assadullah Amiri prosecutor in charge of Appeals with having law active service, (Shariat and lawful) against mentioned names (defendants) from the whole, three US citizen and four Afghan citizens. Therefore, I am adducing quarrel or claim:

Main Subject: Mentioned individuals according the previous report by security divisions of country that by using private jail, Arresting with out being told anyone, had been committed. They arrested 15/16-4-1383 and during searching their house from their operational place, some weapons and ammunitions and some other crime tools had been found that its documents are attached in the file.

That their papers after investigation finished by first presidency prosecutors of NDS attached and document number is 01154 date 23/4/1383. General presidency of prosecution office to the honorable primary court, crimes against internal and external dispatched that the honorable court announced the verdict:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# BANDERAS EXHIBIT # 3

اظهارنامه تورن وحید رسولی بندریس

AFFIDAVIT OF LIEUTENANT ZORRO WAHID RASULI BANDERAS–AFGHAN CIA
IN SUPPORT OF COUNTER-PLAINTIFFS' OPPOSITION TO CBS' MOTION TO DISMISS



["Mr. Jeck Adima and you Brent United States of America citizens"] [sic]
It's found, and according Article 415, 155 of Penal code with consideration
of Article 130 of Constitution including the time in custody for ten, ten years
sentence you imprisonment, you Ed Carabollah [sic] American citizen in
accusation of involvement with these two individuals we call you
responsible according Article 130 of Constitution and Articles 415, 155 of
Penal Code and with consideration Article 39 of Penal Code including the
time in custody with proportion of crime and punishment for eight year we
sentence you imprisonment, and you Abdul Wahid s/o Abdul Razaq [sic] in
accusation of involvement these defendants according mentioned articles
with proportion of crime and punishment including the time in custody we
sentence you for five years. You Ezmerai s/o Muhammed Latif [sic] in
accusation of starting the crime according article 415, 155 of Penal Code
with observance Article 30 of Penal Code including the time in custody [for
two years we sentence you imprisonment].

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# BANDERAS EXHIBIT # 4

**Note: 20 pages of this article were omitted as surplusage and irrelevant to ABC.**

اظهارنامه تورن وحید رسولی بندریس

AFFIDAVIT OF LIEUTENANT ZORRO WAHID RASULI BANDERAS–AFGHAN CIA
IN SUPPORT OF COUNTER-PLAINTIFFS' OPPOSITION TO CBS' MOTION TO DISMISS





* <u>اوا خــــانه</u>



Reprint | March 2004 | Special Report No. 117
**Laurel Miller and Robert Perito**

# Establishing the Rule of Law in Afghanistan

**Original Online Special Report**

📄 Download PDF

🖨 Printer-friendly

**Summary**

o        In most of Afghanistan, the rule of law has never been strong, but after 23 years of warfare it has been displaced almost completely by the 'rule of the gun.' In most of the country, regional power-holders, whether they hold official positions or not, effectively exercise political, police and judicial authority through their control of militia forces.

o        The justice system and law enforcement suffer from a very low level of human resource and physical infrastructure capacity. In addition, the discontinuity of regimes over the last quarter century has left a patchwork of differing and overlapping laws, and an incoherent collection of security structures. Rebuilding and reform will require the commitment of Afghan authorities and foreign donors over a long haul.

o        No national civilian police force yet exists in Afghanistan. The approximately 50,000 men working as police are generally untrained, ill-equipped, poorly paid, and illiterate, and they owe their allegiance to local warlords and militia commanders rather than to the central government. U.S. and German police training programs have begun efforts to shape a national force. From July 2003 through 2005, the United States plans to conduct in-service training for 50,000 police in Kabul and at regional centers. Germany will train a much smaller number of officers in a more comprehensive program at a reconstructed Police Academy in Kabul. No efforts appear underway to reform the parallel and secretive intelligence police under the control of the National Security Directorate.